1  DAVIDA P. BROOK (275370)
   dbrook@susmangodfrey.com
2  SUSMAN GODFREY L.L.P.
   1900 Avenue of the Stars, 14th Floor
3  Los Angeles, CA 90067
   Telephone: (310) 789-3100
4  Facsimile: (310) 789-3150

5  VINEET BHATIA (*Pro Hac Vice*)
   vbhatia@susmangodfrey.com
6  SUSMAN GODFREY L.L.P.
   1000 Louisiana, Suite 5100
7  Houston, TX 77002
   Telephone: (713) 651-9366
8  Facsimile: (713) 654-6666

9  Attorneys for Plaintiff Greg Blatt

10

11

12              **UNITED STATES DISTRICT COURT**

13            **CENTRAL DISTRICT OF CALIFORNIA**

14                   **SOUTHERN DIVISION**

15

16  GREG BLATT,                      | Case No. 2:19-cv-07046-MWF-FFM(x)

17              Plaintiff,

18       v.                          | **FIRST AMENDED COMPLAINT**

19  ROSETTE PAMBAKIAN and            | **JURY TRIAL DEMANDED**
    SEAN RAD; and DOES 1 – 10,
20  inclusive,

21              Defendants.

22

23

24

25

26

27

28

6870235v1/016409

Plaintiff Greg Blatt ("Blatt" or "Plaintiff"), by his attorneys, Susman Godfrey L.L.P., for his First Amended Complaint against defendants Rosette Pambakian ("Pambakian") and Sean Rad ("Rad") (collectively, "Defendants"), alleges the following, on information and belief, except as to Plaintiff's own acts, which are based on Plaintiff's knowledge, as follows:

## NATURE OF THE ACTION

1.    This is an action for defamation and defamation per se.  As part of their scheme to extract billions of dollars from IAC/InterActiveCorp ("IAC") and Match Group, Inc. ("Match"), Pambakian and Rad have conspired to make false allegations of sexual harassment and sexual assault against Blatt with the specific intent to damage Blatt's good name, personal and professional reputation, and credibility.  In so doing, Rad and Pambakian have attempted to weaponize an important social movement, undermining the plight of true victims of sexual abuse by making false accusations in cynical pursuit of a $2 billion windfall.  Blatt brings this action to obtain redress for the false accusations that have been leveled against him, accusations that have been motivated by greed and personal animus, not fact.

2.    Pambakian and Rad are former executives at Tinder, Inc. ("Tinder"). Tinder is wholly owned and operated by Match, and Match is a controlled subsidiary of IAC.  At various times, Blatt served as CEO of IAC, Match, and Tinder.  In August 2018, both Pambakian and Rad (along with several other current and former Tinder executives) filed a lawsuit in New York (the "Valuation Lawsuit") claiming that IAC and Match, in large part through the actions of Blatt, failed to properly value their Tinder stock options.  Specifically, the plaintiffs in the Valuation Lawsuit claim that they would be entitled to an additional $2 billion if their Tinder options were properly valued.  Blatt is expected to be a key witness for IAC and Match in the Valuation Lawsuit.  Damaging Blatt's credibility and tarnishing his character are important elements of Pambakian's and Rad's litigation strategy in that action.

3.    Blatt had been Rad's boss, directly or indirectly, throughout Rad's tenure at Tinder.  Over that time, Rad came to blame Blatt for a variety of perceived transgressions, including Rad's failure to obtain control of Tinder soon after its launch in 2012, Rad's demotion from the position of Tinder's senior executive in 2015, and Rad's ultimate dismissal from Tinder management in 2016.  Following Rad's departure from the company, one executive told Blatt, "I have never met anyone who hated anyone as much as Rad hates you."

4.    But the event that pushed Rad over the edge happened in April 2017. The contractually agreed appraisal process, pursuant to which two investment banks would value the Tinder stock options, was scheduled for May.  Hoping to avoid the process altogether, Rad and Blatt began negotiating in March to see if they could agree on a value, which would obviate the need to continue with the appraisal process.

5.    Rad and Blatt had different perspectives regarding how Tinder should be valued under the relevant agreement, however, and it soon became apparent that an agreement on valuation was unlikely.  As discussions began to fall apart, Rad concluded that Blatt's further participation in the valuation process would lead to a significantly lower payout to Rad.  In Rad's eyes, Blatt had committed an unforgiveable sin:  interfering with Rad's dreams of a lucrative, outsized payout.  Rad snapped.

6.    On April 18, 2017, shortly before negotiations ended, Rad determined to destroy Blatt.  In an email to his financial advisor, Rad wrote: "***Fuck him.  We're at war.  We will destroy him.***  This is going to be the biggest lesson of his life.  He will be a changed man. . . excited for him ☺." *See* Exhibit 22 (emphasis added).  The following week, Rad made a false accusation that Blatt had sexually harassed Pambakian at a Tinder holiday party some five months earlier.  As confirmed by multiple Tinder employees, including Pambakian, Rad made the complaint to obtain Blatt's dismissal or suspension from his position as Tinder's CEO in order to seek retribution against Blatt and secure a significantly higher valuation of Rad's options.

2

At this time, Rad also began working on a lawsuit against IAC and Match, even though the appraisal process had not even started yet.  Rad viewed the situation as a "war," and he would fight it on all possible fronts.

7.     Rad's complaint against Blatt was thoroughly investigated by in house counsel and two outside law firms.  Mandy Ginsberg, the current CEO of Match, later made clear that Pambakian had not supported Rad's claim of sexual harassment at the time, stating in an email to Pambakian, "[Y]ou never reported Greg for sexual harassment. . . . you were interviewed on at least two separate occasions [during the investigation] and you never alleged sexual harassment."  *See* Exhibit 1.  In fact, just before Rad undertook to level his false accusation against Blatt, Pambakian urged a friend to help Pambakian talk Rad out of going forward with his allegation, lamenting presciently that "[m]oney really is the root of all evil."  *See* Exhibit 2.  It was clear to Pambakian that Rad was making accusations against Blatt to increase his long-sought payout from Tinder, and she didn't want him to do it.

8.     Rad's gambit failed: the investigation concluded that Blatt had not engaged in any harassment or abuse, and Blatt was not dismissed or otherwise removed from the appraisal process.  After completion of the appraisal in mid-July 2017, Rad elected to sell all his stock options, personally making hundreds of millions of dollars, even though, after taking the money, he now claims that the price was "unfair."  Pambakian similarly elected to sell her stock options, pocketing nearly $5 million.  However, Rad became furious when the value of Tinder subsequently increased.  If Rad had only held his stock options a few months longer, he would have made hundreds of millions of dollars more.  Seething over this lost opportunity, Rad revisited his plans for a lawsuit against IAC and Match to get a "do over" on the value of the stock options he had already liquidated.

9.     Rad continued to believe, that the key to obtaining the valuation he desired, this time through winning his lawsuit, was destroying Blatt's credibility and tarnishing his character.  Accordingly, Rad once again attempted to enlist Pambakian

6870235v1/016409

to make a harassment or assault claim against Blatt.  Rad was convinced that no jury would side with an accused sexual harasser or the company that employed him.

10.    However, for a second time, Pambakian refused to join his scheme. Pambakian knew Blatt had neither harassed nor assaulted her.  Blatt and Pambakian had a good working relationship and were also good friends.  Her career at Tinder was thriving.  Pambakian had recently received a meaningful promotion and was as happy at work as she had ever been.  Pambakian did not want to attack Blatt.  In fact, rather than attack him, Pambakian aggressively lobbied Blatt to stay on at Tinder even after he announced his plans for departing the company, writing:  "There's still just one right direction to go in. . . . Stay. . . . Things aren't perfect but it's not difficult to make it better." *See* Exhibit 3.

11.    In December 2017, Blatt left the company and Pambakian's new boss decided to bring in a new marketing executive to whom Pambakian would now report. Pambakian was unhappy about being denied the promotion.  Rad saw his opening.

12.    Desperate to recruit Pambakian for his scheme to sue Match and IAC, Rad decided to sweeten the pot to induce Pambakian to join him.  Specifically, under the guise of a litigation funding agreement, Rad promised millions to Pambakian in exchange for her joining the Valuation Lawsuit and making false allegations of sexual harassment against Blatt.  These payments – which Rad arranged through a third-party financial firm, Bench Walk Advisors, came in two parts:  Part One involved a promised upfront payment simply for joining the lawsuit and making the allegations against Blatt.  This upfront payment was Pambakian's to keep, regardless of whether the lawsuit succeeded.  Part Two involved a contingency payment in the event the Valuation Lawsuit was victorious.   This contingent payment would be paid to Pambakian before Rad received even one cent.  Collectively, these multi-million dollar payments far exceeded what Pambakian would have received if she had joined the lawsuit like an ordinary co-plaintiff.  Moreover, under the special arrangement,

she would remain entitled to her payout even if she dropped out of the lawsuit for any reason (which she did just 17-days after filing the complaint).

