1   DEBORAH L. STEIN (SBN 224570)
       DStein@gibsondunn.com
2   MICHAEL H. DORE (SBN 227442)
       MDore@gibsondunn.com
3   GIBSON, DUNN & CRUTCHER LLP
    333 South Grand Avenue
4   Los Angeles, CA  90071
    Telephone:   (213) 229-7164
5   Facsimile:   (213) 229-6164

6   ORIN SNYDER (*pro hac vice* application forthcoming)
       OSnyder@gibsondunn.com
7   GIBSON, DUNN & CRUTCHER LLP
    200 Park Avenue
8   New York, NY 10166-0193
    Telephone:  (212) 351-2400
9   Facsimile:  (212) 351-6335

10  GRETA B. WILLIAMS (SBN 267695)
       GBWilliams@gibsondunn.com
11  GIBSON, DUNN & CRUTCHER LLP
    1050 Connecticut Avenue, N.W.
12  Washington, D.C. 20036
    Telephone:  (202) 887-3745
13  Facsimile:  (202) 530-4230

14  Attorneys for Defendants Rosette Pambakian
    and Sean Rad

15

### UNITED STATES DISTRICT COURT

16

### CENTRAL DISTRICT OF CALIFORNIA

17

| | |
|---|---|
| 18  GREG BLATT, | Case No. 2:19-CV-07046-MWF-FFM |
| 19 | |
| 20              Plaintiff, | Hon. Michael W. Fitzgerald |
| 21        v. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S FIRST AMENDED COMPLAINT (PURSUANT TO CAL. CODE CIV. PROC. § 425.16)** |
| 22  ROSETTE PAMBAKIAN and SEAN RAD; and DOES 1-10, inclusive, | |
| 23 | |
| 24              Defendants. | |
| 25 | Hearing Date:  November 4, 2019 |
| 26 | Hearing Time:  10:00 a.m. |
| 27 | Courtroom:      5A |

28

# TABLE OF CONTENTS

<u>Page</u>

I.      INTRODUCTION ................................................................................1

II.     RELEVANT FACTUAL BACKGROUND ........................................4

    A.  The Harassment Allegations Against Blatt In Other Litigation ..................4

        1.   The New York Litigation...............................................................4

        2.   Pambakian's August 2019 Lawsuit Against Blatt.........................5

    B.  Blatt Sues Pambakian and Rad Based on Allegedly Defamatory
       Statements Tied to Allegations in Publicly Filed Litigation ......................6

        1.   The CNN Interview "which aired on August 14, 2018" .......................7

           a.   What Blatt Alleges.................................................................7

           b.   What the Broadcast Shows ....................................................8

        2.   The "article published by CNN on August 16, 2018"............................10

           a.   What Blatt Alleges.................................................................10

           b.   What the Article Says ............................................................10

         3.   Articles Published by the Verge and CNN on Dec. 18, 2018 ...............12

           a.   What Blatt Alleges.................................................................12

           b.   What the Articles Say .............................................................13

III.    LEGAL STANDARD ......................................................................14

IV.    ARGUMENT ...................................................................................15

    A.  *Step One*: The claims at issue in this lawsuit arise from Defendants'
       exercise of their constitutional rights of petition and free speech. .............16

        1.   The Allegedly Defamatory Statements Were Made in Connection
           with Issues Under Consideration or Review By A Judicial
           Body—Cal. Code Civ. Proc. § 425.16(e)(2) ............................17

        2.   The Allegedly Defamatory Statements Were Made In A Public
           Forum In Connection With An Issue Of Public Interest—
           Cal. Code of Civ. Proc. § 425.16(e)(3).....................................19

    B.  *Step Two*: Blatt cannot show a probability of prevailing on the
       merits.........................................................................................20

        1.   The fair and true reporting privilege bars Blatt's claims........................21

i

Gibson, Dunn &
Crutcher LLP

2.   Blatt cannot establish a reasonable probability of prevailing on his claim for so-called "civil conspiracy." ....................................................25

C.   Blatt's Complaint Should Be Dismissed Without Leave To Amend ..........25

V.   CONCLUSION ............................................................................................25

Gibson, Dunn &
Crutcher LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE
CASE NO. 2:19-CV-07046-MWF-FFM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Annett F. v. Sharon S.*,
119 Cal. App. 4th 1146 (2004) .................................................................17, 19

*Argentieri v. Zuckerberg*,
8 Cal. App. 5th 768 (2017) ...................................................3, 21, 23, 24

*Barrett v. Rosenthal*,
40 Cal. 4th 33 (2006) ...............................................................................19

*Braun v. Chronicle Publ'g Co.*,
52 Cal. App 4th 1036 (1997) .......................................3, 17, 18, 22, 23

*Briggs v. Eden Council for Hope & Opportunity*,
19 Cal. 4th 1106 (1999) ...........................................................................18

*Carver v. Bonds*,
135 Cal. App. 4th 328 (2005) .................................................................24

*Dorsey v. Nat'l Enquirer, Inc.*,
973 F.2d 1431 (9th Cir. 1992) .................................................2, 22, 25

*Greenberg v. Western CPE*,
2013 WL 1628905 (C.D. Cal. Apr. 15, 2013) .....................................22

*Hawran v. Hixson*,
209 Cal. App. 4th 256 (2012) .................................................................21

*Hayward v. Watsonville Register-Pajaronian & Sun*,
265 Cal. App. 2d 255 (1968) .................................................................22

*Heller v. NBCUniversal, Inc.*,
No. CV-15-09631-MWF-KS, 2016 WL 6573985 (C.D. Cal.
Mar. 30, 2016)...............................................................................14, 20

*Hilton v. Hallmark Cards*,
599 F.3d 894 (9th Cir. 2010) .................................................................14

Gibson, Dunn &
Crutcher LLP

*Lafayette Morehouse, Inc. v. Chronicle Publ'g Co.*,
  37 Cal. App. 4th 855 (1995) ............................................................................18

*Magic Laundry Servs., Inc. v. Workers United Serv. Emps. Int'l
  Union*,
  No. CV-12-9654-MWF, 2013 WL 1409530 (C.D. Cal. Apr. 8,
  2013) ................................................................................................................15

*Marantha Corrections, LLC v. Dep't of Corr. & Rehab.*,
  158 Cal. App. 4th 1075 (2008) .......................................................................17

*Microsoft Corp. v. M Media*,
  No. CV-17-347-MWF, 2018 WL 5094969 (C.D. Cal. Mar. 13,
  2018) ....................................................................................................15, 17, 25

*Microsoft Corp. v. Yokohama Telecom Corp.*,
   993 F. Supp. 782 (C.D. Cal. 1998) .................................................................24

*United States ex rel. Newsham v. Lockheed Missiles & Space Co.*,
  190 F.3d 963 (9th Cir. 1999) ..........................................................................15

*Pambakian v. Blatt, IAC/Interactive Corp. and Match Group, Inc.*,
  Case No. 19-STCV-27416 (Cal. Sup. Ct.) ........................................................5

*Planned Parenthood Fed'n of Am. v. Ctr. for Med. Progress*,
  890 F.3d 828 (9th Cir. 2018) .....................................................................15, 20

*Rad, et al. v. IAC, et al.*,
  No. 654038/2013 (N.Y. Sup. Ct.)..................................... 4, 9, 10, 11, 12, 13, 14

*Rohde v. Wolf*,
  154 Cal. App. 4th 28 (2007) ...........................................................................17

*Sipple v. Found. for Nat'l Progress*,
  71 Cal. App 4th 226 (1999) ............................................................................17

