1  DEBORAH L. STEIN (SBN 224570)
    DStein@gibsondunn.com
2  MICHAEL H. DORE (SBN 227442)
    MDore@gibsondunn.com
3  GIBSON, DUNN & CRUTCHER LLP
   333 South Grand Avenue
4  Los Angeles, CA 90071-3197
   Telephone:  (213) 229-7164
5  Facsimile:  (213) 229-6164

6  ORIN SNYDER (*pro hac vice* application forthcoming)
    OSnyder@gibsondunn.com
7  GIBSON, DUNN & CRUTCHER LLP
   200 Park Avenue
8  New York, NY 10166-0193
   Telephone: (212) 351-2400
9  Facsimile: (212) 351-6335

10  GRETA B. WILLIAMS (SBN 267695)
    GBWilliams@gibsondunn.com
11  GIBSON, DUNN & CRUTCHER LLP
    1050 Connecticut Avenue, N.W.
12  Washington, D.C. 20036-5306
    Telephone: (202) 887-3745
13  Facsimile: (202) 530-4230

14  Attorneys for Defendants Rosette Pambakian
    and Sean Rad
15

16              UNITED STATES DISTRICT COURT

17              CENTRAL DISTRICT OF CALIFORNIA

18

19  GREG BLATT,                      Case No. 2:19-CV-07046-MWF-FFM

20              Plaintiff,           Hon. Michael W. Fitzgerald

21      v.                           **REQUEST FOR JUDICIAL
                                     NOTICE IN SUPPORT OF
22  ROSETTE PAMBAKIAN and SEAN       DEFENDANTS' SPECIAL
    RAD; and DOES 1-10, inclusive,   MOTION TO STRIKE
23                                   PLAINTIFF'S FIRST AMENDED
                Defendants.          COMPLAINT**
24
                                     Hearing Date:  November 4, 2019
25                                   Hearing Time:  10:00 a.m.
                                     Courtroom:     5A
26

27

28

1

## REQUEST FOR JUDICIAL NOTICE

2        When evaluating a motion to dismiss or strike allegations in a complaint, a

3 court "must consider the complaint in its entirety, as well as other sources courts

4 ordinarily examine . . . [including] documents incorporated into the complaint by

5 reference, and matters of which a court may take judicial notice." *See Tellabs, Inc.*

6 *v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Pursuant to Federal

7 Rule of Evidence 201, Defendants Rosette Pambakian and Sean Rad (together,

8 "Defendants") hereby respectfully request that the Court take judicial notice of the

9 following two exhibits, true and correct copies of which are both attached hereto:

| Exhibit | Description |
|---------|-------------|
| **A** | Complaint filed on August 14, 2018 in *Rad, et al. v. IAC, et al.*, Case No. 654038/2018 (N.Y. Sup. Ct.) |
| **B** | Complaint filed on August 5, 2019 in *Pambakian v. Blatt, IAC/Interactive Corp. and Match Group, Inc.*, Case No. 19-STCV-27416 (Cal. Sup. Ct.)—also attached as Exhibit A to the Notice of Removal filed by Greg Blatt, Match Group, Inc., and IAC InterActiveCorp. on August 13, 2019, in *Pambakian v. Blatt, et al.*, Case No. 2:19-cv-07053 -MWF-FFM (C.D. Cal.) (Dkt. 1-1) |

**These Exhibits Are Both Judicially Noticeable Documents**

20        A court may take judicial notice of any and all relevant facts that are

21 "not subject to reasonable dispute." Fed. R. Evid. 201(b). This includes facts that

22 are "generally known within the trial court's territorial jurisdiction," and facts that

23 "can be accurately and readily determined from sources whose accuracy cannot

24 reasonably be questioned." Fed. R. Evid. 201(b)(1)–(2). Indeed, a court "*must* take

25 judicial notice if a party requests it and the court is supplied with the necessary

26 information." Fed. R. Evid. 201(c)(2) (emphasis added).

It is well-established that courts "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F. 2d 244, 248 (9th Cir. 1992) (citing *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979)); *see also Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (taking "judicial notice of court filings and other matters of public record"); *Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) ("We may take judicial notice of undisputed matters of public record . . . including documents on file in federal or state courts." (internal citation omitted)); *Bennett v. Medtronic, Inc.*, 285 F.3d 801, 803 n.2 (9th Cir. 2002) (taking judicial notice of Tennessee state court filings).

**Exhibit A** is a true and correct copy of a judicial complaint that Defendants Rosette Pambakian and Sean Rad (along with several co-plaintiffs) filed in New York Supreme Court on August 14, 2018. As detailed at length in the concurrently filed Memorandum of Points and Authorities in Support of Defendants' Special Motion to Strike, this present lawsuit is predicated on statements made by Defendants—and reported by journalists—that either match up exactly with factual allegations contained in Exhibit A, or that explain the basis for those allegations and thus convey the same "gist." *Argentieri v. Zuckerberg*, 8 Cal. App. 5th 768, 790 (2017); *see* Memorandum of Points and Authorities ("MPA") at 22-25.

**Exhibit B** is a true and correct copy of a judicial complaint that Defendant Pambakian filed in Los Angeles Superior Court on August 5, 2019. Blatt—the Plaintiff in the present lawsuit, and a named defendant in Defendant Pambakian's Los Angeles Superior Court suit—removed Defendant Pambakian's case to the United States District Court for the Central District of California (*see* C.D. Cal.

1   Case No. 2:19-cv-07053-MWF-FFM, Dkt. 1, Ex. A.  Blatt cites Defendant

2   Pambakian's complaint in his First Amended Complaint, conceding that the

3   allegations in Defendant Pambakian's suit are "reiterating" the "same" allegations

4   in the New York case with increased "detail."  FAC ¶ 15.  As discussed in the

5   concurrently filed Memorandum of Points and Authorities, to the extent Blatt

6   targets public statements that match the allegations in Pambakian's complaint, they

7   thus provide appropriate detail and the same "gist" as the allegations in the New

8   York complaint.  *Argentieri*, 8 Cal. App. at 790; *Dorsey v. Nat'l Enquirer, Inc.*, 973

9   F.2d 1431, 1437 (9th Cir. 1992) (applying fair reporting privilege to out-of-court

10  statements that provided additional detail and context to in-court statements);

11  *see* MPA at 22-25.

12          Accordingly, pursuant to Fed. R. Evid. 201(b), in ruling on Defendants'

13  Special Motion to Strike, this Court can and should take judicial notice of both the

14  existence of these two judicial complaints, and that they "state what they state."

15  *Warwick v. Bank of N.Y. Mellon*, 2016 WL 2997166, at *12 (C.D. Cal. May 23,

16  2016).

17                                  *      *      *

18          For all of the foregoing reasons, Defendants respectfully request that the

19  Court take judicial notice of and consider Exhibits A and B, both attached hereto,

20  when ruling on Defendants' Special Motion to Strike.

21

22   Dated:  October 7, 2019                    GIBSON, DUNN & CRUTCHER LLP

23

24                                              By: /s/ *Deborah L. Stein*
                                                    Deborah L. Stein

25                                              *Attorneys for Defendants Rosette*
                                                *Pambakian and Sean Rad*

26

27

28

# EXHIBIT A

**FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM**
NYSCEF DOC. NO. 2

INDEX NO. 654038/2018
RECEIVED NYSCEF: 08/14/2018

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------ x

SEAN RAD, JONATHAN BADEEN,
PAUL CAFARDO, GARETH JOHNSON,
JAMES KIM, ALEXA MATEEN,
JUSTIN MATEEN, JOSHUA METZ,
RYAN OGLE, and ROSETTE PAMBAKIAN,

        Plaintiffs,

    - against -

IAC/INTERACTIVECORP and
MATCH GROUP, INC.,

        Defendants.

------------------------------------ x

Index No. 654038/2018

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Sean Rad, Jonathan Badeen, Paul Cafardo, Gareth Johnson, James Kim, Alexa Mateen, Justin Mateen, Joshua Metz, Ryan Ogle, and Rosette Pambakian (collectively, the "**Tinder Plaintiffs**"), by and through their attorneys, Gibson, Dunn & Crutcher LLP, hereby allege as follows:

## INTRODUCTION

1.     Tinder is one of the fastest-growing startups in the history of the technology industry. The Tinder Plaintiffs are the founders, current executives, and early employees who built Tinder. The defendants are Tinder's parent companies, IAC/InterActiveCorp ("**IAC**") and its subsidiary Match Group, Inc. ("**Match**," and collectively, "**Defendants**"). This case arises from Defendants' scheme to cheat the Tinder Plaintiffs out of billions of dollars by violating their contractual rights as optionholders.

2.     From Tinder's founding in 2012, the Tinder Plaintiffs built the company into a global brand that transformed the way an entire generation makes new romantic connections. Led

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM    INDEX NO. 654038/2018
NYSCEF DOC. NO. 2                                  RECEIVED NYSCEF: 08/14/2018

by co-founders and Plaintiffs Sean Rad, Justin Mateen, and Jonathan Badeen, the Tinder Plaintiffs and other Tinder optionholders worked tirelessly to develop, scale, and monetize the company—taking it from unknown startup to cultural icon in less than five years, and earning more than $350 million in annual revenue by 2017.

3.      Although owned by IAC and Match, Tinder always has operated from Los Angeles with its own offices, executive team, and employee base. Because of the hard work and talent of the Tinder Plaintiffs and their colleagues, Tinder has experienced meteoric global growth and has become one of the highest-grossing apps in the history of Apple's App Store. Last week, on August 8, 2018, Match announced in its latest earnings call that Tinder's explosive growth continues to this day, with 81% year-over-year growth in subscribers and 136% year-over-year growth in revenues. According to Match, Tinder is now on pace to exceed $800 million in 2018 revenue. This success is the product of the hard work of the Tinder Plaintiffs and other Tinder optionholders, some of whom are still guiding the company to this day.

4.      To compensate the team for creating and nurturing this kind of growth and success, in 2014 Defendants signed written contracts awarding the Tinder Plaintiffs—and many other current and former Tinder employees—stock options in Tinder (the "**Agreements**"). In total, the Tinder Plaintiffs owned options representing more than 20% of the value of Tinder.

5.      The Agreements rewarded the Tinder Plaintiffs for their hard work and success by giving them skin in the game—the ability to hold and sell their options over sheveral years, as the value of the company increased. Founders and early employees of startup companies often receive equity in the companies they create, giving them an incentive to build the company's success long into the future. Founders of successful companies often hold their stakes for years as their companies continue to grow more valuable. The Agreements offered the same opportunity to the

2

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM

NYSCEF DOC. NO. 2

INDEX NO. 654038/2018

RECEIVED NYSCEF: 08/14/2018

Tinder Plaintiffs, who received Tinder stock options with the right to hold them for years before exercising.

6.       Unlike stock options in a public company, which allow optionholders to exercise and sell on the open market, the Tinder Plaintiffs' stock options called for a different plan. Because Tinder is a private company, the contracts between Defendants and the Tinder Plaintiffs set a schedule of four specific future dates on which the stock options would be independently valued and could be exercised and sold only to Defendants. Those four events—referred to as "**Scheduled Puts**" under the Agreements—were required to occur in or promptly after May 2017, November 2018, May 2020, and May 2021.

7.       Defendants had an illicit motive to undervalue and eliminate the Tinder Plaintiffs' options. Under the Agreements, Defendants were responsible for paying the cost when the Tinder Plaintiffs cashed in their options. The more valuable Tinder became, the more the Tinder Plaintiffs' stock options would cost Defendants. As Tinder continued to become more valuable over time, the long-term cost of those options would skyrocket. But if Defendants could undermine Tinder's valuation at their first opportunity in 2017 and then eliminate the future Scheduled Puts in 2018, 2020, and 2021, they could save themselves billions of dollars. Because the Scheduled Puts occurred in private—beyond the view of public investors and regulators— Defendants could lie about Tinder's financial projections and undermine the valuation of Tinder without hurting their stock prices or the public perception of Tinder's value.

8.       Through a pattern of deception, Defendants executed this scheme to systematically deprive the Tinder Plaintiffs of their rights as optionholders. Defendants first conducted a disinformation campaign—flooding the private valuation of Tinder in May 2017 with false, misleading, and incomplete financial information and projections. By creating a false picture of

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM          INDEX NO. 654038/2018
NYSCEF DOC. NO. 2                                         RECEIVED NYSCEF: 08/14/2018

Tinder's financial condition and prospects, Defendants arrived at a $3 billion valuation based on their bogus numbers. Then, having undermined the first scheduled valuation of Tinder, Defendants moved to extinguish the Tinder Plaintiffs' rights to participate in the company's future upside. Only hours after finalizing their $3 billion valuation, Defendants merged Tinder out of corporate existence—without the prior knowledge or consent of Tinder's Board of Directors or any of the Tinder Plaintiffs. Through this pretextual merger, Defendants stripped away the Tinder Plaintiffs' options in Tinder, cancelled the three remaining Scheduled Puts in 2018, 2020, and 2021, and purported to terminate the Agreements. Having guaranteed the Tinder Plaintiffs four independent valuations and opportunities to ride Tinder's growth years into the future, Defendants permanently deprived them of the money they had earned.

9.      Under the Agreements, Tinder's management, not IAC or Match, was responsible for providing the financial information that would determine Tinder's valuation. This reflected a clear and common-sense alignment of interests: the valuation would decide how much money Tinder optionholders would earn and enable the company to recruit employees and outside investors. Tinder as a company, its optionholders, and Rad and the Tinder Plaintiffs shared the same goal in the valuation process—to ensure that Tinder was valued accurately.

10.      By the end of 2016, Rad had led Tinder to record heights. During Rad's tenure as CEO, Tinder's revenue and profitability had grown faster than perhaps any other tech company in history. Rad also had hired several skilled and experienced executives to strengthen Tinder's management team. With the 2017 Scheduled Put approaching, the contractual plan was for Tinder CEO Rad and the Tinder Plaintiffs to oversee the valuation on behalf of Tinder and enforce the Agreements, which Rad had negotiated to protect all Tinder optionholders. Rad and the Tinder

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM

NYSCEF DOC. NO. 2

INDEX NO. 654038/2018

RECEIVED NYSCEF: 08/14/2018

management team not only had the contractual right to oversee Tinder's valuation, they were in the best position to develop the financial information that would determine the valuation.

11.     Defendants, on the other hand, were not concerned about protecting the best interests of Tinder or its optionholders during the valuation.  Defendants were responsible for paying the bill when the Tinder Plaintiffs exercised their options.  An accurate valuation, based on truthful information provided by CEO Rad and Tinder management, would cost Defendants billions.

12.     In order to gut the Agreements and seize control of the valuation, Defendants installed their own executives at the highest levels of Tinder management.  In December 2016, only months before the 2017 Scheduled Put, Defendants removed Rad and designated Greg Blatt, Match's Chairman and CEO, as the "interim" CEO of Tinder.  Defendants also inserted Match's Chief Financial Officer and Chief Strategy Officer into Tinder's operations.  The reason for these management changes was clear: to allow Defendants to control the valuation of Tinder and deprive Tinder optionholders of their right to participate in the company's future success.

13.     Blatt, a longtime lackey of IAC's controlling shareholder Barry Diller, had served in numerous executive roles at IAC and Match throughout his career.  He had a well-earned reputation as a notorious bully with a volcanic temper and a habit of threatening to fire employees who contradicted him.  As "interim" CEO of Tinder, Blatt would control Tinder throughout the valuation process—all the while still acting as Match's Chairman and CEO.  This was a glaring conflict of interest.  As Tinder's "interim" CEO, Blatt had a duty to comply with the terms of the Agreements and advance the best interests of Tinder optionholders.  But as Match's Chairman and CEO, Blatt had a professional and personal incentive to undervalue Tinder and cheat its optionholders so that Defendants could save money.  Blatt was loyal only to Defendants.

**FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM**  INDEX NO. 654038/2018

NYSCEF DOC. NO. 2  RECEIVED NYSCEF: 08/14/2018

14.     Having put Blatt in charge of carrying out their scheme, Defendants needed him to remain at the helm of Tinder long enough to finish the job.  But Blatt was compromised: during and after Tinder's 2016 holiday party in Los Angeles, Blatt had groped and sexually harassed Plaintiff Rosette Pambakian, Tinder's Vice President of Marketing and Communications, with colleagues present.  Blatt's workplace misconduct was reported to Defendants.  Because a credible investigation—let alone a firing in public view—would have derailed their scheme, Defendants whitewashed Blatt's misconduct.  Defendants kept Blatt in place as Tinder's "interim" CEO long enough to complete the private valuation and secret merger of Tinder.  But just two weeks after their scheme concluded, Defendants publicly announced Blatt's "retirement"—rewarding him with a lucrative golden parachute and a glowing farewell message from Diller praising Blatt's "integrity."

15.     Embedded within Tinder's ranks, Blatt and other IAC and Match executives executed Defendants' scheme.  They created false financial projections, inflating Tinder's expenses and inventing an alternate universe in which Tinder was stagnating toward freefall.  They delayed and concealed the impact new products and features, such as subscription service Tinder Gold, would have on the company's performance—even though existing data already confirmed those products would supercharge Tinder's profits.  They suppressed and lied about the existence of true financial forecasts that contradicted Defendants' false projections.  And they bullied and threatened to fire Tinder executives—including Plaintiff James Kim, Tinder's current Vice President of Finance—to stop them from telling the truth.  On this basis, Defendants manufactured a $3 billion valuation of Tinder that dramatically undervalued the company.

16.     Defendants were not content only to manufacture a sham valuation of Tinder and cheat the Tinder Plaintiffs in the short term.  On July 13, 2017, the very same day Defendants

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM

NYSCEF DOC. NO. 2

INDEX NO. 654038/2018

RECEIVED NYSCEF: 08/14/2018

completed the valuation, they merged Tinder into Match—secretly and without any notice to Tinder optionholders. This merger was a pretext. It caused no meaningful change in Tinder's operating structure, assets, or integration into Defendants' other businesses. It had no legitimate business justification or real-world consequence. The merger was orchestrated to deprive the Tinder Plaintiffs and other optionholders of their right to participate in the future upside of Tinder.

