1   DAVIDA BROOK (275370)
    dbrook@susmangodfrey.com
2   LORA J. KRSULICH (315399)
    lkrsulich@susmangodfrey.com
3   SUSMAN GODFREY LLP
    1900 Avenue of the Stars, 14th Floor
4   Los Angeles, CA 90067
    Telephone: (310) 789-3100
5   Facsimile: (310) 789-3150

6   VINEET BHATIA (*Pro Hac Vice*)
    vbhatia@susmangodfrey.com
7   SUSMAN GODFREY LLP
    1000 Louisiana, Suite 5100
8   Houston, TX 77002
    Telephone: (713) 651-9366
9   Facsimile: (713) 654-6666

10  Attorneys for Plaintiff GREGORY BLATT

11

12              UNITED STATES DISTRICT COURT

13             CENTRAL DISTRICT OF CALIFORNIA

14

15  GREGORY BLATT,                    Case No. 2:19-cv-07046-MWF-FFM(x)

16              Plaintiff,            **MEMORANDUM OF POINTS
                                      AND AUTHORITIES IN**
17       vs.                          **OPPOSITION TO DEFENDANTS'
                                      SPECIAL MOTION TO STRIKE**
18  ROSETTE PAMBAKIAN and SEAN        **PLAINTIFF'S FIRST AMENDED**
    RAD; and DOES 1 – 10, inclusive,  **COMPLAINT (PURSUANT TO**
19                                    **CAL. CODE CIV. PROC. § 425.16)**
20              Defendants.

21                                    Judge: Hon. Michael W. Fitzgerald
                                      Ctrm.: 5A
22                                    Date:  November 4, 2019
                                      Time:  10:00 a.m.
23

24

25

26

27

28

**<u>TABLE OF CONTENTS</u>**

I.     INTRODUCTION ................................................................................ 1

II.    BACKGROUND .............................................................................. 3

     A.    The Parties To This Lawsuit ................................................. 3

     B.    Rad's Effort To Weaponize The Consensual Encounter ....................... 4

     C.    Pambakian Finally Agrees To Join Rad's Scheme ................................ 5

     D.    Defendants' 2018 Statements To The Press .......................... 6

         1.    August 14, 2018, CNN Interview. ............................................... 6

         2.    August 16, 2018, CNN Story. ...................................................... 7

         3.    December 2018 Verge and CNN articles. ...................................... 8

III.   LEGAL STANDARD ....................................................................... 8

IV.   ARGUMENT .................................................................................. 9

     A.    New York's anti-SLAPP statute applies. ............................................. 9

     B.    Even if California's anti-SLAPP law applies, Defendants' arguments fail. ........................................................................... 11

         1.    Prong 1: This Suit Does Not Arise From Protected Activity .................................................................................. 12

             a.    California's anti-SLAPP statute does not apply to claims subject to arbitration. ............................ 12

             b.    Defendants' conduct is not protected. .............................. 13

         2.    Prong 2: Blatt Has Stated A Valid Defamation Claim. ............. 17

             a.    The statements are not a fair and true report of the Valuation Complaint. ......................................... 18

                 i.    The Valuation Complaint is not a sexual harassment complaint. ........................... 18

                 ii.    The defamatory statements do not communicate allegations in the Valuation Complaint or otherwise communicate the "gist" or "sting" of that document. ................... 19

             b.    Defendants do not attribute their statements to the Valuation Complaint. ............................................. 22

i

c.     The statements do not provide a "history" or "background" of the judicial proceeding. ........................23

3.     One defamatory statement is sufficient for a conspiracy claim.............................................................................25

V.     CONCLUSION ...........................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Argentieri v. Zuckerberg,*
   8 Cal. App. 5th 768 (2017) ...................................................................... 18, 21, 23

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ........................................................................................... 9

*Baral v. Schnitt,*
   1 Cal. 5th 376 (2016) ...................................................................................... 12

*Beech Aircraft Corp. v. Superior Court (Aanestad),*
   61 Cal. App. 3d 501 (1976) ............................................................................. 9

*Block v. First Blood Assocs.,*
   691 F. Supp. 685 (S.D.N.Y. 1988) ................................................................ 11

*Braun v. Chronicle Publishing Co.,*
   52 Cal. App. 4th 1036 (1997) ................................................................... 18, 24

*Briarwood Capital, LLC v. KBR Group, LLC,*
   2010 WL 1525453 (S.D. Cal. Apr. 14, 2010) ............................................. 13

*Carver v. Bonds,*
   135 Cal. App. 4th 328 (2005) ................................................................... 18, 20

*Century 21 Chamberlain & Assoc. v. Haberman,*
   92 Cal. Rptr. 3d 249 (2009) ........................................................................... 12

*Cline v. Reetz-Laiolo,*
   329 F. Supp. 3d 1000 (N.D. Cal. 2018) ................................................... 10, 11

*Dorsey v. Nat'l Enquirer, Inc.,*
   973 F.2d 1431, 1436 (9th Cir. 1992) .................................................. 21, 22, 24

*Flatley v. Mauro,*
   39 Cal. 4th 299 (2006) ............................................................................... 16, 17

*Gertz v. Robert Welch, Inc.,*
   418 U.S. 323 (1974) ................................................................................... 15, 16

iii

*Gilman v. Spitzer,*
    902 F. Supp. 2d 389 (S.D.N.Y. 2012), *aff'd*, 538 F. App'x 45 (2d
    Cir. 2013) ............................................................................................... 10, 11

*Hawran v. Hixson,*
    147 Cal. Rptr. 3d 88 (2012) ............................................................................ 22

*Hayward v. Watsonville Register-Pajaronian*
    265 Cal. App. 2d 255 (1968) ..................................................................... 22, 24

*Healthsmart Pacific, Inc. v. Kabateck,*
    7 Cal. App. 5th 416 (2016) ......................................................................... 18, 22

*Hsu v. Puma Biotech., Inc.,*
    213 F. Supp. 3d 1275 (C.D. Cal. 2016) ............................................................ 9

*Kearney v. Salomon Smith Barney, Inc.,*
    39 Cal. 4th 95 (2006) ........................................................................................ 9

*Lafayette Morehouse, Inc. v. Chronicle Publishing Co.,*
    37 Cal. App. 4th 855 (1995) ........................................................................... 14

*Manzari v. Assoc. Newspapers, Inc.,*
    830 F.3d 881 (9th Cir. 2016) ..................................................................... 12, 17

*Mindys Cosmetics, Inc. v. Dakar,*
    611 F.3d 590 (9th Cir. 2010) ..................................................................... 10, 17

*Oasis West Realty, LLC v. Goldman,*
    51 Cal. 4th 811 (2011) ............................................................................... 11, 12

*Paul v. Friedman,*
    95 Cal. App. 4th 853 (2002) ..................................................................... *passim*

*Planned Parenthood Fed. of Am., Inc. v. Ctr. for Med. Progress,*
    890 F.3d 828 (9th Cir. 2018) ............................................................................ 9

*Rand Resources, LLC v. City of Carson*
    6 Cal. 5th 610 (2019) ......................................................................... 13, 15, 16