13.     In essence, Rad was willing to pay Pambakian out of his own pocket in order to convince her to join the Valuation Lawsuit.  This arrangement only made sense from Rad's perspective if he believed that Pambakian's participation would increase his chance of victory in the suit.  Pambakian did not know anything about the central claims of the Valuation Lawsuit; the only way Pambakian's participation could increase the chances of winning the suit was through the addition of the false allegations concerning sexual harassment against Blatt, allegations that Pambakian was only willing to make after receiving the upfront payment.  Securing Pambakian's false allegations was the driving motive behind these payment arrangements.  Indeed, of the nine plaintiffs in the Valuation Lawsuit other than Rad, the only other plaintiff who received an arrangement comparable to Pambakian's was the only other plaintiff who Rad was counting on to make false allegations against Blatt.  All the other plaintiffs, none of whom have any special testimony to offer in the case, have to wait until the lawsuit is concluded to see if they get paid.  The legality of the arrangement with Pambakian is currently being challenged in the Valuation Lawsuit.

14.     Having finally flipped Pambakian and others, on August 14, 2018, Rad brought his lawsuit against IAC and Match.  In that lawsuit, Rad, this time with Pambakian's support, leveled the same allegations of sexual harassment against Blatt that he had made a year before, even though those allegations had nothing to do with the central legal issues relating to the valuation claims.  Rad and Pambakian then embarked on a coordinated media campaign to ensure that their false charges against Blatt were widely-disseminated to the public, which they were.

15.     Months later, at a critical juncture of the Valuation Lawsuit, Pambakian brought a separate lawsuit against Blatt, Match, and IAC (the "Pambakian Lawsuit") reiterating the same false allegations against Blatt, though with increased fictitious detail and sensationalism.  This new lawsuit – and the corresponding new round of

5

coordinated outreach to the media – drove a fresh wave of headlines that once again tarnished Blatt's reputation.   Notably, in this second lawsuit, Pambakian is represented by the law firm whose founding partner is also the founding partner of Bench Walk Advisors, the firm responsible for making the aforementioned payments to Pambakian, and who stands to be paid handsomely if the Valuation Lawsuit is successful.  It is clear that the allegations against Blatt in the Valuation Lawsuit, the press, and the Pambakian Lawsuit, are merely coordinated tactics to tarnish Blatt's reputation to drive an anticipated $2 billion payday in the Valuation Lawsuit, the largest piece of which would go to Rad.

16.   The evolution throughout this period of how Pambakian describes what happened between her and Blatt is illustrative.  Immediately after the holiday party, Pambakian playfully described what happened in a text to her friends as "antics," populating her messages with a smiley face and laughing emojis.  Twenty months later, however, in the Valuation Lawsuit, Pambakian alleged that Blatt "sexually harassed and groped" her.  Months after that, Pambakian ratcheted up the intensity further, claiming to the press that what had happened with Blatt was a "sexual assault." And then finally, months later, in the Pambakian Lawsuit, Pambakian asserted that Blatt had "physically and sexually assaulted" her.  With each passing articulation, Blatt and his transgressions became more nefarious.

17.   Rad and Pambakian's primary defamatory statements against Blatt are the claims of sexual harassment and sexual assault.  In order to support these primary defamatory statements, Rad and Pambakian have made numerous other assertions against Blatt designed to villainize him and make their claims more believable.  All these additional assertions are likewise false.  Specifically:

a.   Rad and Pambakian claim that Blatt routinely subjected Pambakian to inappropriate behavior.  This is false.  In reality, contemporaneous documents show that Blatt and Pambakian had a close professional and personal relationship both before and

6

after the holiday party.  For example, in various messages, Pambakian writes, ***I love Greg Blatt", "I absolutely adore you"*** and "I'm with [Tinder employee] right now drinking tequila and talking about how much ***we love you."*** Pambakian also socialized with Blatt, lobbied Blatt to reverse his decision to leave the company, and repeatedly made clear her desire to maintain her relationship with Blatt even after he departed the company.

b.   Rad and Pambakian claim that after Blatt made unwanted sexual advances to Pambakian at the Tinder holiday party, Pambakian fled Blatt in horror and sought refuge in a hotel room.  This is false.  In reality, Pambakian did not flee Blatt at the holiday party, but rather invited him, in front of other witnesses, to come up to the hotel room and ordered an avocado cheeseburger for him from room service in anticipation of his arrival.

c.   Rad and Pambakian claim that Pambakian dutifully reported Blatt's "assault" but in turn was ignored, marginalized and disparaged.  This is false.  In reality,  Match has publicly stated that she never made any such allegations, and Pambakian acknowledges in contemporaneous messages that she "never wanted anyone to know about" what happened between Blatt and her and wrote to a friend immediately before Rad made his allegations, ***"I need your help talking him out of it."***

d.   Rad claims that Blatt threatened Rad for raising the allegations of sexual misconduct against him.  This is false.  In reality, Blatt and Rad were never alone together during the entire pendency of the investigation into Rad's complaint, and Blatt never threatened Rad about the investigation in any way.  Contemporaneous notes from a conversation between Blatt and Rad after the investigation

had closed demonstrate that Rad apologized to Blatt for having made the false allegations.

e.  Rad and Pambakian claim that Pambakian's career suffered horribly as a result of Blatt demeaning her and not taking her seriously as a business executive. This is false. In reality, while trying to prevent Rad from making his false allegations, Pambakian laments to a friend, "[t]hings were finally going well with work." Then, even after the false complaint was made, Pambakian received, and acknowledges receiving, a meaningful increase in responsibilities, title, and compensation, all while Blatt was CEO of Tinder. In fact, she wrote to Blatt in the wake of her promotion, ***"Thank you for everything – for helping me so much."***

f.  Finally, Rad and Pambakian claim that Blatt reigned over a misogynistic work culture that routinely mistreated women. This is false.  In reality, they were both well aware of Match's unparalleled record for career advancement for women while Blatt was CEO, with over 75% of all Match employees reporting to a woman executive, two-thirds of Blatt's Tinder direct reports being women, almost 50% of all Match vice presidents women, 100% gender equality in pay, and, upon Blatt's departure, the promotion of two women with whom Blatt had worked closely for nearly a decade to the positions of CEO and President. When Blatt announced his departure from Tinder, Pambakian wrote, ***"You'd literally have to resurrect Steve Jobs and make him ceo for anyone to be excited about this."*** In Blatt's entire career he had never been the subject of a single allegation of sexual misconduct, other than the one lodged by Rad, nor has any such

8

1   complaint been made against him in the year since Rad's and

2   Pambakian's false allegation against him were so publicly made.

3      18.   Claims of sexual harassment and sexual assault should be taken seriously

4 and thoroughly investigated.  That is precisely what happened here.  All allegations

5 were investigated, and the claims were found to be without merit.  This is not

6 surprising as, unlike most accusations of sexual misconduct, which are "he-said/she-

7 said" situations in which the accuser typically has no incentive to lie, in this case, (1)

8 there is a clear financial motivation for Pambakian to fabricate and publicize the false

9 claims against Blatt; (2) multiple witnesses contradict Pambakian's allegations; and

10 (3) extensive written communications among Blatt, Pambakian, and others, as well as

11 other documents, materially contradict her accusations.

12      19.   Blatt therefore brings this suit to obtain compensation for the willful and

13 malicious false statements Pambakian and Rad have knowingly and intentionally

14 made to advance their personal, financial interests.

15                            **THE PARTIES**

16      20.   Plaintiff Gregory Blatt is a citizen of the State of Colorado.  Prior to

17 December 2017, Blatt was the CEO and Chairman of Match Group and the CEO and

18 Executive Chairman of Tinder.

19      21.   Defendant Rosette Pambakian is a citizen of the State of California.

20 Pambakian was the Vice-President of Global Communications and Brand and Head

21 of Marketing and Communications at Tinder.

22      22.   Defendant Sean Rad is a citizen of the State of California.  At various

23 times from approximately February 2012 to December 2016, Rad was the CEO of

24 Tinder.

25      23.   Plaintiff is not aware of the true names and capacities of the Defendants

26 sued herein as Does 1 through 10, whether individual, corporate, associate, or

27 otherwise and therefore sues such Defendants by these fictitious names.  Plaintiff will

28 seek leave to amend this Complaint to allege their true names and capacities when

ascertained.  Plaintiff is informed and believes, and on that basis alleges, that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged and that Plaintiff's injuries and damages herein alleged were legally caused by such Defendants.  Unless otherwise indicated, each Defendant was acting within the course and scope of said agency and/or employment, with the knowledge and/or consent of said co-Defendant.