*Sparrow LLC v. Lora*,
  No. CV-14-1188-MWF, 2014 WL 12573525 (C.D. Cal. Dec. 4,
  2014) ................................................................................................................25

*Widdows v. Koch*,
  263 Cal. App. 2d 228 (1968) ..........................................................................25

iv

Gibson, Dunn &
Crutcher LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Statutes**

Cal. Civ. Code § 47(b) ....................................................................25

Cal. Civ. Code § 47(d) ...............................................................3, 21

Cal. Code Civ. Proc. § 340(c) ........................................................6

Cal. Code Civ. Proc. § 425.16 ......................................................14

Cal. Code Civ. Proc. § 425.16(a) .................................................15

Cal. Code Civ. Proc. § 425.16(b)(1) ............................................16

Cal. Code Civ. Proc. § 425.16(c) .................................................15

Cal. Code Civ. Proc. § 425.16(e)(1) ............................................18

Cal. Code Civ. Proc. § 425.16(e)(1)-(4) ......................................16

Cal. Code Civ. Proc. § 425.16(e)(2) .....................................3, 16, 19

Cal. Code Civ. Proc. § 425.16(e)(3) .......................................3, 16

**Other Authorities**

CNN.com, "How 2018 became the year of #MeToo," *available at* https://www.cnn.com/videos/us/2018/12/23/me-too-2018-wrap-lc-me-cs-orig.cnn ........................................................................20

N. Michelle AuBuchon, "A Few Med Who Begged Me Not to Write About Them," *available at* https://gawker.com/5987959/a-few-men-who-begged-me-not-to-write-about-them ....................................2

CNN Money, "Tinder co-founders and 8 others sue dating app's owners, claiming they're owed $2 billion," https://money.cnn.com/2018/08/14/technology/tinder-lawsuit/index.html ...................................................................8

Scott Harvey, "2013 Gawker Article Resurfaces Amid Tinder Harassment Case," *available at* https://www.globaldatinginsights.com/news/2013-gawker-article-resurfaces-amid-tinder-harassment-case/ ...........................................2

Gibson, Dunn &
Crutcher LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Jeff Daniels, "New state laws: From workplace harassment
    protections to mandating women on boards," CNBC (Dec. 28,
    2018), available at https://www.cnbc.com/2018/12/28/new-state-
    laws-in-california-elsewhere-inspired-by-metoo-movement.html....................20

Gibson, Dunn &
Crutcher LLP

vi

# I.    INTRODUCTION

This defamation action is a textbook example of a lawsuit that impermissibly seeks to chill protected speech through costly litigation—a strategic lawsuit against public participation ("SLAPP") that California law prohibits.  The protected speech finds its roots in an August 2018 publicly-filed New York court complaint by the founders and early employees of Tinder, who sued media giants IAC and Match Group for cheating them out of billions of dollars in stock options they earned by building Tinder into a phenomenal success.  In that complaint, Rosette Pambakian, Sean Rad, and others alleged that Greg Blatt, the former Tinder CEO and Chairman and CEO of Match Group, sexually assaulted Pambakian at a company party.  The ensuing crescendo of retaliation—reminiscent of many Hollywood #MeToo cases—included Match circling the wagons around Blatt, publicly belittling Pambakian by chalking up the assault to "consensual cuddling," and firing her months later after she refused to sign an NDA.  Then, when Pambakian filed an assault claim against Blatt this summer, Blatt filed this retaliatory defamation lawsuit targeting privileged statements about the allegations in the New York lawsuit and ***seeking $50,000,000 in damages***.

What makes this lawsuit even more abusive is that Blatt filed it solely to launch a public smear campaign against Pambakian and the person who reported the assault to Match, Sean Rad.  At the same time, and now that Blatt's public court filings have served his media objective, Blatt says that the complaint that ***he himself chose to file in court*** should actually be sent to private arbitration.  Blatt's lawsuit is a shameful effort to stage a public smear campaign against a sexual assault accuser under cover of a court proceeding.[1]

---

[1]  While the Court need not delve into the facts for purposes of this motion, Blatt's false narrative—that this was consensual, and that Pambakian and Rad concocted the assault allegations to aid their valuation lawsuit—is patently false and offensive.  The evidence shows that Blatt admitted being drunk at the holiday party, making inappropriate comments to Pambakian, and "snuggling and nuzzling" her in a hotel bed.  It further shows that Blatt apologized to

At its core, Blatt's complaint is predicated on the claim that any statement that he is a sexual harasser is defamatory.  But every alleged statement he cites is a privileged communication about the New York lawsuit filed against Tinder's corporate parents, IAC and Match.  That New York complaint includes a section entitled "Defendants Cover Up Workplace Misconduct."  It alleges that Blatt "groped and sexually harassed Rosette Pambakian, Tinder's Vice President of Marketing and Communications"; that IAC and Match "covered up Blatt's misconduct"; and that they did so because Blatt "was essential to the execution of Defendants' scheme to deprive the Tinder Plaintiffs of their rights as optionholders—and to save Defendants billions of dollars in the process."  RJN, Ex. A ¶¶ 127–33.  The New York lawsuit further alleges that "Blatt was irate that Rad had reported the allegations of Blatt's sexual misconduct."  *Id.* ¶ 146.  Blatt, according to the New York complaint, "threatened Rad, angrily saying, in sum and substance, that if Rad or anyone else made public the misconduct allegations against him, Blatt would 'take [Rad] down' with him."  *Id.* (brackets in complaint).

Blatt has now acted on his threat, but his defamation lawsuit targets statements that either match up exactly with the complaint's allegations in the New York case or explain details about and the basis for those allegations and convey the same "gist."  *See Dorsey v. Nat'l Enquirer, Inc.*, 973 F.2d 1431, 1437 (9th Cir. 1992) (applying fair reporting privilege to out-of-court statements that provided additional detail and context to in-court statements).  On its face, Blatt's belated defamation suit easily satisfies the anti-SLAPP statute's two-step inquiry and warrants dismissal.

Pambakian the following week, and later offered to resign over his misconduct. These are not the actions of an innocent man, nor is it the first time Blatt has been accused of mistreating women in the workplace. *See* https://gawker.com/ 5987959/a-few-men-who-begged-me-not-to-write-about-them (describing misconduct by CEO of a major dating site while drunk at a company party); https://www.globaldatinginsights.com/news/2013-gawker-article-resurfaces- amid-tinder-harassment-case/ (suggesting Gawker article was describing Blatt).

1    **First**, Pambakian's and Rad's reported statements to journalists last year

2    were in furtherance of the right of petition and free speech, and in connection with

3    a public issue.  Blatt cites an interview with CNN that aired the same day that

4    Pambakian, Rad, and others filed the New York lawsuit; a CNN article published

5    two days later; an article published by the Verge on December 18, 2018; and a

6    similar CNN article published that same day.  FAC ¶ 95.  One need only watch the

7    cited August 2018 CNN video, and read the CNN and Verge articles attached to

8    the FAC, to see very clearly that all of Defendants' statements were "made in

9    connection with an issue under consideration or review by a . . . judicial body,"

10   Cal. Code Civ. Proc. § 425.16(e)(2), and/or "made in a place open to the public or

11   a public forum in connection with an issue of public interest," *id.* § 425.16(e)(3).