17. Acting under cover of the secret merger, Defendants immediately converted all Tinder stock options into Match options at the lowball $3 billion valuation. This meant that the Tinder Plaintiffs received far fewer Match options, and a far less valuable stock option, than they had been promised. Defendants then purported to terminate the Agreements and eliminate the future scheduled valuations in 2018, 2020, and 2021. Defendants' sham merger and conversion permanently deprived the Tinder Plaintiffs of the long-term value they had earned.

18. Defendants executed their dishonest scheme in private, behind closed doors and outside the view of the public markets and regulators. At the same time, as publicly traded and regulated companies, Defendants made representations to investors, analysts, and regulators—on SEC-regulated earnings calls and in public filings—about Tinder and their other businesses. As with any public disclosure about financial performance, federal and state securities laws require that everything said on an earnings call by a company and its executives must be truthful, accurate, and not misleading.

19. Because the valuation and merger of Tinder occurred in private, Defendants could enrich themselves by talking out of both sides of their mouths. In secret, Defendants peddled false projections and orchestrated a sham merger to cheat the Tinder Plaintiffs out of billions of dollars. As a private company, Tinder did not itself publicly report financial

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM
NYSCEF DOC. NO. 2

INDEX NO. 654038/2018

RECEIVED NYSCEF: 08/14/2018

information.  Defendants created a $3 billion valuation of Tinder based on bogus doom-and-gloom numbers they manufactured for a private process.

20.     Meanwhile, in public, Defendants could boost their stock prices by extolling Tinder's explosive growth and long-term profitability.  Since the valuation and merger, Defendants have made numerous public statements about Tinder—many during SEC-regulated earnings calls—that celebrate Tinder's financial performance and directly contradict their private misrepresentations during the valuation.

21.     For example, throughout the private valuation, Defendants trivialized Tinder Gold's anticipated impact, providing depressed projections about an explosive new subscription product that Defendants knew would catalyze Tinder's profits.  But during Match's August 2017 earnings call—only weeks after the valuation concluded—Blatt told investors that Match expected Tinder Gold to be "the single biggest driver of incremental monetization that [Tinder had] launched since the beginning."  The market recognized the true value of Tinder Gold immediately after it launched in late August 2017—within one week, Match's market capitalization increased by approximately one billion dollars, or more than 18%.

22.     Defendants also claimed during the private valuation in 2017 that Tinder's revenue growth rate would collapse by more than 90% over the next five years.  But during Match's August 2017 earnings call—again, only weeks after Defendants finalized their valuation—Defendants sang the opposite tune: they acknowledged that Tinder would see "meaningful expansion and . . . reacceleration" of its growth rate and continue to be "the major driver of Match Group revenue growth for certainly several years."

23.     Defendants are now telling the truth about Tinder publicly for the same reason they lied about Tinder privately—to enrich themselves.  But Defendants have never disclosed to

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM
NYSCEF DOC. NO. 2

INDEX NO. 654038/2018
RECEIVED NYSCEF: 08/14/2018

investors or to regulators the true multibillion-dollar price tag of all Tinder options or that Defendants faced billions of dollars in liability resulting from their scheme.

24.     Tinder's financial performance since July 2017 further confirms, with objective precision, the illegitimacy of Defendants' false financial projections and resulting lowball valuation. During the valuation in 2017, Defendants said that Tinder would earn $454 million in 2018 revenue. Last week, in its August 8, 2018 earnings call, Match announced that "Tinder is on pace to exceed $800 million in revenue in 2018"—more than 75% higher than Defendants projected for 2018 revenue and more than 33% higher than Defendants projected even for 2021 revenue. Defendants also disclosed that Tinder Gold's success had "reset" Tinder's metrics, generating "very sustained lifts" in key Tinder performance measures. Defendants told investors they were "confident" that Tinder's profit margins, already "strong," will "continue to expand," making the company even more profitable for years in the future.

25.     Defendants' admissions of Tinder's continued explosive growth and financial success confirm that their valuation projections in 2017 were a farce. Having successfully executed their scheme, Defendants are now telling the truth about Tinder's financial performance and prospects—exposing the lies at the heart of their financial manipulations in 2017.

26.     The Tinder Plaintiffs founded and built Tinder into the company it is today. They include several of Tinder's current senior executives: its Chief Strategy Officer, Vice President of Finance, and Vice President of Marketing and Communications. Standing alongside the company's founders and early employees, those senior members of Tinder's current leadership are now speaking out against IAC and Match's systematic deprivation of their rights—a scheme that has harmed not only the Tinder Plaintiffs but scores of other current and former Tinder employees who also held Tinder options.

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM
NYSCEF DOC. NO. 2

INDEX NO. 654038/2018
RECEIVED NYSCEF: 08/14/2018

27.     Defendants cheated the Tinder Plaintiffs out of their contractual right to participate in the future growth of the company they built.  Defendants willfully breached their contracts and their legal duties, pocketing billions of dollars earned by the Tinder Plaintiffs and other Tinder optionholders.  The Tinder Plaintiffs bring this action to right that wrong and to reclaim the dignity, credit, and money Defendants stole from them.

## THE PARTIES

28.     Sean Rad ("**Rad**") is an individual who resides in Los Angeles, California.  Rad is a co-founder of Tinder.  At various times from approximately February 2012 to September 2017, Rad served as the CEO of Tinder.

29.     Jonathan Badeen ("**Badeen**") is an individual who resides in Los Angeles, California.  Badeen is a co-founder of Tinder.  Badeen has served in multiple roles at Tinder since 2012, including today as Chief Strategy Officer.  He also was the former Senior Vice President of Product and the former Vice President of Engineering.

30.     Paul Cafardo ("**Cafardo**") is an individual who resides in Los Angeles, California.  Cafardo served as an engineer at Tinder from April 2013 to June 2017, including as Director of Engineering from January 2016 to June 2017.

31.     Gareth Johnson ("**Johnson**") is an individual who resides in Los Angeles, California.  Johnson served as Lead Designer at Tinder from February 2014 to June 2017.

32.     James Kim ("**Kim**") is an individual who resides in Los Angeles, California.  Kim has served as Tinder's Vice President of Finance since February 2016.

33.     Alexa Mateen ("**Alexa Mateen**") is an individual who resides in Los Angeles, California.  Alexa Mateen joined Tinder in May 2012 and served in a variety of roles until May 2015, including as Tinder's Head of U.S. Expansion.

10

**FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM**
NYSCEF DOC. NO. 2

INDEX NO. 654038/2018
RECEIVED NYSCEF: 08/14/2018

34.     Justin Mateen ("**Mateen**") is an individual who resides in Las Vegas, Nevada. Mateen is a co-founder of Tinder.  From approximately February 2012 to September 2014, Mateen served as the Chief Marketing Officer of Tinder.  From September 2014 until 2017, he served as an advisor to Tinder.

35.     Joshua Metz ("**Metz**") is an individual who resides in Los Angeles, California. Metz joined Tinder in June 2013 as Tinder's Marketing Manager and has served as Director of Marketing since July 2014.

36.     Ryan Ogle ("**Ogle**") is an individual who resides in Los Angeles, California.  Ogle served as Tinder's Chief Technology Officer from August 2012 to June 2017.

37.     Rosette Pambakian ("**Pambakian**") is an individual who resides in Los Angeles, California.  Pambakian began leading Tinder's communications efforts in 2012.  Pambakian joined Tinder full-time in March 2014 and today serves as Tinder's Vice President of Marketing and Communications.

38.     As of July 2017, all of the Tinder Plaintiffs owned and were permitted to exercise Tinder stock options.

39.     IAC/InterActiveCorp ("**IAC**") is a Delaware corporation with its principal place of business in New York, New York.  IAC is a media and Internet conglomerate controlled by its Chairman and Senior Executive, Barry Diller.  On information and belief, IAC owns or controls over 150 brands, including Dictionary.com, The Daily Beast, Vimeo, Investopedia, and Ask.com. IAC also has spun off a number of its former assets into separate corporate entities, including Match Group, Inc.

40.     Match Group, Inc. ("**Match**," and together with IAC, "**Defendants**") is a Delaware corporation with its principal place of business in Dallas, Texas.  On information and belief, Match

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM

NYSCEF DOC. NO. 2

INDEX NO. 654038/2018

RECEIVED NYSCEF: 08/14/2018

owns several online dating brands, including Match.com and OkCupid. Before Match became a public company on November 19, 2015, it was a wholly owned subsidiary of IAC. Since November 19, 2015, IAC has owned a majority of Match's outstanding shares.

41.     Tinder, Inc. ("**Tinder**" or the "**Company**") was a Delaware corporation with its principal place of business in Los Angeles, California. From March 11, 2013, to July 13, 2017, Tinder was a Delaware corporation owned by Match. On July 13, 2017, Match merged Tinder into itself. On information and belief, Tinder currently operates in Los Angeles, California as a brand within Match. On information and belief, upon the merger, Match assumed all of Tinder's liabilities and obligations, including those arising from the agreements that underlie the Tinder Plaintiffs' claims in this action.

## JURISDICTION AND VENUE

42.     This Court has subject matter jurisdiction of this dispute pursuant to Article VI, Section 7 of the New York Constitution.

43.     This Court has personal jurisdiction over IAC pursuant to N.Y. C.P.L.R. § 301 because IAC's principal place of business is New York.

44.     This Court has personal jurisdiction over Match pursuant to N.Y. C.P.L.R. §§ 301, 302(a)(1), and 302(a)(2).

    a.     Match is subject to general jurisdiction pursuant to N.Y. C.P.L.R. § 301 because Match is registered to do business in New York with the New York Department of State and has consented to personal jurisdiction in New York.

    b.     Match is subject to general jurisdiction pursuant to N.Y. C.P.L.R. § 301 based on its status as a subsidiary of IAC. On information and belief, Match

12

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM

NYSCEF DOC. NO. 2

INDEX NO. 654038/2018

RECEIVED NYSCEF: 08/14/2018

operates as a mere department of IAC, which exerts pervasive control over Match's operations, including the selection and assignment of Match's personnel and Match's marketing and operational policies. On information and belief, Match shares corporate resources with IAC in New York. On information and belief, IAC also acted as Match's agent in New York to further Match's interests in negotiating and enforcing agreements that are relevant to this dispute.

c.   Match is subject to specific jurisdiction pursuant to N.Y. C.P.L.R. § 302(a)(1). On information and belief, Match and Tinder (before it was merged into Match) negotiated in New York the agreements that underlie the Tinder Plaintiffs' claims in this action.

d.   Match is subject to specific jurisdiction pursuant to N.Y. C.P.L.R. § 302(a)(2). On information and belief, Match and Tinder (before it was merged into Match) committed tortious acts in New York that give rise to certain of the Tinder Plaintiffs' claims in this action.

i.   On information and belief, Greg Blatt, Match's Chairman and CEO and Tinder's "interim" CEO during the events giving rise to this lawsuit, principally lived in New York, worked out of the IAC office in New York, and was physically located in New York during the period in which, as an agent of Match and IAC, he had communications and made decisions that inflicted harm on the Tinder Plaintiffs. Among other things, while working and living in

13

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM

NYSCEF DOC. NO. 2

INDEX NO. 654038/2018

RECEIVED NYSCEF: 08/14/2018

New York, Blatt made decisions and participated in calls and email exchanges with respect to the events giving rise to this lawsuit.

ii.    On information and belief, Gary Swidler, Match's Chief Financial Officer during the events giving rise to this lawsuit, principally lived in New York, worked out of the IAC office in New York, and was physically located in New York during the period in which, as an agent of Match and IAC, he had communications and made decisions that inflicted harm on the Tinder Plaintiffs.  Among other things, while working and living in New York, Swidler made decisions and participated in calls and email exchanges with respect to the events giving rise to this lawsuit.

45.    Venue is proper in New York County pursuant to N.Y. C.P.L.R. § 503(a) and (c) because IAC's principal place of business is New York County and because IAC is registered to do business in New York County with the New York Department of State.

## FACTUAL BACKGROUND

### I.    Rad Invents Tinder

46.    In late 2011, Sean Rad—already an accomplished entrepreneur with two successful startups under his belt—invented the concept for Tinder: a location-based, social networking app that would connect mutually interested users.

47.    Rad's inspiration for this app came from his own life experience.  As a shy twenty-something, Rad struggled to make initial connections with women.  He realized that the biggest obstacle he and millions of others faced was the fear of rejection.

14

018

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM
NYSCEF DOC. NO. 2

INDEX NO. 654038/2018
RECEIVED NYSCEF: 08/14/2018

48.     This problem crystalized for Rad one night at a restaurant with his friends.  The restaurant was full of young people all potentially interested in forming new connections, but his friends were focused on their phones instead of interacting with others in the room.

49.     Rad designed a solution: a smartphone app that would let users express interest in individuals near their physical location.  Rad also understood that a mobile app-based platform would take advantage of the trend to mobile devices—unlike legacy dating platforms like Match.com that remained web-based and failed to adapt their clunky interfaces for new users.  And only when two users expressed interest in each other could they start chatting within the app.  Rad believed that this "double opt-in" system would significantly reduce the barriers to new connections by eliminating the fear of rejection.  Rad's central insights went on to revolutionize the online dating industry.

50.     Rad and Justin Mateen, another Los Angeles entrepreneur with successful startups to his credit, began discussing potential endeavors around this time as well.  Among other concepts, they discussed Rad's idea for what would become Tinder.

II.     **The Tinder Plaintiffs Begin To Build Tinder**

51.     Rad was recruited to join Hatch Labs in or around February 2012.  Hatch Labs was a startup incubator—a term for a company that provides resources and support services to early-stage enterprises.  Hatch Labs had formally launched in March 2011 as a joint venture between IAC and Xtreme Labs, a mobile strategy and product development company.  IAC was the majority owner of Hatch Labs, and Xtreme Labs owned a minority stake.

52.     Days after joining Hatch Labs in February 2012, Rad participated in a "hackathon," or "HATCHathon," hosted by the incubator—a short-term intense design event in which participants collaborate to develop the best new software product.  Rad competed in the hackathon with Joe Muñoz, another Hatch Labs employee.  Rad used the event to develop his dating app idea,

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM
NYSCEF DOC. NO. 2

INDEX NO. 654038/2018
RECEIVED NYSCEF: 08/14/2018

building a presentation for what was originally called "MatchBox" and eventually became known throughout the world as Tinder.  Rad's presentation included the core designs and functionality of the app, which remain the centerpiece of the Tinder experience today, as well as descriptions of what would become some of Tinder's main revenue streams.  Muñoz explored various location-based technologies for the app.

53.     Rad's MatchBox concept won the hackathon.  But once the hackathon ended, Rad returned to his "day job" at Hatch Labs building Cardify, a different app focused on loyalty card programs for retail businesses.  The Cardify team grew as Rad recruited colleagues to join his project, including Jonathan Badeen, Joe Muñoz, and Chris Gulczynski.  Together, they spent several months building Cardify.  Rad and Badeen also recruited Ryan Ogle and Chris Lim to work on another Hatch Labs product.  Gulczynski, Ogle, and Lim would each go on to play key roles in the early stages and growth of Tinder.

54.     Rad also suggested creating a new Hatch Labs initiative to incubate MatchBox. Hatch Labs management told Rad the incubator would not fund any additional startups at that time. Rad proposed that he would partner with Mateen and together they would finance the development of MatchBox, outside of Hatch Labs.  Hatch Labs also did not want Rad to pursue the MatchBox project independently.   Instead, Hatch Labs suggested that Rad work on MatchBox using the existing Cardify team, leveraging their free time without additional funding.

55.     Because MatchBox was Rad's idea and would be built on the side with few Hatch Labs resources, Rad proposed founder-friendly ownership terms for MatchBox: the founding team would own a substantial majority of MatchBox, with Hatch Labs as a minority owner or investor. IAC and Hatch Labs agreed to this proposal.

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM

NYSCEF DOC. NO. 2

INDEX NO. 654038/2018

RECEIVED NYSCEF: 08/14/2018

### III. The Tinder Plaintiffs Launch Tinder And IAC Deprives Them Of Their Promised Ownership

56.     Rad asked Mateen to partner with him and to spearhead innovative marketing and growth strategies for the app.  Rad asked Badeen to partner with him in developing the app.  And he asked Muñoz and Gulczynski to dedicate their free time to building the app.  Badeen and Gulczynski worked on brand and app graphical design.  Badeen was responsible for programming the original app for iPhone.  He remains with the company today as its Chief Strategy Officer.

57.     In or around July 2012, Hatch Labs told Rad that he would have to rename MatchBox before submitting it to Apple's App Store—IAC would not permit another dating company to have a name similar to its legacy dating brand, Match.com.  MatchBox was renamed Tinder, and the team submitted the app to Apple's App Store in August 2012.  Tinder was officially released for iPhone users in September 2012 and for Android users in July 2013.

58.     Mateen partnered with Rad to launch Tinder and worked tirelessly to promote it.  He targeted college campuses and developed an international network of celebrities and social media "influencers" to promote the app throughout the world.  Almost immediately, the Tinder team realized it had created something viral and potentially explosive.  Tinder downloads soared and user engagement was off-the-charts.

59.     The Tinder team continued to expand in order to scale the rapidly growing company.  The team recruited Alexa Mateen and Whitney Wolfe, both then working at Cardify, to help define the company's grassroots strategy to reach millennials, including by recruiting "student ambassadors" to promote the app on college campuses.  The team also recruited Gareth Johnson, who helped shape Tinder's marketing design.  Rosette Pambakian, then an established communications professional at a prominent public relations agency, joined forces to build and

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM

NYSCEF DOC. NO. 2

INDEX NO. 654038/2018

RECEIVED NYSCEF: 08/14/2018

scale Tinder's global communications and brand strategy. And Joshua Metz came on-board to jumpstart Tinder's international expansion.