*Renewable Res. Coal. Inc. v. Pebble Mines Corp.,*
    159 Cal. Rptr. 3d 901 (Ct. App. 2013) ....................................................... 16, 17

*Rivero v. Am. Fed. of State, Cty. & Mun. Emps.,*
    105 Cal. App. 4th 913 (2003) ......................................................................... 15

iv

*Rothman v. Jackson*,
   49 Cal. App. 4th 1134 (1996) ................................................................ 8

*Sarlot-Kantarjian v. First Penn. Mortgage Trust*,
   599 F.2d 915 (9th Cir. 1979) .................................................... 9, 13, 19

*Sheppard v. Lightpost Museum Fund*,
   52 Cal. Rptr. 3d 821 (2006) ................................................................ 12

*Steuve Bros. Farms, LLC v. Berger Kahn*,
   166 Cal. Rptr. 3d 116 (Ct. App. 2013) ............................................... 25

*Wentworth v. Bennett*,
   2018 WL 3521340 (Cal. Ct. App. July 23, 2018) (unpublished) ........ 22

*Youngevity Int'l Corp. v. Andreoli*,
   749 F. App'x 634 (9th Cir. Jan. 24, 2019) ......................................... 18

**Statutes**

Cal. Civ. Code § 47 .............................................................................. 20

Cal. Civ. Code § 47(d) ......................................................................... 17

Cal. Civ. Code § 425.16 ........................................................... 10, 12, 16

Cal. Civ. Code § 425.16(b)(1) .............................................................. 17

Cal. Civ. Code § 425.16(e)(2) .......................................................... 13, 14

Cal. Civ. Code § 425.16(e)(3) .............................................................. 13

Cal. Code Civ. Proc. § 425.16(c)(1) ................................................... 3, 4

N.Y. Civ. Rts. Law § 70-a .................................................................... 10

N.Y. Civ. Rts. Law § 76-a(1)(a) ........................................................... 10

N.Y. Civ. Rts. Law § 76-a(1)(b) ........................................................... 10

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ........................................ 8, 16

NY Civ. R. 70-a, 76-a ........................................................................... 10

v

**Treatises**

Black's Law Dictionary ................................................................................. 21

Restatement (Second) of Conflict of Laws § 150 (1971) ........................................ 11

Restatement Second Torts, § 611, com. C .................................................... 23

6908255v1/016409

I.      **INTRODUCTION**

Defendants Sean Rad and Rosette Pambakian contend that the claims against them should be dismissed at the pleading stage because they represent a "textbook" example of a strategic lawsuit designed to chill their participation in a matter of public concern. *See* Motion to Strike ("MS") 1. Nothing could be further from the truth. This suit, rather, represents an effort by former Match and Tinder CEO, Greg Blatt, to obtain redress for the damage that the Defendants have inflicted on his reputation in furtherance of an illicit scheme to advance their personal financial interests through extra-judicial, malicious lies that defame Blatt by falsely accusing him of sexual assault.

The contemporaneous documents identified and included in the First Amended Complaint detail the extent of Defendants' wrongdoing:

- They establish that the challenged statements—which purportedly describe Blatt's interactions with Pambakian at a 2016 Tinder holiday party—are false. Ex. A (FAC), Exs. 1–22.[1] Pambakian originally acknowledged that she and Blatt's 2016 encounter at the holiday party was consensual, describing it in a text message to friends the very next morning as "antics." *See* Ex. 6. Later, when she was interviewed by Match's investigators, she did not allege any harassment. *See* Ex. 1. She then resisted Rad's effort to inject allegations of harassment into his planned options valuation lawsuit, and instead pressed Blatt to stay-on as CEO of Tinder. *See, e.g.*, Exs. 13–15. Defendants do not challenge any of this evidence. Instead, they summarily conclude—in a footnote—that Blatt's account is inaccurate. *See* MS fn. 1.

---

[1] All alphanumeric exhibits are attached to the contemporaneously filed Declaration of Vineet Bhatia or Request for Judicial Notice. All numeric exhibits refer to the exhibits attached to the First Amended Complaint (FAC); Opposition, Ex. A.

1

- They establish that Rad first sought to bring down Blatt by raising allegations of sexual harassment to the Match Board, declaring "***Fuck him. We're at war. We will destroy him.***" *Id*. ¶42, Ex. 22 (emphasis added). It is hard to imagine a more stark admission of actual malice and ill-will.

- They establish that Pambakian, who was first pleading with Rad to leave her out of his vendetta against Blatt, bemoaning that "Money truly is the root of all evil," made her allegations of sexual harassment and switched sides only after Rad promised her millions of dollars to do so, a promise that is the subject of an ongoing ethics challenge in the Valuation Lawsuit[2] that Rad initiated against Match and IAC. *Id*. ¶¶ 12, 91, 132, Ex. 2.

The notion that a complaint alleging these facts—which detail a cynical effort by Rad and Pambakian to advance their personal financial interest, and not some greater cause—could be dismissed at the pleading stage is ludicrous. Anti-SLAPP statutes were never intended to and do not protect a malicious defamation campaign. The "fair reporting" privilege likewise has no application here. Defendants did not merely repeat the allegations they have made against Blatt in the Valuation Lawsuit and label them as such. They made expansive, detailed false statements of "sexual assault" to the press, statements that go beyond the allegations in the Valuation Complaint and presented them as actual facts. No privilege applies.

Accordingly, as shown below, Defendants cannot avoid litigating the merits of this dispute through an anti-SLAPP motion to strike. The pending motion should be denied for any of the following, independent reasons:

---

[2] "Valuation Lawsuit" refers to a lawsuit filed in the New York Supreme Court on August 14, 2018. *See* Defendants' Request for Judicial Notice (Def. RJN), ECF No. 21, Ex. A.

2

(1)  New York's anti-SLAPP statute applies to Defendants' statements, which were designed to influence judicial proceedings in New York and injure Blatt, then a resident and businessperson in New York.

(2)  Even if California law governs, California's anti-SLAPP statute does not apply to the claims that are subject to arbitration.

(3)  Even if California's anti-SLAPP statute applies, Defendants' statements fall outside the statute because they (A) were not made in connection with a judicial proceeding; (B) were not made in connection with a matter of public interest; and (C) were in fact made as part of an unlawful conspiracy that included unethical payments to witnesses to procure false testimony.

(4) The fair report privilege does not protect Defendants' communications which, to varying degrees: (A) do not repeat the allegations in the Valuation Complaint; (B) do not fairly represent the "gist" or "sting" of the Valuation Complaint; (C) do not identify the Valuation Complaint as the source of their statements; and (D) do not provide any sound basis for looking beyond the Valuation Complaint as the source of their privileged communication. Moreover, any dispute about whether the statements are a "fair report" of the Valuation Complaint is a fact question for a jury and cannot be decided on this motion.

The Court therefore should deny the motion and, instead, grant Blatt attorney's fees and costs. *See* Cal. Code Civ. Proc. Section 425.16(c)(1).