24.     Plaintiff is informed and believes and thereupon alleges that all times mentioned herein, each of the Defendants, including each Doe Defendant, was acting as the agent and/or servant, and/or partner of and was acting in concert with each of the remaining Defendants, including each Doe Defendant, in doing the things herein alleged, while at all times acting within the course and scope of such agency, service, and/or partnership.  Each Defendant, in doing the acts alleged herein, was acting both individually and within the course and scope of such agency and, with the knowledge and/or consent of the remaining Defendants.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this action between citizens of different states and the amount in controversy exceeds $75,000.

26.     Venue is proper in the Central District of California, Southern Division because all the Defendants are California residents who reside in the Central District of California and a substantial part of the events that give rise to the claim occurred in the Central District of California.

## FACTUAL ALLEGATIONS

### I.     Rad's Tumultuous Career at Tinder

27.     In 2012, Rad took a job working at Hatch Labs, an IAC subsidiary.  The sole purpose of Hatch Labs was to start and develop new businesses which would be owned and controlled by IAC.  While an employee at Hatch, Rad and other Hatch employees developed Tinder.  Once Tinder had launched and gained early success,

Rad demanded the majority of Tinder's economic ownership and associated control. Given that the whole point of Hatch was to develop businesses IAC would own and control, IAC declined this rather odd request. Rad was outraged and has never gotten over this perceived slight.

28.     While IAC was not willing to simply give Tinder to Rad, IAC did believe in providing ownership incentives for its employees. IAC thus provided Tinder employees a stock option structure similar to one that had been used for other business lines within IAC, although Tinder's was substantially more generous. Rad and other Tinder employees would receive stock options in Tinder that would vest over time and would be valued in future years through a contractually-defined appraisal process. Following the appraisal, Tinder employees would be able to sell their stock options back to IAC. This structure would effectively give Tinder employees the economic benefits of stock ownership, even though Tinder was actually owned by IAC. These stock options, and the ultimate payout Rad would receive for them, became his "white whale." Everything Rad did from that point forward was designed to maximize that payout, and he obsessed over it relentlessly.

29.     As Tinder grew into a global phenomenon, it quickly became clear that Rad was not cut out to be CEO. In the fall 2014, about two years after Tinder was launched and almost three years before Tinder's stock options would be valued, Rad was informed that a new CEO was to be brought in. Rad was demoted to President – the number two position in Tinder management. After several months, however, Blatt determined that the new Tinder CEO was not a good fit at that stage of the company's development. Recognizing the challenges of bringing in a second outside person to lead an organization like Tinder, and fearing destabilization if that second CEO struggled, Blatt approached Rad about a new solution: Rad would be restored the title of CEO, but Rad would report directly to Blatt. For his part, Blatt would now spend the majority of his time on actively managing Rad and Tinder. Rad would continue to be the number two executive at Tinder, just as he had been since his demotion

11

earlier that year, but he would regain the CEO title, which he coveted, as well as certain other responsibilities he had previously lost.

30.    In the summer 2015, Blatt and Rad together announced that Rad would be returning as CEO, and Blatt would become his direct boss, stepping into the newly created position of Tinder's Executive Chairman.  The hope was that Rad's passion for the business coupled with Blatt's managerial experience and industry expertise would be the combination that Tinder needed.  However, it quickly became clear that Rad was not up to the task.  Internal chaos intensified, failed initiatives proliferated, and executive calls for change became the norm.  Ironically, the most pressing problems were in product development, which was ostensibly Rad's strong suit.  Rad claimed that he was too distracted with other elements of his job to drive product development as required. Accordingly, Blatt and Rad agreed to reorganize Rad's responsibilities to eliminate those supposed distractions.  In July 2016, Rad surrendered all his responsibilities and direct reports to Blatt, other than those relating to product development.

31.    Rad was given six months to reverse certain product trends.  If successful, Rad and Blatt would discuss whether Rad should have additional responsibilities restored.  However, the trends were not reversed, and finally Rad relinquished the Tinder CEO title and his remaining responsibilities in December 2016, receiving the honorary title of non-executive Chairman of Tinder.  At the same time, Blatt formally assumed the role of Tinder CEO, even though he had functionally been in the role for 6 months and had been the senior Tinder executive for 18 months.

32.    In the Valuation Lawsuit, Rad alleges that Match removed Rad in December 2016, just months before the options appraisal process, so that Blatt would be able to conduct the appraisal process on Tinder's behalf instead of Rad.  Rad attempts to portray the management change as a conspiratorial usurpation of his rightful authority.  But there was no plot.  Rad was incompetent in his position, and, after multiple failed attempts to put Rad in a position to succeed, he was removed.

Moreover, given that Rad had not been in charge of Tinder for approximately two years by that point, his removal hardly had the consequences he now tries to attribute to it. Accepting responsibility for his own actions was not a substantial part of Rad's character, and so he blamed Blatt, singularly and intensely, for the fact that his own incompetence had ended his tenure at Tinder.

## II.   The 2016 Tinder Holiday Party

33.   Pambakian was a public relations executive and well-regarded Tinder employee.   Beginning in July 2015, Blatt worked closely with Pambakian, even though she did not report to Blatt.   During the time they worked together, Blatt and Pambakian developed a productive professional relationship and a close friendship. For example, on December 7, 2016, just two days before the Tinder holiday party, Pambakian wrote a text message to James Kim, a Match finance executive.   In it, she wrote, ***"I love Greg Blatt."***   Kim responded, "He's a great business leader." Pambakian replied, ***"Well I don't know about that.   Lol.   I just love him."***   *See* Exhibit 4 (emphasis added).   (Kim would later become a co-plaintiff in the Valuation Lawsuit.)

34.   On the evening of December 9, 2016, Blatt attended the Tinder holiday party.   During the party, Blatt and Pambakian started talking and the conversation turned flirtatious when Pambakian said, "You have a magnificent chest, Greg Blatt." After that, they had an irreverent and, at times, ribald and suggestive conversation, with Pambakian and Blatt both laughing throughout.   Neither of them indicated at any time that they took offense at the other's comments, and both were enthusiastic participants.   At some point afterward, Pambakian suggested to Blatt that when the party was over, they find a hotel room to host an after-party.

35.   Later, as the party was winding up, Blatt and Pambakian, among others, wanted to find something to eat.   Unable to find any restaurants open in the hotel, Blatt suggested broadly to the people he was with, including Pambakian, that they "get out of there" to find food.   Pambakian asked a hotel employee whether there was

any way they could get food at the hotel, and the employee responded that food could only be obtained at that hour by hotel guests through room service.  Pambakian then suggested to Blatt and two other Tinder employees who were with them at the time that they all go to one of the Tinder employees' hotel room to order food.

36.     Blatt did not go straight up to the room with the others, but instead spoke to some other Tinder employees who had not yet left the party.  Blatt then texted one of the Tinder employees for the room number, and the employee, with Pambakian's knowledge, texted the number to him.

37.     Blatt ultimately came to the hotel room.  Pambakian and two other Tinder employees were there.  For a brief period, Blatt's and Pambakian's fully-clothed bodies were in contact, and Blatt and Pambakian kissed.  The interaction was consensual.   Room service was then delivered.   Soon after eating, Blatt departed.  While in the hotel room, Blatt and Pambakian were fully clothed at all times.  After that evening, Pambakian and Blatt never engaged in any further physical encounters.

38.     On Monday morning, Blatt apologized to Pambakian for the other night, saying he had used poor judgment and, given their working relationship, he had let things go too far.  Pambakian responded, "Please.  I'm sorry, too.  It was as much me as it was you."  They agreed that they didn't want anything to interfere with their good relationship, and Pambakian suggested to Blatt that they not tell anyone Blatt had gone up to the room.  Blatt agreed.  Blatt also apologized to the other two employees who had been in the hotel room for what had happened the previous evening.

39.     Work went on as usual for Blatt and Pambakian, and their good relationship continued.   But after Pambakian entered into the litigation funding agreement, she attempted to rewrite history.

40.     Pambakian now claims that she was so offended by the conversation she and Blatt had at the holiday party that she fled Blatt and sought refuge from him in a friend's hotel room.  But the truth is that, rather than flee, Pambakian invited Blatt up

14

to the hotel room in front of several people, well after the allegedly offensive conversation had ended.

41.     Pambakian makes no claim that in the hotel room she ever asked Blatt to stop their encounter or otherwise provided any clear signal of reluctance.  Instead, she claims that, as a way of "de-escalating the situation," she broke away from Blatt, saying "We're all hungry.  I'm going to order food," and then went ahead and ordered room service.  However, that never happened.  Room service records and text messages establish that Pambakian actually ordered food fifteen minutes before Blatt even arrived in the room.  Relatedly, Pambakian claims she was surprised when Blatt showed up, but these same records establish that she ordered four cheeseburgers to the room, even though it was only with Blatt's arrival that there were four people there to eat them.  Pambakian had invited Blatt up to the room, knew he would soon be there and ordered food for him accordingly.