12   Each statement describes the New York lawsuit, the events giving rise to the

13   publicly filed allegations, and harassment issues that are particularly salient in

14   what Blatt clumsily describes as "an era where most companies would be afraid to

15   challenge assertions of sexual misconduct."  FAC ¶ 67.  Indeed, the title of the

16   Verge article is "Tinder fires its head of comms, following her participation in a $2

17   billion lawsuit against Match."  FAC App'x. A at 27.

18       **Second**, Blatt cannot show a probability of prevailing on his claims because

19   they attack protected speech under California's fair and true reporting privilege.

20   Cal. Civ. Code § 47(d).  That privilege "pertains specifically to communications to

21   the press," *Argentieri v. Zuckerberg*, 8 Cal. App. 5th 768, 787 (2017), and it

22   protects speech about the "basis and background of a judicial proceeding," *Braun*

23   *v. Chronicle Publ'g Co.*, 52 Cal. App 4th 1036, 1050 (1997).  Every statement in

24   the CNN broadcast and news articles that Blatt cites is absolutely protected.

25       Blatt's transparent use of litigation to cover up his misconduct and to

26   suppress protected speech by both his accuser and the person who reported him is a

27   cynical and retrograde ploy that is prohibited by law.  His claims should be

28

3

Gibson, Dunn &
Crutcher LLP

dismissed without leave to amend.  Moreover, attorneys' fees and costs should be awarded to Defendants for having to file this motion to resist Blatt's improper attempt to chill the valid exercise of Defendants' constitutional rights.

## II. RELEVANT FACTUAL BACKGROUND

### A.    The Harassment Allegations Against Blatt In Other Litigation

#### 1.    The New York Litigation

On August 14, 2018, a group of former and then-current executives and employees of the online dating startup Tinder (the "Tinder Plaintiffs")—including Defendants Pambakian and Rad—brought an action against Tinder's parent companies, IAC and Match, in New York Supreme Court for, among other things, breach of contract and interference with contractual relations.  *See* FAC ¶ 2; RJN, Ex. A.  In that complaint, *Rad, et al. v. IAC, et al.*, No. 654038/2013 (N.Y. Sup. Ct.), Docket No. 2, (the "New York Complaint"), the Tinder Plaintiffs allege that IAC and Match schemed to undervalue and eliminate the Tinder Plaintiffs' stock options in Tinder for the parent companies' own benefit.  RJN Ex. A ¶¶ 7–9. The lawsuit drew extensive media coverage.

The New York Complaint alleges that IAC and Match, in furtherance of their scheme, removed Tinder's executive leadership and installed their own at the highest levels of Tinder management—including by removing Rad, a Tinder co-founder and its CEO between 2012 and December 2016, and replacing him with Plaintiff Greg Blatt, who at the time was Match's Chairman and CEO.   RJN, Ex. A ¶ 12.  Once installed, Blatt worked with IAC and Match to devalue Tinder on paper and flood the market with disinformation about its financial performance. *Id*. ¶¶ 8, 13.  The New York Complaint alleges that IAC/Match then merged Tinder out of corporate existence, cancelling the options in the process.  *Id*. ¶ 8.

The New York Complaint alleges that IAC/Match's scheme was threatened in December 2016—shortly after Blatt had been named CEO of Tinder—when

Blatt "groped and sexually harassed [Defendant] Rosette Pambakian, Tinder's Vice President of Marketing and Communications" at Tinder's holiday party. *Id.* ¶¶ 14, 127–33. It further alleges that Rad "learned about these events" in mid-2017 and asked Pambakian about them, who "confirmed that Blatt had groped and sexually harassed her with colleagues present." *Id*. ¶ 129. Rad "reported Blatt's conduct to Match's General Counsel . . . and demanded that Tinder commission an independent investigation." *Id*. ¶ 130.

According to the New York Complaint, Rad "[b]eliev[ed] that credible allegations of workplace misconduct against its CEO threatened Tinder and should be independently investigated," but that IAC and Match "refused [to investigate] and covered up Blatt's conduct instead." *Id*. ¶ 132. In fact, Match/IAC "kept Blatt in place as Tinder's 'interim' CEO long enough to complete the private valuation and secret merger of Tinder," only to announce Blatt's "retirement" two weeks after their scheme was concluded. *Id*. ¶ 14. The New York Complaint alleges that shortly thereafter, Blatt asked Rad to meet in person. *Id.* ¶ 146. It states that "Blatt was irate that Rad had reported the allegations of Blatt's sexual misconduct." *Id.* The New York Complaint further alleges that "Blatt threatened Rad, angrily saying, in sum and substance, that if Rad or anyone else made public the misconduct allegations against him, Blatt would 'take [Rad] down' with him." *Id.* (brackets in N.Y. Compl.).[2]

### 2.     Pambakian's August 2019 Lawsuit Against Blatt

On August 5, 2019, almost one year after the Tinder Plaintiffs filed the New York Complaint, Pambakian brought a separate action—*Pambakian v. Blatt, IAC/Interactive Corp. and Match Group, Inc.*, Case No. 19-STCV-27416 (Cal. Sup. Ct.)—against Blatt, IAC, and Match, alleging, among other things, sexual

---

[2]  On August 31, 2018, Pambakian and three other Tinder Plaintiffs voluntarily dismissed themselves from *Rad v. IAC*. The allegations about Blatt's misconduct remain a part of that ongoing case.

battery, retaliation, and wrongful termination of her employment (the "Pambakian Complaint").  In the Pambakian Complaint, Pambakian alleges in greater detail Blatt's sexual misconduct at the Tinder holiday party in 2016; the ensuing cover-up in furtherance of IAC/Match's valuation scheme; and, finally, her retaliatory termination from Tinder on December 18, 2018.  RJN Ex. B ¶¶ 15-19, 37-64.

## B. Blatt Sues Pambakian and Rad Based on Allegedly Defamatory Statements Tied to Allegations in Publicly Filed Litigation

On August 13, 2019—one week after Pambakian brought her sexual harassment lawsuit and almost one year after the August 14, 2018 filing of the New York Complaint—Blatt brought this case against Defendants Pambakian and Rad.[3]  He alleges causes of action against Pambakian and Rad for (1) defamation, (2) defamation *per se*, and (3) "civil conspiracy."  On October 3, 2019, Blatt filed a first amended complaint, but his claims remained the same.  Blatt only added false and misleading allegations and exhibits about Pambakian's and Rad's purported motivations in alleging that Blatt sexually harassed Pambakian.  The thrust of these allegations is that Pambakian and Rad made "allegations of sexual harassment against Blatt … even though those allegations had nothing to do with the central legal issues relating to the Valuation Claims."  FAC ¶ 14.

The "Valuation Claims"—which Blatt invokes more than thirty times in his First Amended Complaint—are part of a New York lawsuit that is deeply intertwined with Blatt's suit here.  In describing the "Nature of the Action," Blatt's First Amended Complaint alleges that "Pambakian and Rad (along with several other current and former Tinder executives) filed a lawsuit in New York (the "Valuation Lawsuit") claiming that IAC and Match, in large part through the actions of Blatt, failed to properly value their Tinder stock options."  FAC ¶ 2; *compare with* RJN Ex. A.  Blatt's amended complaint continues, "Blatt is expected

---

[3]  The statute of limitations for a defamation claim under California law is one year.  Cal. Code Civ. Proc. § 340(c).