60.     To keep pace with Tinder's unprecedented growth, the team also recruited new engineers, including Ryan Ogle to lead the engineering team as Chief Technology Officer and rebuild Tinder's code from scratch. Ogle worked sleepless nights to rebuild Tinder's back-end technology. Badeen invented and built Tinder's iconic "swipe" feature. He also collaborated with Ogle and others on rewriting the Tinder iPhone app.

61.     Around the end of 2012, the Tinder Plaintiffs learned that IAC planned to shutter Hatch Labs and no longer wanted to incubate companies—an approach IAC Chairman and Senior Executive Barry Diller recently described as inherently a "crapshoot[]." Tinder would need to raise outside capital to keep Tinder alive.

62.     Rad and Mateen's established relationships and credibility in the tech community and Tinder's potential enabled them to raise multimillion-dollar investment offers from a number of prominent technology venture capitalists. They executed this successful fundraising effort while they and the rest of the Tinder team continued working around the clock, with few resources, to keep pace with the growing demands of Tinder.

63.     After watching Tinder continue to skyrocket and prominent outside investors express interest in buying the company, IAC reneged on the founder-friendly deal to which it had agreed and insisted that Hatch Labs owned all of Tinder's equity. The Tinder team received no equity in Tinder, Inc. when it was formally incorporated in March 2013. Instead, they received only dilutable "stock appreciation rights" representing a fraction of the value IAC had promised. Defendants would come to own all of the equity of Tinder, Inc.

18

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM
NYSCEF DOC. NO. 2

INDEX NO. 654038/2018
RECEIVED NYSCEF: 08/14/2018

### IV.    As Tinder Skyrockets, IAC Secures Its Ownership Through Deception

64.    Following Tinder's successful launch, the Tinder Plaintiffs and their colleagues worked tirelessly to build and scale the company's product, organization, and revenue streams to what they are today.

65.    Rad and Jonathan Badeen, Tinder's current Chief Strategy Officer, oversaw Tinder's product and design team, which went on to ideate and create all of Tinder's current products and revenue features—from the iconic "swipe" to many of Tinder's key revenue features. Justin Mateen scaled Tinder's user base from scratch, both domestically and internationally, by developing innovative marketing and product monetization strategies that redefined how companies connect with millennials worldwide.   Ryan Ogle built and led Tinder's engineering team and architected the infrastructure required to scale to tens of millions of users.   As the leader of Tinder's global communications group and now Vice President of Marketing and Communications, Rosette Pambakian forged Tinder's unique identity and communications infrastructure from the ground up.   Joshua Metz, Tinder's current Director of Marketing, catalyzed Tinder's global growth.   Alexa Mateen helped define the company's grassroots strategies.   Paul Cafardo oversaw the development of Tinder's Android app, helping Tinder expand to a huge pool of new Android users.   Gareth Johnson helped develop and construct Tinder's marketing design. And James Kim, Tinder's current Vice President of Finance, set in place the financial systems and controls that enabled the team and investors to gain clear knowledge of the company's financial performance.

66.    Tinder's founders and early employees formed a close and passionate community of colleagues and friends.   They knew they were working together on a once-in-a-lifetime opportunity and supported each other while building an explosive tech company from scratch.

19

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM
NYSCEF DOC. NO. 2

INDEX NO. 654038/2018
RECEIVED NYSCEF: 08/14/2018

67.     The Tinder Plaintiffs' dedication and hard work propelled Tinder to enormous success.  By March 2014, Tinder had over 15 million total registered users, with more than four million daily active users.  Each day, Tinder users collectively swiped on over 600 million profiles, with each user spending enough time engaged to swipe, on average, approximately 150 profiles.

68.     As Tinder continued to grow, IAC set about securing total ownership of Tinder by buying out Xtreme Labs' minority stake in Hatch Labs.  Again, IAC resorted to deception.  On information and belief, IAC misled Xtreme Labs about Tinder's true value during a private valuation to determine the worth of Xtreme Labs' minority stake, restricting Xtreme Labs' access to information and feeding it inaccurate data.  On information and belief, IAC misled Xtreme Labs into valuing Tinder at only $500 million—half of what existing evidence showed it was already worth—and acquired complete ownership of Tinder at a significant discount.

## V.     The Tinder Plaintiffs Obtain Written Contracts To Protect Tinder Optionholders

69.     After Defendants had secured complete ownership of Tinder by deceiving the founding team and Xtreme Labs, Rad and Mateen realized they needed to renegotiate their agreements with Defendants to obtain specific protections for the Tinder team.

70.     Conventionally, a startup employee may receive some number of stock options in a company when he or she joins.  Those options vest over time—as the employee remains at the company, he or she gains control over an increasingly large portion of his or her options.  Once those options vest, employees have the right to exercise them; unvested options, by contrast, cannot be exercised.  This arrangement, standard in startups, means that employees take a risk on the companies they join.  They earn lower salaries than may otherwise be available.  But if they work long enough for their options to vest and the company succeeds, their options can become very valuable.

20

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM

NYSCEF DOC. NO. 2

INDEX NO. 654038/2018

RECEIVED NYSCEF: 08/14/2018

71.    For public companies, the process of valuing stock options is straightforward. Employees typically receive stock options granting them the right to buy a share of the company's stock at a certain strike price. When employees have worked long enough for their options to vest, they have the right to exercise them at their discretion, meaning they buy the stock at the option's strike price and then sell it at the current market price on a public stock exchange, receiving the difference as profit. For a private company like Tinder, however, there is no public market for employees to buy and sell shares. Privately held startups must therefore use a different process to set a fair valuation on the company as a whole, so that options can be valued and exercised.

72.    The existing agreements governing Tinder "stock appreciation rights"—which IAC had imposed on the Tinder Plaintiffs in 2013 when it held all the cards—lacked critical safeguards for the employees. Rad and Mateen set out to negotiate new agreements that would better protect Tinder employees and hired respected Silicon Valley attorney Larry Sonsini, a founder of the law firm Wilson Sonsini Goodrich & Rosati ("**WSGR**"), to negotiate with Defendants.

73.    IAC and Match executives expressed anger when they learned Rad and Mateen had hired WSGR to renegotiate their contracts and to solidify and strengthen the rights of the Tinder team. On one occasion, Greg Blatt, then Chairman of Match who led the business negotiations for Defendants, erupted at Rad, screaming profanely, in sum and substance, "Why the fuck did you get Larry Sonsini involved?"

74.    Blatt was a close advisor to IAC Chairman and controlling shareholder Barry Diller and has served Diller in various senior leadership roles within IAC since 2003—including as CEO of IAC from 2010 to 2013, Chairman of Match from 2013 to 2017, and CEO of Match from 2015 to 2017. On information and belief, Blatt's personal financial interests were aligned with IAC and

025

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM   INDEX NO. 654038/2018
NYSCEF DOC. NO. 2                                      RECEIVED NYSCEF: 08/14/2018

Match based on his ownership of significant IAC and/or Match equity and/or stock options. Blatt also had a reputation for bullying and intimidation.

75.    Other executives at IAC, including Gregg Winiarski, IAC's General Counsel, participated in the 2014 contract negotiations. Winiarski had served as an in-house attorney for IAC since 2005 and as IAC's General Counsel since 2009.

76.    After negotiating for six months, Rad and Mateen obtained valuable contractual protections for the Tinder Plaintiffs and other Tinder optionholders. The new contracts granted Tinder employees traditional stock options—the industry standard for employee equity and far easier for prospective employees to understand—instead of "stock appreciation rights," and they protected those options against dilution by Defendants. The contracts set a schedule of specific future dates when Tinder employees could exercise their options in 2017, 2018, 2020, and 2021. And they instituted an independent process for valuing Tinder on each of those specific dates. Tinder employees could choose to exercise their options on any of those dates based on the price determined through the valuation process—or, if they believed that Tinder would continue to become more valuable, Tinder employees could hold their options until the next opportunity.

## VI.   The 2014 Agreements: Contractual Rights And Protections For All Tinder Optionholders

77.    Four primary agreements (the "**Agreements**") set forth the new deal Rad and Mateen negotiated to protect Tinder optionholders: (1) the Tinder, Inc. Restated 2014 Equity Incentive Plan; (2) the Tinder, Inc. 2014 Equity Settlement Plan; (3) a Funding and Governance Agreement between Tinder, IAC, and Rad; and for each of the Tinder Plaintiffs, (4) a Tinder, Inc. Restated 2014 Equity Incentive Plan Restated Stock Option Agreement.

78.    The Tinder, Inc. Restated 2014 Equity Incentive Plan, adopted by Tinder on July 28, 2014 (the "**2014 Equity Incentive Plan**"), permitted the company to, among other things,

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM

NYSCEF DOC. NO. 2

INDEX NO. 654038/2018

RECEIVED NYSCEF: 08/14/2018

grant "Nonstatutory Stock Options, Stock Appreciation Rights, Restricted Stock and Restricted Stock Units" for the purposes of "attract[ing] and retain[ing] the best available personnel for positions of substantial responsibility"; "provid[ing] additional incentive[s] to Employees, Directors and Consultants"; and "promot[ing] the success of the Company's business."

79.     The <u>Tinder, Inc. 2014 Equity Settlement Plan</u>, adopted by Tinder and IAC as of July 28, 2014 and amended as of October 15, 2014 (the "**Settlement Plan**"), provided two different types of opportunities for Tinder optionholders to exercise their vested options.

    a.     On specific dates, termed "**Scheduled Puts**," Tinder would be required to undergo an independent valuation, and optionholders would have the right to exercise their options at the price determined through that process.  The Scheduled Puts were required to occur "[o]n or promptly following" May 15, 2017, November 15, 2018, May 15, 2020, and May 15, 2021.

    b.     Tinder would also have the authority to grant additional, unscheduled opportunities for optionholders to exercise their vested options, termed "**Discretionary Puts**."

    c.     During any exercise event, whether a Scheduled Put or a Discretionary Put, Tinder was required to "deliver to all Plan Beneficiaries eligible to participate in the Qualifying Put written notice of the Put Price and supporting calculation(s) (the '**Put Price Notice**')."  The Put Price Notice was required to "include instructions for exercising any vested Options that such holders may choose to exercise."

    d.     Tinder was also required to provide vested optionholders with a "**Put Exercise Window**" of at least 10 days' duration when they could exercise

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM
NYSCEF DOC. NO. 2

INDEX NO. 654038/2018
RECEIVED NYSCEF: 08/14/2018

their options by delivering a "**Put Exercise Notice**" to Tinder which served as written notice of the decision to exercise.

    e.     No more than 10 days following receipt of a Put Exercise Notice, Tinder was required to pay an exercising optionholder an amount equal to the "**Option Spread**" of the exercised options, less applicable tax withholding; "Option Spread" was defined as "an amount equal to (x) the excess, if any, of the applicable Put Price over the exercise price of such Option multiplied by (y) the number of Shares underlying such Option."

    f.     The Option Spread was payable in freely tradable shares of Match or IAC.

80.     The Settlement Plan also mandated two alternative outcomes in the event that IAC or any of its affiliates merged with or acquired Tinder (an "**IAC Acquisition**").

    a.     If such an IAC Acquisition caused a "meaningful change" in the assets owned or controlled by Tinder "or its successor" or in "the operating structure or integration of the [Tinder] business into any of IAC's other businesses," then Tinder was required to institute a Discretionary Put in which Tinder optionholders could exercise their options if they chose. The Settlement Plan further provided that "[a]ll outstanding Options that are not exercised in such Discretionary Put (if such Discretionary Put is consummated prior to the IAC Acquisition) shall be converted into options in the successor entity, as permitted by and pursuant to the terms of the Stock Option Plan and the Stock Option Agreement applicable to such Options."

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM
NYSCEF DOC. NO. 2

INDEX NO. 654038/2018
RECEIVED NYSCEF: 08/14/2018

    b.    Alternatively, "notwithstanding the foregoing," the Settlement Plan provided that if such an IAC Acquisition did not cause "any meaningful change" in the assets owned or controlled by Tinder "or its successor" or in "the operating structure or integration of the [Tinder] business into any of IAC's other businesses," then "no Discretionary Put shall be triggered and these arrangements shall remain unchanged."

81.    The Settlement Plan provided that it would terminate only in the event of "a Public Offering" of Tinder or at "such time as IAC, together with its affiliates, owns less than a majority of the outstanding equity of" Tinder.

82.    Schedule A to the Settlement Plan described the valuation process—the "**Qualifying Valuation Process**"—by which Tinder would be valued in a Scheduled Put or a Discretionary Put.

    a.    The Qualifying Valuation Process required Tinder, not Match or IAC, to retain two banks to provide their "independent" determinations of Tinder's "**Public Company Trading Price**," or the "best estimate of the price at which a Share would trade if the Shares were then trading in the United States on a major exchange, treating the Company as widely traded with a significant public float."

    b.    Tinder, not Match or IAC, was required to provide access to diligence information and its management to discuss Tinder's business and prospects, as well as in-person opportunities for management to present its perspectives.

029

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM
NYSCEF DOC. NO. 2

INDEX NO. 654038/2018
RECEIVED NYSCEF: 08/14/2018

83.     The <u>Funding and Governance Agreement</u>, entered into by and among Rad, Tinder, and IAC as of July 28, 2014 ("**Rad's Funding and Governance Agreement**"), provided, among other things, that Rad would receive: unaudited balance sheets and statements of income and cash flows for Tinder at the end of each fiscal quarter and fiscal year; "all determinations of the Public Company Trading Price . . . following any such determination"; and "copies of all Put Price Notices."

84.     Rad entered into a new stock option agreement, the <u>Tinder, Inc. Restated 2014 Equity Incentive Plan Restated Stock Option Agreement</u>, by and among Rad, Tinder, and IAC as of July 28, 2014 ("**Rad's Option Agreement**") to govern his Tinder stock options.  Rad's Option Agreement set forth certain specific provisions of Rad's equity deal:

    a.    Rad was an "express third party beneficiary" of the Settlement Plan.

    b.    Matters relating to the exercise, transfer, and settlement of Rad's Tinder options "shall be controlled by the Settlement Plan," "for so long as the Settlement Plan is in effect pursuant to its terms."

    c.    With respect to the Qualifying Valuation Process set forth in Schedule A of the Settlement Plan, Rad "shall have the same rights as IAC."  In addition, Tinder shall provide Rad with equivalent diligence information and reasonable access to company management.

    d.    "[I]n connection with an IAC Acquisition [Rad's] Options shall be treated as contemplated in the Settlement Plan."

85.     Each of the other Tinder Plaintiffs—Jonathan Badeen, Paul Cafardo, Gareth Johnson, James Kim, Alexa Mateen, Justin Mateen, Joshua Metz, Ryan Ogle, and Rosette Pambakian—entered into one or more stock option agreements, by and among each Tinder

INDEX NO. 654038/2018
RECEIVED NYSCEF: 08/14/2018

Plaintiff, Tinder, and IAC (for each Tinder Plaintiff, an "**Option Agreement**," and together with Rad's Option Agreement, the "**Tinder Plaintiffs' Option Agreements**") to govern each Tinder Plaintiff's Tinder stock options.  Those agreements were substantially identical in relevant part. In particular:

    a.    Each Tinder Plaintiff was an "express third party beneficiary" of the Settlement Plan.

    b.    Matters relating to the exercise, transfer, and settlement of each Tinder Plaintiff's Tinder options "shall be controlled by the Settlement Plan," "for so long as the Settlement Plan is in effect pursuant to its terms."

    c.    "[I]n connection with an IAC Acquisition [each Tinder Plaintiff's] Options shall be treated as contemplated in the Settlement Plan."

## VII.   Defendants Gain Additional Control Of Tinder

86.   In the midst of negotiating these new contractual terms to protect all Tinder employees, Whitney Wolfe filed a complaint against Tinder, Match, and IAC in the Superior Court of California for Los Angeles County, alleging that she had been subjected to sexual harassment, discrimination, and retaliation at Tinder.

87.   Wolfe previously had served as Tinder's Vice President of Marketing before she left Tinder in early 2014.  Wolfe and Mateen previously had been in a long-term, public romantic relationship, including when Tinder was founded and while they both worked at Tinder.

88.   Before filing, Wolfe made her employment allegations privately to Match and IAC. Defendants suspended Mateen at that time and directed him not to comment or respond.

89.   Defendants responded to the lawsuit by threatening that if Mateen did not agree to resign immediately and forfeit options, IAC would fire Rad, even though IAC did not suggest Rad

27

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM
NYSCEF DOC. NO. 2
INDEX NO. 654038/2018
RECEIVED NYSCEF: 08/14/2018

had done anything wrong.  Mateen knew that Rad's leadership was essential to Tinder's continued success.  He agreed to resign and reluctantly gave up half of his Tinder options to Defendants.

90.    In September 2014, Defendants settled Wolfe's lawsuit against Tinder, Match, and IAC, without any admission of wrongdoing.

**VIII.    Defendants Demote Rad—And Then Reinstate Him As CEO Five Months Later**

91.    By November 2014, Tinder had more than 40 million registered users and almost 7 million daily active users.  In the span of only two years, Rad, Mateen, and Badeen, as co-founders, along with the Tinder team created, built, and led one of the fastest growing tech companies ever.

92.    Despite this record, in late 2014, Sam Yagan, then the CEO of Match, informed Rad that Defendants no longer wanted Rad to serve as Tinder's CEO.  Defendants now said that Rad lacked adequate experience to continue as CEO.

93.    Rad agreed to serve as CEO until Defendants found a suitable replacement.  For five months, IAC and Match searched unsuccessfully for a replacement CEO.  All the while, Rad remained committed to supporting his employees and nurturing the company he had founded. Under Rad's leadership Tinder continued to grow.  By mid-March 2015, Tinder had almost 22 million monthly active users.

94.    During this period, Tinder also developed and launched incredibly successful revenue features.  For example, Rad and Badeen developed a paid subscription option to allow unlimited swiping.  This feature launched in 2015 to immediate success.  It has been a mainstay of Tinder's revenue and profit strategy ever since.