## II.  <u>BACKGROUND</u>

### A.  <u>The Parties To This Lawsuit</u>

Defendants are former executives at Tinder. Ex. A ¶2. Tinder is wholly owned and operated by Match, and Match is a controlled subsidiary of IAC. *Id*. At various times, Blatt—who at all times relevant to this dispute resided in New York—served as CEO of Tinder, Match, and IAC. *Id*. ¶¶2–3; Declaration of Gregory Blatt ("Blatt Decl.") ¶¶2–3; *see also* Def. RJN, Ex. A (Valuation Complaint) ¶44(d)(i) ("[Blatt] principally lived in New York, worked out of the IAC

office in New York, and was physically located in New York"). Over that time, Rad came to blame Blatt for a variety of perceived transgressions. Ex. A ¶3.

By contrast, Blatt and Pambakian had a productive, professional relationship and a close friendship while Blatt was CEO. *Id.* ¶¶33, 71–80. On December 9, 2016, Pambakian and Blatt attended the Tinder holiday party. *Id.* ¶34. During the party, the two flirted and Pambakian ultimately invited Blatt to meet her in an upstairs hotel room. *Id.* They eventually found themselves in a hotel room with other Tinder employees, whereupon Pambakian and Blatt briefly engaged in a one-time, fully clothed, consensual physical encounter. *Id.* ¶37. Shortly after, Blatt left on his own accord. *Id.* In the following days, Blatt and Pambakian joked about the incident over text and email and apologized to each other in-person for letting things go too far. *Id.* ¶¶38, 42, 43.

### B.   Rad's Effort To Weaponize The Consensual Encounter

Although Rad learned about the encounter at the holiday party as early as February 2017, *see* FAC ¶54, he did not report it until he and Blatt were adversaries in the Tinder options valuation process. *Id.* ¶49. Rad became enraged when Blatt and Match would not agree to Rad's preferred valuation—and instead elected to engage in a contractually mandated appraisal process with investment banks to determine a fair market value for the business. *Id.* ¶46. Specifically, on April 18, 2017, Rad confirmed his plan to seek retribution against Blatt as a means of advancing his valuation objectives, writing: "***Fuck him. We're at war. We will destroy him.*** This is going to be the biggest lesson of his life.  He will be a changed man . . . excited for him ☺." *Id.* ¶42, Ex. 22.

Pambakian (initially) refused to go along with Rad's vendetta. Before Rad filed his accusation against Blatt, Pambakian urged a friend to help Pambakian talk Rad out of going forward with his plan, lamenting presciently that "[m]oney really is the root of all evil." FAC ¶7, Ex. 2. She was unsuccessful. Nine days later, on April 27, 2017, Rad called Match's General Counsel and asserted that Blatt had

1  committed sexual harassment at the holiday party and had created a hostile
2  atmosphere at the company. *Id*. ¶49.

3      Match responded by launching a thorough investigation, first internally and
4  then with the assistance of two nationally recognized law firms. *See* FAC ¶58.
5  Pambakian actively tried to protect Blatt from the accusations. *See id*. ¶57. At the
6  time of the investigation, she wrote to Blatt, "My attempt to fix this seemingly
7  unfixable situation might seem feeble, but I needed to try . . . We both know what's
8  happening here. I just hope that everyone who has been brought into this can see it
9  for what it is and move on." *Id.*, Ex. 8. Pambakian was interviewed "on at least two
10 separate occasions and [] never alleged sexual harassment." *Id.*, Ex. 1.

11     Meanwhile, Rad pursued his vendetta. From the date he filed his accusation to
12 July 13, 2017, the date the valuation process was completed, Rad and/or his
13 attorneys contacted Match and its representatives dozens of times to argue that Blatt
14 was dangerous to the company and should be removed as CEO. FAC ¶59. However,
15 once the valuation was competed, Rad dropped the matter entirely, never raising it
16 again until the Valuation Complaint was filed more than a year later. *Id*.

17     Ultimately, after the investigation was concluded, the Board determined that
18 Blatt had not committed sexual harassment or violated any other company policy,
19 though he was reprimanded for exercising poor judgment. FAC ¶58. Blatt and
20 Pambakian remained friends, with Pambakian urging him to stay at Match and
21 reaching out even after he left the company. Ex A, ¶¶73–88; Exs. 3, 13, 14.

22     **C.    Pambakian Finally Agrees To Join Rad's Scheme**

23     After initially resisting Rad's requests to make false claims, Pambakian
24 agreed to a total about face, after Rad provided direct financial incentives to
25 Pambakian. FAC ¶12. Under the guise of a litigation funding agreement, Rad
26 arranged a multi-million-dollar payment to Pambakian in exchange for her promise
27 to join the Valuation Lawsuit and make false allegations against Blatt. *Id*. These
28 payments—which Rad arranged with and through a third-party financial firm,

Bench Walk Advisors—far exceeded what Pambakian would have received if she had joined the lawsuit like an ordinary co-plaintiff and treated her differently than the other co-plaintiffs who did not have false accusations to make against Blatt. *Id.* The legality of this arrangement is being challenged in the Valuation Lawsuit, and the New York court will hold a hearing on the matter.

Having flipped Pambakian, on August 14, 2018, ten plaintiffs—including Rad and Pambakian—sued IAC and Match in New York Supreme Court. Def. RJN, Ex. A. Plaintiffs seek compensatory damages in an amount not less than $2 billion and punitive damages. Blatt is not a party to that case, and none of the counts in the Valuation Complaint turns on whether Blatt sexually harassed Pambakian. Yet, the Valuation Complaint included a conclusory allegation that Blatt "groped and sexually harassed" Pambakian at the holiday party. *See* Def. RJN, Ex. A ¶¶14, 128, 129. Although there is some discussion about an alleged cover-up of the incident, nothing else is said about Blatt's and Pambakian's relationship or the 2016 holiday party. As Pambakian now concedes, the "Valuation Case is unrelated to [her] claims [regarding sexual harassment]." Plaintiff's Request for Judicial Notice (Plf. RJN), Ex. X, at 7. She admits that the incident "does not give rise to a single claim or cause of action" in the Valuation Lawsuit. *Id.*

### D.   Defendants' 2018 Statements To The Press

After they filed the Valuation Complaint, Rad and Pambakian used the filing as pretext to embark on a coordinated media campaign to smear Blatt to the public. Ex. A ¶14. Specifically:

#### 1.   August 14, 2018, CNN Interview.

In a pre-arranged interview with CNN that aired on August 14, 2018, Rad sits down with a reporter (in what appears to be his lawyer's New York offices) to discuss not just the Valuation Lawsuit but also the alleged harassment. FAC, Appx A; *see also* Plf. RJN, Ex. Z (video). While the video cuts to the Valuation Complaint to show the allegation that Blatt "groped and sexually harassed" Pambakian, the

6

complaint is then removed from the screen and the video cuts to Rad saying: "I actually reported that misconduct to the company and the board—and the board had a choice." *Id*. "They could either do the right thing and properly investigate and take the right action, or they can keep that executive in a place where he can finish the job of corrupting the valuation." *Id*. Rad goes on to say that Blatt "threatened" him in connection with the false harassment claim. *Id*. Specifically, he tells the reporter: "I was threatened. I believe it was, 'If you take me down, I'm going to take you down with me.'" *Id*. At no point during this segment does Rad attribute his statements to allegations in the Valuation Complaint. *Id*. Rather, Rad presents the information as established facts. *Id*.