42.     A flurry of friendly messages exchanged the next morning between Pambakian and Blatt in which they joked about their hangovers belie Pambakian's assertion that she believed she had been assaulted by Blatt just hours earlier.  For example, Blatt emailed Pambakian and one of the Tinder employees, "My head hurts." Pambakian promptly responded "Same.  I literally can't get out of bed."  Later she emailed "This is nothing a Bloody Mary can't fix 😉" and then toward the end of the day she wrote, "Well I don't know about you two but I just had a 90 minute massage and I feel amazing." *See* Exhibit 5.

43.     That same morning, Pambakian sent the following text message to the other two Tinder employees who had been in the hotel room with her and Blatt: *See* Exhibit 6.

> Good morning! Hope no one is as hung over as I am. About last night...we should keep the hotel room antics to ourselves. It would be bad if word got out that greg came back to the room. So for his sake and ours let's keep that in the vault. But by all means we can rehash it amongst ourselves as often as possible 😂

Thus, just hours after what she now claims was a "physical and sexual assault", Pambakian described what happened with Blatt as "antics" to the two other people who had been in the room. "Antics" means "a wildly playful or funny act." By contrast, "assault" means a "physical attack." Consistent with this word choice, Pambakian then invited the others to "rehash" these "antics" with her later as "often as possible," underscoring how fun that would be by ending her text with an emoji that conveys laughter to the point of tears. It seems it was only after she received a promise of substantial payments to join the Valuation Lawsuit that "antics" and "physical and sexual assault" became interchangeable descriptions.

**III.  Rad's False Allegations Against Blatt**

44.    During spring 2017, Blatt, Pambakian, and the rest of the Tinder team were enjoying a period of relative calm in the wake of Rad's departure. However, the first valuation of Tinder for purposes of its stock options was scheduled for May 2017, and given how much Rad had obsessed about this event, there was no way this calm could continue. Starting in late March, Blatt began meeting with Rad and Rad's financial and legal advisors trying to agree upon a value for Tinder. If they could agree, there was no need to go through the contractually-defined appraisal process, because Rad had the contractual right under the option arrangement to negotiate on behalf of all option holders, even though he was no longer an executive at the company.

45.     But not surprisingly, there was a large gap between Rad's fantastical view of valuation and reality.  The agreement called for Tinder to be valued as it would be by the public markets as a standalone company at that moment in time.  Yet Rad was arguing for a valuation that was comparable to, or larger than, what the stock market was putting on Match as a whole, which encompassed 100% of Tinder and many other businesses much larger than Tinder.  Rad could not separate his view of what Tinder would be worth in the future from the contractual requirement to value Tinder as the actual stock market would at that time.  In fact, the exercise did not require much speculation, given the market was, in fact, valuing Tinder every day as the most focused-on element of Match's stock.  Given Rad's unrealistic view, the valuation discussions fell apart on April 25.  What Blatt did not know at the time was that Rad had already switched strategies more than a week before.

46.     Rad had always been known for his emotional volatility: high highs and low lows.  And since Tinder's founding, when IAC had refused to turn over control of the business to him, he had lived in a paranoid state, profoundly believing that everything was rigged against him.  When Rad concluded that Blatt would not simply concede a Tinder valuation that Blatt deemed unsupported by the facts, and would instead engage in a full appraisal process with investment banks to try to determine a fair value for the business, something inside of Rad snapped.  He came to view the process to value Tinder as an existential contest and the possibility that he would not receive what he wanted apocalyptic.  Toward the "end" of securing his desired payout, all "means" would be justified.

47.     Accordingly, on April 18, 2017, Rad confirmed his plan to seek retribution against Blatt as a means of advancing his valuation objectives: "***Fuck him. We're at war.  We will destroy him.***  This is going to be the biggest lesson of his life. He will be a changed man … excited for him 😊."  *See* Exhibit 22 (emphasis added). At the same time, he reached out to the law firm of Alston & Bird to begin drafting a complaint for the lawsuit against IAC and Match that would follow the appraisal,

regardless of the outcome.  Rad had made the determination.  He would "win" the valuation fight at any cost, and the more damage he could inflict on his perceived enemies in the process, the better.

48.     On May 3, 2017, Blatt was called into a meeting with IAC's General Counsel and a senior IAC litigator.  They told him they had received a complaint and wanted to know what had occurred at the Tinder holiday party six months prior.  Blatt conveyed his account of the evening.  But something wasn't right.  Blatt had adhered to Pambakian's wishes and never discussed that evening with anybody.  He also knew Pambakian viewed the evening as he had – a mutual lapse in judgment – and would therefore have never made a complaint about it.  So he asked, "Who made the complaint?"  The lawyers said they couldn't disclose that information, but Blatt, at risk of losing all credibility, said, "I'll bet anything it wasn't [Pambakian]."

49.     Ultimately, Blatt learned that he had been right and that Pambakian had not made the complaint against him.  Instead, it had been Rad.  On April 27, 2017, just two days after negotiations with Blatt over the value of Tinder broke down, and nine days after Rad declared war against Blatt, Rad called Match's General Counsel and asserted that Blatt had committed sexual harassment at the holiday party five months earlier and had created a hostile atmosphere at the company, especially to women.

50.     Rad acknowledges in the Valuation Lawsuit that he believed Blatt's removal would lead to a higher valuation of Tinder in the appraisal process.  And multiple Tinder employees, including Pambakian, have confirmed that Rad intended to use the false harassment claim to improve the valuation outcome for himself and other Tinder employees.

51.     For example, on May 23, 2017, in Blatt's office at Tinder, Pambakian said to Blatt:

> [Rad] came to me and said Greg is out to kill our valuation.  We need to do something about it  .  .  .  Sean said he wanted to use [the holiday

18

party] against you to help valuation.  I told him he can't . . . I begged

him not to.  I cried.  But he wouldn't listen.

52.     And on July 22, 2017, at the Tinder summer party, a Tinder executive familiar with the situation confirmed what a frenzy Rad had stirred himself into in order to destroy Blatt and drive a higher valuation.  He told Blatt:

[Rad] was crazy . . . You don't know.  I had to stop him.  I stopped it

from going crazy . . . You did nothing wrong.  I know you did nothing

wrong.  We all know you did nothing wrong . . .

53.     Later, after Pambakian entered into the litigation funding agreement and the Valuation Lawsuit was filed, Rad and Pambakian attempted to paint a false portrait of two people committed to pulling back the curtain on Blatt's and Match's wrongdoing, whatever the cost.  Unfortunately for them, their electronic footprints from the time reveal a different reality.

54.     For example, Rad claimed in the Valuation Lawsuit that he learned about what happened at the holiday party in "mid-2017" and "immediately reported Blatt's conduct."  However, on February 11, 2017, nearly three months prior to the time he actually made his complaint to the board, Rad received a text from his good friend and co-plaintiff in the Valuation Lawsuit, Justin Mateen, stating: "Forgot to tell you.  The dokhtar[1] actually did make out etc with greg Blatt."  *See* Exhibit 7.  This timeline demonstrates that Rad knew about what had happened at the holiday party for months and remained silent.  Rad chose to report the incident only when his valuation negotiations with Blatt broke down.  Notably, the message makes no mention of assault or harassment.  Instead it says Pambakian "did make out etc" with Blatt, hardly the wording one would expect to convey that Pambakian, his good friend, had been violently assaulted.  Similarly, Mateen presents the information as an afterthought, having forgotten earlier to pass on the news.  Finally, Rad's reaction is not one of alarm.  None of this is consistent with having just discovered that a sexual assault

---

[1] "dokhtar" means "girl" in Persian.

19

occurred.

55.     In the Pambakian Lawsuit, Pambakian claims that she reported the assault to her then boss, with the expectation that he would report it to Human Resources on her behalf.  However, to the extent Pambakian did report it to her then boss, she certainly did not do so in the hopes that he would seek some sort of official redress.  She makes this clear in a May 15, 2017, email in which she expresses her regret that Rad made the complaint against Blatt and commenced the internal investigation.  In the email, she states:  "I never wanted anyone to know about that incident and why [my boss] thought it appropriate to tell Sean about it I'll never understand.  But he did and here we are."  *See* Exhibit 8.

56.     Pambakian also claims she told Rad about the holiday party with the intention of his reporting it through the proper channels.   However, in truth, Pambakian was horrified when she learned that Rad had found out about what happened, as evidenced by a lengthy text chain from March 1, 2017, in which she tries to determine how Rad found out and expresses concern that Rad will "use it against" Blatt.  *See* Exhibit 9.  Then, on April 27, the day Rad would ultimately make the complaint against Blatt, Pambakian writes a friend saying:  "I need your help talking him out of it."  *See* Exhibit 10.