Gibson, Dunn & Crutcher LLP

to be a key witness for IAC and Match in the Valuation Lawsuit." *Id.*

Blatt alleges that "in the Valuation Lawsuit, Pambakian alleged that Blatt 'sexually harassed and groped' her." FAC ¶ 16. He further alleges that "[i]n that lawsuit," Rad "leveled the same allegations of sexual harassment against Blatt that he had made a year before." FAC ¶ 14. Blatt's amended complaint later again explicitly states that the New York Lawsuit ***contained allegations of 'sexual harassment and groping' against Blatt***." *Id.* ¶ 67 (emphasis added). He claims these allegations in the New York Complaint are an attempt to "gain publicity" for the New York lawsuit, to "apply pressure to settle the lawsuit in an era where most companies would be afraid to challenge assertions of sexual misconduct," and to "tar the character of" Blatt. *Id.*

Further tying his allegations here directly to the New York lawsuit, Blatt alleges that "over a span of two days Rad, Pambakian and [their] lawyer conducted a series of coordinated interviews on CNN to promote ***the lawsuit***, in which Blatt was defamed in multiple ways." FAC ¶ 68 (emphasis added). He claims that the alleged defamatory statements were part of a "coordinated media campaign to ensure that their false charges" in the August 14, 2018 New York Lawsuit "were widely-disseminated to the public." *Id.* ¶ 14. These admissions confirm the inextricable link between Blatt's defamation allegations and the New York lawsuit—and mandate dismissal.

As to what the purportedly defamatory statements are, Blatt identifies "a CNN interview" that "aired on August 14, 2018"; "an article published by CNN on August 16, 2018"; and December 18, 2018 articles published by CNN and the Verge. FAC ¶ 95.

### 1. The CNN Interview "which aired on August 14, 2018"

#### a. What Blatt Alleges

Blatt alleges that Rad defamed him in a CNN video interview that aired on

August 14, 2018, the same day the New York Complaint was filed.  FAC ¶ 95. According to Blatt, in that interview Rad falsely stated "that Blatt had committed sexual harassment" and that "Rad had 'reported that misconduct' to the Match Board." *Id*. ¶ 96.  Blatt further alleges that Rad "accused Blatt of corruption, claiming that Blatt was kept on at Match so 'he can finish the job of corrupting the valuation'" and that Rad "falsely stated that Blatt 'threatened' Rad in connection with the false harassment claim and warned Rad that '[i]f you take me down, I'm going to take you down with me.'"  *Id*. (brackets in original).

### b.   What the Broadcast Shows

Money.cnn.com presented a five minute, four second video news piece that includes an interview with Rad.[4]  As the URL web address indicates, the broadcast is about the New York lawsuit.  Indeed, in the first ten seconds of the piece, the CNN journalist states that "it's an explosive lawsuit; at the center of it, major media giant IAC, which owns Match Group, the parent company of Tinder."  FAC App'x. A at 11.  Approximately 33 seconds into the piece, the CNN journalist states that Rad and current and former Tinder employees "are suing IAC, alleging [IAC] purposely lowered the value of Tinder."  *Id*.  One minute into the video, the journalist states that "the suit says IAC installed Greg Blatt as Tinder CEO ahead of the valuation process; his role, according to Rad and the lawsuit: to purposely paint a pessimistic view of Tinder to the banks valuing the company."  *Id*.

In the video, clips of Rad's interview describing the allegations of the lawsuit are interspersed with the journalist's summary of the case and graphics showing excerpts of the New York Complaint.  In fact, at 3:08 of the video, the CNN journalist states in a voiceover that, "The suit [referring to the New York Complaint] also alleges that soon after Blatt was named Tinder CEO in late 2016,

---

[4]   *See* Laurie Segall and Chris Isodore, "Tinder co-founders and 8 others sue dating app's owners, claiming they're owed $2 billion, CNN Money (Aug. 16, 2018), *available at* https://money.cnn.com/2018/08/14/technology/tinder-lawsuit/index.html.

Gibson, Dunn & Crutcher LLP

he groped and sexually harassed . . . Rosette Pambakian at a Company holiday party." *Id.*  While that voiceover plays, a text excerpt **pulled directly from paragraph 14 of the New York Complaint** is displayed on the screen, reading:

> Blatt was compromised: during and after Tinder's 2016 holiday party in Los Angeles, Blatt had groped and sexually harassed Plaintiff Rosette Pambakian, Tinder's Vice President of Marketing and Communications, with colleagues present.

Rad then states at 3:18 of the video, "I actually reported that misconduct to the company and the Board."  FAC App'x. A at 13.  Again, Rad's words correspond to allegations in the New York Complaint.  *Compare with* RJN Ex. A (N.Y. Compl.) ¶ 130 ("Rad immediately reported Blatt's conduct to Match's General Counsel, Jared Sine, and demanded that Tinder commission an independent investigation."); *Id.* ¶ 132 ("Believing that credible allegations of workplace misconduct against its CEO threatened Tinder and should be independently investigated, Rad pressed for a meeting of Tinder's Board of Directors.").  Neither in that sequence nor in any other portion of the broadcast interview does Rad utter the word "harassment." *See* FAC App'x A at 10–14.

Rad then says that after he reported the misconduct, "the board had a choice."  *Id.* at 13.  "They could either do the right thing and properly investigate and take the right action, or they can keep that executive in a place where he can finish the job of corrupting the valuation."  *Id.*; *compare with* RJN Ex. A (N.Y. Compl.) ¶ 133 ("On information and belief, Defendants covered up Blatt's misconduct in part because he was essential to the execution of Defendants' scheme to deprive the Tinder Plaintiffs of their rights as optionholders….").

At 3:35 of the CNN video, the journalist asks if Rad spoke to Blatt about the allegations and then, "What was that conversation like?"  Rad responds, "I was threatened.  I believe it was, 'If you take me down, I'm going to take you down

Gibson, Dunn &
Crutcher LLP

with me.'"  FAC App'x A at 13.  This statement, too, closely tracks an allegation in the New York Complaint.  *Compare with* RJN Ex. A (N.Y. Compl.) ¶ 146 ("Blatt threatened Rad, angrily saying, in sum and substance, that if Rad or anyone else made public the misconduct allegations against him, Blatt would 'take [Rad] down' with him.").

### 2.    The "article published by CNN on August 16, 2018"

#### a.    What Blatt Alleges

Blatt claims that in an article published by CNN on August 16, 2018, Pambakian falsely stated: (1) "that Blatt behaved inappropriately towards her at the 2016 holiday party"; (2) "that Blatt caused Pambakian to flee to an upstairs room"; (3) "that Blatt entered the hotel room, and without her consent, 'pushed [Pambakian] back onto the mattress, climbed on top of her, and began kissing and fondling her'"; (4) "that Blatt's conduct 'wasn't consensual'"; (5) "that Blatt had committed sexual harassment and that Blatt's conduct 'wasn't an isolated incident'"; and (6) "that there was 'pervasive sexual harassment and misogyny by Match executives.'"  FAC ¶ 97.

#### b.    What the Article Says

The August 16, 2018 article posted on CNN is entitled "Tinder exec: I had to protect the company from my story."  FAC App'x A at 23.  The article's first sentence states: "A lawsuit filed by ten current and former Tinder executives accuses former CEO Greg Blatt of groping and sexually harassing a vice president of the company."  *Id.*  It repeatedly quotes the New York Complaint and references the New York "lawsuit" or "suit" sixteen times.  *See id.* at 23–26.