95.    In March 2015, Defendants hired former eBay executive Chris Payne to serve as Tinder's new CEO.  Rad agreed to step down, take the new title of "President," remain on Tinder's Board of Directors, and focus day-to-day on product development.

28

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM   INDEX NO. 654038/2018

NYSCEF DOC. NO. 2   RECEIVED NYSCEF: 08/14/2018

96.     Payne's tenure as CEO was short-lived.  His management style clashed with Tinder employees and the company struggled.  In August 2015, after only five months, Defendants fired Payne and asked Rad to resume his role as CEO.

**IX.     In 2015, Defendants Value Tinder At $3 Billion**

97.     As Tinder's success continued, Rad wanted to give the company's hardworking team an opportunity to participate in Tinder's success.  The Agreements included a provision allowing Tinder's founders to sell some of their options to outside investors in a so-called secondary sale.  Rad did not want to take advantage of that opportunity unless it was extended to all Tinder employees.  Rad asked Defendants to permit all of Tinder's vested optionholders to participate in a secondary sale and Defendants agreed.

98.     Investors who wanted to buy Tinder stock options in a secondary sale would pay optionholders directly to acquire their options.  To set a price on those options in such a sale, outside investors would have to determine the value they assigned to Tinder as a whole—in other words, the value they believed Tinder would command if it were a publicly traded company—and use that value to determine what an individual Tinder option was worth.

99.     The Tinder founders solicited offers from several prominent outside investors to purchase options from all the Tinder Plaintiffs and other optionholders.  Several investors offered to purchase options at valuations of Tinder of $3 billion and above.

100.     Defendants refused to permit a secondary sale.  Instead, they offered to buy back options directly from Tinder optionholders—but with a catch.  Either Match would offer all optionholders—including Rad and Mateen—the opportunity to sell their options at a valuation of $1.75 billion, or Match would offer all employees—except Rad and Mateen—the same opportunity at a $3 billion valuation.  In other words, Defendants forced Rad and Mateen to choose between their own interests and the interests of the Tinder team.

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM
NYSCEF DOC. NO. 2

INDEX NO. 654038/2018
RECEIVED NYSCEF: 08/14/2018

101.    Rad and Mateen put the Tinder team first.   Defendants allowed all vested optionholders except Rad and Mateen to exercise their options at a $3 billion valuation.

**X.      In 2016, Defendants Force A Lowball $1.6 Billion Valuation**

102.    On November 19, 2015, Match held an initial public offering ("**IPO**") for its stock. Match raised over $400 million that first day.  On information and belief, Tinder was by far the most important and fastest-growing company in Match's portfolio.  In fact, much of the press reported Match's IPO with a headline explaining that "Tinder's parent company" was going public.

103.    Aware of the significant role Tinder had played in Match's IPO, Tinder employees wanted an opportunity to realize some of the value they had created.  In mid-2016, Rad proposed to Blatt that Tinder institute a Discretionary Put, allowing every optionholder the opportunity to exercise his or her vested options.  The first Scheduled Put in May 2017 was one year away, and Rad believed that the Tinder team deserved an earlier opportunity to receive money for the value they had created.

104.    Although Blatt agreed to permit the Discretionary Put, he refused to follow the Agreements to set the value of Tinder.  Blatt would allow the Discretionary Put to go forward only if the valuation of Tinder was determined by averaging the valuations in outside financial analyst reports that Blatt himself selected.  Those hand-picked reports did not accurately reflect the value of the company and lacked material information about Tinder.

105.    Rad told Blatt the analyst reports undervalued Tinder, but Blatt insisted on using them.  Averaging those reports, Blatt assigned Tinder the lowball valuation of approximately $1.6 billion for the Discretionary Put—even though Defendants themselves had valued Tinder at $3 billion one year earlier when it was much smaller and far less profitable.

30

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM

NYSCEF DOC. NO. 2

INDEX NO. 654038/2018

RECEIVED NYSCEF: 08/14/2018

106.   Because he believed that Blatt's valuation was far too low, Rad told Tinder employees that he was not exercising his own options and urged them not to exercise.  Rad and other executives told Tinder employees they should wait until the May 2017 Scheduled Put, when the Agreements required an independent valuation of the company, rather than the valuation Blatt had manufactured.

## XI.   Defendants Hijack Tinder And The Valuation Process

107.   From the start, Defendants schemed to undermine the May 2017 Scheduled Put.

108.   Under the Agreements, Tinder management (not IAC or Match) would control the information that would determine Tinder's valuation.  This meant that, absent a management change, Tinder CEO Sean Rad would oversee the valuation.

109.   The Agreements reflected a clear and common-sense alignment of interests between Tinder, Tinder management, and all of Tinder's employees.  Under the Agreements, Tinder was the company being valued and Tinder management was responsible for providing the information that would determine Tinder's value.  The valuation would decide how much compensation Tinder optionholders would earn.  An accurate valuation would benefit Tinder itself, making it easier to recruit the most talented employees, generate positive media attention, and attract outside investors.  Tinder as a company, its optionholders, and its employees shared the same goal in the valuation process—to ensure Tinder was valued accurately.

110.   Defendants, in contrast, had a clear incentive to undervalue Tinder.  Defendants were responsible for paying the bill when the Tinder Plaintiffs and other optionholders exercised their options.  The greater the value assigned to Tinder in the valuation process, the more it would cost Defendants to compensate Tinder optionholders.  But if Defendants could devalue the Tinder Plaintiffs' options and eliminate their right to participate in the future upside of the company, Defendants could save themselves billions of dollars.

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM
NYSCEF DOC. NO. 2

INDEX NO. 654038/2018
RECEIVED NYSCEF: 08/14/2018

111.     By the end of 2016, the decision to reinstate Rad as CEO the year before had paid enormous dividends.  Rad's second tenure as CEO was another banner period for Tinder.  By the end of 2016, Tinder increased revenues to over $175 million, with revenues forecasted to reach over $350 million in 2017.  Tinder's revenue and profitability by this time had grown faster than perhaps any other tech company in history.

112.     Tinder also hired several skilled and experienced executives to expand the Tinder executive team, including seasoned executives in engineering, management, and finance roles. One such executive, James Kim, had worked in the finance and accounting departments of several finance and tech companies in Los Angeles.  Kim joined Tinder in February 2016 as the Vice President of Finance, a role he still holds today.

113.     Although Rad was leading Tinder to record growth, Defendants decided to remove him as CEO in order to execute their scheme to deprive the Tinder Plaintiffs of their rights.  With Rad at the helm, Tinder would use truthful and accurate information about the company's financial prospects, and Tinder would be assigned a value consistent with its meteoric growth profile.  But if Defendants could hijack Tinder, they could execute their scheme.

114.     Defendants implemented their takeover of Tinder on December 8, 2016, when they installed Blatt—Match's Chairman and CEO—as "interim" CEO of Tinder.  In furtherance of their scheme, Defendants also inserted at least two other Match and IAC executives into Tinder's operations: Gary Swidler and Amarnath Thombre.  Swidler, Match's Chief Financial Officer, worked from IAC's headquarters in New York.  Thombre, then Match's Chief Strategy Officer, was embedded in Tinder's finance department in Los Angeles.  The reason for these management changes was clear: to allow Defendants to control and undermine Tinder's valuation.

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM

NYSCEF DOC. NO. 2

INDEX NO. 654038/2018

RECEIVED NYSCEF: 08/14/2018

115.    Once installed as "interim" CEO of Tinder, Blatt displayed his infamous management style—routinely bullying and degrading employees.  Blatt had a volcanic temper, and he created and exploited a climate of fear in which employees were afraid to tell the truth. Blatt also banned Rad, the company's founder and leader, from Tinder's headquarters.

116.    Defendants' conflict of interest was glaring.  As Tinder's CEO, Blatt had a duty to comply with the Agreements and to advance the best interests of the Tinder Plaintiffs and other Tinder optionholders.  But Blatt, loyal only to Defendants, violated that duty.  On information and belief, Blatt held significant options and/or equity in Match and/or IAC, meaning the less Defendants had to pay the Tinder Plaintiffs and other Tinder optionholders, the more valuable Blatt's Match and/or IAC equity would be.

## XII.    Defendants Try To Circumvent The Agreements

117.    In early 2017, Blatt attempted to kill the upcoming 2017 Scheduled Put.  Because Defendants did not want an accurate valuation of Tinder, they proposed to value Tinder outside the structure of the Agreements.  Blatt suggested that they use approximately $1.8 billion as the valuation.

118.    Defendants' proposed $1.8 billion valuation was a sham.  Two years earlier, Defendants had agreed to value Tinder at $3 billion, and outside investors had expressed interest in buying Tinder options at even higher valuations.  In 2015, Tinder had approximately 22 million monthly active users and earned almost $52 million in revenue.  By 2017, Tinder had exploded like a rocket ship.  In April 2017, Tinder had more than 33 million monthly active users.  And Tinder was projecting, and would achieve, 2017 revenue of approximately $350 million— approximately 600% higher than its 2015 revenue.  Yet Defendants pressed for a lower valuation than it had assigned two years earlier.

119.    Rad rejected Defendants' proposal and required Tinder to follow the Agreements.

33

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM

NYSCEF DOC. NO. 2

INDEX NO. 654038/2018

RECEIVED NYSCEF: 08/14/2018

### XIII.    Defendants Undermine The Valuation Process

120.    Defendants' attempt to value Tinder outside the Agreements failed.  With the 2017 Scheduled Put approaching, Defendants understood that they would now have to provide financial information about Tinder to value the company.  Defendants had two choices: they could provide truthful information to facilitate an accurate valuation, or they could provide false and incomplete information to undermine an accurate valuation.

121.    Defendants chose the latter.  From approximately April 2017 until July 2017, Defendants knowingly and willfully created false, misleading, and incomplete information about Tinder's financial performance and projected growth.  The false financial picture manufactured by Defendants was directly contradicted by truthful financial information and data within Defendants' knowledge and control.  But Defendants suppressed this information and threatened to fire Tinder employees if they attempted to tell the truth or otherwise interfere with Defendants' scheme.  Blatt in particular bullied and intimidated Tinder executives and management to silence them.  Blatt and other embedded Match executives, such as Thombre, also pressured Tinder's finance team to adopt assumptions and projections that Defendants knew to be incorrect.

122.    During the valuation process, it was agreed that Tinder would be valued based on its present and projected financial performance through 2021.  To carry out their scheme, Defendants manufactured false, misleading, and incomplete financial information about Tinder's future revenues, expenses, and growth rate, and hid the impact of new products and features.

123.    In particular, Defendants manipulated the projections of Tinder's revenue in 2018 and subsequent years by, for example, assigning only limited incremental revenue boosts to forthcoming new products.  Defendants also inflated—without any basis in reality—Tinder's expenses in several categories, including its marketing budget.

34

**FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM**
NYSCEF DOC. NO. 2

INDEX NO. 654038/2018
RECEIVED NYSCEF: 08/14/2018

124.    Tinder's growth rate always had been extraordinary, and the company's new products and features made certain that its historic momentum would continue and increase.  But Defendants created the illusion that Tinder was headed for stagnation.  They concealed material information about Tinder's new products and projected that Tinder's revenue growth rate would collapse by more than 90% over the next five years.  And Defendants falsely projected that the growth rate of Tinder's profits would also plummet.

125.    Defendants hid the impact of new products and features that Tinder knew would propel the company to even faster growth.

   a.    **Tinder Gold**.  By the time the valuation process was underway, Tinder already knew that a new subscription product, Tinder Gold, would supercharge Tinder's earnings when it launched worldwide.  But Defendants claimed that Tinder Gold was risky and understated the impact it would have on revenue.  On information and belief, Defendants even delayed the design and worldwide launch of Tinder Gold so that its enormous value to Tinder would not appear in Tinder's financials until after the valuation ended—subjecting it to unusually heavy scrutiny, demanding unnecessary and excessive testing, postponing deadlines and launch goals, and making other decisions to delay the launch.

   b.    **SMS Authentication**.  Tinder had developed a new feature that would allow new users to register for the app and authenticate their identity by receiving text messages (sometimes called "Short Message Service" or "SMS" messages) to their cellphones.  Defendants represented that SMS authentication would have only a small effect on new registrations.  But

**FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM**
NYSCEF DOC. NO. 2

INDEX NO. 654038/2018
RECEIVED NYSCEF: 08/14/2018

existing data already confirmed that SMS authentication would drive a huge increase in new registrations—potentially as high as 150%. In fact, after the valuation process began, Tinder launched SMS authentication in some markets around the world and saw twice as many new users register with SMS authentication than Defendants had projected. Tinder's paying subscriber base already had increased a whopping 20% above Defendants' initial, fictitious estimates.

126.    In furtherance of their scheme, Defendants also concealed true financial information that directly contradicted their fabricated financial picture of Tinder. In July 2017, Tinder updated its internal projections in the ordinary course of business. The updated forecast reflected significant, documented gains in revenue and profit, boosting Tinder's projected financial performance for 2018 by a large margin. The forecast confirmed that Tinder would significantly outperform Defendants' false financial projections based on existing business trends alone. Defendants hid the updated forecast during the valuation process—going so far as to say that it did not even exist.

## XIV.    Defendants Cover Up Workplace Misconduct

127.    With Defendants in control of Tinder throughout the valuation of the company, Defendants were poised to successfully execute their scheme. But unbeknownst to most people, events that took place in December 2016 threatened to derail the scheme.

128.    At Tinder's December 2016 holiday party in Los Angeles, Blatt, who had just taken over as Tinder's "interim" CEO, groped and sexually harassed Rosette Pambakian, Tinder's Vice President of Marketing and Communications.

129.    In mid-2017, Rad learned about these events. Rad asked Pambakian about them, and she confirmed that Blatt had groped and sexually harassed her with colleagues present.

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM

NYSCEF DOC. NO. 2

INDEX NO. 654038/2018

RECEIVED NYSCEF: 08/14/2018

130.     Rad immediately reported Blatt's conduct to Match's General Counsel, Jared Sine, and demanded that Tinder commission an independent investigation.

131.     Sine informed Rad that the Match Board of Directors—of which Blatt was Chairman—would run its own investigation instead.  Defendants placed Sine and the head of Match's Human Resources Department, Lisa Nelson—who had worked for Blatt for more than 10 years—at the head of the "investigation."  On information and belief, IAC General Counsel Gregg Winiarski also was aware of this "investigation" and included on correspondence related to it. Meanwhile, Blatt remained at the helm of Tinder as its "interim" CEO.

132.     Believing that credible allegations of workplace misconduct against its CEO threatened Tinder and should be independently investigated, Rad pressed for a meeting of Tinder's Board of Directors.  Defendants refused and covered up Blatt's conduct instead.  Defendants even allowed Blatt to contact Pambakian and one of the eyewitnesses directly, whom Blatt then pressured to conceal his misconduct.  On information and belief, Blatt also misled IAC and Match Board members about the allegations made against him.  On information and belief, based on statements made by a former IAC communications executive, Match had previously concealed other sexual misconduct allegations through confidential payoffs and settlements.

133.     On information and belief, Defendants covered up Blatt's misconduct in part because he was essential to the execution of Defendants' scheme to deprive the Tinder Plaintiffs of their rights as optionholders—and to save Defendants billions of dollars in the process.

XV.   **Defendants Value Tinder At $3 Billion**

134.     On July 13, 2017, Defendants valued Tinder at approximately $3 billion.  That valuation was based on an average of the valuations submitted by the banks.  Those valuations relied on financial information provided by Defendants.  As a private company, Tinder did not itself publicly report financial information.  The banks based their valuations on the financial

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM

NYSCEF DOC. NO. 2

INDEX NO. 654038/2018

RECEIVED NYSCEF: 08/14/2018

information provided by Defendants during the private valuation process. The banks were entitled to rely upon the accuracy and completeness of all information Defendants submitted and to rely exclusively on that information. The banks were not tasked with the independent verification of any information provided by Defendants. The Tinder Plaintiffs understand that the banks acted professionally and diligently during the valuation process. Defendants did the opposite.

135.    Defendants knew that the $3 billion valuation was a sham based on their bogus numbers. Tinder was in the midst of explosive user and revenue growth, yet Defendants' valuation meant the company was stagnating and headed toward freefall. Defendants themselves had valued Tinder at $3 billion two years earlier, when the company was far smaller and less profitable. As alleged below, Tinder continued its dynamic growth in 2018—further confirming, with objective precision, the illegitimacy of Defendants' financial projections and resulting $3 billion valuation.

## XVI.  Defendants Merge Tinder To Extinguish Tinder Option Rights

136.    Some of the Tinder Plaintiffs who left the company before the 2017 Scheduled Put began were contractually required to exercise their options at Defendants' illegitimate $3 billion valuation. But other Tinder Plaintiffs had the contractual right to keep their options until one of the three remaining Scheduled Puts in 2018, 2020, and 2021.

137.    Defendants were not content only to undermine the 2017 Scheduled Put—which itself had robbed the Tinder Plaintiffs of billions of dollars by lowballing the valuation of Tinder. Defendants were determined to extinguish forever the Tinder Plaintiffs' right to participate in the future growth of the company they had built. Through a secret merger, Defendants would move to terminate the Agreements and eliminate the Tinder Plaintiffs' opportunity to exercise their options years in the future, when Tinder would be even more valuable.

138.    Only hours after finalizing their $3 billion valuation of Tinder, Defendants merged Tinder into Match—a clearly premeditated act. Match's Board of Directors voted unanimously to

38

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM
NYSCEF DOC. NO. 2

INDEX NO. 654038/2018
RECEIVED NYSCEF: 08/14/2018

dissolve Tinder and transfer its assets to Match as the surviving corporation. Tinder's Board of Directors was not aware of and did not consent to the merger. Neither Rad nor any other Tinder Plaintiff had any prior notice that the company they had built together was about to be merged out of existence.

139. At approximately 9:00 p.m. on July 13, 2017, Match filed a Certificate of Ownership and Merger with the Delaware Secretary of State. On information and belief, Blatt, Winiarski, and other IAC and Match executives were working at IAC's offices in New York when they planned and executed the merger. The Tinder Plaintiffs and other Tinder optionholders were not notified until the next day, July 14.