### 2. August 16, 2018, CNN Story.

Two days later, CNN publishes an article for which Pambakian provided an interview. FAC, Appx A. After briefly describing the allegations in the Valuation Complaint, the article shifts gear, and Pambakian details her supposed memory of the holiday party. None of her factual statements appear in the Valuation Complaint. As just a few examples, Pambakian reports that:

(1)    During the 2016 holiday party, Blatt behaved inappropriately toward her and then suggested at one point, "Let's get out of here."

(2)    In response to Blatt's comments, she "basically bolted," fleeing to her hotel room with friends for protection.

(3)    Upon arriving at her hotel room soon after, Blatt entered the room and, without saying anything to anyone else in the room, "pushed her back onto the mattress, climbed on top of her, and began kissing and fondling her." *Id*. Pambakian describes Blatt as the aggressor, emphasizing that the interaction "wasn't consensual." FAC, Appx A. She claims the incident was not isolated, and there was "pervasive sexual harassment and misogyny by Match executives." *Id*. Pambakian does not attribute these statements to the Valuation Complaint.

### 3.    December 2018 Verge and CNN articles.

In December 2018, Rad and Pambakian sought another round of press, this time providing reporters with emails from December 18, 2018. FAC, Appx A. Notably, by this point Pambakian had withdrawn as a plaintiff in the Valuation Lawsuit. Because the emails post-date the Valuation Complaint, they are not cited, or even described in, the Valuation Complaint. *See id.* The emails not only repeat the allegations of groping and harassment without attributing them to any legal document, they go far beyond that language, describing Match (with Blatt at the helm) as having "subjected [Pambakian] to ongoing intimidation and retaliation." *Id.* Perhaps most significantly, they go on to say that Blatt engaged in both "sexual misconduct" and "sexual assault." *Id.*

Nearly a year after filing the Valuation Complaint (which Pambakian withdrew from 17-days after it was filed), and nearly six months after the latest-published article containing the defamatory statements, Pambakian filed a lawsuit against Match and Blatt alleging, among other claims, sexual harassment, sexual assault, and sexual battery. Def. RJN, Ex. B (the "Pambakian Complaint"). Blatt does not detail the allegations in that lawsuit because they long post-date the defamatory statements at issue in this case.[3]

### III.    <u>LEGAL STANDARD</u>

Defendants' anti-SLAPP motion challenges only the legal sufficiency of the allegations in the Complaint. "When an anti-SLAPP motion to strike challenges only the legal sufficiency of a claim, a district court should apply the Federal Rule of Civil Procedure 12(b)(6) standard and consider whether a claim is properly

---

[3] That the allegations in the Pambakian Complaint "reiterat[e]" some of the allegations in the Valuation Complaint is not pertinent to this motion. *See* MS 22–23. Because the Pambakian Complaint was filed well after the defamatory statements, it cannot serve as the basis of the "fair report" privilege. *See Rothman v. Jackson*, 49 Cal. App. 4th 1134, 1145 n.3 (1996).

stated." *Planned Parenthood Fed. of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018). Moreover, because the motion makes only legal arguments, Blatt is "not required to present prima facie evidence" to support his claims. *Id.* at 833–34 ("[T]here's no requirement for a plaintiff to submit evidence to oppose contrary evidence that was never presented by defendants.").

The court first identifies "all the factual allegations in the complaint and accept[s] them as true." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). The court may consider documents attached to the complaint through incorporation by reference. *See Hsu v. Puma Biotech., Inc.*, 213 F. Supp. 3d 1275, 1280–81 (C.D. Cal. 2016). The Court may also consider matters properly subject to judicial notice.[4]

## IV.   ARGUMENT

First, New York, not California law, applies to this anti-SLAPP motion, and under New York law, Blatt's claims are well-outside the scope of the state anti-SLAPP statute. Second, even if California law applies, Defendants arguments still fail. Both arguments are addressed in turn.

### A.   New York's anti-SLAPP statute applies.

California applies the three-step governmental interest analysis in resolving choice-of-law issues. *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 107 (2006) (describing choice-of-law analysis); *see also Sarlot-Kantarjian v. First Penn. Mortgage Trust*, 599 F.2d 915, 917 (9th Cir. 1979) (forum state rules apply).[5]

---

[4] Blatt does not oppose Defendants' request for judicial notice and submits a similar request along with this motion.

[5] Under California's approach, conflicts analysis must be conducted for ***each*** issue in a case. *See Beech Aircraft Corp. v. Superior Court (Aanestad)*, 61 Cal. App. 3d 501, 518–19 (1976) (emphasis added).

At the first step, the court must identify whether there is a difference between the substantive elements of the two states' laws.[6] There is one here. *Compare* NY Civ. R. 70-a, 76-a, *with* Cal. Civ. Code § 425.16; *see also Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 595 (9th Cir. 2010) (providing for a motion to strike if the complaint "arises from any act . . . in furtherance of the person's right of petition or free speech . . ."), *with Gilman v. Spitzer*, 902 F. Supp. 2d 389, 398 (S.D.N.Y. 2012), *aff'd*, 538 F. App'x 45 (2d Cir. 2013) ("[F]or an anti-SLAPP claim to exist under New York law: '1) there must be a public application or petition'"); *accord, e.g., Cline v. Reetz-Laiolo*, 329 F. Supp. 3d 1000, 1028 (N.D. Cal. 2018) (comparing California and New York state anti-SLAPP statutes). Because New York's anti-SLAPP statute applies to a narrow set of conduct, the state laws are different.

As the second and third steps, the court must identify each state's interest and determine which state's interest is paramount. New York's interest in applying its law to Blatt's claims is greater than California's interest. Defendants here—plaintiffs in the Valuation Lawsuit—chose to file their suit in New York state court, and they were represented in that lawsuit by a New York-based legal team.[7] Def.

---

[6] New York's anti-SLAPP statute provides: "A defendant in an action *involving public petition and participation* . . . may maintain a[] . . . counterclaim to recover damages, including costs and attorney's fees, from any person who commenced or continued such action." N.Y. Civ. Rts. Law § 70-a (emphasis added). "Action involving public petition and participation" is defined narrowly as an "action . . . brought by a *public applicant or permittee*, and is materially related to any efforts of the defendant to report on, comment on, rule on, challenge or oppose such application or permission." N.Y. Civ. Rts. Law § 76-a(1)(a). The phrase "public applicant or permittee," in turn, is defined as "any person who has applied for or obtained a permit, zoning change, lease, license, certificate or other entitlement for use or permission to act from any government body, or any person with an interest, connection or affiliation with such person that is materially related to such application or permission." N.Y. Civ. Rts. Law § 76-a(1)(b).

[7] Moreover, Rad's August 14, 2018 interview appears to have taken place in his lawyer's New York offices. *See* Plf. RJN, Ex. Z.