57.     Similarly, Pambakian claims she told the company's investigators that Blatt had assaulted her, but Mandy Ginsberg, CEO of Match, wrote Pambakian in an email, "you were interviewed on at least two separate occasions [during the investigation] and you never alleged sexual harassment."  *See* Exhibit 1.  Indeed, in an email written for Blatt on May 15, 2017, while the Board's investigation was ongoing, Pambakian stated, "My attempt to fix this seemingly unfixable situation might seem feeble, but I needed to try . . . We both know what's happening here.  I just hope that everyone who has been brought into this can see it for what it is and move on."  *See* Exhibit 8.  At the time of the investigation, rather than trying to implicate Blatt, Pambakian was trying to save him from Rad.

58.     In response to Rad's complaint, the Match Board promptly commenced a thorough investigation of the allegations, first internally, and then with the assistance of two nationally recognized law firms.  Blatt cooperated fully with the investigation, conveying his account of the relevant events, acknowledging his poor judgment that evening, and expressing genuine regret at what had occurred.  When the investigation concluded, the Board determined that Blatt had not committed sexual harassment or violated any other company policy or law.  The Board did, however, agree with Blatt that he had exercised poor judgment.  As a result, the Board determined that an appropriate reprimand was to cancel an option grant Blatt had been scheduled to receive in early May worth millions of dollars.  Blatt accepted his punishment without objection.  But the Board otherwise considered Blatt an executive in good standing.

59.     The timing of Rad's allegations against Blatt make clear this was all just a tactic to achieve a greater payout, rather than an attempt to serve justice.  Rad had learned about the holiday party in February 2017 but did nothing about it for months.  Then, beginning on April 27, 2017, precisely when the valuation process started, to July 13, 2017, when the valuation process was completed, Rad and/or his attorneys reached out to Match and its representatives dozens of times to argue Blatt was dangerous to the company and should be removed.   However, once the valuation was completed, Rad dropped the matter entirely, despite the fact that Blatt continued as CEO for another five months, supervising Pambakian.  The claim was only raised again more than a year later, the day that Rad initiated his second pursuit of a higher valuation for Tinder in the Valuation Lawsuit.

### IV.    Rad Reacts to Tinder's Valuation and Offers a Hollow Mea Culpa

60.     The appraisal process relating to Tinder's options was completed in mid-July 2017, determining Tinder's value to be approximately $3.0 billion, far below the level Rad had been clamoring for, but entirely consistent with Match's market valuation of approximately $5.0 billion, which included all of Tinder plus a host of other well-known businesses.

6870235v1/016409

61.     In August 2017, Rad did not sue Tinder for an unfair valuation.  Instead, he elected to sell all his options related to Tinder at the price he now claims was so unfair and went on vacation to Mykonos.  But Tinder had launched a new product feature at the end of July which quickly exceeded everyone's expectations, including Rad's.  When Rad returned from vacation in September, Tinder's financial prospects were improving more than expected.  By selling his options instead of holding onto them a little longer, as he could have, Rad gave up hundreds of millions of dollars of additional compensation. Rad was fuming.

62.     Pambakian and another Tinder executive reported to Blatt that Rad was considering litigation against Tinder and Match.  However, Pambakian and the other executive did not want Rad to sue Tinder.  They met with him repeatedly to diffuse his anger and reported to Blatt on Rad's volatile state of mind.  Pambakian and the executive finally called Blatt one evening in September saying Rad needed to meet with Blatt that evening.  Blatt tried to put it off, but Rad texted Blatt demanding that they meet immediately.  (In an example of Rad's and Pambakian's willingness to lie about matters big and small, they contend in the Valuation Lawsuit that Blatt and Rad met at Blatt's urging, when the text messages make clear that the opposite is true.)

63.     Blatt met with Rad at a local hotel for several hours.  Rad was varyingly disconsolate and indignant, rehashing the panoply of grievances that had driven him since the beginning: a supposed lack of respect, alleged stolen ownership of Tinder, and an unfair valuation of Tinder options.  Rad was emotionally volatile, cycling from anger, to remorse, to hostility, to a desire for reconciliation.  Rad  demanded a new, undefined role at Tinder and significant new equity ownership in the business.  Blatt informed Rad that given his behavior over the last months, he thought it was highly unlikely that the company would be willing to re-engage with him.

64.     At that meeting, which occurred long after the investigation into the holiday party had concluded, Blatt and Rad discussed for the first and only time the harassment allegations Rad had made against him.  Blatt expressed his shock and

22

disappointment that Rad had stooped so low as to make the false allegations.  Rad responded: "The one thing I regret is coming after you like that.  At the time I thought I had to do it.  But I realize I didn't.  I'm sorry about that.  And I promise you I will never come after you or hurt you like that again."  After making the apology, Rad followed Blatt into the men's room and attempted to give him what he seemed to think was a conciliatory hug.  It was clear that Rad was not stable at the time.  At a regularly scheduled Match Board meeting a few days later, Blatt described his meeting with Rad and Rad's apology, naively asserting that whatever Rad's next move, he believed the days of false allegations of sexual misconduct were behind them.

65.    As Blatt had long planned, he left the company in December 2017, replaced by Elie Seidman.  Then, in spring of 2018, Pambakian was told that Seidman had decided to hire a new Chief Marketing Officer, to whom Pambakian would report.  Pambakian was upset; she had wanted that position.  As a result of this perceived slight, she quickly grew unhappy with her situation at Tinder, and nervous about her prospects under her fourth boss in approximately a year.  Pambakian's communications with Rad increased, and she became more withdrawn from the group of Tinder employees with whom she had previously spent the most time.  This was the opportunity for which Rad had been waiting.

## V.    Rad Finally Recruits Pambakian

66.    On August 14, 2018, Rad finally brought his lawsuit against Match and IAC.  This time, however, unlike the last time, Pambakian conspired with him, joining the lawsuit as a co-plaintiff.  Of course, Pambakian did not do so until she entered into the litigation funding arrangement that paid her millions of dollars, regardless of the outcome, and which would pay her meaningfully more in the event of a successful suit than she would have received by virtue of her option holdings.

67.    Nonetheless, as Rad had desired for so long, he now had a lawsuit that contained allegations of "sexual harassment and groping" against Blatt, even though such claims had no legal relevance to the central claim that Tinder had been

23

undervalued. Instead, it was a brazen attempt to gain publicity for what would otherwise be a run-of-the-mill financial lawsuit, to apply pressure to settle the lawsuit in an era where most companies would be afraid to challenge assertions of sexual misconduct, and to tar the character of the person who would likely be the central witness on behalf of the defendants: Blatt.

68.  Rad and Pambakian shared the same lawyer, and over a span of two days Rad, Pambakian, and the lawyer conducted a series of coordinated interviews on CNN to promote the lawsuit, in which Blatt was defamed in multiple ways. Rad, who had by far the largest option stake of any Tinder employee, orchestrated and directed, and was the primary beneficiary of, the coordinated legal and public relations campaign.

69.  Finally, the Pambakian Lawsuit was filed, in which Pambakian's false rendition of the holiday party and the claimed injustices she suffered under Blatt's management became even more sensational. This drove another round of press coverage intended to weaken Blatt and further promote Pambakian's and Rad's interests in the Valuation Lawsuit.

## VI.  Pambakian Attempts to Recast Her Relationship with Blatt

70.  In order to bolster her false claims about what happened at the Tinder holiday party, Pambakian felt compelled to falsely paint Blatt in a negative light and to misrepresent the nature of their professional and personal relationship. For example, she now claims that "Blatt was a notorious bully, known for violent outbursts and vindictive retribution." However, she does not offer a single example to support her contentions. She also asserts that she endured Blatt's "inappropriate behavior throughout their working relationship, culminating in December 2016." Another falsehood. In reality, Blatt and Pambakian had a strong working and personal relationship, incompatible with her current assertions against Blatt, as made clear by dozens and dozens of written communications from Pambakian herself.

71.  For example, on December 7, 2016, after years of what Pambakian now alleges was Blatt's inappropriate behavior, Pambakian wrote a text message to James

24

Kim, who would later become a co-plaintiff in the Valuation Lawsuit.  In it, she wrote, **_"I love Greg Blatt."_**  Kim responded, "He's a great business leader."  Pambakian replied, "Well I don't know about that.  Lol.  **_I just love him."_**  *See* Exhibit 4 (emphasis added).  This was just two days before the holiday party.

72.     Later, in the midst of the investigation into Rad's complaint against Blatt, Pambakian wrote an email to Blatt.  In it, she states "Maybe I haven't made it obvious enough but **_I absolutely adore you_** – I admire and respect you and I would never intentionally or maliciously do anything that would jeopardize your reputation or your job – not for anything.  **_You've been good to me over the years and I'll always be grateful to you for that."_**  *See* Exhibit 8 (emphasis added).