The article states that "CNN has learned more details surrounding the alleged incident, which occurred during Tinder's 2016 holiday party at the SLS Hotel in Los Angeles."  *Id.* at 24.  It says that Pambakian "said Blatt started behaving inappropriately, including saying at one point, 'I get hard every time

Gibson, Dunn & Crutcher LLP

I look at you'" and "[a]ccording to Pambakian, Blatt then said, 'let's get out of here.'" *Id.*; compare RJN Ex. B (Pambakian Compl.) ¶ 16 ("At the party, Defendant Blatt approached Plaintiff and said to her in a lewd voice, in sum and substance, 'I get hard every time I look at you' and 'Let's get out of here.'").[5]

Pambakian is quoted in the article as saying, "'In that moment, I thought 'My boss actually thinks I'm going home with him,'" and "'I basically bolted, found two people I knew and said, "Hey, let's go up to your room.'" FAC App'x A at 24; *compare with* RJN Ex. B (Pambakian Compl.) ¶ 16 ("Plaintiff quickly walked away from Defendant Blatt, found a colleague and close friend, Witness No. 2, and went upstairs to friend and colleague, Witness No. 1's hotel room, in an attempt to distance herself from Defendant Blatt.").

The CNN article further states that, according to Pambakian, "she was sitting on the bed when Blatt entered the room and, without saying anything to anyone else in the room, pushed her back onto the mattress, climbed on top of her, and began kissing and fondling her." FAC App'x at 24; *compare with* RJN Ex. A (N.Y. Compl.) ¶ 128 ("At Tinder's December 2016 holiday party in Los Angeles, Blatt … groped and sexually harassed Rosette Pambakian…."); RJN Ex. B (Pambakian Compl.) ¶ 18 ("Immediately upon entering the room, Defendant Blatt went straight for Plaintiff who was sitting on the bed. Defendant Blatt climbed on top of Plaintiff and pulled her backwards so that Plaintiff was lying beside him with his arm draped over Plaintiff. Defendant Blatt then began forcibly groping Plaintiff's breasts and upper thighs, and kissing her shoulders, neck and chest—all without Plaintiff's consent.").

The August 16, 2018 CNN article includes a statement from a Match Group spokesperson, stating in part: "As it relates to the matter alleged in the lawsuit, an

---

[5] As discussed, *infra*, Blatt alleges that the details of his conduct included in Pambakian's complaint are merely "reiterating" the New York Lawsuit's allegations with increased "detail." FAC ¶ 15 (emphasis added).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE
CASE NO. 2:19-CV-07046-MWF-FFM

Gibson, Dunn &
Crutcher LLP

incident occurred in late 2016 and was reported at the end of April 2017," with the Match Board concluding "that there was no violation of law or company policy." FAC App'x A at 24.  An unnamed source—apparently associated with Match— added, "'this was a one-off consensual error in judgment'" and "'[f]rom what we understood from interviews and investigations, there was consensual cuddling taking place.'"  *Id*.  According to the article, "***Blatt did not respond to a CNN request for comment***."  *Id.* (emphasis added).

The CNN article also reports that "Pambakian says Blatt's behavior wasn't an isolated incident" and that "[a]ccording to [Pambakian], many other women were subjected to 'pervasive sexual harassment and misogyny by Match executives.'"  *Id*. at 25; *see* RJN Ex. A (N.Y. Compl.) ¶ 132 ("On information and belief, based on statements by a former IAC communications executive, Match had previously concealed other sexual misconduct allegations through confidential payoffs and settlements.").  It describes alleged instances of misconduct, quoting a Match spokesperson's statement that one executive "was promptly removed from the Company" following an investigation "into his behavior."  FAC App'x A at 25.

### 3.    Articles Published by the Verge and CNN on Dec. 18, 2018

#### a.    What Blatt Alleges

Last, Blatt cites an article published on theverge.com entitled "Tinder fires its head of comms, following her participation in a $2 billion lawsuit against Match" and a CNN.com article entitled "Tinder fires employees who sued its parent companies."  FAC ¶ 98, FAC App'x. A at 27, 33.  Blatt alleges Rad and Pambakian defamed him by "directing the circulation of emails"—including emails "authored by Pambakian and published by The Verge on December 18, 2018"— "to news organizations so that those news organizations would publish the defamatory statements."  FAC ¶ 98.  He appears to allege that emails published by the Verge are defamatory because they state that Pambakian "was 'subjected to

Gibson, Dunn & Crutcher LLP

ongoing intimidation and retaliation' by Match, that Blatt engaged in sexual 'assault' toward Pambakian, and that Blatt, without her consent, 'grop[ed] [Pambakian] in front of other employees.'"  *Id*.  Blatt alleges that the December 18, 2018 CNN article "quotes Pambakian's allegation of 'sexual assault' contained in a second email from Pambakian to Mandy Ginsberg."  *Id*.

### b.  What the Articles Say

The Verge and CNN articles also focus on the New York lawsuit.  The first paragraph of the Verge article states that Match fired multiple Tinder employees who had sued Match, including Rosette Pambakian, "who, ***in the original lawsuit***, claimed that former Tinder CEO Greg Blatt sexually assaulted her."  FAC App'x A at 27 (emphasis added).  The CNN article also notes that Tinder fired "multiple employees who were part of a $2 billion lawsuit against the dating app's parent companies"  FAC App'x. A at 33.  It states that that the New York "***lawsuit alleges*** Blatt groped and sexually harassed Pambakian at a holiday party," and that the "***suit also alleges*** that when Tinder co-founder Sean Rad informed IAC of Blatt's conduct, it was covered up and Blatt was kept as CEO."  *Id*. (emphasis added).

The articles refer to an email they say Pambakian sent to the new Match Group CEO, Mandy Ginsburg, although—according to the Verge article—"[m]uch of this correspondence has already played out in public."  *Id*. at 29.

The email attributed to Pambakian states in its first paragraph that "you have now fired me from a company I was so proud to build in blatant retaliation ***for joining a group of colleagues and Tinder's original founding members in a lawsuit*** against Match and IAC, standing up for our rights, calling out the company's CEO Greg for sexual misconduct, and confronting the company about covering up what happened to me."  *Id*. (emphasis added).  The email later states that, "[t]o make matters worse, you told the world that a sham investigation (in which I was never even interviewed) determined the assault was some sort of

‘consensual cuddling’—as if there could be anything consensual about a CEO groping his subordinate in front of other employees after making sexually explicit comments throughout the evening of a company holiday party.” *Id.* at 30. The email further states: “I've been subjected to ongoing intimidation and retaliation clearly designed to pressure me into resigning—from immediately removing my name from my office and converting it into a conference room, to trying to coerce me into turning over my private and personal data on my phone.” *Id.*

Ginsburg's response states in part, “you were terminated because it was not possible for you to fulfill the duties and responsibilities of your role as Tinder's spokesperson for a number of reasons, including your public position against the company over a valuation process.” *Id.* at 31. Ginsburg adds that, “***You're free to talk about anything publicly that you'd like. You have already done so and that's your prerogative***.” *Id.* at 31–32 (emphasis added).

### III.   LEGAL STANDARD

As this Court has recognized, California's anti-SLAPP statute targeting strategic lawsuits against public participation (Cal. Code Civ. Proc. § 425.16) “was enacted to allow early dismissal of meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation.” *Heller v. NBCUniversal, Inc.*, No. CV-15-09631-MWF-KS, 2016 WL 6573985, at *7 (C.D. Cal. Mar. 30, 2016) (citing *Metabolife Int'l v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001)). The Ninth Circuit has also recognized that because “‘it is in the public interest to encourage continued participation in matters of public significance, and [because] this participation should not be chilled through abuse of the judicial process,’ the anti-SLAPP statute is to be construed broadly.” *Hilton v. Hallmark Cards*, 599 F.3d 894, 902 (9th Cir. 2010) (quoting CCP § 425.16(a)).