140. The dead-of-night merger was a pretext. Under the Agreements, Defendants had a limited right to convert Tinder options into Match options, but only upon an acquisition or merger that caused a "meaningful change" in Tinder's operating structure, assets, or integration into Defendants' other businesses.

141. In reality, Defendants' merger of Tinder into Match was a sham. It caused no meaningful change of any kind for Tinder's operating structure, assets, or integration into Defendants' other businesses. Both before and after the merger, Match was Tinder's sole stockholder and had ultimate control over the company. Tinder continued to have its own CEO, just as it did before the merger. The Tinder business operated as it always had, with its own operating division located in Los Angeles subject to Match oversight. The corporate functions that Tinder performed internally still continued to be performed by Tinder employees, while the functions that had always been outsourced to Defendants remained so. In short, Defendants' merger of Tinder into Match had no legitimate business justification or real-world consequence.

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM

NYSCEF DOC. NO. 2

INDEX NO. 654038/2018

RECEIVED NYSCEF: 08/14/2018

It simply gave Defendants a pretext to convert the Tinder Plaintiffs' options and eliminate their contractual right to three additional Scheduled Puts.

142.    As a result of the secret merger, the Tinder Plaintiffs lost their Tinder options, which were converted without their consent into Match options based on the $3 billion valuation Defendants had rigged.  This meant that the Tinder Plaintiffs and other Tinder optionholders received significantly fewer Match options in the conversion than their Tinder options actually were worth.  And by forcing the Tinder Plaintiffs and other Tinder optionholders to accept Match options, Defendants stripped away something incredibly valuable—stock options in Tinder, one of the fastest growing standalone companies in tech history—for options in Match, a bloated stagnant holding company weighed down by aging brands.

143.    Having merged Tinder into Match and deprived the Tinder Plaintiffs of their stock options in Tinder, Defendants then purported to terminate the Agreements—even though Defendants had no right to do so under these circumstances—and eliminate the future Scheduled Puts in 2018, 2020, and 2021.

144.    On information and belief, Defendants never revealed to investors or to regulators the true multibillion-dollar price tag of all Tinder options, their misconduct in rigging Tinder's valuation, or that they faced billions of dollars in liability based on undermining Tinder's valuation.

**XVII.  Defendants Reward Blatt And Fire Rad**

145.    Only two weeks later, on August 1, 2017, Defendants announced that Blatt would soon leave his positions as the CEO of Match and Tinder.  Blatt had been "interim" CEO of Tinder for fewer than eight months, spending the bulk of his time executing Defendants' scheme.  He had also been credibly accused of groping and sexually harassing a subordinate.  Yet Blatt received a lucrative golden parachute from Defendants featuring a glowing farewell message from IAC's

40

044

**FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM**
NYSCEF DOC. NO. 2

INDEX NO. 654038/2018
RECEIVED NYSCEF: 08/14/2018

controlling shareholder Barry Diller, in which Diller praised Blatt's "integrity." On information and belief, Defendants allowed Blatt to walk away with hundreds of millions of dollars, without any disclosure to the investing public or the IAC Board of the allegations of sexual misconduct, the ensuing cover-up, or the scheme to take billions of dollars from the Tinder Plaintiffs and other Tinder optionholders.

146.    In September 2017, Blatt asked Rad to meet in person. Blatt was irate that Rad had reported the allegations of Blatt's sexual misconduct. Blatt threatened Rad, angrily saying, in sum and substance, that if Rad or anyone else made public the misconduct allegations against him, Blatt would "take [Rad] down" with him.

147.    On September 14, 2017, Match's General Counsel, Sine, terminated Rad's employment at Tinder.

**XVIII. Defendants' Public Statements And Tinder's Performance Contradict Defendants' Private Statements**

148.    Defendants executed their dishonest scheme in private, behind closed doors and outside the view of the public markets and regulators. At the same time, as publicly traded and regulated companies, Defendants routinely made statements to investors, analysts, and regulators—on earnings calls and in public filings—about Tinder and their other businesses. Earnings calls, in particular, are a critical moment, when the public pays careful attention to every word a company says about its growth, risks, and value. And as with any public disclosure about financial performance, federal and state securities laws require that everything said on an earnings call by a company and its executives must be truthful, accurate, and not misleading.

149.    Because the valuation of Tinder was conducted in private, Defendants could enrich themselves by talking out of both sides of their mouths. In secret, Defendants made false doom-and-gloom statements to fleece the Tinder Plaintiffs out of billions of dollars. But when it came

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM

NYSCEF DOC. NO. 2

INDEX NO. 654038/2018

RECEIVED NYSCEF: 08/14/2018

time to make public statements about Tinder that would impact their stock prices, Defendants told the truth—bragging to the public markets about Tinder's historic growth and profitability.

150.   Since the valuation and merger, Defendants have made numerous public statements about Tinder—many during SEC-regulated earnings calls—that praise Tinder's financial performance and directly contradict their private misrepresentations during the valuation.

151.   **Tinder Gold**

   a.   *Private Statements*: Defendants said that Tinder Gold would have a trivial impact on Tinder's revenue model and would have no meaningful long-term impact on its revenue growth rate.

   b.   *Public Statements*: During an August 2, 2017 earnings call, Blatt told investors that Defendants had "a great deal of confidence in" Tinder Gold, which was "really unlocking a tremendous amount of value" even during testing.  Defendants said that Tinder Gold would be "one of, if not the single biggest driver of incremental monetization that [Tinder had] launched since the beginning."  Within one week of Tinder Gold's U.S. launch in August 2017, Match's market capitalization increased by approximately one billion dollars, or more than 18%.  In a May 9, 2018 earnings call, Defendants disclosed the truth: Tinder Gold had "led to a surge in subscriber levels" and was the "most obvious driver" for Tinder's "dramatically higher" revenue per user.

42

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM

NYSCEF DOC. NO. 2

INDEX NO. 654038/2018

RECEIVED NYSCEF: 08/14/2018

152.   **SMS Authentication**

a.   *Private Statements*: Defendants dismissed the significance of SMS authentication, arguing that it would have only limited impact on Tinder's business.

b.   *Public Statements*: On a May 9, 2018 earnings call, Defendants disclosed that, within two months of launching SMS authentication, 75% of all new Tinder registrations in North America and a similar proportion of all new registrations globally use SMS authentication. Tinder's success with SMS authentication was the principal data point Defendants relied on during that call to demonstrate to analysts that Facebook's newly announced online dating product did not represent a significant threat to Tinder.

153.   **Growth Rate**

a.   *Private Statements*: Defendants said that Tinder's best days were behind it; Tinder's growth rate would soon stall and permanently decline. Defendants projected that Tinder's revenue would only grow by 31% by the end of 2018, and its revenue growth rate would collapse by more than 90% over the next five years.

b.   *Public Statements*: During an August 2, 2017 earnings call, Blatt told investors that Tinder would continue to be "the major driver of Match Group revenue growth for certainly several years." Swidler told the public that Defendants expected "revenue momentum to build throughout [2017] as Tinder's product momentum accelerate[d]." And Blatt told investors that Tinder would see "meaningful expansion and . . . reacceleration" of its

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM          INDEX NO. 654038/2018
NYSCEF DOC. NO. 2                                                     RECEIVED NYSCEF: 08/14/2018

growth rate.  More recently, on a May 9, 2018 earnings call, Defendants explained that thanks to "the long-term plan that [they had] put in place," "Tinder's margins are expanding, while at the same time Tinder is achieving tremendous growth."  And Defendants crowed that Tinder is "well positioned to keep capturing more and more of [its] market over time," has "multiple revenue drivers," and remains "in the early stages [of] how sophisticated [it] can be in terms of monetization."

154.    Defendants are now telling the truth about Tinder publicly for the same reason they lied about Tinder privately—to enrich themselves.  But Defendants have never disclosed to investors or to regulators the true multibillion-dollar price tag of all Tinder options or that they faced billions of dollars in liability resulting from their scheme.

155.    Tinder's financial performance since July 2017 further confirms the illegitimacy of Defendants' financial projections and resulting $3 billion valuation.  During the valuation, Defendants claimed that Tinder would earn $454 million in 2018 revenue.  On August 8, 2018, during Match's latest earnings call, Defendants revealed that "Tinder is on pace to exceed $800 million in revenue in 2018"—more than 75% higher than Defendants projected for 2018 revenue and more than 33% higher than Defendants projected even for 2021 revenue.  Defendants assured investors they were "confident" that Tinder's profit margins, already "strong," will "continue to expand," making the company even more profitable.  Defendants also disclosed that Tinder Gold's success had "reset" Tinder's metrics, generating "very sustained lifts" in key Tinder performance measures.

156.    Now that they have successfully executed their scheme, Defendants freely admit that Tinder is exactly the historic company the Tinder Plaintiffs always knew it was.

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM

NYSCEF DOC. NO. 2

INDEX NO. 654038/2018

RECEIVED NYSCEF: 08/14/2018

157.   Defendants' path to Tinder "gold" was paved with systematic exploitation and greed.  For years, Defendants cheated the Tinder Plaintiffs out of the credit and value they had earned—culminating in Defendants' scheme to deprive the Tinder Plaintiffs of their contractual rights as Tinder optionholders.  The Tinder Plaintiffs seek redress for themselves and all the other Tinder employees whom Defendants manipulated and cheated.

## CLAIMS FOR RELIEF

## COUNT I

### BREACH OF CONTRACT
*(Against IAC and Match)*

158.   The Tinder Plaintiffs repeat and reallege paragraphs 1 through 157 of this Complaint as if fully set forth herein.

159.   Each of the Tinder Plaintiffs has fully performed his or her obligations under his or her Option Agreement, as applicable, except as excused or prevented by Tinder, Match, or IAC.

160.   Pursuant to the Settlement Plan and each of the Tinder Plaintiffs' Option Agreements, each of the Tinder Plaintiffs is an express third-party beneficiary of the Settlement Plan.

161.   Each of the Tinder Plaintiffs has fully performed his or her obligations under the Settlement Plan, except as excused or prevented by Tinder, Match, or IAC.

162.   Each of the Tinder Plaintiffs is an intended third-party beneficiary of Rad's Funding and Governance Agreement, as the agreement's primary purpose was to effectuate and protect the integrity of the Qualifying Valuation Process set forth in the Settlement Plan, of which each of the Tinder Plaintiffs is an express third-party beneficiary.

163.   Each of the Tinder Plaintiffs has fully performed his or her obligations under Rad's Funding and Governance Agreement, except as excused or prevented by Tinder, Match, or IAC.

45

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM

NYSCEF DOC. NO. 2

INDEX NO. 654038/2018

RECEIVED NYSCEF: 08/14/2018

164. On information and belief, upon the July 13, 2017 merger of Tinder into Match, Match assumed all of Tinder's liabilities and obligations.

## A. Information Rights

165. Defendants breached Rad's Funding and Governance Agreement by failing to provide him with certain information to which he was entitled.

166. Pursuant to Section 4(a) of Rad's Funding and Governance Agreement, Tinder was required to "furnish the following financial information to [Rad]: (i) as soon as practicable after the end of each fiscal year of the Company, an unaudited balance sheet of the Company as at the end of such fiscal year, and unaudited statements of income and cash flows of the Company for such year, prepared in accordance with U.S. generally accepted accounting principles consistently applied; and (ii) as soon as practicable after the end of the first, second and third quarterly accounting periods in each fiscal year of the Company, an unaudited balance sheet of the Company as of the end of each such quarterly period, and unaudited statements of income and cash flows of the Company for such period, prepared in accordance with U.S. generally accepted accounting principles consistently applied, subject to changes resulting from normal year-end audit adjustments."  Defendants breached this provision by failing to provide Rad with all such information or preventing the provision thereof.

## B. May 2017 Scheduled Put

167. By their actions in connection with the May 2017 Scheduled Put, Defendants breached the Settlement Plan and the Tinder Plaintiffs' Option Agreements.

168. Pursuant to Section 1 of Schedule A to the Settlement Plan, in connection with the May 2017 Scheduled Put, Tinder was required to obtain "independent" determinations of Tinder's Public Company Trading Price.  Defendants breached this provision of the Settlement Plan by undermining the independent determination of Tinder's valuation.

46

050

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM
NYSCEF DOC. NO. 2

INDEX NO. 654038/2018
RECEIVED NYSCEF: 08/14/2018

169.     Pursuant to <u>Section 2 of Schedule A to the Settlement Plan</u>, in connection with the May 2017 Scheduled Put, Tinder was obligated to provide all reasonably requested diligence information regarding Tinder.  Defendants breached this provision of the Settlement Plan by withholding and refusing to provide reasonably requested diligence information.

170.     <u>Section 2 of Schedule A to the Settlement Plan</u> also obligated Tinder to grant access to Tinder management to discuss Tinder's business and prospects and diligence information about Tinder.  Defendants breached this provision of the Settlement Plan by limiting and interfering with access to Tinder executives and employees.

171.     Pursuant to <u>Section 10(d)(iii) of Rad's Option Agreement</u>, in connection with the May 2017 Scheduled Put, Tinder was required to give Rad equal access to Tinder diligence information and reasonable access to Tinder management.  Defendants breached this provision of Rad's Option Agreement by withholding information from Rad and interfering with Rad's ability to speak with Tinder management.

172.     Pursuant to <u>Section 2(b) of the Settlement Plan</u>, in connection with the May 2017 Scheduled Put, Tinder was required to "deliver to all Plan Beneficiaries eligible to participate in the Qualifying Put" a Put Price Notice, which was supposed to contain the Put Price, supporting calculations, and instructions for exercising vested options.  Defendants breached this provision of the Settlement Plan by depriving the Tinder Plaintiffs of this notice.

173.     Pursuant to <u>Section 2(c) of the Settlement Plan</u>, in connection with the May 2017 Scheduled Put, Tinder optionholders were entitled to a ten business day period, called a Put Exercise Window, in which to exercise their vested Tinder options.  Defendants breached this provision of the Settlement Plan by depriving the Tinder Plaintiffs of this window.

47

**051**

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM
NYSCEF DOC. NO. 2

INDEX NO. 654038/2018
RECEIVED NYSCEF: 08/14/2018

### C.    Tinder-Match Merger

174.    By their actions in connection with the July 13, 2017 merger of Tinder into Match, Defendants breached the Settlement Plan and Rad's Funding and Governance Agreement.

175.    Pursuant to <u>Section 6 of the Settlement Plan</u>, in connection with an "IAC Acquisition," including any merger of Tinder "with IAC or any of its affiliates," Tinder (before the merger) or Match (after the merger) was required to "institute a Discretionary Put with respect to which all Plan Beneficiaries [would] be deemed Holders" and conduct that Discretionary Put pursuant to Section 2 and Schedule A of the Settlement Plan.

176.    <u>Section 6 of the Settlement Plan</u> alternatively provided that "if the IAC Acquisition [did] not result in any meaningful change in the assets owned or controlled by [Tinder] (or its successor) and there [was] no meaningful change in the operating structure or integration of the business into any of IAC's other businesses, no Discretionary Put [would] be triggered and these arrangements shall remain unchanged."

177.    Defendants breached Section 6 of the Settlement Plan.  The merger of Tinder into Match did not result in any "meaningful change" in the assets owned or controlled by Tinder or Match or in the operating structure or integration of Tinder's business into any of IAC's other businesses.  Yet Defendants failed to preserve the arrangements of the Settlement Plan following the merger as Section 6 required.

178.    Alternatively, even if the merger of Tinder into Match did result in a "meaningful change" in Tinder's assets or operating structure or in the integration of Tinder's business into one or more of IAC's other businesses, Defendants breached Section 6 by failing to institute or conduct a Discretionary Put.

179.    Pursuant to <u>Section 2 of Rad's Funding and Governance Agreement</u>, "[i]n the event of an IAC Acquisition, the price paid to . . . the holders of Options and Shares issued upon the

48

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM

NYSCEF DOC. NO. 2

INDEX NO. 654038/2018

RECEIVED NYSCEF: 08/14/2018

exercise thereof" was required to be determined in accordance with the Qualifying Valuation Process set forth in Schedule A to the Settlement Plan. Thus, even if Defendants were not already required to institute a Discretionary Put in connection with the merger of Tinder into Match, they were required in any event to initiate a Qualifying Valuation Process to adequately compensate the Tinder Plaintiffs. Defendants breached this provision of Rad's Funding and Governance Agreement by failing to institute a compliant Qualifying Valuation Process in connection with the merger of Tinder into Match.

**D.      Termination of the Agreements**

180.    Defendants breached the Settlement Plan, the Tinder Plaintiffs' Option Agreements, and Rad's Funding and Governance Agreement by improperly terminating them after the merger of Tinder into Match.

181.    Pursuant to <u>Section 10 of the Settlement Plan</u>, the Settlement Plan could only terminate "upon the earlier to occur of (i) a Public Offering and (ii) such time as IAC, together with its affiliates, owns less than a majority of the outstanding equity of the Company (measured on a fully-diluted, as-converted-to-common-stock basis)." Defendants breached this provision by terminating the Settlement Plan without a proper basis to do so.

a.      At the time the Settlement Plan was terminated, a Public Offering had not taken place. For purposes of the Settlement Plan, as set forth in Section 4, a "Public Offering" means "a transaction or series of related transactions resulting in the common stock of [Tinder] (or of such company resulting from such transactions or series of transactions) being publicly traded and registered under the Exchange Act (whether by underwritten public offering, spin off to shareholders or similar means)." Tinder's shares have

49

**FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM**
NYSCEF DOC. NO. 2

INDEX NO. 654038/2018
RECEIVED NYSCEF: 08/14/2018

never been publicly traded, and the Tinder-Match merger did not result in Match's shares being publicly traded.

    b.   At the time the Settlement Plan was terminated, IAC and its affiliates did not own less than a majority of the outstanding shares of Tinder. Match, an IAC affiliate, owned all of Tinder's outstanding shares at that time.