RJN Ex. A, at 55. Defendants cannot claim the protections of *California* law while simultaneously claiming to speak about a lawsuit that they filed in *New York* and attempted to influence in *New York*. Because "New York has a compelling interest in policing tortious conduct committed in New York . . . with reference to future or pending litigation in New York," *Block v. First Blood Assocs.*, 691 F. Supp. 685, 697 (S.D.N.Y. 1988), New York law should apply.

Moreover, at the time the statements were made, Blatt was a New York resident and, as result, his business and personal relationships were and are still now based principally in New York. *See* Def. RJN Ex. A, ¶44(d)(i); Blatt Decl. ¶¶2–4. In cases like this one involving "multistate communication," where the statements are made in a single location but disseminated widely, courts apply "the local law of the state where the plaintiff has suffered the greatest injury by reason of [his] loss of reputation," which "will usually be the state of the plaintiff's domicile if the matter complained of has there been published." Restatement (Second) of Conflict of Laws § 150 (1971). In this case, New York, where Blatt resided at the time and felt his most acute injuries, displaces California law. *See Cline*, 329 F. Supp. 3d at 1028–29 (applying New York anti-SLAPP law).

Accordingly, New York law applies. And under New York law, Defendants' motion must be denied. New York law's anti-SLAPP law is "expressly defined narrowly" to include only actions involving a "public application or petition." *Gilman*, 902 F. Supp. 2d at 398. Because this case does not involve such an action or petition, it falls outside the bounds of the New York's anti-SLAPP law.

## B. <u>Even if California's anti-SLAPP law applies, Defendants' arguments fail.</u>

Even if California's anti-SLAPP law applies, Defendants' motion should be denied. In California, the anti-SLAPP analysis involves two steps. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one 'arising from' protected activity." *Oasis West Realty, LLC v.*

*Goldman*, 51 Cal. 4th 811, 819 (2011). Second, the Court considers "whether the plaintiff has demonstrated a probability of prevailing on the claim." *See Manzari v. Assoc. Newspapers, Inc.*, 830 F.3d 881, 887 (9th Cir. 2016). "Only a cause of action that satisfies ***both*** prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning activity *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." *Oasis West Realty, LLC*, 51 Cal. 4th at 819–20. Here, Defendants fail at both steps.

### 1.    Prong 1: This Suit Does Not Arise From Protected Activity

"At the first step, the moving defendant bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them." *Baral v. Schnitt*, 1 Cal. 5th 376, 396 (2016). Defendants have not met their burden for at least two independent reasons.

### a.    California's anti-SLAPP statute does not apply to claims subject to arbitration.

California's anti-SLAPP statute does not apply to claims subject to arbitration.[8] *See Sheppard v. Lightpost Museum Fund*, 52 Cal. Rptr. 3d 821, 826 (2006) (concluding that anti-SLAPP motions are not available in nonjudicial arbitration proceedings). "Section 425.16 is expressly intended to target 'abuse of judicial process,'" but "its terms are not reconcilable with a legislative intent to extend it to arbitration claims filed only in private nonjudicial forums." *Id.*; *see also Century 21 Chamberlain & Assoc. v. Haberman*, 92 Cal. Rptr. 3d 249, 255 (2009) ("Arbitration is not a judicial proceeding triggering anti-SLAPP protection.").

---

[8] Defendants fault Blatt for choosing to file these claims in court and then moving to compel arbitration against Pambakian. But this move was of necessity, not choice. Because the motion to compel in the related *Pambakian* case could not be decided before the limitations period, Blatt elected to file his claims in both judicial and arbitral forum. Moreover, because Blatt does not seek to compel arbitration with respect to the claims against Rad, a judicial filing would have been necessary regardless.

And because the motion to compel may change the issues properly before this Court, the Court must decide the pending motion to compel prior to deciding defendants' anti-SLAPP motion. *Cf. Briarwood Capital, LLC v. KBR Group, LLC*, 2010 WL 1525453, at *2 (S.D. Cal. Apr. 14, 2010) (concluding that motion for leave to amend should be decided before anti-SLAPP motion). At a minimum, the claims subject to arbitration should not be stricken.

### b.     Defendants' conduct is not protected.

Defendants claim that their conduct is protected because (1) their statements were "made in connection with an issue under consideration or review by a . . . judicial body," § 425.16(e)(2), and (2) their statements were "made in a place open to the public or a public forum in connection with an issue of public interest," § 425.16(e)(3). Far from it. Rather, the bulk of the defamatory statements do not appear in the Valuation Complaint. *Cf.* Def. RJN, Ex. A. And because the statements are pursuant to an unlawful conspiracy, anti-SLAPP law does not apply.

*First*, Defendants' defamatory statements were not "under consideration or review by a . . . judicial body." Simply inserting irrelevant and erroneous statements in a pleading does not mean that a court will consider them for purpose of an anti-SLAPP analysis. The California Supreme Court understood as much in *Rand Resources, LLC v. City of Carson* where it explained that, for purposes of section 425.16(e)(2), it is "insufficient" to merely allege that certain statements were made "'in connection with' an official proceeding." 6 Cal. 5th 610, 620 (2019) (quoting *Paul v. Friedman*, 95 Cal. App. 4th 853, 867 (2002)). "There must be a connection with an issue ***under review*** in that proceeding." *Id.* (emphasis added); *see also id.* at 627 ("'Under consideration or review' does not mean any issue a legislative body may conceivably decide to take up months or years in the future.").

Here, there is no indication whatsoever that the events at a 2016 holiday party constitute a material part of deciding whether Tinder's options were undervalued. To the contrary, as Pambakian admits, the events at the party are totally "unrelated"

to the Valuation Lawsuit. Plf. RJN, Ex. X, at 7. And in the New York Supreme Court's 26-page order on defendants' motion to dismiss, the Court does not mention the harassment allegations even once. Plf. RJN, Ex. Y. Because the statements are unrelated to the underlying lawsuit, they are not covered by section 425.16(e)(2).

*Paul v. Friedman* is on all fours. There, the defendants investigated plaintiff as part of an underlying securities arbitration and published their highly personal and irrelevant findings to the public. 95 Cal. App. 4th at 856–57. The Court of Appeal concluded that the anti-SLAPP law did not bar the plaintiff's later-filed defamation claims because, although the defendant's investigation was part of an official proceeding, the disclosures "***about [plaintiff's] personal life . . . had nothing to do with the claims under consideration in the arbitration***." *Id.* at 866 (emphasis added). By the same logic, Rad and Pambakian cannot seek cover simply because they inserted their irrelevant statements in the Valuation Complaint. Because the allegations about the holiday party have "nothing to do with" the claims filed there, statements about those allegations do not fall under section 425.16(e)(2).

*Lafayette Morehouse, Inc. v. Chronicle Publishing Co.*, 37 Cal. App. 4th 855 (1995), cited in the MS, is inapposite. *See* MS 18. In *Lafayette*, the court expressly concluded that the topics discussed in *The Chronicle* articles were the subject of a "series of public hearings," a county enforcement action, and the federal lawsuit. *See id.* at 863. There was therefore no dispute in *Lafayette* that the allegedly defamatory statements were actually "under consideration" by a legislative or judicial body. By contrast, the fact that Rad and Pambakian inserted the irrelevant allegations to "apply pressure" on Match and IAC to "settle the [Valuation] lawsuit" offers no such assurance that they are "under consideration." They are thus outside section 425.16(e)(2).