73.     Pambakian's warmth toward Blatt cannot be explained away as just cover because Pambakian needed to keep Blatt happy as her boss.  Even after Pambakian learned Blatt was leaving Tinder and would no longer be her boss, and even after Blatt had, in fact, left Tinder, Pambakian continued to express her admiration and affection for Blatt, and her desire to socialize and maintain a close relationship with him.  These sentiments are reflected in literally dozens of written exchanges, only a few of which are included here, but all of which, especially in totality,  are inconsistent with the current allegations.

74.     For example, in July 2017, months after the holiday party and weeks after Pambakian learned Blatt would soon be leaving Tinder, Blatt was at a Tinder event that had been organized by Pambakian.  Pambakian playfully wrote to Blatt:

> Already seeing posts on Instagram from influencers  .  .  .  Instagram is an app where you can upload photos and share with all of your friends and followers.  Influencers are people with a high number of followers.  (Sorry. Couldn't help myself)  Have some more frosè pops for me.  That shade of blue looks nice on you.

*See* Exhibit 11.

6870235v1/016409

75.     In early August 2017, Blatt wrote: "in a crowning achievement of an awesome few weeks I spontaneously developed an eye infection on Tuesday which has progressed to the point that it is now swollen shut and itchy as Hell." Pambakian responded, "I'm sure you're still gorgeous, even with an itchy swollen eye." *See* Exhibit 12.

76.     Indeed, in direct response to Blatt's announced departure from Tinder, Pambakian repeatedly praised his leadership and expressed her sadness at his impending departure, writing:

- ***"You'd literally have to resurrect Steve Jobs and make him ceo for anyone to be excited about this*.**"
- "***If you didn't know already, everyone has a lot of respect for you. You're crazy smart and talented and you care.  We are lucky to have you.  Just wish we can keep you longer.***"
- "I'm with [another Tinder employee] right now drinking tequila and ***talking about how much we love you."***
- "I don't even want to think about [you leaving the company].   So depressing.  Nothing to look forward to anymore."

*See* Exhibits 13, 14, & 15 (emphasis added).

77.     Pambakian also repeatedly asked Blatt, who she now alleges had forcibly assaulted her earlier, to change his mind about leaving the company.  In early August, they shared this email exchange, in which Pambakian explicitly references Rad's recent attempt to get Blatt fired:

Pambakian:  But you can cut through the bullshit.  End of the day, what's right is right.  Take everyone's emotions and personal agendas out of it.  There's still just one right direction to go in.  And you know what that is.

Blatt:  Absolutely.  (What is it?)

26

1

2          Pambakian:  Hahaha.  ***Stay.***  Get rid of the people who don't put what's

3          best for the company first. . . . we're all on the same page. Things aren't

4          perfect but it's not difficult to make it better. ***Various external forces***

5          ***were causing chaos. They shouldn't be an issue anymore. Everyone***

6          ***just had a reality check and has put their heads back on straight,***

7          ***finally (except for you know who).***

8

9          Anyway, more to say in person one day.

10   *See* Exhibit 3 (emphasis added).

11          78.    In November 2017, just a few weeks prior to his departure, Pambakian

12   and another Tinder employee invited Blatt for drinks in LA.  Pambakian wrote in her

13   text:  ***"[Greg] - don't say no.  Our fragile hearts can't take any more rejection."***

14   After going out to dinner with Pambakian and other employees the next night,

15   Pambakian asked Blatt in a text: "***Can you keep coming out to LA so we can do that***

16   ***at least once a month?***"  Blatt responds, ***"Yes***." and Pambakian replies, ***"Yay!!!"***  *See*

17   Exhibit 15 (emphasis added).  Similarly, in the same time frame, Pambakian emailed

18   Blatt and another marketing employee stating she was thinking about doing a

19   marketing junket to Sundance Film Festival in Park City, and wrote, "Greg you should

20   come," even though she knew Blatt would be departing his job at Tinder in a few

21   weeks, long before the Sundance Film Festival would occur.  *See* Exhibit 21.

22          79.    Just before Blatt's final day at Tinder, Pambakian expressed her respect

23   for Blatt and desire to maintain a relationship with him after he departed the company.

24   Blatt wrote her:  "I've asked [] to schedule time together tomorrow so that I can walk

25   you through what I walked him through and impart to you a few tidbits of wisdom

26   from an old has-been."  She replied, "30 years from now you still won't be an old has-

27   been.  And we'll all still be coming to for advice."  Blatt wrote, "30 years from now

28

27

I'll be a dead has-been." Pambakian quipped, "Ok. We'll call the Long Island medium." *See* Exhibit 16.

80. Finally, on December 30, 2017, weeks after Blatt had ceased to be Pambakian's boss, she wrote: "I hope you've already started planning your first LA trip of 2018." *See* Exhibit 17. And then in April of 2018, four months since Blatt's last day at Tinder, she texted him an invitation to a party in New York, saying "You should come." Blatt responded, "Unfortunately I can't change my plans. Next time you're in NY putting on a nice event maybe send an invitation in advance?" Pambakian pressed, "You should just make an executive decision and change your plans." Blatt replied, "Unfortunately, can't." *See* Exhibit 18. Blatt didn't hear from Pambakian directly ever again. The next time he heard from her indirectly was when the Valuation Lawsuit was filed, days after Pambakian entered into the agreement that would guarantee her millions of dollars, and she first made allegations against him.

## VII. Pambakian Lies About Retaliation Against Her and Misrepresents Match's Workplace Culture

81. In further effort to boost her false accusations, Pambakian decided to lie about supposed retaliation she experienced as a result of what happened at the holiday party and to misrepresent the workplace culture at Match.

82. For example, Pambakian now claims that when Blatt and his "team" (which consisted solely of two seasoned female executives) arrived at Tinder they brought with them Match's "misogynistic culture." However, far from misogynistic, Match's record under Blatt on matters of gender equality was a rare achievement in the tech world.

83. When Blatt left Tinder and Match at the end of 2017, more than 75% of all Match employees reported up to a female executive in the senior most ranks of the company. At Tinder, when Blatt departed, two-thirds of Blatt's direct reports were women, with over 80% of the company's employees reporting up to these female direct reports of Blatt's. During Blatt's last five years at Match, the percentage of

28

female vice presidents increased from 30% to 44%.  Upon departing Match, Mandy Ginsberg succeeded Blatt as CEO, and Sharmistha Dubey became President, two accomplished female executives who had worked closely and successfully with Blatt for nearly a decade.  And shortly after Blatt departed Match, Ginsberg undertook a third-party audit of pay equity that determined women were "100% equally paid" as men.  Rather than the misogynistic culture Pambakian claims, Match had a culture where women's careers thrived.

84.     Pambakian recognized that Match had achieved superlative gender equality under Blatt's leadership, and that part of his mission at Tinder was to address certain gender issues that had plagued Tinder in the past while Rad had managed day-to-day operations.  Writing to Blatt about addressing those lingering issues, she said, "I'm not sure if there is anyone else more qualified or up for the challenge of being CEO of Tinder than you."  *See* Exhibit. 8.  And Blatt did, in fact, take meaningful steps to improve Tinder's culture after Rad was removed.  Pambakian was well aware of these efforts and resulting improvements in Tinder's culture when she made her false accusations.

85.     In the Pambakian Lawsuit, Pambakian claims that her "career was on the rise until she was sexually assaulted" by Blatt.  She claims that after the complaint was made against Blatt she was "marginalized" and "disparaged."  Rather than offer specific examples to support these accusations, however, she oddly chooses to instead admit that none of these allegations are, in fact, accurate.  In the same breath that she asserts her career tumbled after the holiday party, she states that at the time of the holiday party, she "held the position of Vice President of Global Communications and Brand."  She then admits "her role eventually expanded to Head of Marketing and Communications, managing an in-house group of more than 40 people."  In other words, after the time at which she claims her career suffered, and that she was marginalized and disparaged, she acknowledges getting a substantial increase in responsibilities.  Blatt was CEO when Pambakian received this promotion.

6870235v1/016409

86.     In fact, Pambakian, contrary to her assertions, did not report to Blatt during most of their time at Tinder together.  Then, in May 2017, months after the holiday party, Pambakian's boss left the company.  Blatt wanted to give her the opportunity to take on many of her former boss' responsibilities, but this would mean she would report to him for the first time.  Because Rad had recently made false allegations against Blatt that related to Pambakian, the HR department was sensitive to any discomfort Pambakian might have in regard to a new reporting arrangement.  Accordingly, Lisa Nelson, the head of HR, spoke with Pambakian and informed her that if she was uncomfortable, her job could be structured to avoid Pambakian having to report to Blatt.  Nelson emailed Blatt after their conversation, writing that Pambakian says "she is fine working with you [Blatt] and has always had a good relationship and just wants to get back to business as usual."  *See* Exhibit 19.