Motions brought under the anti-SLAPP statute “are evaluated in two steps.” *Microsoft Corp. v. M Media*, No. CV-17-347-MWF (AJWx), 2018 WL 5094969,

14

Gibson, Dunn & Crutcher LLP

at *4 (C.D. Cal. Mar. 13, 2018) (granting anti-SLAPP motion).  First, "a defendant must make a threshold showing that the act or acts giving rise to the claim were in furtherance of the right of petition or free speech, or in connection with a public issue."  *Magic Laundry Servs., Inc. v. Workers United Serv. Emps. Int'l Union*, No. CV-12-9654-MWF (AJWx), 2013 WL 1409530, at *1 (C.D. Cal. Apr. 8, 2013) (granting anti-SLAPP motion).  Next, if the defendant meets its burden, "the plaintiff must show a probability of prevailing on the challenged claim."  *Id.*

To make the necessary showing under the second step of the analysis, the plaintiff "must demonstrate that the complaint is legally sufficient and supported by a prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited."  *Planned Parenthood Fed'n of Am. v. Ctr. for Med. Progress*, 890 F.3d 828, 833 (9th Cir. 2018) (internal quotations and citation omitted).  According to the Ninth Circuit's recent *Planned Parenthood* decision, which re-affirms the availability of the anti-SLAPP remedy in federal court, "when an anti-SLAPP motion to strike challenges only the legal sufficiency of a claim, a district court should apply the Federal Rule of Civil Procedure 12(b)(6) standard and consider whether a claim is properly stated."  *Id.* at 834.

Movants who prevail on an anti-SLAPP motion are also statutorily entitled to recover their reasonable attorneys' fees and costs incurred in the course of litigation of that motion.  Cal. Code Civ. Proc., § 425.16(c); *see Microsoft*, 2018 WL 5094969, at *8 ("The Ninth Circuit has held that [§ 425.16(c)] applies in federal courts adjudicating Anti-SLAPP motions….").[6]

## IV.   ARGUMENT

Defendants Pambakian and Rad easily meet their burden of showing that California's anti-SLAPP statute applies to their challenged activity (that is, speech

---

[6] If this motion is not granted, Defendants will bring a Rule 12 motion to dismiss.  *See United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 972 (9th Cir. 1999) (If a SLAPP defendant's motion to strike is unsuccessful, he or she "remains free to bring a Rule 12 motion to dismiss.").

Gibson, Dunn &
Crutcher LLP

in a public forum regarding a legal proceeding).  That shifts the burden to Blatt to show that he could prevail on his claims.  Under well-established law applying California's fair and true reporting privilege, Blatt cannot meet his burden.  Nor can Blatt remedy his claims.  Accordingly, Blatt's case should be dismissed without leave to amend.  In addition, he should be ordered to pay Defendants' attorneys' fees and costs in connection with this improper attempt to use litigation to stifle protected speech.

### A.   *Step One*: The claims at issue in this lawsuit arise from Defendants' exercise of their constitutional rights of petition and free speech.

Under the first step of anti-SLAPP analysis, Pambakian and Rad must establish that the claims at issue in this case—*i.e.*, one claim for defamation, one claim for defamation *per se*, and one wholly-dependent "claim" for conspiracy—all "arise from . . . act[s they have undertaken] in furtherance of [their] right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue."  Cal. Code Civ. Proc. § 425.16(b)(1).

The anti-SLAPP statute provides four ways in which an act is "in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue."  Cal. Code Civ. Proc. § 425.16(e)(1)–(4).  Two types of covered acts particularly relevant here are: "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law" (*id*. § 425.16(e)(2)), and "any written or oral statement or writing made . . . in connection with an issue of public interest" (*id*. § 425.16(e)(3)).

As explained below, Pambakian and Rad easily meet their burden under the anti-SLAPP statute's first prong.  Every statement Blatt appears to challenge directly relates to ongoing court proceedings and matters of public interest.

16

Gibson, Dunn & Crutcher LLP

*See Microsoft Corp.*, 2018 WL5094969, at *5 (In evaluating whether an anti-SLAPP movant has established that his or her conduct falls within the scope of the statute, "the Anti-SLAPP statute is to be construed broadly.").

### 1.    The Allegedly Defamatory Statements Were Made in Connection with Issues Under Consideration or Review By A Judicial Body—Cal. Code Civ. Proc. § 425.16(e)(2)

To satisfy the first prong of the anti-SLAPP analysis under section 425.16(e)(2), "all that is needed is that the statement or writing be made in connection with an issue under consideration or review by a legislative, executive or judicial body, or any other official proceeding authorized by law." *Braun v. Chronicle Publ'g Co.*, 52 Cal. App. 4th 1036, 1043 (1997) (quotation marks omitted).  This statutory requirement, like the other prongs of section 425.16(e), is "straightforward and unambiguous." *Id.*

The statute thus applies to filings in litigation.  *See Microsoft Corp.*, 2018 WL 5094969, at *5 ("'Section 425.16 is construed broadly, to protect the right of litigants to the utmost freedom of access to the courts without [the] fear of being harassed subsequently by derivative tort actions.'") (quoting *Rohde v. Wolf*, 154 Cal. App. 4th 28, 35 (2007)).  It also applies to statements about—that is, "in connection with"—litigation.  *See, e.g.*, *Marantha Corrections, LLC v. Dep't of Corr. & Rehab.*, 158 Cal. App. 4th 1075, 1085 (2008) (agreeing with trial court and applying section 425.16(e)(2) to defamation-related causes of action that "were predicated on the dissemination of [a] letter to the press"); *Annett F. v. Sharon S.*, 119 Cal. App. 4th 1146, 1158, 1161 (2004) (applying section 425.16(e)(2) to statements in a letter published by a newspaper about matters that were "at issue" in pending court proceedings); *Sipple v. Found. for Nat'l Progress*, 71 Cal. App 4th 226, 237–38 (1999) (applying anti-SLAPP statute to an article's discussion of statements made during a deposition and hearing).[7]

---

[7]  The *Sipple* court concluded without explanation that the challenged statements fell within the scope of CCP § 425.16(e)(1).  71 Cal. App. 4th at 238.

17

Gibson, Dunn & Crutcher LLP

For example, in *Lafayette Morehouse, Inc. v. Chronicle Publishing Co.*, 37 Cal. App. 4th 855, 863 (1995), the California Court of Appeal considered whether speech *about* litigation, rather than speech in furtherance of the litigation itself, fell within the scope of the anti-SLAPP statute's protections.  The *Lafayette* court noted that Black's Law Dictionary defined "connected" as 'united by … dependence or relation.'"  37 Cal. App. 4th at 863 (quoting Black's Law Dict. (6th ed. 1990) p. 302, col. 2) (ellipses in *Lafayette*).  It then found that the articles in question reported on a dispute, related hearings before a county board of supervisors, and a federal lawsuit.  *Id.*  As a result, "[t]hey were clearly united by dependence on or relation to the official executive, legislative, and judicial actions they described."  *Id.*; *see also Braun*, 52 Cal. App. 4th at 1046 (holding that an article reporting on an investigation was made "in connection with" an official proceeding and noting that "[n]othing in any portion of subdivision (e), which is unambiguous on its face, confines free speech to speech which furthers the exercise of petition rights"); *Briggs v. Eden Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1116–17 (1999) (approving *Braun*).