182.   Defendants also breached each of the Tinder Plaintiffs' Option Agreements and Rad's Funding and Governance Agreement by terminating them without a proper basis to do so.

*    *    *

183.   As a result of Defendants' material breaches of the Settlement Plan, the Tinder Plaintiffs' Option Agreements, and Rad's Funding and Governance Agreement, the Tinder Plaintiffs have been damaged in an amount to be determined at trial, but not less than $2,000,000,000.

**COUNT II**

**BREACH OF THE IMPLIED COVENANT OF**
**GOOD FAITH AND FAIR DEALING**
***(Against IAC and Match)***

184.   The Tinder Plaintiffs repeat and reallege paragraphs 1 through 183 of this Complaint as if fully set forth herein.

185.   Each of the Tinder Plaintiffs has fully performed his or her obligations under his or her Option Agreement, as applicable, except as excused or prevented by Tinder, Match, or IAC.

186.   Pursuant to the Settlement Plan and each of the Tinder Plaintiffs' Option Agreements, each of the Tinder Plaintiffs is an express third-party beneficiary of the Settlement Plan.

187.   Each of the Tinder Plaintiffs has fully performed his or her obligations under the Settlement Plan, except as excused or prevented by Tinder, Match, or IAC.

50

**054**

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM
NYSCEF DOC. NO. 2

INDEX NO. 654038/2018
RECEIVED NYSCEF: 08/14/2018

188.    Each of the Tinder Plaintiffs is an intended third-party beneficiary of Rad's Funding and Governance Agreement, as the agreement's primary purpose was to effectuate and protect the integrity of the Qualifying Valuation Process set forth in the Settlement Plan, of which each of the Tinder Plaintiffs is an express third-party beneficiary.

189.    Each of the Tinder Plaintiffs has fully performed his or her obligations under Rad's Funding and Governance Agreement, except as excused or prevented by Tinder, Match, or IAC.

190.    On information and belief, upon the July 13, 2017 merger of Tinder into Match, Match assumed all of Tinder's liabilities and obligations.

191.    Implied in each of the Settlement Plan, the Tinder Plaintiffs' Option Agreements, and Rad's Funding and Governance Agreement is a covenant that the parties will act in good faith and deal fairly with each other, including in connection with the Qualifying Valuation Process set forth in Schedule A to the Settlement Plan.

192.    The inclusion of an independent, good-faith Qualifying Valuation Process to fairly value Tinder options in connection with certain liquidity events was central to the bargain the parties struck and to the overarching purpose of the Agreements.

193.    Defendants, acting in bad faith, breached the implied covenant of good faith and fair dealing inherent in each of the Settlement Plan, the Tinder Plaintiffs' Option Agreements, and Rad's Funding and Governance Agreement by, among other things, undermining the Qualifying Valuation Process in 2017.

194.    As a result of Defendants material breaches of the implied covenant of good faith and fair dealing, the Tinder Plaintiffs have been damaged in an amount to be determined at trial, but not less than $2,000,000,000.

51

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM
NYSCEF DOC. NO. 2

INDEX NO. 654038/2018
RECEIVED NYSCEF: 08/14/2018

### COUNT III

### UNJUST ENRICHMENT
*(Against IAC and Match)*

195.    The Tinder Plaintiffs repeat and reallege paragraphs 1 through 194 of this Complaint as if fully set forth herein.

196.    In the alternative to the Tinder Plaintiffs' claims for breach of contract and breach of the implied covenant of good faith and fair dealing, Defendants were unjustly enriched at the expense of the Tinder Plaintiffs.

197.    Defendants unjustly benefitted by undercompensating the Tinder Plaintiffs for their Tinder options intentionally and in bad faith.

198.    Equity and good conscience require that the Tinder Plaintiffs receive restitution, as it would be unjust to allow Defendants to retain the benefit of their bad faith and manipulative conduct.

199.    As a result of Defendants' unjust enrichment at the Tinder Plaintiffs' expense, the Tinder Plaintiffs have been damaged in an amount to be determined at trial, but not less than $2,000,000,000.

### COUNT IV

### INTERFERENCE WITH CONTRACTUAL RELATIONS
*(Against Match)*

200.    The Tinder Plaintiffs repeat and reallege paragraphs 1 through 199 of this Complaint as if fully set forth herein.

201.    Each of the Tinder Plaintiffs has fully performed his or her obligations under his or her Option Agreement, as applicable, except as excused or prevented by Tinder, Match, or IAC.

52

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM

NYSCEF DOC. NO. 2

INDEX NO. 654038/2018

RECEIVED NYSCEF: 08/14/2018

202.    Pursuant to the Settlement Plan and each of the Tinder Plaintiffs' Option Agreements, each of the Tinder Plaintiffs is an express third-party beneficiary of the Settlement Plan.

203.    Each of the Tinder Plaintiffs has fully performed his or her obligations under the Settlement Plan, except as excused or prevented by Tinder, Match, or IAC.

204.    Each of the Tinder Plaintiffs is an intended third-party beneficiary of Rad's Funding and Governance Agreement, as the agreement's primary purpose was to effectuate and protect the integrity of the Qualifying Valuation Process set forth in the Settlement Plan, of which each of the Tinder Plaintiffs is an express third-party beneficiary.

205.    Each of the Tinder Plaintiffs has fully performed his or her obligations under Rad's Funding and Governance Agreement, except as excused or prevented by Tinder, Match, or IAC.

206.    Although before the merger of Tinder into Match, Match was not a party to the Settlement Plan, the Tinder Plaintiffs' Option Agreements, or Rad's Funding and Governance Agreement, Match had knowledge of these agreements.

207.    By its actions in connection with the May 2017 Scheduled Put and the merger of Tinder into Match, Match induced numerous breaches of, and undermined the Tinder Plaintiffs' rights under, the Settlement Plan, the Tinder Plaintiffs' Option Agreements, and Rad's Funding and Governance Agreement.

208.    Match either acted with the purpose and intent to cause a breach or interfere with the Tinder Plaintiffs' contractual rights or, alternatively, Match knew that a breach or disruption in the Tinder Plaintiffs' contractual rights was certain or substantially certain to occur as a result of its actions.

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM
NYSCEF DOC. NO. 2

INDEX NO. 654038/2018
RECEIVED NYSCEF: 08/14/2018

209.    As a result of Match's interference with the Settlement Plan, the Tinder Plaintiffs' Option Agreements, and Rad's Funding and Governance Agreement, the Tinder Plaintiffs have been damaged in an amount to be determined at trial, but not less than $2,000,000,000.

## COUNT V

### INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### *(Against IAC and Match)*

210.    The Tinder Plaintiffs repeat and reallege paragraphs 1 through 209 of this Complaint as if fully set forth herein.

211.    Defendants were aware that the Tinder Plaintiffs had economic relationships with Tinder, from which they expected to receive future economic benefits, including in connection with their Tinder options.

212.    By their actions in connection with the May 2017 Scheduled Put and the merger of Tinder into Match, Defendants disrupted the Tinder Plaintiffs' economic relationships with Tinder.

213.    Defendants either acted with the purpose and intent to disrupt these relationships or, alternatively, Defendants knew that the disruption was certain or substantially certain to occur as a result of their actions.

214.    As a result of Defendants' inference with the economic relationships between the Tinder Plaintiffs and Tinder, the Tinder Plaintiffs have been damaged in an amount to be determined at trial, but not less than $2,000,000,000.

### PRAYER FOR RELIEF

WHEREFORE, the Tinder Plaintiffs respectfully request the following relief:

a.    Compensatory damages in an amount to be determined at trial, but not less than $2,000,000,000;

b.    Punitive damages in an amount to be determined at trial;

FILED: NEW YORK COUNTY CLERK 08/14/2018 10:49 AM
NYSCEF DOC. NO. 2

INDEX NO. 654038/2018
RECEIVED NYSCEF: 08/14/2018

c.    Pre-judgment and post-judgment interest; and

d.    Such further relief as the Court deems just and proper.

Dated:  New York, New York
        August 14, 2018             Respectfully submitted,

                       GIBSON, DUNN & CRUTCHER LLP

                       By: _____
                          Orin Snyder
                          Matthew Benjamin
                          Laura Raposo
                          Connor Sullivan
                          200 Park Avenue
                          New York, NY 10166-0193
                          Telephone: 212.351.4000
                          OSnyder@gibsondunn.com
                          MBenjamin@gibsondunn.com
                          LRaposo@gibsondunn.com
                          CSSullivan@gibsondunn.com

                          Christine Demana
                          2100 McKinney Avenue
                          Dallas, TX 75201-6912
                          Telephone: 214.698.3100
                          CDemana@gibsondunn.com

                          *Attorneys for Tinder Plaintiffs Sean Rad,
Jonathan Badeen, Paul Cafardo, Gareth
Johnson, James Kim, Alexa Mateen, Justin
Mateen, Joshua Metz, Ryan Ogle, and
Rosette Pambakian*

**EXHIBIT B**

Electronically FILED by Superior Court of California, County of Los Angeles on 08/05/2019 09:40 AM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Clifton,Deputy Clerk
19STCV27416

Assigned for all purposes to: Spring Street Courthouse, Judicial Officer: Stephen Goorvitch

M. Elizabeth Graham, CA 143085
Grant & Eisenhofer, P.A.
101 California Street, Suite 2710
San Francisco, California 94111
Phone: (415) 365-9585
Fax: (415) 365-9650
Email: egraham@gelaw.com

*Additional Counsel for Plaintiff on
Signature Page*

# IN THE SUPERIOR COURT FOR THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES – UNLIMITED CIVIL JURISDICTION

| | |
|---|---|
| ROSETTE PAMBAKIAN, | CASE NO. _____ |
|         Plaintiff, | **COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL** |
| v. | |
| GREGORY BLATT, IAC/INTERACTIVE CORP. and MATCH GROUP, INC. | (1) Negligence<br>(2) Intentional Infliction of Emotional Distress<br>(3) Sexual Battery (Civ. Code § 1708.5)<br>(4) Gender Violence (Civ. Code § 52.4)<br>(5) Ralph Act Violation (Civ. Code § 51.7)<br>(6) Negligent Misrepresentation<br>(7) Wrongful Termination (Labor Code § 1102.5)<br>(8) Retaliation for Engaging in Protected Activity (Gov. Code § 12940) |
|         Defendants. | |
| | **JURY TRIAL DEMANDED** |

Plaintiff Rosette Pambakian, ("Plaintiff") by her attorneys, files this Complaint seeking judgment against Defendants GREGORY BLATT (hereinafter, "Defendant Blatt"), IAC/INTERACTIVE CORP. (hereinafter, "IAC") AND MATCHGROUP, INC. (hereinafter, "Match Group" or "Match") (collectively, "Defendants") for claims arising from a sexual assault perpetrated by Defendant Blatt on Ms. Pambakian while both were employed at Tinder, Inc., the subsequent cover-up by Defendants, and the retaliatory wrongful termination of Ms. Pambakian, and alleges as follows:

## I.   SUMMARY OF CLAIMS

1.      This case is about the abuse of the personal rights and well-being of Plaintiff, Rosette Pambakian, a successful marketing executive, by an insidious corporate culture that emphasized profit at all costs.   Plaintiff was one of the earliest executive hires and the longest standing female executive at the dating app Tinder, until her retaliatory termination in 2018.   While at an outside public relations agency, Plaintiff spearheaded the launch of Tinder in 2012.   In 2014, she officially joined the company as Tinder's Head of Communications, where she was essential to building the company from its early startup phase into the world's most popular dating app, a multi-billion dollar enterprise and technology innovator.

2.      Plaintiff has been credited as an integral part of Tinder's success. Several Tinder founders have commented that Tinder could not have gotten where it did without the expertise and dedication of Plaintiff.  When parent company Match marked its IPO in November 2015, due in large measure to the success of Tinder, Ms. Pambakian was invited to the NASDAQ trading floor for the ceremonial ringing of the bell.  She was named one of the 40 under 40 by PR Week, one of Refinery 29's Top Women in Tech, and included in Cosmopolitan Magazine's Millennial Power List, all for her work at Tinder. Plaintiff's career was on the rise until she was sexually assaulted by the CEO of Match Group and Tinder, Gregory Blatt.

3.      Before stepping in, and while serving as, interim CEO of Tinder, Defendant Blatt was also the CEO and Chairman at Match Group.  Match Group and its parent company IAC (hereinafter, "Company Defendants"), owned Tinder. However, when Defendant Blatt and his team arrived at Tinder, they brought IAC and Match Group's misogynistic culture with them.

4.      Defendant Blatt has a reputation for being a notorious bully, known for volatile outbursts and vindictive retribution.  Plaintiff endured Defendant Blatt's inappropriate behavior throughout their working relationship, culminating in December 2016 when he physically and sexually assaulted Plaintiff.

5.      As soon as the Company Defendants became aware of Defendant Blatt's assault and the events leading up to it, including the cultivation of a harassing work environment that rewarded men like Defendant Blatt, the Company Defendants began a campaign to cover up the assault and disparage Plaintiff.  Indeed, a meaningful "investigation" of Plaintiff's complaint about Defendant Blatt's assault, which was required under IAC and Match company policies, and California law, never occurred.  The Company Defendants failed to interview a key eyewitness and ignored damning facts, because the Company Defendants did not want to risk their bottom line.  Rather, Plaintiff was marginalized, subject to additional harassing, offensive, and insulting behavior, put on administrative leave, publicly accused of consenting to her attacker's advances, and finally, wrongfully terminated by Defendants.

## II.      PARTIES

6.      Plaintiff is an individual who was and is at all times relevant to the claims alleged herein, a resident of Los Angeles County, California.  At all times relevant to the claims herein, Plaintiff was employed and worked at Tinder headquarters in Los Angeles, California.

7.     Tinder, Inc. ("Tinder), at all times relevant to the claims alleged herein, was a Delaware corporation with its principal place of business in Los Angeles, California.  From March 11, 2013 to July 13, 2017, Tinder was a Delaware corporation owned by Match Group.  On July 13, 2017, Match Group merged Tinder into itself.  On information and belief, Match Group assumed all of Tinder's liabilities and obligations, including those arising from Plaintiff's sexual assault, the inadequate investigation of Plaintiff's complaints about the assault, and Defendants' subsequent attempts to cover up both the events giving rise to Plaintiff's complaints and Plaintiff's complaints themselves.

8.     Defendant Gregory Blatt is an individual, who at all times relevant to the claims alleged herein, was employed by Defendant Match Group and maintained an office at Tinder headquarters in Los Angeles, CA.

9.     Defendant IAC, is, and at all relevant times mentioned herein was a corporation organized under the laws of the State of Delaware.  At all relevant times mentioned herein, IAC's primary place of business was located in New York, New York.  IAC owns or controls Match Group, Inc.

10.    Defendant Match Group is, and at all relevant times mentioned herein, was a corporation organized under the laws of the State of Delaware.  At all relevant times mentioned herein, Match Group's primary place of business was located in Dallas, Texas.  Before Match became a public company on November 19, 2015, it was a wholly owned subsidiary of IAC.  Since November 19, 2015, IAC has owned a majority of Match Group's outstanding shares.

## III.    JURISDICTION AND VENUE

11.    This Court has jurisdiction over this action pursuant to California Code of Civil Procedure § 410.10.  Plaintiffs seek damages under the statutory and common law of the State of California.

12. Venue is proper in this Court pursuant to California Code of Civil Procedure § 395 because (a) some of the acts and transactions described herein occurred within this county, including Plaintiff's employment with Defendants, the sexual assault of Plaintiff, the resulting "investigation," and ultimate termination of Plaintiff; (b) some Defendants are or were registered to do business in the State of California and/or are or were doing business within this county; and (c) Defendants did do business in this county by operating and/or exercising complete control over the operations of the company formerly known as Tinder, Inc.

### IV.    FACTS COMMON TO ALL CAUSES OF ACTION

**A.    Defendant Blatt's Sexual Assault of Plaintiff**

13. In December 2016, Plaintiff was the longest standing (and one of the only) female executives at Tinder. Plaintiff held the executive position of Vice President of Global Communications and Brand. Her role eventually expanded to Head of Marketing and Communications, managing an in-house group of more than 40 people, as well as external agencies and consultants. Publicly, she served as the face of the brand on panels and in the press.

14. During all events described herein, Defendant Blatt was the CEO and Chairman of Match Group, as well as the CEO of Tinder, and directly in charge of Plaintiff.

15. On December 9, 2016, Tinder held its holiday party at the SLS Hotel in Beverly Hills Hotel, in Los Angeles, California. Plaintiff attended the party. Several Tinder employees had rooms at the hotel, paid for by Tinder, including Witness No. 1, Defendant Blatt's Executive Assistant.

16. At the party, Defendant Blatt approached Plaintiff and said to her in a lewd voice, in sum and substance, "I get hard every time I look at you" and "Let's get out of here." Plaintiff was stunned. Defendant Blatt's conduct was so aggressive that Plaintiff feared that Defendant Blatt might actually act on it. Plaintiff quickly

walked away from Defendant Blatt, found a colleague and close friend, Witness No. 2, and went upstairs to friend and colleague, Witness No. 1's hotel room, in an attempt to distance herself from Defendant Blatt.

17.    Plaintiff, Witness No. 1 and Witness No. 2, were upstairs in Witness No. 1's hotel room at approximately 2:00 AM when, Defendant Blatt texted Witness No. 1. Plaintiff asked Witness No. 1 not to tell Defendant Blatt where they were. Several minutes later, there was a knock at the door. Witness No. 1 answered the door and Plaintiff saw that Defendant Blatt had arrived at the room. When Defendant Blatt arrived, Plaintiff was sitting on the bed.