**Second**, Defendants' communications were not made "in connection with an issue of public interest." "An issue of public interest" is defined as a statement that (1) "concerns a person or entity in the public eye," (2) "involves conduct that could

*directly* affect a large number of people beyond the direct participants," and (3) "involves a topic of widespread public interest." *Rivero v. Am. Fed. of State, Cty. & Mun. Emps.*, 105 Cal. App. 4th 913, 919 (2003) (denying anti-SLAPP motion) (emphasis added). None of defendants' statements meet this test.

As an initial matter, defendants' passing suggestion that Blatt is a "powerful public figure in the media business" is not sufficient to establish that Blatt is a person "in the public eye." *See* MS 19. At the time the statements were made, Blatt had retired from Match and lived a private life. *See* Blatt Decl. ¶2. Defendants have not argued that Blatt is an "all purpose" public figure or a limited public figure for the purposes of this analysis. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). Nor could they given that Blatt has neither achieved "pervasive fame or notoriety" nor "voluntarily inject[ed] himself" into a public controversy such that defendants' statements would be shielded. *Id.*

Defendants' speech is not transformed into a matter of public concern simply because the Valuation Lawsuit allegedly involves "billions of dollars." Defendants have not met their burden of showing that a business dispute—even one worth billions to them personally——is a matter of concern to the public. *See Rand*, 6 Cal. 5th at 630 (recognizing that the anti-SLAPP statute does not "absorb every commercial dispute that happens to touch on the public interest"). As in *Rand*, where the Court understood that the decision to build an NFL stadium in a city was a matter of public interest but the decision about ***who*** would represent the city was not, *id.* at 627 (emphasis added), the court must disentangle the subject matter of the suit from its effects. Although Match and Tinder may be household names, the decision whether a small group of Tinder executives were entitled to more money is not a matter of public concern. *See id.* ("[A] matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest.").

Blatt agrees that the #MeToo movement is a matter of public interest. But "a court scrutinizing the nature of speech in the anti-SLAPP context must focus on []

15

the speech at hand, rather than the prospects that such speech may conceivably have indirect consequences for an issue of public concern." *Id.* at 625 (citing cases). In other words, that #MeToo generally is a matter of public concern does not mean that in this case, defendants can immunize their defamation of Blatt, a private individual, by claiming that their lies advance a matter of public interest. "At a sufficiently high level of generalization, any conduct can appear rationally related to a broader issue of public importance." *Id.* But here, where the allegations, taken in the light most favorable to the plaintiff, show that defendants made the statements with actual malice to damage Blatt's reputation, they do not advance the #MeToo movement or otherwise comment on a matter of public interest.

*Third*, the anti-SLAPP statute does not apply because Defendants' statements are simply one part of a broader scheme of unethical conduct. Speech in furtherance of an unlawful scheme is not protected under California law. *See, e.g.*, *Flatley v. Mauro*, 39 Cal. 4th 299, 305 (2006); *Paul*, 95 Cal. App. 4th at 864 ("The scope of [section 425.16] is not without limits."); *Renewable Res. Coal. Inc. v. Pebble Mines Corp.*, 159 Cal. Rptr. 3d 901, 903 (Ct. App. 2013). And although defendants would have the court focus on their statements alone, the Court cannot—and should not—ignore the litigation funding agreement that triggered these events.[9]

*Renewable Resources* illustrates why. There, the plaintiff alleged that defendants unlawfully obtained confidential documents from the plaintiff's former associate and used the documents as the basis for a lawsuit against the plaintiff. 159 Cal. Rptr. 3d at 903. The defendants urged the court to take a narrow approach in its anti-SLAPP analysis, arguing that the statute protected their filing of a lawsuit. But the court determined (correctly) that a broader view was appropriate; the

---

[9] Because the 12(b)(6) standard applies, the Court must accept Blatt's allegations about the litigation funding agreement and defendants' conspiracy as true. If necessary, Blatt requests leave to amend to add further facts regarding the underlying litigation funding agreement and the unethical conspiracy.

"gravamen" of the plaintiff's action was not the lawsuit the defendants had filed but the defendants' unethical conduct that provided them with the basis for filing their lawsuit in the first place. *Id.* at 909. It denied the anti-SLAPP motion, concluding that the plaintiff's lawsuit was "not an act by defendants in furtherance of their right of petition or free speech." *Id.* Similarly, here the Court must look beyond the 2018 statements to the conduct that provoked those statements in the first place—Defendants' unlawful conspiracy and the improper litigation funding agreement. From that broader lens, Defendants' conduct is surely not protected.[10]

## 2.    Prong 2: Blatt Has Stated A Valid Defamation Claim.

At step two, the Court must consider whether Blatt has demonstrated a reasonable probability of prevailing. Cal. Civ. Code § 425.16(b)(1). "Reasonable probability in the anti-SLAPP statute has a specialized meaning." *Manzari*, 830 F.3d at 887. It requires "only a ***minimum*** level of legal sufficiency and triability." *Id.* (quoting *Mindys Cosmetics*, 611 F.3d at 598) (emphasis added).

Blatt's claims are for common law defamation, defamation per se, and conspiracy. *See* FAC ¶¶ 110–35. Not surprisingly given the evidence already in the record, Defendants do not dispute that Blatt has met the elements of these claims. Instead, Defendants raise the fair report privilege as an affirmative defense. They also argue that, if Blatt's defamation claims are stricken, the conspiracy claim should be stricken too. Both arguments fail.

Under California law, the fair report privilege protects a "fair and true report in, or a communication to, a public journal, of . . . a judicial . . . proceeding, or anything said in the course thereof."[11] Cal. Civ. Code § 47(d). Unlike the typical

---

[10] Without refuting the underlying allegations, Defendants claim that "motive" is not relevant, *see* MS at 21, but they overlook a line of cases, under prong one, where motive is, in fact, a relevant factor. *See, e.g.*, *Flatley*, 39 Cal. 4th at 313.

[11] Blatt does not argue that New York law should apply to prong two as the fair and true report privilege does not differ substantively between New York and California.

prong 2 analysis, **Defendants bear the burden** (*Carver v. Bonds*, 135 Cal. App. 4th 328, 348–49 (2005)) of proving that **each statement** (*Youngevity Int'l Corp. v. Andreoli*, 749 F. App'x 634 (9th Cir. Jan. 24, 2019)) falls within the privilege. Defendants have not met this burden for the following reasons.