87.     Later, when Blatt completed a reorganization that effectively finalized this promotion, including an associated increase in her compensation, Pambakian wrote to Blatt:  "Thank you for everything – for helping me so much.  It means a lot and I know there was a much easier route that would have resulted in much less work for you.  I realize that and I appreciate what you've done for me.  I promise I'll do my best to make you not regret it."  Blatt responded, "It's a good investment for the company.  You're going to do great."  *See* Exhibit 20.  She claims that Blatt didn't take her seriously, and treated her differently because she was a woman, but it was Blatt who promoted her and increased her compensation.  Blatt took those steps because he respected Pambakian professionally and took her seriously.

88.     On April 28, 2017, months after she now claims her career began to crumble as a result of Blatt's inappropriate behavior, Pambakian expresses her regret to a friend that Rad is about to make the complaint against Blatt.  In that text, she doesn't convey her belief that she is being treated poorly because she is a woman, or because of what happened after the holiday party.  Instead, she laments that Rad is

about to make an unsolicited complaint when "[t]hings were finally going well with work." *See* Exhibit 2.

89.     Pambakian offers no support for her many assertions about Blatt "behaving inappropriately toward women."  To the contrary, during Blatt's entire career, including the 14 years he spent at IAC, Match and Tinder, the only complaint that was ever made against Blatt for sexual misconduct was the false  allegation made by Rad.  Unlike in so many other of the instances in which an executive has been alleged to have engaged in sexual misconduct, not a single additional allegation has been made against Blatt since Pambakian and Rad's assertions were first widely publicized, more than one year ago.  (And this is not for lack of trying.  Rad and Pambakian hired private investigators to scour Blatt's past in search of other alleged "victims" with no success.)

## VIII.  <u>The Damage to Blatt</u>

90.     The false allegations against Blatt completely blindsided him.  Blatt and Pambakian had always had a close relationship, both professionally and personally.  How, he thought naively, could this be happening, when the last time he heard from Pambakian, just a few months before, she was asking him to join her at a party?   But the new reality quickly set in.  Pambakian had provided a detailed and sensational, but fundamentally false, account of events, creating a false narrative that was – as it was intended to be – hungrily consumed by the media.  The truth is that two people who knew each other well and had become good friends forgot their work relationship for a brief moment after two in the morning following a holiday party.  Then  Blatt apologized to Pambakian; Pambakian said, "Please, it was as much me as it was you"; and they went back about their business with their good working and personal relationship intact.

91.     But that moment created an opportunity for Rad.  His blind lust for money and revenge drove him to chip away at Pambakian over many months, finally getting her to make false allegations against Blatt in the wake of corrupt, possibly

illegal, payments of millions of dollars. Then, they went on the attack, falsely transforming a momentary lapse of judgment into a violent sexual crime as a tactic designed to enhance the odds of winning an unrelated lawsuit. There is a vast gulf between what actually happened, for which Blatt apologized unprompted and received an appropriate reprimand, and the current, false allegations against him. Blatt's reputation and career – a twenty-five-year record of working with, hiring and promoting women that he believed was second to none in the tech industry – were shattered so that Rad, who had just been paid hundreds of millions of dollars, could try to get hundreds of millions more. As Pambakian had so presciently lamented to her friend about Rad's initial attempts to attack Blatt: "Money really is the root of all evil." *See* Exhibit 2.

92. As a result of Defendants' defamatory conduct, Blatt has suffered damages in the form of harm to his professional and personal reputation. Blatt has also suffered damages of the type that are a fair and natural consequence of the Defendants' tortious conduct, including humiliation, embarrassment, and ostracism, and the deprivation of social relationships.

## **FIRST CAUSE OF ACTION**

### **(Defamation Against Pambakian & Rad)**

93. Blatt repeats and incorporates the allegations set forth in Paragraphs 1 through 92 as though fully set forth herein.

94. Rad and Pambakian either directly or through agents, proxies and co-conspirators, have caused to be published numerous defamatory statements of fact about Blatt. Defendants' defamatory statements include false statements that Blatt among other things:

        a.    Sexually harassed Pambakian;

        b.    Sexually assaulted Pambakian;

        c.    Kissed and groped Pambakian without her consent;

d.   Created an atmosphere of fear for her at the holiday party, causing Pambakian to flee to an upstairs hotel room;

e.   Pushed Pambakian down on the bed and climbed on top of her and in so doing had engaged in improper sexual misconduct; and

f.   Threatened Rad with retribution for reporting the false claim of sexual harassment to the Match board.

95.   Rad made the initial defamatory statements in a CNN interview that aired on August 14, 2018.  That interview was widely viewed, and other news outlets in-turn published Rad's defamatory statements.  Following Rad's CNN interview, Pambakian made further defamatory statements about Blatt in an article published by CNN on August 16, 2018.  The article was widely read, and other news outlets in-turn published Pambakian's defamatory statements.  On December 18, 2018, a fresh wave of news articles published by, among others, CNN and the Verge, contained additional allegations against Blatt.   Rad's and Pambakian's false and defamatory accusation of sexual assault received significant media attention and was widely read.  Other news outlets published these defamatory statements.   The transcript of Rad's CNN interview, the August 16, 2018 CNN article, and the December 18, 2018 articles published by CNN and the Verge are attached as Appendix A to this Amended Complaint.

96.   In particular, Rad defamed Blatt by, among other things, falsely stating in his interview with CNN on August 14, 2018 that Blatt had committed sexual harassment and that Rad had "reported that misconduct" to the Match Board.  Rad also accused Blatt of corruption, claiming that Blatt was kept on at Match so "he can finish the job of corrupting the valuation."   Rad also falsely stated that Blatt "threatened" Rad in connection with the false harassment claim and warned Rad that "[i]f you take me down, I'm going to take you down with me."

97.   In particular, Pambakian defamed Blatt by, among other things, falsely stating in the August 16, 2018 CNN article that Blatt behaved inappropriately toward

33

her at the 2016 holiday party.  Specifically, Pambakian falsely stated that Blatt caused Pambakian to flee to an upstairs hotel room and falsely stated that Blatt entered the hotel room and, without her consent, "pushed [Pambakian] back onto the mattress, climbed on top of her, and began kissing and fondling her."  Pambakian further falsely claimed that Blatt's conduct "wasn't consensual."  Pambakian continued making defamatory statements in the same CNN article by falsely stating that Blatt had committed sexual harassment and that Blatt's conduct "wasn't an isolated incident." Pambakian falsely stated that there was "pervasive sexual harassment and misogyny by Match executives" and, given her other statements in the CNN article, a reader would understand that Pambakian was stating that Blatt was one of those Match executives.

98.    The Defendants further defamed Blatt by directing the circulation of emails containing defamatory statements about Blatt to news organizations so that those news organizations would publish the defamatory statements.  Such emails include emails authored by Pambakian and published by The Verge on December 18, 2018, stating that Pambakian was "subjected to ongoing intimidation and retaliation" by Match, that Blatt engaged in sexual "assault" toward Pambakian, and that Blatt, without her consent, "grop[ed] [Pambakian] in front of other employees . . ."  The same email was sent to other news organization, including CNN.  In an article published by CNN on December 18, 2018, CNN quotes Pambakian's allegation of "sexual assault" contained in a second email from Pambakian to Mandy Ginsberg, which Pambakian provided to CNN.

99.    The statements are false and defamatory because they tend to expose Blatt to public contempt, hatred, ridicule, aversion or disgrace.

100.    The Defendants, either directly or through agents, proxies, and co-conspirators, have assisted in the publication of additional defamatory statements and continue to do so.

6870235v1/016409

101.   Every statement about Blatt described above is categorically false and untrue.

102.   The Defendants, either directly or through agents, proxies, and co-conspirators, published these false statements to multiple third persons in California and across the world on television, in newspapers, on the radio, and through the Internet.

103.   The audience for these false statements of fact reasonably understood them to be about Blatt because each statement specifically names Blatt or taken as a whole clearly identifies Blatt.

104.   Defendants' publication of these false and defamatory statements concerning Blatt was not privileged.

105.   Defendants published these false and defamatory statements concerning Blatt, or caused them to be published, without justification.

106.   The Defendants acted with actual malice in making the statements.  At the time the statements were made, Defendants knew they were false or acted with reckless disregard for truth or falsity.

107.   The Defendants also acted with common law malice in making the statements.   Defendants harbor spite, ill will and animus toward Blatt, and the Defendants have evil and sinister motivations in causing the publication of the statements above.

108.   As a result of Defendants' defamatory conduct, Blatt has suffered damages in the form of harm to his professional and personal reputations, damages of the type that are a fair and natural consequence of the Defendants' tortious conduct; specifically, humiliation, embarrassment, and ostracism, and the deprivation of social and relationships and professional opportunities.

109.   Because the Defendants acted with malice in making their statements about Blatt, this Court should award punitive damages.

35

## SECOND CAUSE OF ACTION

### (Defamation Per Se Against Pambakian & Rad)

110.     Blatt repeats and incorporates the allegations set forth in Paragraphs 1 through 92 as though fully set forth herein.