Here, as discussed above, the CNN broadcast, CNN articles, and Verge article—and all the statements attributed to Pambakian and/or Rad therein—directly related to the New York lawsuit.  The CNN broadcast aired the same day the New York Complaint was filed and even displayed paragraphs of the complaint on the screen.  The CNN article was published two days later and discussed the lawsuit at length, as did the later CNN article and the article in the Verge, which both highlighted the New York lawsuit in their titles.  *See* FAC App'x. A at 27, 33.

The statements that Blatt claims are defamatory all relate to that lawsuit and the allegations therein that Blatt "groped and sexually harassed" Pambakian.  RJN Ex. A (N.Y. Compl.) ¶ 128.  Indeed, the premise of Blatt's lawsuit is that Pambakian's and Rad's statements were intended "to apply pressure to settle the

Gibson, Dunn & Crutcher LLP

[New York] lawsuit," which Blatt concedes included allegations "that Blatt 'sexually harassed and groped'" Pambakian.  FAC ¶¶ 67, 16.  The record is clear. The alleged defamatory statements here were made in connection with the New York judicial proceeding, and thus are squarely protected under California Code of Civil Procedure 425.16(e)(2).

### 2. The Allegedly Defamatory Statements Were Made In A Public Forum In Connection With An Issue Of Public Interest— Cal. Code of Civ. Proc. § 425.16(e)(3)

The alleged statements also were made in "a public forum in connection with an issue of public interest" under Section 425.16(e)(3).  As a threshold matter, the California Supreme Court has recognized that "[w]eb sites accessible to the public … are 'public forums' for purposes of the anti-SLAPP statute."  *Barrett v. Rosenthal*, 40 Cal. 4th 33, 41 n.4 (2006); *see also Annett F.*, 119 Cal. App. 4th at 1161 ("This court has concluded that a news publication is a 'public forum' within the meaning of the anti-SLAPP statute if it is a vehicle for discussion of public issues and it is distributed to a large and interested community.").

Likewise, these were issues of public interest.  There are "billions of dollars" at issue in the New York lawsuit, FAC ¶ 1, which involves allegations of significant wrongdoing by two massive and publicly-traded media companies: IAC, a media and Internet conglomerate that owns or controls over 150 brands, including Dictionary.com and The Daily Beast; and Match, which owns the highly successful Tinder online dating brand as well as other less successful, but still relatively well-known, online dating brands like Match and OkCupid.  *See* RJN Ex. A ¶¶ 39-40.  Greg Blatt is a powerful public figure in the media business, as is IAC's controlling shareholder, media mogul Barry Diller.

Further, Defendants' purported statements relate to the broader public discussion of sexual harassment and assault in the workplace that has been a matter of enormous public interest since the #MeToo movement began garnering greater

19

Gibson, Dunn & Crutcher LLP

attention in late 2017.  *See* CNN.com, "How 2018 became the year of #MeToo," *available at* https://www.cnn.com/videos/us/2018/12/23/me-too-2018-wrap-lc-me-cs-orig.cnn; *see also* Heller, 2016 WL 6573985, at *8 (C.D. Cal. Mar. 30, 2016).

The August 16, 2018 CNN article cited by Blatt concludes with a statement by Pambakian that asks, "Why should I be the one to leave my job that I love when I did nothing wrong?" and "Why is it that the men responsible for this type of behavior are allowed to quietly resign with a hefty severance package while no one is the wiser?"  FAC App'x A at 26.  Sadly, a great many targets of harassment have been left to ask these same questions.  As these issues are regularly a topic of discussion, and state legislatures strengthen protections against sexual harassment, it cannot be disputed that the statements at issue here relate to "an issue of public interest."[8]  For this reason as well, Pambakian and Rad have satisfied their burden under the first prong of the anti-SLAPP statute and the burden shifts to Blatt to show he has a reasonable probability of prevailing on his claims.

**B.     *Step Two*: Blatt cannot show a probability of prevailing on the merits.**

Under the second step of anti-SLAPP analysis, the burden shifts to Blatt, who must "demonstrate that the complaint is legally sufficient and supported by a prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited."  *Planned Parenthood*, 890 F.3d at 833 (internal quotations omitted).  Here, all of Blatt's claims are barred as a matter of law by the fair and true reporting privilege.  Blatt cannot cure this fundamental defect, and thus this motion to strike Blatt's complaint should be granted.

---

[8]  *See* Jeff Daniels, "New state laws: From workplace harassment protections to mandating women on boards," CNBC (Dec. 28, 2018), *available at* https://www.cnbc.com/2018/12/28/new-state-laws-in-california-elsewhere-inspired-by-metoo-movement.html.

### 1.      The fair and true reporting privilege bars Blatt's claims.

The statements that Blatt attributes to Sean Rad repeat almost verbatim the allegations in the New York Complaint.  The statements he attributes to Rosette Pambakian do the same, and also give details about the background of those allegations in the ongoing New York lawsuit.  Any viewer or reader would conclude that the purportedly defamatory statements refer to the allegations in the New York Complaint.  California's fair and true reporting privilege thus applies to both types of statements, and Blatt's claims are barred.

As codified in California Civil Code Section 47(d), the "fair and true reporting privilege" protects any "fair and true report in, *or a communication to*, a public journal" of a judicial proceeding or anything said in the course thereof. Cal. Civ. Code § 47(d) (emphasis added); *see Argentieri*, 8 Cal. App. 5th at 787 (2017) (noting that "the fair and true reporting privilege pertains specifically to communications to the press").[9]

Blatt's baseless conspiracy allegations about *why* the statements were communicated to news outlets have no bearing on this motion.  If the fair and true reporting privilege applies, "the statement is absolutely privileged *regardless of the defendants' motive for reporting it*."  *Hawran v. Hixson*, 209 Cal. App. 4th 256, 278 (2012) (emphasis added); *Argentieri*, 8 Cal. App. 5th at 787 (The fair and true report privilege is "absolute" and "applies regardless of the defendants' motive for making the report").  In an anti-SLAPP analysis, application of this absolute privilege "forecloses a plaintiff from showing a probability of prevailing on the merits."  *Argentieri*, 8 Cal. App. 5th at 787.

In determining whether a statement made in connection with a judicial

---

[9]  In 1996, the California Legislature "opted to expand the fair and true reporting privilege of section 47, subdivision (d) so that it would cover not just a report *in* a public journal, but also a report of pleadings and other documents *to* a public journal." *Argentieri*, 8 Cal. App. 5th at 785 (emphasis in original).

Gibson, Dunn & Crutcher LLP

1    proceeding is "fair and true," the privilege is interpreted broadly.  *See, e.g.*,

2    *Greenberg v. Western CPE*, 2013 WL 1628905, at *6 (C.D. Cal. Apr. 15, 2013)

3    (noting the "flexibility allowed under the 'fair and true' standard").  For example,

4    "case law is clear that reports which comprise a *history* of the proceeding come

5    within the privilege." *Braun*, 52 Cal. App. 4th at 1050 (emphasis in original).

6    That "history" includes events at issue in the court proceeding that pre-date the

7    filing of that litigation.  *See id.*  As the *Braun* court noted, there is "breathing

8    room" under the fair and true reporting privilege that extends to "explaining the

9    ***basis and background*** of a judicial proceeding."  *Id.* (emphasis added).