18.    Immediately upon entering the room, Defendant Blatt went straight for Plaintiff who was sitting on the bed. Defendant Blatt climbed on top of Plaintiff and pulled her backwards so that Plaintiff was lying beside him with his arm draped over Plaintiff. Defendant Blatt then began forcibly groping Plaintiff's breasts and upper thighs, and kissing her shoulders, neck and chest—all without Plaintiff's consent. Then, Defendant Blatt said, sum and substance, "Turn off the lights." In a state of shock and disbelief, Plaintiff was also acutely aware of the subordinates in the room, and made the decision to de-escalate the situation and not cause a further scene. Plaintiff began to pull away from Defendant Blatt and said, in sum and substance, "Ok, we are all hungry; I'm going to order food." Defendant Blatt then removed his hands from Plaintiff enabling her to stand up.

19.    Plaintiff, Defendant Blatt, Witness No. 1 and Witness No. 2 remained in Witness No. 1's room waiting for the food to arrive. At some point after the food was ordered, Defendant Blatt again pushed Plaintiff onto the bed and began groping her and attempting to kiss her. While again attempting to end Defendant Blatt's unwanted sexual contact and remove herself from his immediate proximity, Plaintiff announced it was time to leave. Witness No. 1, begged Plaintiff not to leave her alone with Defendant Blatt. Plaintiff and Witness No. 2 waited until Defendant Blatt

1   left in his car service to request separate Ubers and went to the lobby to await their

2   respective rides.

3   **B.   The Aftermath of Blatt's Assault**

4       20.   Defendant Blatt was the CEO of Tinder, the Chairman and CEO of

5   Match Group, and Plaintiff's boss.  Plaintiff knew that Defendant Blatt was a

6   powerful man, a long-time executive at Match Group and IAC, and feared retaliation

7   and the loss of her job at Tinder.  Plaintiff's fears were based on Defendant Blatt's

8   reputation for openly behaving inappropriately toward women without any

9   consequences.  Defendant Blatt seemed untouchable.

10       21.   Plaintiff feared damage to her reputation and a change in how she would

11   be perceived by her subordinates and colleagues if her assault were made public.

12   Plaintiff also feared damage to Tinder's business, which she had worked years to

13   build.

14       22.   The morning after the sexual assault, Plaintiff asked Witness No. 1 and

15   Witness No. 2 not to share what had happened with anyone.

16       23.   Two days after the assault, Defendant Blatt called Plaintiff into his

17   office and apologized profusely for his actions the night of the holiday party.  Faced

18   with the reality that she would have to continue to work with and be supervised by

19   Defendant Blatt—the new CEO of Tinder—and scared of the consequences to her

20   working relationships and reputation if the sexual assault were made public, Plaintiff

21   and Defendant Blatt agreed to quash the incident and not to speak of it again.

22   **C.   Plaintiff Reported the Assault to Her Supervisor**

23       24.   Several days after the sexual assault, Plaintiff attended a Tinder/Match

24   Communications Team Dinner.  Also present was Vice President of Public Affairs

25   for Match Group, Matt David, to whom Plaintiff also reported.  At all times relevant

26   herein, Mr. David reported directly to Defendant Blatt.

27

28

6

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

25.     During this dinner, Plaintiff told Mr. David about the sexual assault. Plaintiff felt that it was necessary to report Defendant Blatt's actions to Mr. David both because Defendant Blatt's actions were unacceptable and because she feared a potential public relations crisis as there were witnesses to the assault.

26.     In response, Mr. David said nothing.  However, Mr. David's expression was one of shock.

27.     On information and belief, rather than comply with the obligations placed on him to report any such complaints to Human Resources, Mr. David did not report Defendant Blatt's misconduct to Human Resources.

**D.     The Company Defendants' Inadequate and Biased "Investigation" Amounts to a Cover-Up of Defendant Blatt's Misconduct**

28.     On information and belief, Sean Rad, former Tinder CEO and then-Tinder Chairman, began hearing rumors of Defendant Blatt's disturbing behavior toward Plaintiff at the Holiday Party from multiple sources, including indirectly from Witness No. 1.  Mr. Rad took Plaintiff aside, told her that he heard something happened at the holiday party, and asked her if there was anything she wanted to tell him.  Plaintiff relayed to Mr. Rad what Defendant Blatt said to her at the holiday party and how he assaulted her in Witness No. 1's hotel room.

29.     On information and belief, Mr. Rad reported Defendant Blatt's sexual assault of Plaintiff to Gregg Winiarski, Executive Vice President and General Counsel of IAC, Joey Levin, CEO of IAC, and Jared Sine, Chief Legal Officer of Match Group.  On information and belief, Mr. Rad also discussed the incident with Lisa Nelson, Chief Human Resources Officer at Match Group and Tinder.  On information and belief, Ms. Nelson told Mr. Rad that she was contemplating quitting her job because of Defendant Blatt's alleged behavior.  On information and belief, Mr. Rad thereafter learned that there would be an investigation and that Mr. Sine and

Ms. Nelson would be running it.  Both of these individuals reported directly to Defendant Blatt.

30.     On information and belief, Mr. Rad expressed his fears that the investigation was biased, because two executives who reported directly to Defendant Blatt, the subject of the investigation, were in fact in charge, but his concerns fell on deaf ears.

31.     On information and belief, after Mr. Rad reported Defendant Blatt's assault, Mr. Rad started receiving threats from Match executives that if he did not stop pursuing the investigation into Defendant Blatt's misconduct he would face retribution.

32.     Mr. Rad pressed Tinder and Match Board members for a meeting of Tinder's Board of Directors to discuss Defendant Blatt's assault on Plaintiff, to no avail.  On information and belief, Defendant Blatt emailed the board members and discouraged them from speaking to Mr. Rad.

33.     On information and belief, Matt Cohler, a General Partner of Benchmark and then-Tinder Board member, told Mr. Rad that there was no reason for a board meeting, and that the Tinder Board could not do anything until Plaintiff formally "reported" the assault—notwithstanding the fact that she already had reported it to her direct supervisor (Mr. David) and Tinder's Chairman (Rad).

34.     On information and belief, Mr. Rad spoke with a then-Match Board member, to express concern about the way Plaintiff's complaint was being handled. Consistent with their corporate culture emphasizing profit over people, the Match Board Member assured Mr. Rad he had nothing to worry about because, in sum and substance, "everyone [was] going to make a lot of money."

35.     On information and belief, the Tinder Board of Directors was never convened regarding Defendant Blatt's sexual assault of Plaintiff.

36.     On April 28, 2017 - which, on information and belief, was approximately one day after Mr. Rad reported Defendant Blatt's sexual assault of Plaintiff to Defendants IAC and Match Group executives – Defendant Blatt exercised approximately 5 million stock options in Match Group, realizing over $44 million in value.  The questionable timing of this transaction cannot be ignored, given the affect a scandal of this magnitude could have on Match Group's stock price if made public.

37.     On or about April 30, 2017, Plaintiff was approached by Lisa Nelson, Chief Human Resources Officer to discuss the sexual assault.  Plaintiff was leery of speaking with Ms. Nelson, as Plaintiff was aware that Ms. Nelson was very closely linked to Defendant Blatt, having worked with him for many years, and that she reported directly to him.

38.     Plaintiff told Ms. Nelson that she was reluctant to talk with her and wanted to ensure confidentiality out of fear of retaliation by Defendants.  Only after Ms. Nelson assured Plaintiff of the confidentiality of her statements did Plaintiff agree to speak to Ms. Nelson.

39.     When Plaintiff met with Ms. Nelson, Jared Sine, Chief Legal Officer at Match, was also present.  Plaintiff confirmed the sexual assault.

40.     On May 3, 2017, Plaintiff was asked to meet with Ed Ferguson, Vice President and Associate General Counsel at IAC, and Mr. Sine.  During this meeting, Plaintiff again recounted Defendant Blatt's assault.  Mr. Ferguson told Plaintiff that they had spoken to Defendant Blatt and he had insinuated that it was consensual.  In response, Plaintiff told the men that Defendant Blatt had approached her earlier at the Holiday Party and said, "I get hard every time I look at you," and "Let's get out of here."  She explained that she immediately walked away embarrassed, stunned, and concerned that he might actually try to act on it.  Both Mr. Ferguson and Mr. Sine expressed shock and were appalled by Defendant Blatt's actions.  Both apologized to Plaintiff for having to endure such an incident.

41.     Just one day following her meeting with Mr. Sine and Mr. Ferguson, despite assurances of confidentiality and privacy, Defendant Blatt emailed Plaintiff and his Executive Assistant, Witness No. 1, asking both women to participate in separate video conferences with him.  Plaintiff knew in that moment that Defendants' promise of confidentiality had been violated and that information was going from Human Resources and Defendants IAC and Match Group's Legal Counsel to Defendant Blatt.

42.     Plaintiff did not respond to Defendant Blatt's email and did not attend the video conference, but, upon information and belief, Witness No. 1 did.  After the video conference, Witness No. 1 group-texted Plaintiff and Chief Human Resources Officer Lisa Nelson and told them, in sum and substance, that Defendant Blatt knew everything that they had said to Ms. Nelson and Mr. Sine.  During a phone conversation later that day, Witness No. 1 told Plaintiff that Defendant Blatt had begged her not to continue cooperating in the investigation as it would ruin his life and his family.

43.     After talking with Witness No. 1, Plaintiff responded to the group text that she did not feel comfortable talking further about what happened until she consulted with a lawyer.  Ms. Nelson responded that she understood.  After this text, Plaintiff was no longer contacted as part of the "investigation."

44.     The purported "investigation" Company Defendants conducted did not comply with either California law or their own internal policies.  The Company Defendants used the investigation as an attempt to cover-up and conceal the misconduct of Defendant Blatt.

45.     For example, Defendants' purported "investigators" failed to interview one of the two eyewitnesses to the sexual assault, Witness No. 2.  Instead, among those two eyewitnesses, Defendants only interviewed Witness No. 1 – Defendant Blatt's Executive Assistant.  As Witness No. 2 was present in the room, and

witnessed the assault, no adequate investigation could be conducted without interviewing Witness No. 2.  Furthermore, while the purported "investigation" was ongoing, Defendants required Plaintiff to continue to report to Defendant Blatt.  The Company Defendants also told Defendant Blatt information provided by Plaintiff and other witnesses, violating promises of confidentiality.

46.    In or around July 2017, a reporter from Tech Crunch began asking Plaintiff questions about rumors of sexual misconduct at Tinder by high-level Match Group executives.  A few months later, Plaintiff learned that the same reporter was still investigating, and that the story was about Plaintiff's own assault at the hands of Defendant Blatt.

47.    Plaintiff informed Defendant Blatt and Chief Human Resources Officer, Ms. Nelson, about the reporter's inquiry.  Defendant Blatt, Plaintiff's own perpetrator, asked Plaintiff to talk with the reporter to explain the ways Tinder combats sexual harassment, and to throw the reporter off the story.  Plaintiff refused to comply with Blatt's instruction, and referred the reporter to the Head of Communications at IAC.

48.    In or around October 2017, when it became apparent that Defendant Blatt and Company Defendants could no longer get Plaintiff to say or do whatever Defendants needed or wanted to cover-up the assault, they asked Plaintiff to sign a non-disclosure/disparagement agreement ("NDA") concerning the sexual assault and investigation, in exchange for increased compensation.  Chief Human Resources Officer at Match Group and Tinder, Lisa Nelson, approached Plaintiff and said in sum and substance that she and Defendant Blatt would petition the Compensation Committee to increase Plaintiff's compensation if she signed the NDA.  During that conversation, Ms. Nelson said to Plaintiff, in sum and substance, "We want to put this terrible ordeal behind us."  Plaintiff declined to sign.

49.     After declining to sign the NDA, Plaintiff became aware that Defendant Blatt was going to resign as Tinder CEO.  During a conversation with Plaintiff, Defendant Blatt, and another male executive, the male executive asked Defendant Blatt what it would take to get Defendant Blatt to stay.  Defendant Blatt turned to Plaintiff and said in sum and substance, "Well, you would have to sign something." Defendant Blatt immediately walked it back, saying in sum and substance to Plaintiff, "Never mind, I shouldn't have said that, I could get in big trouble."  It was then clear that Defendant Blatt was being asked to resign because of his sexual assault of Plaintiff.

50.     Upon information and belief, even after resigning, Defendant Blatt retained his Tinder and Match Group email accounts, worked from the IAC Office for several months, and appeared actively involved in Defendants IAC and Match Group's business.  Defendant Blatt also continued to "check in" on Plaintiff to ensure she would not speak out publicly.

51.     Through their actions and inaction, Company Defendants violated their own internal policies.  IAC and Match Group's stated policy is to be "good corporate citizen(s)" and "committed to full, prompt, and fair enforcement" of their Code of Ethics.  The Code of Ethics states that, upon reporting of a violation of the Code of Ethics, IAC and Match Group legal departments shall investigate all relevant facts. IAC and Match Group's Code of Ethics also specifically prohibits retaliation.

52.     Pursuant to the Code of Ethics, "In conducting and monitoring investigations, the IAC Legal Department shall consult and coordinate as appropriate with senior management, the Internal Audit Department, the Human Resources Department, and the Audit Committee, and shall seek to ensure that the provisions of the Code of Ethics are applied and enforced consistently across the population of covered persons and across IAC business."  Match Group's Code of Ethics has this identical provision.

53.     IAC and Match Group also have a stated policy against harassment. Pursuant to this policy, "It is the policy of IAC/InterActiveCorp and its Operating Businesses and Corporate Office . . . to be committed to a workplace free of discrimination or harassment.  Harassment of applicants or employees on the basis of . . . sex, including sexual harassment, is unacceptable and will not be tolerated."

54.     IAC and Match Group's Policy defines sexual harassment as "offensive or unwelcome sexual advances, verbal comments or innuendo of a sexual nature. . . . Comments, physical touching of another person . . . may also constitute sexual harassment."  Pursuant to this policy, "Human Resources will investigate all reports of harassment promptly and thoroughly."

55.     All of these policy statements turned out to be false and misleading.

56.     The Company Defendants disregarded their stated policies when the allegations were against CEO Defendant Blatt.  Instead, they engaged in a sham investigation conducted by biased executives in an effort to conceal and discredit the sexual assault suffered by Plaintiff.    Only when faced with the fact that they could no longer keep the assault quiet, did the Company Defendants take any action.

57.     The Company Defendants were willful, wanton, reckless, negligent in overseeing and supervising and grossly negligent as a result of its employee, agent and/or servant's acts as follows:

> a.  In failing to supervise and control Defendant Blatt's sexual misconduct;
>
> b.  In failing to conduct an unbiased, independent, prompt, and legally compliant investigation;
>
> c.  In retaining Defendant Blatt as CEO for approximately 10 months after he assaulted Plaintiff;
>
> d.  In failing to use ordinary skill and care to protect Plaintiff; and

e.  In such other ways as will become evident during discovery.

58.     The Company Defendants' knowing acquiescence and silence with respect to the known, or reasonably knowable, activities of Defendant Blatt constituted a course of conduct through which Defendant Blatt's sexual assault of, and retaliation against, Plaintiff was condoned, approved and authorized. The Company Defendants' actions made clear that, but for the reporters learning of the assault, the Company Defendants would have taken no action against Defendant Blatt.

59.     Through the Company Defendants' failure to timely investigate Plaintiff's complaint and/or reprimand and sanction the acts referenced herein, and for all of the other reasons set forth in this Complaint including, without limitation, their failure to take the steps necessary to prevent and/or independently investigate the occurrence of such reprehensible acts, the Company Defendants ratified said actions and, accordingly, are vicariously liable for the actions of Defendant Blatt.

E.     **Plaintiff's Retaliatory and Wrongful Termination**

60.     On August 14, 2018, Plaintiff filed a lawsuit with several others regarding the valuation of her stock options, alleging in part that when Plaintiff's assault was reported to Defendants IAC and Match Group executives, they failed to properly investigate and take timely corrective action against Defendant Blatt.  The suit alleged that the Company Defendants failed to act because they needed Defendant Blatt, whom as CEO and the highest-ranking executive in charge of the valuation process of Tinder, was the lynchpin in Company Defendants' scheme to undervalue Tinder and decrease the amount Plaintiff and her fellow Tinder stock holders would receive in exercising their stock options by billions of dollars.

61.     The next day, the Company Defendants placed Plaintiff on "leave."

62.     The Company Defendants immediately revoked Plaintiff's email account—forcing incoming emails to bounce back to the sender—removed her

nameplate from her office door, and turned her office into a conference room.  Within one month, and three months before officially terminating Plaintiff, the Company Defendants hired a new Chief Marketing Officer to replace her.

63.     On December 18, 2018, Plaintiff received notice via e-mail that Tinder was terminating her employment.  Upon information and belief, Defendants terminated Plaintiff in retaliation for speaking out against Defendant Blatt for his sexual misconduct and for participating in a lawsuit against the Company Defendants related to her stock options.

64.     As a result of these actions, Plaintiff was forced to surrender millions of dollars in equity granted to her as compensation for her work as an executive at Tinder.

**F.     The Company Defendants Fostered a Misogynistic Work Culture that Promoted Sexual Harassment and Assault**

65.     The Company Defendants promoted a misogynistic culture where female employees were marginalized and sexually harassed on a regular basis.  From the time that Defendant Blatt and other Company Defendants' executives arrived from Match Group at Tinder, it became clear that their corporate culture and managerial style was not respectful towards women, including Plaintiff.

66.     After Defendant Blatt arrived, he quickly made it difficult for Plaintiff to do her job effectively.  Because she was a young woman, Defendant Blatt treated Plaintiff differently than other executives.  Despite her experience and track record as a successful marketing executive, Defendant Blatt did not take Plaintiff seriously.  On more than one occasion when Plaintiff disagreed with him and/or addressed Defendant Blatt in a professional tone in meetings,  Defendant Blatt responded by asking Plaintiff to leave the meetings and come back "when [her] attitude changed."

67.     On another occasion, Plaintiff was told by a fellow marketing executive, that when he asked Defendant Blatt about a budget for activities to boost the

marketing team's morale, Defendant Blatt said: Plaintiff and two of her female team members "*were* the team morale," because in his view "they were hot."  The male executives then joked about how one of the women did not count "because she had peaked" and "wasn't getting any prettier, so she needed to get married tomorrow."  This is but one example of how Defendant Blatt objectified women in his employ and spread a misogynistic work culture, which promoted sexual harassment and assault.