### a.   The statements are not a fair and true report of the Valuation Complaint.

To determine here whether a "report" or "communication" is "fair and true," the Court must compare the Defendants' statements with the allegations in the Valuation Complaint, not with the underlying events that are referenced in that complaint. *See Healthsmart Pacific, Inc. v. Kabateck*, 7 Cal. App. 5th 416 (2016), as modified (Jan. 10, 2017). The privilege's scope is limited to reports and communications that capture "the substance, the 'gist' or 'sting,' of the subject proceedings" as measured by the "natural and probable effect on the mind of the average reader." *Braun v. Chronicle Publishing Co.*, 52 Cal. App. 4th 1036, 1050 n.6 (1997). If reasonable minds may disagree as to whether the communication is a fair and true report, the applicability of the privilege is a question of fact for a jury. *See Argentieri v. Zuckerberg*, 8 Cal. App. 5th 768, 791 (2017). Here, the statements are not a fair and true report because they neither communicate the "substance" of the underlying judicial proceeding nor its "gist" and "sting."

### i.   The Valuation Complaint is not a sexual harassment complaint.

The "substance" of the Valuation Lawsuit is not an accusation of sexual harassment but is, instead, that Match breached an agreement by causing two independent investment banks to undervalue their Tinder stock options. Inserting a single, irrelevant allegation into the Valuation Complaint about alleged misconduct at a holiday party does not allow Defendants to make statements about "sexual assault" front and center in later communications to the press. *Accord Paul*, 95 Cal. App. 4th at 866. As Pambakian herself admits, the claims in the Valuation

18

Complaint are entirely "unrelated" to the sexual assault claims. Plf. RJN, Ex. X. And she concedes that her sexual harassment allegations do "not give rise to a single claim or cause of action in the Valuation Case." *Id.* Indeed, Blatt is not even named as a party in the Valuation Complaint. Accordingly, Rad's and Pambakian's defamatory statements cannot possibly be a "fair report" of the Valuation Lawsuit's dispute over the value of the Tinder options.

### ii.    The defamatory statements do not communicate allegations in the Valuation Complaint or otherwise communicate the "gist" or "sting" of that document.

Defendants appear to concede that most of the statements at issue do not communicate the substance of the Valuation Complaint but instead argue that the statements are nonetheless protected because they communicate the "gist," or "sting" of one limited statement in the Valuation Complaint. MS 24. Even if this and not the "substance" of the proceeding discussed in the prior section were the appropriate standard, it would fail for at least two reasons.[12]

*First*, the majority of the statements at issue provide facts that cannot be found anywhere in the Valuation Complaint, which, in total, contains a single, conclusory allegation (repeated on three occasions) that Blatt "sexually harassed and groped" Pambakian at a holiday party and generalized allegations that the Match Board covered up Blatt's conduct. *See* Def. RJN, Ex. A ¶¶14, 127–33, 146.

For example, in the August 16 article, Pambakian states that Blatt suggested that she and Blatt "get out of here." Ex. A, Appx A. She says, "I basically bolted, found two people I knew and said, 'Hey. Let's go up to your room.'" *Id.* Pambakian then said that Blatt entered the room and, without saying anything to anyone else in the room, "pushed her back onto the mattress, climbed on top of her, and began

---

[12] Attached as Exhibit B to the Bhatia Declaration is a chart comparing Defendants' statements to the principal allegations in the Valuation Complaint.

kissing and fondling her." *Id.* These detailed statements, as well as the ones listed in the attached Exhibit B to the Bhatia Declaration, which present Blatt as a rapacious aggressor, do not appear in the Valuation Complaint. Simply put, because these statements appear publicly for the ***first time*** in the press, they cannot possibly be a "report" or "communication" of an underlying judicial proceeding. *See* Cal. Civ. Code § 47.

     ***Second***, the details supplied in Pambakian's statements have a very different "gist" and "sting" than the Valuation Complaint, which relies upon only a conclusory allegation of "groping" and "harassment." In comparison, in her statements to CNN, Pambakian says that "Blatt entered the [hotel] room and, without saying anything to anyone else in the room, ***pushed her back onto the mattress, climbed on top of her, and began kissing and fondling her***." FAC, Appx A (emphasis added). Not only are these additional facts not true, but it is reasonable to expect that their sensationalized and lurid detail will and was intended to have a different effect on the reader than the generic allegation in the underlying complaint. *See Carver*, 135 Cal. App. 4th at 351 (concluding that if the "deviation . . . 'produce[s] a different effect' on the reader," the privilege is "suspended").

     Even more so, Pambakian's characterization of the conduct in the December 2018 articles as "sexual assault" is plainly of a different degree than the allegation in the Valuation Complaint. Specifically, in *The Verge* emails, Pambakian ratchets up considerably the severity of what it alleged, recasting her claims of "grop[ing] and sexual[] harass[ment]" to accusations of "sexual misconduct," "assault," and "sexual assault." *See* Appx A.[13] Claims of "assault," and "sexual assault," which imply that Blatt's conduct was criminal, are a "deviation [] of a 'substantial character'" that

---

[13] Pambakian's emails are not—and cannot—be a report of the underlying lawsuit as they were submitted originally to then Match Group CEO Mandy Ginsberg to dispute Pambakian's employment termination, and not intended to communicate the public the progress of the Valuation Lawsuit.

1   would be expected to produce a "different effect on the reader" than the initial

2   allegations of sexual harassment in the Valuation Complaint.

3        The caselaw supports this finding. In *Argentieri*, for example, the court was

4   concerned about whether a statement to the press where the speaker said that the

5   plaintiff "***knew*** the case was based on forged documents" was the same as a

6   statement in the complaint that said that "the lawyers ***knew or should have known***

7   that the lawsuit was fraud." *See Argentieri* 8 Cal. App. 5th 768 at 790 (emphasis

8   added). Although the court permitted the statement, acknowledging that the lay

9   reader likely would not be able to tell the difference between the legal standard and

10  the common nomenclature, the court recognized that the specific words used in the

11  communication mattered for the analysis. *Id.* The same analysis occurred in *Dorsey*

12  where the court relied upon Black's Law Dictionary to parse whether an allegation

13  made as to "information and belief" in a complaint is the same as statement to the

14  press without such a qualifier. *Dorsey v. Nat'l Enquirer, Inc.*, 973 F.2d 1431, 1436

15  (9th Cir. 1992). Here, the Court does not need the aid of a dictionary to determine

16  whether Pambakian's statements have a different "sting." A reader is not likely to

17  believe that the generic accusation of sexual harassment and groping at a party

18  amounted to conduct that would be the equivalent of the violent crime subsequently

19  described by Pambakian to the press. The side-by-side comparison illustrates that

20  Pambakian's statements to the press offer far more detail than the underlying

21  Valuation Complaint and likely had a different effect on the reader. *See Argentieri*,

22  8 Cal. App. 5th at 791 ("[W]hether report is 'fair and true' is a question of fact and,

23  provided reasonable minds could disagree on that point, a question for the jury."

24  (quoting *J-M*, 247 Cal. App. 4th at 98–99)). For all these reasons, Defendants'

25  statements do not capture the substance of the underlying judicial proceeding.