111.     Rad and Pambakian either directly or through agents, proxies and co-conspirators, have caused to be published numerous defamatory statements of fact about Blatt.   Defendants' defamatory statements include false statements that Blatt among other things:

       a.     Sexually assaulted Pambakian;

       b.     Kissed and groped Pambakian without her consent;

       c.     Pushed Pambakian down on the bed and climbed on top of her and in so doing had engaged in improper sexual misconduct; and

       d.     Threatened Rad with retribution for reporting the false claim of sexual harassment to the Match board; and

       e.     Stated that Blatt corrupted the valuation process.

112.     Rad made the initial defamatory statements in a CNN interview that aired on August 14, 2018.   That interview was widely viewed, and other news outlets in-turn published Rad's defamatory statements.   Following Rad's CNN interview, Pambakian made further defamatory statements about Blatt in an article published by CNN on August 16, 2018.   The article was widely read, and other news outlets in-turn published Pambakian's defamatory statements.   On December 18, 2018, a fresh wave of news articles published by, among others, CNN and the Verge, contained additional allegations against Blatt.     Rad's and Pambakian's false and defamatory accusation of sexual assault received significant media attention and was widely read.   Other news outlets published these defamatory statements.   The transcript of Rad's CNN interview, the August 16, 2018 CNN article, and the December 18, 2018 articles published by CNN and the Verge are attached as Appendix A to this Amended Complaint.

36

6870235v1/016409

113.   In particular, Rad defamed Blatt by, among other things, falsely stating in his interview with CNN on August 14, 2018 that Blatt had committed sexual harassment and that Rad had "reported that misconduct" to the Match Board.  Rad also accused Blatt of corruption, claiming that Blatt was kept on at Match so "he can finish the job of corrupting the valuation."   Rad also falsely stated that Blatt "threatened" Rad in connection with the false harassment claim and warned Rad that "[i]f you take me down, I'm going to take you down with me."

114.   In particular, Pambakian defamed Blatt by, among other things, falsely stating in the August 16, 2018 CNN article that Blatt behaved inappropriately toward her at the 2016 holiday party.  Specifically, Pambakian falsely stated that Blatt caused Pambakian to flee to an upstairs hotel room and falsely stated that Blatt entered the hotel room and, without her consent, "pushed [Pambakian] back onto the mattress, climbed on top of her, and began kissing and fondling her."  Pambakian further falsely claimed that Blatt's conduct "wasn't consensual."   Pambakian continued making defamatory statements in the same CNN article by falsely stating that Blatt had committed sexual harassment and that Blatt's conduct "wasn't an isolated incident." Pambakian falsely stated that there was a "pervasive sexual harassment and misogyny by Match executives" and, given her other statements in the CNN article, a reader would understand that Pambakian was stating that that Blatt was one of those Match executives.

115.   The Defendants further defamed Blatt by directing the circulation of emails containing defamatory statements about Blatt to news organizations so that those news organizations would publish the defamatory statements.   Such emails include emails authored by Pambakian and published by The Verge on December 18, 2018, stating that Pambakian was "subjected to ongoing intimidation and retaliation" by Match, that Blatt engaged in sexual "assault" toward Pambakian, and that Blatt, without her consent, "grop[ed] [Pambakian] in front of other employees . . ."  The same email was sent to other news organization, including CNN. In an article

37

6870235v1/016409

published by CNN on December 18, 2018, CNN quotes Pambakian's allegation of "sexual assault" contained in a second email from Pambakian to Mandy Ginsberg, which Pambakian provided to CNN.

116. The statements are per se defamatory because they accuse Blatt of serious criminal wrongdoing.

117. These statements are libelous per se because their defamatory content appears on their face and they tend to expose Blatt to public contempt, ridicule, aversion, or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society.

118. The Defendants, either directly or through agents, proxies, and co-conspirators, assisted in the publication of additional defamatory statements and continue to do so.

119. Every statement about Blatt described above is categorically false and untrue.

120. The Defendants, either directly or through agents, proxies, and co-conspirators, published these false statements to multiple third persons in California and across the world on television, in newspapers, on the radio, and through the Internet.

121. The audience for these false statements of fact reasonably understood them to be about Blatt because each statement specifically names Blatt or taken as a whole clearly identifies Blatt.

122. Defendants' publication of these false and defamatory statements concerning Blatt was not privileged.

123. Defendants published these false and defamatory statements concerning Blatt, or caused them to be published, without justification.

124. The Defendants acted with actual malice in making the statements. At the time the statements were made, Defendants knew they were false or acted with reckless disregard for truth or falsity.

38

125.   The Defendants also acted with common law malice in making the statements. Defendants harbor spite, ill will, and animus towards Blatt, and the Defendants had evil and sinister motivations in causing the publication of the statements above.

126.   Because the statements are defamatory per se, Blatt is presumed to have been injured by their utterance. Defendants' tortious conduct has also caused Blatt to suffer special damages in an amount in excess of $1 million, including, but not limited to, attorneys' fees and other related professional consulting fees to investigate, monitor, and mitigate the effects of the defamatory statements.

127.   As a result of Defendants' defamatory conduct, Blatt has also suffered damages in the form of harm to his professional and personal reputations, damages of the type that are a fair and natural consequence of the Defendants' tortious conduct; specifically, humiliation, embarrassment, and ostracism, and the deprivation of social relationships and professional opportunities.

128.   Because the Defendants acted with malice in making their statements about Blatt, this Court should award punitive damages.

### THIRD CAUSE OF ACTION

### (Civil Conspiracy Against Pambakian, Rad & the Doe Defendants)

129.   Blatt repeats and incorporates the allegations set forth in Paragraphs 1 through 92 as though fully set forth herein.

130.   The Defendants, either directly or through agents, proxies, and co-conspirators, each committed the torts of defamation and defamation per se.

131.   The Defendants each knowingly and intentionally combined, conspired, and agreed together and with others to engage in this course of conduct.

132.   The Defendants entered into this conspiracy when Rad offered and Pambakian accepted millions of dollars in exchange for Pambakian joining the Valuation Lawsuit and making false allegations of sexual harassment against Blatt. Rad offered the payment under the guise of a litigation funding agreement, but the

agreement provided that Pambakian would be paid regardless of whether the Valuation Lawsuit succeeded, and Pambakian remained entitled to the payout even if she dropped out of the Valuation Lawsuit. Additionally, she would receive further payments in the event of victory in the lawsuit which, together with the upfront payments, would yield a far greater payout than she would have received as an ordinary plaintiff. Rad arranged the payment mechanism through a third-party funder Bench Walk Capital, whose founding partner is also the founding partner of the law firm representing Pambakian in the Pambakian Lawsuit, and who stands to be paid handsomely if the Valuation Lawsuit is successful. The clear object of the conspiracy is to tarnish Blatt's reputation and credibility and to extract billions of dollars of additional compensation in the Valuation Lawsuit the largest portion of which would go to Rad.

133. The Defendants have taken numerous acts in furtherance of their corrupt agreement, including engaging in a coordinated media strategy to damage Blatt's reputation and credibility, as set forth herein. In the course of the conspiracy, Defendants have caused substantial damage to Blatt's personal and professional reputation.

134. Numerous tortious activities occurred within the State of California in furtherance of the conspiracy.

135. Defendants are actively engaged in an unlawful conspiracy to defame Blatt thus entitling Blatt to monetary and punitive damages.

## **PRAYER FOR RELIEF**

Blatt requests entry of judgment in his favor and against Defendants as follows:

        a.   Awarding Blatt money damages in accordance with the evidence, together with interest thereon, to compensate Blatt for Defendants' tortious conduct, including for damage to Mr. Blatt's personal and professional

40

1   reputations, in an amount not less than $50 million;

2   b.   Awarding Blatt punitive damages sufficient to punish and

3        deter the conduct complained of herein in an amount not

4        less than $50 million;

5   c.   Awarding Mr. Blatt attorneys' fees and costs of suit

6        herein;

7   d.   Granting such other and further relief as the Court may

8        deem just and proper.

9   Dated:  October 3, 2019                     VINEET BHATIA
                                                DAVIDA BROOK
10                                              SUSMAN GODFREY L.L.P.

11

12                                       By:  /s/ Vineet Bhatia
                                              Vineet Bhatia
13                                            Attorneys for Plaintiff Greg Blatt

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

41

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **JURY DEMAND**

Plaintiff believes that all claims against Defendant Rosette Pambakian should be resolved in a contractually-mandated arbitration.  In light of the fact, however, that Pambakian is challenging that reality, and given that the Court will not have an opportunity to resolve that issue for some time, out of an abundance of caution, pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

Dated:  October 3, 2019

VINEET BHATIA
DAVIDA BROOK
SUSMAN GODFREY L.L.P.


By:  /s/ *Vineet Bhatia*
    Vineet Bhatia
    Attorneys for Plaintiff Greg Blatt

6870235v1/016409