10        The Ninth Circuit's decision in *Dorsey v. National Enquirer, Inc.*, 973 F.2d

11   1431 (9th Cir. 1992), is instructive.  The Ninth Circuit court applied the fair

12   reporting privilege to statements that went beyond what had been filed in court

13   because the out-of-court statements "'detail[ed] the circumstances, and [the

14   speakers'] theories based upon the circumstances, in regard to the [court

15   proceeding].'" *Id.* at 1437 (*quoting Hayward v. Watsonville Register-Pajaronian*

16   *& Sun*, 265 Cal. App. 2d 255, 260 (1968)); *see Hayward*, 265 Cal. App. 2d at 260

17   (relying on Oregon Supreme Court holding that the "sheriff and his deputies had

18   the right to detail the circumstances, and their theories based upon the

19   circumstances, in regard to the arrest, and it was proper for the newspaper to

20   publish the same"); *Braun*, 52 Cal. App. 4th at 1050.

21        To the extent Rad's or Pambakian's statements do not repeat exactly the

22   allegations in the New York lawsuit, they convey and detail the circumstances

23   underlying those allegations and thus are protected under the reasoning of *Dorsey*,

24   *Hayward*, and similar decisions.  As even Blatt concedes in his amended

25   complaint, the allegations in Pambakian's assault case against Blatt pending in this

26   Court, which match up almost verbatim with the defamatory statements he alleges

27   against Pambakian here, are merely "***reiterating***" the New York Lawsuit's

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' SPECIAL MOTION TO STRIKE
CASE NO. 2:19-CV-07046-MWF-FFM

allegations with "increased" "*detail*." FAC ¶ 15 (emphases added). He admits that the more detailed statements about his assault relate to the "*same*" allegations against Blatt in the New York Lawsuit. *Id.* (emphasis added). Every alleged defamatory statement thus is absolutely privileged.

*Argentieri v. Zuckerberg*, 8 Cal. App. 5th 768 (2017), is another example of why the fair and true reporting privilege applies here. In *Argentieri*, Facebook and its founder Mark Zuckerberg filed a malicious prosecution claim against two law firms based on their representation of a litigant, Paul Ceglia, who had sued Facebook and Zuckerberg in a separate case. *Id.* at 776. The malicious prosecution complaint alleged that "[t]he lawyers representing Ceglia knew or should have known that the lawsuit was a fraud," and that the suit was based "on an implausible story and obviously forged documents." *Id.* (italics and quotations omitted). That same day, Facebook's general counsel sent an email to members of the press that went beyond what the complaint alleged. Rather than stating that the law firms "knew *or should have known*" that the lawsuit was a fraud, the email stated that the law firms "*knew* the case was based on forged documents yet they pursued it anyway." *Id.* (italics and quotations omitted; emphasis added).

One of the lawyers named in the malicious prosecution suit, Paul Argentieri, sued Facebook, Zuckerberg, and Facebook's general counsel for defamation *per se*, alleging that the statement that the lawyers "knew" the Ceglia action was based on forged documents was defamatory on its face. 8 Cal. App. 5th at 778. The trial court granted the Facebook defendants' anti-SLAPP motion to strike Argentieri's defamation complaint. *Id.* at 779. Holding that the fair and true reporting privilege applied to the Facebook general counsel's email to the media, the Court of Appeal affirmed. *Id.* at 795.

Acknowledging the distinction between one who knew about the forgery and one who knew or should have known about it, the *Argentieri* court nevertheless

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE
CASE NO. 2:19-CV-07046-MWF-FFM

Gibson, Dunn & Crutcher LLP

held that "[i]t is sufficient if the statement conveys the 'gist' of the action, as measured by 'how those in the community where the matter was published would reasonably understand it.'"  8 Cal. App. 5th at 790.  The *Argentieri* court cited established California law that "a statement about ongoing litigation 'need not track verbatim the underlying proceeding,' because '[o]nly if the deviation is of such a substantial character that it produces a different effect on the reader will the privilege be suspended.'"  *Id.* (quoting *Carver v. Bonds*, 135 Cal. App. 4th 328, 351 (2005)) (internal quotations omitted); *see Microsoft Corp. v. Yokohama Telecom Corp.*, 993 F. Supp. 782, 784 (C.D. Cal. 1998) (corporation's "paid announcement" in a national publication was a fair and true reporting of a civil lawsuit because it generally "capture[d] the substance of" the proceedings).

Here, every alleged statement at issue relates to the New York litigation. Rad's alleged statements, and several of the statements attributed to Pambakian, simply repeat allegations in the publicly filed case in describing that ongoing judicial proceeding.  *Compare* FAC ¶ 96 ("Rad also falsely stated that Blatt 'threatened' Rad in connection with the false harassment claim and warned Rad that '[i]f you take me down, I'm going to take you down with me.'") *with* RJN Ex. A (N.Y. Compl.) ¶ 146 ("Blatt threatened Rad, angrily saying, in sum and substance, that if Rad or anyone else made public the misconduct allegations against him, Blatt would 'take [Rad] down' with him.") *and* FAC App'x at 13 (CNN video) (Rad: "I was threatened.  I believe it was, 'If you take me down, I'm going to take you down with me.'").

The broadcast and news articles on which Blatt apparently rely further show that every other purportedly defamatory statement merely explains the basis and background of the New York Complaint's allegation that Blatt "groped and sexually harassed Rosette Pambakian" at the December 2016 Tinder holiday party. RJN Ex. A (N.Y. Compl.) ¶ 128  Blatt himself concedes this.  FAC ¶¶ 14–15.

Accordingly, they "comprise the history of the proceedings," *Dorsey*, 973 F.2d at 1437, and are absolutely privileged.

### 2. Blatt cannot establish a reasonable probability of prevailing on his claim for so-called "civil conspiracy."

Blatt's inability to show a probability of prevailing on his claims extends to his claim for civil conspiracy. California law does not recognize civil conspiracy as a stand-alone tort. *See Widdows v. Koch*, 263 Cal. App. 2d 228, 234 (1968). In any event, the basis of Blatt's conspiracy claim is the same speech at issue in his defamation claims. Accordingly, the same anti-SLAPP analysis that bars his defamation claims applies to bar his conspiracy claim. *See Sparrow LLC v. Lora*, No. CV-14-1188-MWF (JCx), 2014 WL 12573525, at *3 (C.D. Cal. Dec. 4, 2014) (granting anti-SLAPP motion) ("It is well-established that a plaintiff will not avoid the application of the anti-SLAPP statute by disguising the pleading as a 'garden variety' tort claim if the basis of the alleged liability is predicated on protected speech or conduct.") (citation and quotations omitted).

### C. Blatt's Complaint Should Be Dismissed Without Leave To Amend

Blatt cannot remedy the FAC's overarching and fatal flaw: it challenges statements falling squarely within California's fair and true reporting privilege. In a similar case where the alleged defamatory statements fell within the scope of the litigation privilege, Cal. Civil Code § 47(b), this Court granted an anti-SLAPP motion without granting leave to amend. *Microsoft Corp.*, 2018 WL 5094969, at *7 ("Absent pleading entirely new Counterclaims premised on entirely different allegations, Defendants cannot possibly remedy their claims."). Blatt's second round of allegations here warrant the same result.

### V. CONCLUSION

This Court should grant Defendants' anti-SLAPP motion and strike the First Amended Complaint in its entirety without leave to amend. Attorneys' fees and costs also should be awarded to Defendants.

Gibson, Dunn & Crutcher LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE
CASE NO. 2:19-CV-07046-MWF-FFM

1

2

Dated:  October 7, 2019                    GIBSON, DUNN & CRUTCHER LLP

3

4                                          By: /s/ *Deborah L. Stein*
                                               Deborah L. Stein
5
                                           *Attorneys for Defendants Rosette*
                                           *Pambakian and Sean Rad*
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

26