68.     Out of a sense of responsibility to protect the company she had helped build, Plaintiff fought against Match Group's misogynistic culture, to her detriment. Behind the scenes Plaintiff fought for equal pay for the women on her team who were grossly underpaid compared to male counterparts, asked for an official pay audit to be conducted, promoted women to titles equal to male counterparts, advocated for the company to cover egg-freezing for its female employees, advocated for a more female centric approach to product development, and asked for an anonymous reporting tool be implemented by Human Resources for reporting complaints of sexual harassment within the company.  Her efforts to advance women's rights within the company and on the platform were so contrary to Defendants' culture that they led to threats of violence and a covert smear campaign on Twitter by one male employee.  In yet another example of how Defendants marginalized Plaintiff and emphasized profit over people, when they discovered the male employee who was responsible for a smear campaign and threats against Plaintiff, Defendants allowed him to quietly resign, rather than fire him and risk a scandal.

69.     As a direct and proximate result of the foregoing, Plaintiff has suffered, and continues to suffer, severe emotional distress.  Plaintiff has suffered, and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full

077

enjoyment of life; and/or has suffered a loss of income and/or loss of earning capacity.

70.     Defendants and each of them, engaged in the conduct alleged herein with malice, oppression, and fraud.  The conduct of Defendants, and each of them, was despicable and was done with a willful and knowing disregard of the rights or safety of Plaintiff.  Defendants, and each of them, knew that Defendant Blatt engaged in sexual misconduct against Plaintiff, yet they continued to retain him as CEO and allowed him to retaliate against Plaintiff.  Defendants' conduct was despicable and subjected Plaintiff to cruel and unjust hardship in knowing disregard of her rights.  Their conduct was so vile, base, and contemptible that it would be looked down on and despised by reasonable people.  Defendants intentionally conducted a biased "investigation" of Defendant Blatt's sexual assault of Plaintiff with reckless indifference toward Plaintiff's health, safety, and emotional well-being. Defendants' conduct alleged herein is outrageous and so extreme that it goes beyond all possible bounds of decency.  A reasonable person would regard the conduct of Defendants as intolerable in a civilized community.

## V.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### (AGAINST DEFENDANTS MATCH AND IAC)

### Negligence

71.     Plaintiff incorporates herein by reference, as though set forth in full, all proceeding Paragraphs of this Complaint.

72.     Prior to the incidents, Defendants Match Group and IAC, and each of them, expressly and implicitly warranted to Plaintiff that Defendants, in the event of a sexual assault at the Company, would provide a thorough and unbiased investigation and take immediate action to address such an occurrence.

73.     At all relevant times herein Defendant Blatt, while in the course and scope of his employment with Company Defendants, intended to cause harmful or offensive contact with intimate parts of Plaintiff, and sexually offensive contact with Plaintiff directly and indirectly resulted therefrom.

74.     At all relevant times herein, Defendant Blatt, while in the course and scope of his employment with Company Defendants, acted to cause Plaintiff to be in imminent apprehension of sexually offensive contact, and sexually offensive contact with Plaintiff directly and indirectly resulted therefrom.

75.     The Company Defendants owed to the public in general, and to Plaintiff in particular, a duty to reasonably and promptly identify, remove, and/or report to law enforcement authorities and/or to government agencies individuals who it knew, or should have known, were sexual predators in its employ.  The Company Defendants owed to the public in general, and to Plaintiff in particular, a duty to reasonably supervise and/or monitor individuals who it knew, or should have known, were sexual predators in its employ.  The Company Defendants owed to Plaintiff a duty to control the acts of their agents, servants, and/or employees.

76.     The acts and omissions of The Company Defendants complained of herein constitute negligent and reckless hiring, training, supervision, and retention of Defendant Blatt.  It was foreseeable that if the Company Defendants did not adequately exercise or provide the duty of care owed to female employees in their care, including, but not limited to Plaintiff, they would be vulnerable to sexual misconduct by Defendant Blatt.  Based on the acts alleged above, The Company Defendants knew, or should have known, that their failure to exercise due care toward Plaintiff would, and did, cause Plaintiff severe emotional distress.

77.     The Company Defendants did not have in place or failed to enforce adequate, reasonable, and necessary rules, regulations, policies, and procedures that could effectively identify, and deal with sexual predators such as Defendant Blatt.

18
COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

The Company Defendants did not have in place adequate, reasonable, and necessary rules, regulations, policies, and procedures for the prompt removal of sexual predators in the employ and/or service of the Company Defendants.

78.  The Company Defendants failed to fulfill their legal duty to protect Plaintiff from the sexual misconduct of Defendant Blatt and the ensuing retaliatory treatment.  These failures included the following:  (a) failure to reasonably and investigate allegations of sexual misconduct; (b) failure to properly train and instruct investigators; (c) failure to have in place and enforce standards of acceptable and unacceptable conduct; and (d) failure to designate competent investigators to evaluate complaints of sexual misconduct.

79.  Moreover, the negligent, reckless, outrageous, deliberately and recklessly indifferent and unlawful conduct of the Company Defendants, as set forth above and herein, further consisted of:

    a.  failing to properly and adequately supervise and discipline their employees to prevent the improper touching that occurred to Plaintiff;

    b.   failing to adopt, enforce and/or follow adequate policies and procedures for the protection and reasonable supervision of female employees, including Plaintiff, and, in the alternative, failing to implement and comply with such procedures which had been adopted;

    c.  failing to implement, enforce and/or follow adequate protective and supervisory measures for the protection of female employees, including Plaintiff;

    d.  creating an environment that facilitated improper touching by Defendant Blatt on Plaintiff;

e.  violating their own policies and/or by-laws regarding sexual misconduct by employees and executive;

f.  ignoring, concealing, or otherwise mitigating the seriousness of the assault perpetrated by Defendant Blatt;

g.  failing to properly supervise and/or discipline their employees; and

h.  failing to adequately and properly train their employees regarding sexual misconduct.

80.     The Company Defendants had a policy to independently investigate sexual assault/harassment, explicitly and/or implicitly represented to Plaintiff.

81.     The Company Defendants made these explicit and implied representations knowing that they were false and/or having reason to believe that they were false, and with the expectation that they would be relied upon by female employees who decided to work at for The Company Defendants.

82.     The Company Defendants did not have in place adequate, reasonable, and necessary rules, regulations, policies, and procedures with respect to the removal and/or supervision of individuals in its employ or service who were suspected of being sexual predators.

83.     The Company Defendants failed to reasonably supervise and/or monitor individuals who it knew, or should have known, were sexual predators in their service and employ.

84.     The Company Defendants further breached their duty of care to Plaintiff by failing to protect the Plaintiff from foreseeable harm from the sexual misconduct of an employee of Defendants.

85.     The Company Defendants ratified the improper touching and harassment committed by Defendant Blatt by continuing to employ him and allowing him to be in charge of female employees including Plaintiff, after having actual knowledge that Defendant Blatt had improperly touched and harassed Plaintiff.

86.     Plaintiff is informed and believes and thereon alleges that she will continue to suffer extreme mental, physical, and pain and suffering in the future as a result of the injuries alleged herein.

## SECOND CAUSE OF ACTION

## (AGAINST ALL DEFENDANTS)

### Intentional Infliction of Emotional Distress

87.     Plaintiff incorporates herein by reference, as though set forth in full, all preceding Paragraphs of this Complaint.

88.     As described above, without Plaintiff's consent, the Company Defendant' employee and CEO Defendant Blatt engaged in unlawful, sexual misconduct and harassment against Plaintiff.

89.     Defendant Blatt's sexual misconduct conduct was outrageous and he acted with reckless disregard for the probability that Plaintiff would suffer emotional distress as a result of his actions.

90.     The Company Defendants allowed, adopted, approved, aided, abetted, and ratified the behavior of the Defendant Blatt by allowing him to continue to have female employees including Plaintiff report to him knowing that he had a history of sexual misconduct, including improperly touching and harassing female employees.

91.     The Company Defendants employed defendant Blatt.  The Company Defendants failed to adequately and promptly investigate and discipline Defendant Blatt.  By allowing Defendant Blatt to continue as the CEO after each of the aforementioned incidents and failing to adequately and promptly investigate and discipline him, Defendants approved, aided and abetted, adopted, and ratified Defendant Blatt's sexual misconduct.

92.     Plaintiff is informed and believes and thereon alleges that she will continue to suffer extreme mental, physical, and pain and suffering in the future as a result of the injuries alleged herein.

93.     As a further proximate result, Plaintiff has been damaged in that she has been required to expend money and incur obligations for medical services, drugs, and sundries reasonably required in the treatment and relief of the injuries alleged according to proof.  As a further proximate result, Plaintiff will continue to incur medical and related expenses.

94.     The acts of Company Defendants alleged above were willful, wanton, malicious, oppressive, fraudulent, despicable, and outrageous and justify the awarding of exemplary and punitive damages.

### THIRD CAUSE OF ACTION
### (AGAINST DEFENDANT BLATT)

**Sexual Battery**

95.     Plaintiff incorporates herein by reference, as though set forth in full, all preceding Paragraphs of this Complaint.

96.     As described above, Defendant Blatt, without Plaintiff's consent, engaged in sexual misconduct, including sexual assault, against Plaintiff, all with the intent of sexual arousal in violation of Civil Code § 1708.5 and Penal Code § 243.4(e)(1).

97.     Plaintiff is informed and believes and thereon alleges that she will continue to suffer extreme mental, physical, and pain and suffering in the future as a result of the injuries alleged herein.

98.     The acts of Defendant Blatt alleged above were willful, wanton, malicious, oppressive, fraudulent, despicable, and outrageous and justify the awarding of exemplary and punitive damages.

**FOURTH CAUSE OF ACTION**

**(AGAINST DEFENDANT BLATT)**

**Gender Violence**

**Violation of California Civil Code § 52.4**

99.     Plaintiff incorporates herein by reference, as though set forth in full, all preceding Paragraphs of this Complaint.

100.    As described above, Defendant Blatt committed gender violence on Plaintiff, which constituted criminal offenses under California law, including Penal Code § 243.4, sexual battery, which includes the use, attempted use, or threatened use of physical force against a person.

101.    These crimes are at least in part based on the gender of Plaintiff.

102.    Defendant Blatt caused a physical intrusion or a physical invasion of a sexual nature under coercive conditions to Plaintiff's person in that Plaintiff was improperly touched by Defendant Blatt, all without Plaintiff's consent.

103.    The acts of violence as alleged above were directed at Plaintiff because she is a woman.  These acts were intended to humiliate and degrade Plaintiff because she is a woman.  These acts robbed Plaintiff of her dignity.

104.    Plaintiff is informed and believes and thereon alleges that she will continue to suffer extreme mental, physical, and pain and suffering in the future as a result of the injuries alleged herein.

105.    Defendant Blatt's aforementioned conduct was accomplished intentionally and/or recklessly with conscious disregard for Plaintiff's health, safety, privacy, freedom, and human dignity.  The aforementioned conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and should be regarded as despicable, atrocious, and utterly intolerable in a civilized community.  The acts of Defendant Blatt alleged above were willful,

1   wanton, malicious, oppressive, fraudulent, despicable, and outrageous and justify the

2   awarding of exemplary and punitive damages.

3       106.   Plaintiff has also been required to expend attorney fees to pursue their

4   rights under Civil Code § 52.4, and request that she be awarded all attorney fees and

5   costs reasonably required to pursue her claims pursuant to Civil Code § 52.4.

6   **FIFTH CAUSE OF ACTION**

7   **(AGAINST ALL DEFENDANTS)**

8   **Freedom from Violence Pursuant to The Ralph Act**

9   **Violation of California Civil Code §§ 51.7 and 52**

10       107.   Plaintiff incorporates herein by reference, as though set forth in full, all

11   preceding Paragraphs of this Complaint.

12       108.   Defendants subjected, and/or aided and abetted in the subjection of

13   Plaintiff to violence based on her sex, causing physical and psychological injuries to

14   her.  A motivating reason for their conduct was Plaintiff's sex.

15       109.   Plaintiff is informed and believes and thereon alleges that she will

16   continue to suffer extreme mental, physical, and pain and suffering in the future as a

17   result of the injuries alleged herein.

18       110.   Defendants' conduct was a substantial factor in causing Plaintiff's harm.

19       111.   As a result of the aforementioned conduct, Plaintiff is entitled to a

20   $25,000.00 penalty and/or punitive damages for Defendants' conduct in violation of

21   Civil Code § 51.7, as well as attorney's fees and costs pursuant to Civil Code § 52.

22       112.   The aforementioned conduct was accomplished intentionally and/or

23   recklessly with conscious disregard for said Plaintiff's health, safety, privacy,

24   freedom, and human dignity.  Defendants' aforementioned conduct was so

25   outrageous in character and so extreme in degree as to go beyond all possible bounds

26   of decency, and should be regarded as despicable, atrocious, and utterly intolerable in

27   a civilized community.  The acts of Defendants alleged above were willful, wanton,

28

malicious, oppressive, fraudulent, despicable, and outrageous and justify the awarding of exemplary and punitive damages.

## SIXTH CAUSE OF ACTION
## (AGAINST ALL DEFENDANTS)
### Negligent Misrepresentation

113. Plaintiff incorporates herein by reference, as though set forth in full, all preceding Paragraphs of this Complaint.

114. All Defendants negligently misrepresented material facts to Plaintiff, namely that Defendants' would conduct a thorough, prompt, and impartial investigation into Defendant Blatt's sexual misconduct and harassment and that she would not suffer any retaliation by Defendants.

115. Defendants negligently misrepresented material facts to Plaintiff, namely that their policies and protocol created an environment where sexual assault is not and will not be tolerated.

116. Defendants made these misrepresentations under circumstances and at a time when they knew or should have known of the falsity of these representations.

117. Defendants made these representations with a reckless disregard for the truth or falsity of such statements and/or with an intent to induce Plaintiff to act on the representations, which, in turn, exposed Plaintiff to harm.

118. Plaintiff's justifiable reliance on Defendants' misrepresentations resulted directly in injury to Plaintiff as described above and such injuries and damages were legally caused by the justifiable reliance upon Defendants' misrepresentations.

119. Plaintiff is therefore entitled to any and all damages resulting from Defendants' negligent misrepresentations that are necessary to make Plaintiff whole, including, but not limited to, all damages, fees, and costs.

## SEVENTH CAUSE OF ACTION

## (AGAINST DEFENDANTS IAC AND MATCH)

### Wrongful Termination in Violation of Public Policy

120.  Plaintiff incorporates herein by reference, as though set forth in full, all preceding Paragraphs of this Complaint.

121.  California law recognizes public policies that employees should be free from termination for reporting illegal activities, refusing to engage in illegal activities and for reporting sexual harassment.  These public policies are embodied in Labor Code §1102.5(b).

122.  Plaintiff was at all relevant times employed by the Company Defendants.  The Company Defendants terminated Plaintiff, in violation of public policy embodied in Labor Code §1102.5(b) and Article I, Section 8, of the California Constitution, for reporting illegal activities and in retaliation for making a good faith complaint about sexual harassment and assault.

123.  As a proximate result of Defendants' wrongful termination of Plaintiff, Plaintiff has sustained and continues to sustain substantial losses in earnings and other employment benefits.

124.  As a proximate result of Defendants' wrongful termination of Plaintiff, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

125.  Plaintiff is informed and believes, and thereupon alleges that Defendants' actions were taken with malice, oppression, fraud, and/or willful and conscious disregard of Plaintiff's rights, and were carried out by Defendants' managing agents and/or ratified by Defendants.  Plaintiff is therefore entitled to punitive damages in an amount to be determined at trial.

# EIGHT CAUSE OF ACTION

## (AGAINST DEFENDANTS IAC AND MATCH)

### Retaliation for Engaging in Protected Activity

126.   Plaintiff incorporates herein by reference, as though set forth in full, all preceding Paragraphs of this Complaint.

127.   California law recognizes public policies that employees should be free from retaliation at the workplace for reporting illegal activities, refusing to engage in illegal activities and for reporting sexual harassment.  These public policies are embodied in Government Code § 12940(h).

128.   Defendants terminated Plaintiff, in retaliation for reporting illegal activities and in retaliation for making a good faith complaint about sexual harassment and assault.  Defendants' conduct, therefore, violated the public policies that are embodied in Government Code § 12940(h) and Article I, Section 8, of the California Constitution.

129.   As a proximate result of Defendants' wrongful termination of Plaintiff, Plaintiff has sustained and continues to sustain substantial losses in earnings and other employment benefits.

130.   As a proximate result of Defendants' wrongful termination of Plaintiff, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

131.   Plaintiff is informed and believes, and thereupon alleges that Defendants' actions were taken with malice, oppression, fraud, and/or willful and conscious disregard of Plaintiff's rights, and were carried out by Defendants' managing agents and/or ratified by Defendants.  Plaintiff is therefore entitled to punitive damages in an amount to be determined at trial.

## VI.    RELIEF REQUESTED

WHEREFORE, Plaintiff prays for judgment against Defendants and, as appropriate to each cause of action alleged and as appropriate to the standing of Plaintiff, as follows:

1.      compensatory damages, including but not limited to, pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial;

2.      economic damages in the form of medical expenses, out of pocket expenses, lost earnings and earning capacity, and other economic damages in an amount to be determine at trial;

3.      an award of attorneys' fees and costs;

4.      prejudgment interest;

5.      post-judgment interest;

6.      punitive or exemplary damages according to proof; and

7.      for such other and further relief as this Court may deem just and proper.

## VII.   DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all of her claims.

Dated:  August 5, 2019

By: _Elizabeth Graham_ _____
M. Elizabeth Graham, CA 143085
Paige Alderson
**GRANT & EISENHOFER P.A.**
101 California Street, Suite 2710
San Francisco, California  94111
Phone:  (415) 365-9585
Fax:  (415) 365-9650
Email:  egraham@gelaw.com
Email:  palderson@gelaw.com