26

27

28

1

2

b.     **Defendants do not attribute their statements to the Valuation Complaint.**

3      Adding insult to injury, none of the defamatory statements at issue are

4  properly attributed to the Valuation Complaint. Rather, for all the defamatory

5  statements, Rad and Pambakian purport to speak from personal experience, without

6  referencing the Valuation Complaint as the source of their information. This is yet

7  another disqualifying event as the privilege does not protect communications that do

8  not identify the source of the information as the underlying judicial proceeding. *See*

9  *Hayward*, 265 Cal. App. 2d at 259 ("[I]n order to qualify as privileged . . . an article

10  must state the source of its information."); *Wentworth v. Bennett*, 2018 WL

11  3521340, at *10 (Cal. Ct. App. July 23, 2018) (unpublished) (declining to apply fair

12  report privilege where speaker failed to identify source); *accord Dorsey*, 973 F.2d at

13  1436–37 (statements referring back to what was "stated in the court documents").

14      In each statement at issue here, Rad and Pambakian identify themselves as the

15  source of the information, not the Valuation Complaint. This brings their statements

16  outside the bounds of the privilege. As the court understood in *Healthsmart Pacific*,

17  "[t]here is [] a critical difference between communicating to the media what is

18  alleged in a complaint and communicating the alleged facts without reference to the

19  complaint." 7 Cal. App. 5th at 435; *see also id. Hawran v. Hixson*, 147 Cal. Rptr. 3d

20  88, 109 (2012) ("The fact information in the press release was also disclosed to the

21  SEC . . . does not transform the press release into a report *about* the SEC

22  proceedings or about statements made in the course of that proceeding.").

23      In the August 14, 2018 CNN broadcast, for example, Rad says there that Blatt

24  threatened him if Rad reported what happened at the holiday party to Match

25  executives. *See* Ex. A, Appx A ("I was threatened. I believe it was, 'If you take me

26  down, I'm going to take you down with me.'"). Rad does not attribute his statement

27  to the Valuation Complaint, but purports to state factual events. *Id.*

28

1      Even further untethered from the Complaint, in the August 16, 2019 CNN
2  article, CNN attributes all the facts to Pambakian, not the Valuation Complaint. *See*
3  Appx A ("According to Pambakian"; "Pambakian said"; "Pambakian strongly
4  disagrees.") The reader would certainly think that these statements come from
5  Pambakian, not from the Valuation Complaint—particularly given that none of
6  these statements appear in the Valuation Complaint in the first instance.

7      Finally, *The Verge* attributes the third set of statements in the December 18,
8  2018 article to Pambakian's emails, without any reference to the underlying
9  Complaint. Those articles, and the timing of them, months after the Valuation
10  Complaint was filed, make clear that the statements in them are not from the
11  Valuation Complaint, but emails sent well after. *See* Ex. A, Appx A. The allegations
12  of sexual misconduct, assault, and sexual assault in the emails never appeared in the
13  Valuation Complaint either.

14      Defendants' failure to attribute their statements to the Valuation Complaint is
15  fatal here because the average observer is not able to tell whether Rad and
16  Pambakian, as individuals who participated in the underlying events, are speaking
17  from personal experience or simply recounting allegations from a complaint. That
18  their statements would fall outside the fair report privilege makes sense, given that
19  the privilege was never intended to protect the original speaker. *See* Restatement
20  Second Torts, § 611, com. C ("A person cannot confer this privilege upon himself
21  by making the original defamatory publication himself and then reporting to other
22  people what he had stated."). And if there is doubt about whether the viewer would
23  consider the statements a fair and true report, the issue is a question for a jury. *See*
24  *Argentieri*, 8 Cal. App. 5th at 791.

25           **c.**     **The statements do not provide a "history" or**
26                    **"background" of the judicial proceeding.**

27      Recognizing that the Valuation Complaint does not provide a basis for the
28  privilege to be applied to their statements, Defendants suggest that the law allows

them to shoehorn their statements into the fair report privilege because the statements offer a "background" of the underlying events, which is purportedly another avenue to protect the statements. MS 22. This argument is frivolous.

As an initial matter, the cases do not support Defendants' broad approach. In each instance where the court has discussed the "history" or "background" of a proceeding, the history/background itself has been part of the judicial proceeding or another proceeding protected by the privilege. For example, in *Dorsey*, the court concluded that what was contained in ***prior court filings*** was fair game as "background" information under the privilege. *See* 973 F.2d at 1436–38. Similarly, in *Braun v. Chronicle Publishing Co.* and *Hayward v. Watsonville Register-Pajaronian*, the court allowed the media defendant to describe other "official proceedings" that had led up to the present report. *See Braun*, 52 Cal. App. 4th at 1052 (describing the State Auditor's investigative audit of a state hospital which led to the termination of a state employee); *Hayward*, 265 Cal. App. 2d 255, 260 (1968) (describing the sheriff department's investigation). But, in each instance, the court required the "background" or "history" to emanate from, or describe, the judicial proceedings themselves, not the underlying events that gave rise to those proceedings.

It makes sense the fair report privilege would protect the history of the judicial proceeding—as it was designed to promote public knowledge of public proceedings. By stark contrast, it would be a perversion of the privilege to read it to also protect statements not found in any judicial proceeding, but rather providing background of private affairs, not previously the subject of any government inquiry or public proceeding. In fact, in this instance, Defendants do not even point to any identifiable source of any nature from which the content of their statements originate. Were the court to find that the underlying events are themselves part of the judicial proceeding, the inquiry collapses onto itself as the only way to determine whether the fair and true report privilege applies is to determine whether

24

Rad and Pambakian are telling the truth about their account of the holiday party—which is precisely the issue disputed in this lawsuit. And if the court instead found that the statements to the press were themselves the source, then similarly the privilege would not apply, as it only protects the fair and true account of something attributed to another source. It does not protect the primary source itself. Tellingly, Defendants have not cited a single case suggesting that an expansion to such private background information is supported by existing law.

### 3. One defamatory statement is sufficient for a conspiracy claim.

"Although conspiracy to commit a tort is not a separate cause of action from the tort itself, alleging conspiracy fastens liability on those who agree to the plan to commit the wrong as well as those who actually carry it out." *Steuve Bros. Farms, LLC v. Berger Kahn*, 166 Cal. Rptr. 3d 116, 132 (Ct. App. 2013). The Complaint's facts, which must be accepted as true, allege that Rad and Pambakian entered a conspiracy "when Rad offered and Pambakian accepted millions of dollars in exchange for Pambakian joining the Valuation Lawsuit and making false allegations of sexual harassment against Blatt." Ex. A, ¶132. Because both Rad and Pambakian are parties to the conspiracy, it does not matter who made the defamatory statements for purposes of the conspiracy claim. Or, in other words, if even a single statement survives the motion to strike, both Rad and Pambakian remain proper defendants as to the conspiracy claims, regardless of who made the statement. Thus, for the reasons discussed above, the Court should deny the motion as to the conspiracy claim as well.

### V. CONCLUSION

Blatt files this suit to redress the Defendants' cynical attack on his reputation. None of defendants' arguments merit dismissal at this early stage. The motion should be denied.

DATED:  October 15, 2019          DAVIDA P. BROOK
                                  VINEET BHATIA
                                  LORA J. KRSULICH
                                  SUSMAN GODFREY LLP


                                  By: */s/ Vineet Bhatia*
                                  _____
                                       VINEET BHATIA

                                  Attorneys for Plaintiff
                                  GREGORY BLATT