# Exhibit A

DAVIDA P. BROOK (275370)
dbrook@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, 14th Floor
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

VINEET BHATIA (*Pro Hac Vice*)
vbhatia@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

Attorneys for Plaintiff Greg Blatt

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| GREG BLATT, | Case No. 2:19-cv-07046-MWF-FFM(x) |
|---|---|
| Plaintiff, | |
| v. | **FIRST AMENDED COMPLAINT** |
| ROSETTE PAMBAKIAN and SEAN RAD; and DOES 1 – 10, inclusive, | <u>**JURY TRIAL DEMANDED**</u> |
| Defendants. | |

6870235v1/016409

Plaintiff Greg Blatt ("Blatt" or "Plaintiff"), by his attorneys, Susman Godfrey L.L.P., for his First Amended Complaint against defendants Rosette Pambakian ("Pambakian") and Sean Rad ("Rad") (collectively, "Defendants"), alleges the following, on information and belief, except as to Plaintiff's own acts, which are based on Plaintiff's knowledge, as follows:

## NATURE OF THE ACTION

1.     This is an action for defamation and defamation per se.  As part of their scheme to extract billions of dollars from IAC/InterActiveCorp ("IAC") and Match Group, Inc. ("Match"), Pambakian and Rad have conspired to make false allegations of sexual harassment and sexual assault against Blatt with the specific intent to damage Blatt's good name, personal and professional reputation, and credibility.  In so doing, Rad and Pambakian have attempted to weaponize an important social movement, undermining the plight of true victims of sexual abuse by making false accusations in cynical pursuit of a $2 billion windfall.  Blatt brings this action to obtain redress for the false accusations that have been leveled against him, accusations that have been motivated by greed and personal animus, not fact.

2.     Pambakian and Rad are former executives at Tinder, Inc. ("Tinder"). Tinder is wholly owned and operated by Match, and Match is a controlled subsidiary of IAC.  At various times, Blatt served as CEO of IAC, Match, and Tinder.  In August 2018, both Pambakian and Rad (along with several other current and former Tinder executives) filed a lawsuit in New York (the "Valuation Lawsuit") claiming that IAC and Match, in large part through the actions of Blatt, failed to properly value their Tinder stock options.  Specifically, the plaintiffs in the Valuation Lawsuit claim that they would be entitled to an additional $2 billion if their Tinder options were properly valued.  Blatt is expected to be a key witness for IAC and Match in the Valuation Lawsuit.  Damaging Blatt's credibility and tarnishing his character are important elements of Pambakian's and Rad's litigation strategy in that action.

3.      Blatt had been Rad's boss, directly or indirectly, throughout Rad's tenure at Tinder.  Over that time, Rad came to blame Blatt for a variety of perceived transgressions, including Rad's failure to obtain control of Tinder soon after its launch in 2012, Rad's demotion from the position of Tinder's senior executive in 2015, and Rad's ultimate dismissal from Tinder management in 2016.  Following Rad's departure from the company, one executive told Blatt, "I have never met anyone who hated anyone as much as Rad hates you."

4.      But the event that pushed Rad over the edge happened in April 2017. The contractually agreed appraisal process, pursuant to which two investment banks would value the Tinder stock options, was scheduled for May.  Hoping to avoid the process altogether, Rad and Blatt began negotiating in March to see if they could agree on a value, which would obviate the need to continue with the appraisal process.

5.      Rad and Blatt had different perspectives regarding how Tinder should be valued under the relevant agreement, however, and it soon became apparent that an agreement on valuation was unlikely.  As discussions began to fall apart, Rad concluded that Blatt's further participation in the valuation process would lead to a significantly lower payout to Rad.  In Rad's eyes, Blatt had committed an unforgiveable sin:  interfering with Rad's dreams of a lucrative, outsized payout.  Rad snapped.

6.      On April 18, 2017, shortly before negotiations ended, Rad determined to destroy Blatt.  In an email to his financial advisor, Rad wrote:  "***Fuck him.  We're at war.  We will destroy him.***  This is going to be the biggest lesson of his life.  He will be a changed man. . . excited for him ☺."  *See* Exhibit 22 (emphasis added).  The following week, Rad made a false accusation that Blatt had sexually harassed Pambakian at a Tinder holiday party some five months earlier.  As confirmed by multiple Tinder employees, including Pambakian, Rad made the complaint to obtain Blatt's dismissal or suspension from his position as Tinder's CEO in order to seek retribution against Blatt and secure a significantly higher valuation of Rad's options.

2

At this time, Rad also began working on a lawsuit against IAC and Match, even though the appraisal process had not even started yet.  Rad viewed the situation as a "war," and he would fight it on all possible fronts.

7.     Rad's complaint against Blatt was thoroughly investigated by in house counsel and two outside law firms.  Mandy Ginsberg, the current CEO of Match, later made clear that Pambakian had not supported Rad's claim of sexual harassment at the time, stating in an email to Pambakian, "[Y]ou never reported Greg for sexual harassment. . . . you were interviewed on at least two separate occasions [during the investigation] and you never alleged sexual harassment."  *See* Exhibit 1.  In fact, just before Rad undertook to level his false accusation against Blatt, Pambakian urged a friend to help Pambakian talk Rad out of going forward with his allegation, lamenting presciently that "[m]oney really is the root of all evil."  *See* Exhibit 2.  It was clear to Pambakian that Rad was making accusations against Blatt to increase his long-sought payout from Tinder, and she didn't want him to do it.

8.     Rad's gambit failed: the investigation concluded that Blatt had not engaged in any harassment or abuse, and Blatt was not dismissed or otherwise removed from the appraisal process.  After completion of the appraisal in mid-July 2017, Rad elected to sell all his stock options, personally making hundreds of millions of dollars, even though, after taking the money, he now claims that the price was "unfair."  Pambakian similarly elected to sell her stock options, pocketing nearly $5 million.  However, Rad became furious when the value of Tinder subsequently increased.  If Rad had only held his stock options a few months longer, he would have made hundreds of millions of dollars more.  Seething over this lost opportunity, Rad revisited his plans for a lawsuit against IAC and Match to get a "do over" on the value of the stock options he had already liquidated.

9.     Rad continued to believe, that the key to obtaining the valuation he desired, this time through winning his lawsuit, was destroying Blatt's credibility and tarnishing his character.  Accordingly, Rad once again attempted to enlist Pambakian

6870235v1/016409

1   to make a harassment or assault claim against Blatt.  Rad was convinced that no jury

2   would side with an accused sexual harasser or the company that employed him.

3      10.    However, for a second time, Pambakian refused to join his scheme.

4   Pambakian knew Blatt had neither harassed nor assaulted her.  Blatt and Pambakian

5   had a good working relationship and were also good friends.  Her career at Tinder was

6   thriving.  Pambakian had recently received a meaningful promotion and was as happy

7   at work as she had ever been.  Pambakian did not want to attack Blatt.  In fact, rather

8   than attack him, Pambakian aggressively lobbied Blatt to stay on at Tinder even after

9   he announced his plans for departing the company, writing:  "There's still just one

10  right direction to go in. . . . Stay. . . . Things aren't perfect but it's not difficult to make

11  it better." *See* Exhibit 3.

12     11.    In December 2017, Blatt left the company and Pambakian's new boss

13  decided to bring in a new marketing executive to whom Pambakian would now report.

14  Pambakian was unhappy about being denied the promotion.  Rad saw his opening.

15     12.    Desperate to recruit Pambakian for his scheme to sue Match and IAC,

16  Rad decided to sweeten the pot to induce Pambakian to join him.  Specifically, under

17  the guise of a litigation funding agreement, Rad promised millions to Pambakian in

18  exchange for her joining the Valuation Lawsuit and making false allegations of sexual

19  harassment against Blatt.  These payments – which Rad arranged through a third-party

20  financial firm, Bench Walk Advisors, came in two parts:  Part One involved a

21  promised upfront payment simply for joining the lawsuit and making the allegations

22  against Blatt.  This upfront payment was Pambakian's to keep, regardless of whether

23  the lawsuit succeeded.  Part Two involved a contingency payment in the event the

24  Valuation Lawsuit was victorious.   This contingent payment would be paid to

25  Pambakian before Rad received even one cent.  Collectively, these multi-million

26  dollar payments far exceeded what Pambakian would have received if she had joined

27  the lawsuit like an ordinary co-plaintiff.  Moreover, under the special arrangement,

28

4

1    she would remain entitled to her payout even if she dropped out of the lawsuit for any

2    reason (which she did just 17-days after filing the complaint).

3          13.    In essence, Rad was willing to pay Pambakian out of his own pocket in

4    order to convince her to join the Valuation Lawsuit.  This arrangement only made

5    sense from Rad's perspective if he believed that Pambakian's participation would

6    increase his chance of victory in the suit.  Pambakian did not know anything about the

7    central claims of the Valuation Lawsuit; the only way Pambakian's participation could

8    increase the chances of winning the suit was through the addition of the false

9    allegations concerning sexual harassment against Blatt, allegations that Pambakian

10   was only willing to make after receiving the upfront payment.  Securing Pambakian's

11   false allegations was the driving motive behind these payment arrangements.  Indeed,

12   of the nine plaintiffs in the Valuation Lawsuit other than Rad, the only other plaintiff

13   who received an arrangement comparable to Pambakian's was the only other plaintiff

14   who Rad was counting on to make false allegations against Blatt.  All the other

15   plaintiffs, none of whom have any special testimony to offer in the case, have to wait

16   until the lawsuit is concluded to see if they get paid.  The legality of the arrangement

17   with Pambakian is currently being challenged in the Valuation Lawsuit.

18         14.    Having finally flipped Pambakian and others, on August 14, 2018, Rad

19   brought his lawsuit against IAC and Match.  In that lawsuit, Rad, this time with

20   Pambakian's support, leveled the same allegations of sexual harassment against Blatt

21   that he had made a year before, even though those allegations had nothing to do with

22   the central legal issues relating to the valuation claims.  Rad and Pambakian then

23   embarked on a coordinated media campaign to ensure that their false charges against

24   Blatt were widely-disseminated to the public, which they were.

25         15.    Months later, at a critical juncture of the Valuation Lawsuit, Pambakian

26   brought a separate lawsuit against Blatt, Match, and IAC (the "Pambakian Lawsuit")

27   reiterating the same false allegations against Blatt, though with increased fictitious

28   detail and sensationalism.  This new lawsuit – and the corresponding new round of

6870235v1/016409

1    coordinated outreach to the media – drove a fresh wave of headlines that once again

2    tarnished Blatt's reputation.   Notably, in this second lawsuit, Pambakian is

3    represented by the law firm whose founding partner is also the founding partner of

4    Bench Walk Advisors, the firm responsible for making the aforementioned payments

5    to Pambakian, and who stands to be paid handsomely if the Valuation Lawsuit is

6    successful.  It is clear that the allegations against Blatt in the Valuation Lawsuit, the

7    press, and the Pambakian Lawsuit, are merely coordinated tactics to tarnish Blatt's

8    reputation to drive an anticipated $2 billion payday in the Valuation Lawsuit, the

9    largest piece of which would go to Rad.

10          16.    The evolution throughout this period of how Pambakian describes what

11   happened between her and Blatt is illustrative.  Immediately after the holiday party,

12   Pambakian playfully described what happened in a text to her friends as "antics,"

13   populating her messages with a smiley face and laughing emojis.  Twenty months

14   later, however, in the Valuation Lawsuit, Pambakian alleged that Blatt "sexually

15   harassed and groped" her.  Months after that, Pambakian ratcheted up the intensity

16   further, claiming to the press that what had happened with Blatt was a "sexual assault."

17   And then finally, months later, in the Pambakian Lawsuit, Pambakian asserted that

18   Blatt had "physically and sexually assaulted" her.  With each passing articulation,

19   Blatt and his transgressions became more nefarious.

20          17.    Rad and Pambakian's primary defamatory statements against Blatt are

21   the claims of sexual harassment and sexual assault.  In order to support these primary

22   defamatory statements, Rad and Pambakian have made numerous other assertions

23   against Blatt designed to villainize him and make their claims more believable.  All

24   these additional assertions are likewise false.  Specifically:

25                 a.    Rad and Pambakian claim that Blatt routinely subjected

26                       Pambakian to inappropriate behavior.  This is false.  In reality,

27                       contemporaneous documents show that Blatt and Pambakian had

28                       a close professional and personal relationship both before and

6

after the holiday party.  For example, in various messages, Pambakian writes, ***"I love Greg Blatt", "I absolutely adore you"*** and "I'm with [Tinder employee] right now drinking tequila and talking about how much ***we love you."*** Pambakian also socialized with Blatt, lobbied Blatt to reverse his decision to leave the company, and repeatedly made clear her desire to maintain her relationship with Blatt even after he departed the company.

b.  Rad and Pambakian claim that after Blatt made unwanted sexual advances to Pambakian at the Tinder holiday party, Pambakian fled Blatt in horror and sought refuge in a hotel room.  This is false.  In reality, Pambakian did not flee Blatt at the holiday party, but rather invited him, in front of other witnesses, to come up to the hotel room and ordered an avocado cheeseburger for him from room service in anticipation of his arrival.

c.  Rad and Pambakian claim that Pambakian dutifully reported Blatt's "assault" but in turn was ignored, marginalized and disparaged.  This is false.  In reality,  Match has publicly stated that she never made any such allegations, and Pambakian acknowledges in contemporaneous messages that she "never wanted anyone to know about" what happened between Blatt and her and wrote to a friend immediately before Rad made his allegations, ***"I need your help talking him out of it."***

d.  Rad claims that Blatt threatened Rad for raising the allegations of sexual misconduct against him.  This is false.  In reality, Blatt and Rad were never alone together during the entire pendency of the investigation into Rad's complaint, and Blatt never threatened Rad about the investigation in any way.  Contemporaneous notes from a conversation between Blatt and Rad after the investigation

7

1   had closed demonstrate that Rad apologized to Blatt for having

2   made the false allegations.

3   e.   Rad and Pambakian claim that Pambakian's career suffered

4   horribly as a result of Blatt demeaning her and not taking her

5   seriously as a business executive.  This is false.  In reality, while

6   trying to prevent Rad from making his false allegations,

7   Pambakian laments to a friend, "[t]hings were finally going well

8   with work."  Then, even after the false complaint was made,

9   Pambakian received, and acknowledges receiving, a meaningful

10   increase in responsibilities, title, and compensation, all while

11   Blatt was CEO of Tinder.  In fact, she wrote to Blatt in the wake

12   of her promotion, ***"Thank you for everything – for helping me***

13   ***so much."***

14   f.   Finally, Rad and Pambakian claim that Blatt reigned over a

15   misogynistic work culture that routinely mistreated women.  This

16   is false.   In reality, they were both well aware of Match's

17   unparalleled record for career advancement for women while

18   Blatt was CEO, with over 75% of all Match employees reporting

19   to a woman executive, two-thirds of Blatt's Tinder direct reports

20   being women, almost 50% of all Match vice presidents women,

21   100% gender equality in pay, and, upon Blatt's departure, the

22   promotion of two women with whom Blatt had worked closely

23   for nearly a decade to the positions of CEO and President.  When

24   Blatt announced his departure from Tinder, Pambakian wrote,

25   ***"You'd literally have to resurrect Steve Jobs and make him ceo***

26   ***for anyone to be excited about this."***  In Blatt's entire career he

27   had never been the subject of a single allegation of sexual

28   misconduct, other than the one lodged by Rad, nor has any such

8

complaint been made against him in the year since Rad's and Pambakian's false allegation against him were so publicly made.

18.     Claims of sexual harassment and sexual assault should be taken seriously and thoroughly investigated.  That is precisely what happened here.  All allegations were investigated, and the claims were found to be without merit.  This is not surprising as, unlike most accusations of sexual misconduct, which are "he-said/she-said" situations in which the accuser typically has no incentive to lie, in this case, (1) there is a clear financial motivation for Pambakian to fabricate and publicize the false claims against Blatt; (2) multiple witnesses contradict Pambakian's allegations; and (3) extensive written communications among Blatt, Pambakian, and others, as well as other documents, materially contradict her accusations.

19.     Blatt therefore brings this suit to obtain compensation for the willful and malicious false statements Pambakian and Rad have knowingly and intentionally made to advance their personal, financial interests.

## THE PARTIES

20.     Plaintiff Gregory Blatt is a citizen of the State of Colorado.  Prior to December 2017, Blatt was the CEO and Chairman of Match Group and the CEO and Executive Chairman of Tinder.

21.     Defendant Rosette Pambakian is a citizen of the State of California.  Pambakian was the Vice-President of Global Communications and Brand and Head of Marketing and Communications at Tinder.

22.     Defendant Sean Rad is a citizen of the State of California.  At various times from approximately February 2012 to December 2016, Rad was the CEO of Tinder.

23.     Plaintiff is not aware of the true names and capacities of the Defendants sued herein as Does 1 through 10, whether individual, corporate, associate, or otherwise and therefore sues such Defendants by these fictitious names.  Plaintiff will seek leave to amend this Complaint to allege their true names and capacities when

ascertained.  Plaintiff is informed and believes, and on that basis alleges, that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged and that Plaintiff's injuries and damages herein alleged were legally caused by such Defendants.  Unless otherwise indicated, each Defendant was acting within the course and scope of said agency and/or employment, with the knowledge and/or consent of said co-Defendant.

24.    Plaintiff is informed and believes and thereupon alleges that all times mentioned herein, each of the Defendants, including each Doe Defendant, was acting as the agent and/or servant, and/or partner of and was acting in concert with each of the remaining Defendants, including each Doe Defendant, in doing the things herein alleged, while at all times acting within the course and scope of such agency, service, and/or partnership.  Each Defendant, in doing the acts alleged herein, was acting both individually and within the course and scope of such agency and, with the knowledge and/or consent of the remaining Defendants.

## JURISDICTION AND VENUE

25.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this action between citizens of different states and the amount in controversy exceeds $75,000.

26.    Venue is proper in the Central District of California, Southern Division because all the Defendants are California residents who reside in the Central District of California and a substantial part of the events that give rise to the claim occurred in the Central District of California.

## FACTUAL ALLEGATIONS

### I.    Rad's Tumultuous Career at Tinder

27.    In 2012, Rad took a job working at Hatch Labs, an IAC subsidiary.  The sole purpose of Hatch Labs was to start and develop new businesses which would be owned and controlled by IAC.  While an employee at Hatch, Rad and other Hatch employees developed Tinder.  Once Tinder had launched and gained early success,

Rad demanded the majority of Tinder's economic ownership and associated control. Given that the whole point of Hatch was to develop businesses IAC would own and control, IAC declined this rather odd request. Rad was outraged and has never gotten over this perceived slight.

28.     While IAC was not willing to simply give Tinder to Rad, IAC did believe in providing ownership incentives for its employees. IAC thus provided Tinder employees a stock option structure similar to one that had been used for other business lines within IAC, although Tinder's was substantially more generous. Rad and other Tinder employees would receive stock options in Tinder that would vest over time and would be valued in future years through a contractually-defined appraisal process. Following the appraisal, Tinder employees would be able to sell their stock options back to IAC. This structure would effectively give Tinder employees the economic benefits of stock ownership, even though Tinder was actually owned by IAC. These stock options, and the ultimate payout Rad would receive for them, became his "white whale." Everything Rad did from that point forward was designed to maximize that payout, and he obsessed over it relentlessly.

29.     As Tinder grew into a global phenomenon, it quickly became clear that Rad was not cut out to be CEO. In the fall 2014, about two years after Tinder was launched and almost three years before Tinder's stock options would be valued, Rad was informed that a new CEO was to be brought in. Rad was demoted to President – the number two position in Tinder management. After several months, however, Blatt determined that the new Tinder CEO was not a good fit at that stage of the company's development. Recognizing the challenges of bringing in a second outside person to lead an organization like Tinder, and fearing destabilization if that second CEO struggled, Blatt approached Rad about a new solution: Rad would be restored the title of CEO, but Rad would report directly to Blatt. For his part, Blatt would now spend the majority of his time on actively managing Rad and Tinder. Rad would continue to be the number two executive at Tinder, just as he had been since his demotion

11

earlier that year, but he would regain the CEO title, which he coveted, as well as certain other responsibilities he had previously lost.

30.     In the summer 2015, Blatt and Rad together announced that Rad would be returning as CEO, and Blatt would become his direct boss, stepping into the newly created position of Tinder's Executive Chairman.  The hope was that Rad's passion for the business coupled with Blatt's managerial experience and industry expertise would be the combination that Tinder needed.  However, it quickly became clear that Rad was not up to the task.  Internal chaos intensified, failed initiatives proliferated, and executive calls for change became the norm.  Ironically, the most pressing problems were in product development, which was ostensibly Rad's strong suit.  Rad claimed that he was too distracted with other elements of his job to drive product development as required. Accordingly, Blatt and Rad agreed to reorganize Rad's responsibilities to eliminate those supposed distractions.  In July 2016, Rad surrendered all his responsibilities and direct reports to Blatt, other than those relating to product development.

31.     Rad was given six months to reverse certain product trends.  If successful, Rad and Blatt would discuss whether Rad should have additional responsibilities restored.  However, the trends were not reversed, and finally Rad relinquished the Tinder CEO title and his remaining responsibilities in December 2016, receiving the honorary title of non-executive Chairman of Tinder.  At the same time, Blatt formally assumed the role of Tinder CEO, even though he had functionally been in the role for 6 months and had been the senior Tinder executive for 18 months.

32.     In the Valuation Lawsuit, Rad alleges that Match removed Rad in December 2016, just months before the options appraisal process, so that Blatt would be able to conduct the appraisal process on Tinder's behalf instead of Rad.  Rad attempts to portray the management change as a conspiratorial usurpation of his rightful authority.  But there was no plot.  Rad was incompetent in his position, and, after multiple failed attempts to put Rad in a position to succeed, he was removed.

12

Moreover, given that Rad had not been in charge of Tinder for approximately two years by that point, his removal hardly had the consequences he now tries to attribute to it. Accepting responsibility for his own actions was not a substantial part of Rad's character, and so he blamed Blatt, singularly and intensely, for the fact that his own incompetence had ended his tenure at Tinder.

## II.   The 2016 Tinder Holiday Party

33.     Pambakian was a public relations executive and well-regarded Tinder employee.   Beginning in July 2015, Blatt worked closely with Pambakian, even though she did not report to Blatt.   During the time they worked together, Blatt and Pambakian developed a productive professional relationship and a close friendship. For example, on December 7, 2016, just two days before the Tinder holiday party, Pambakian wrote a text message to James Kim, a Match finance executive.   In it, she wrote, *"I love Greg Blatt."*   Kim responded, "He's a great business leader." Pambakian replied, *"Well I don't know about that.   Lol.   I just love him."*   *See* Exhibit 4 (emphasis added).   (Kim would later become a co-plaintiff in the Valuation Lawsuit.)

34.     On the evening of December 9, 2016, Blatt attended the Tinder holiday party.   During the party, Blatt and Pambakian started talking and the conversation turned flirtatious when Pambakian said, "You have a magnificent chest, Greg Blatt." After that, they had an irreverent and, at times, ribald and suggestive conversation, with Pambakian and Blatt both laughing throughout.   Neither of them indicated at any time that they took offense at the other's comments, and both were enthusiastic participants.   At some point afterward, Pambakian suggested to Blatt that when the party was over, they find a hotel room to host an after-party.

35.     Later, as the party was winding up, Blatt and Pambakian, among others, wanted to find something to eat.   Unable to find any restaurants open in the hotel, Blatt suggested broadly to the people he was with, including Pambakian, that they "get out of there" to find food.   Pambakian asked a hotel employee whether there was

13

any way they could get food at the hotel, and the employee responded that food could only be obtained at that hour by hotel guests through room service.  Pambakian then suggested to Blatt and two other Tinder employees who were with them at the time that they all go to one of the Tinder employees' hotel room to order food.

36.    Blatt did not go straight up to the room with the others, but instead spoke to some other Tinder employees who had not yet left the party.  Blatt then texted one of the Tinder employees for the room number, and the employee, with Pambakian's knowledge, texted the number to him.

37.    Blatt ultimately came to the hotel room.  Pambakian and two other Tinder employees were there.  For a brief period, Blatt's and Pambakian's fully-clothed bodies were in contact, and Blatt and Pambakian kissed.  The interaction was consensual.    Room service was then delivered.    Soon after eating, Blatt departed.  While in the hotel room, Blatt and Pambakian were fully clothed at all times.  After that evening, Pambakian and Blatt never engaged in any further physical encounters.

38.    On Monday morning, Blatt apologized to Pambakian for the other night, saying he had used poor judgment and, given their working relationship, he had let things go too far.  Pambakian responded, "Please.  I'm sorry, too.  It was as much me as it was you."  They agreed that they didn't want anything to interfere with their good relationship, and Pambakian suggested to Blatt that they not tell anyone Blatt had gone up to the room.  Blatt agreed.  Blatt also apologized to the other two employees who had been in the hotel room for what had happened the previous evening.

39.    Work went on as usual for Blatt and Pambakian, and their good relationship continued.    But after Pambakian entered into the litigation funding agreement, she attempted to rewrite history.

40.    Pambakian now claims that she was so offended by the conversation she and Blatt had at the holiday party that she fled Blatt and sought refuge from him in a friend's hotel room.  But the truth is that, rather than flee, Pambakian invited Blatt up

14

to the hotel room in front of several people, well after the allegedly offensive conversation had ended.

41.     Pambakian makes no claim that in the hotel room she ever asked Blatt to stop their encounter or otherwise provided any clear signal of reluctance.  Instead, she claims that, as a way of "de-escalating the situation," she broke away from Blatt, saying "We're all hungry.  I'm going to order food," and then went ahead and ordered room service.   However, that never happened.   Room service records and text messages establish that Pambakian actually ordered food fifteen minutes before Blatt even arrived in the room.  Relatedly, Pambakian claims she was surprised when Blatt showed up, but these same records establish that she ordered four cheeseburgers to the room, even though it was only with Blatt's arrival that there were four people there to eat them.  Pambakian had invited Blatt up to the room, knew he would soon be there and ordered food for him accordingly.

42.     A flurry of friendly messages exchanged the next morning between Pambakian and Blatt in which they joked about their hangovers belie Pambakian's assertion that she believed she had been assaulted by Blatt just hours earlier.  For example, Blatt emailed Pambakian and one of the Tinder employees, "My head hurts." Pambakian promptly responded "Same.  I literally can't get out of bed."  Later she emailed "This is nothing a Bloody Mary can't fix 😊" and then toward the end of the day she wrote, "Well I don't know about you two but I just had a 90 minute massage and I feel amazing." *See* Exhibit 5.

43.     That same morning, Pambakian sent the following text message to the other two Tinder employees who had been in the hotel room with her and Blatt: *See* Exhibit 6.

> Good morning! Hope no one is as hung over as I am. About last night...we should keep the hotel room antics to ourselves. It would be bad if word got out that greg came back to the room. So for his sake and ours let's keep that in the vault. But by all means we can rehash it amongst ourselves as often as possible 😂

Thus, just hours after what she now claims was a "physical and sexual assault", Pambakian described what happened with Blatt as "antics" to the two other people who had been in the room.  "Antics" means "a wildly playful or funny act."  By contrast, "assault" means "a physical attack."  Consistent with this word choice, Pambakian then invited the others to "rehash" these "antics" with her later as "often as possible," underscoring how fun that would be by ending her text with an emoji that conveys laughter to the point of tears.  It seems it was only after she received a promise of substantial payments to join the Valuation Lawsuit that "antics" and "physical and sexual assault" became interchangeable descriptions.

## III.   Rad's False Allegations Against Blatt

44.    During spring 2017, Blatt, Pambakian, and the rest of the Tinder team were enjoying a period of relative calm in the wake of Rad's departure.  However, the first valuation of Tinder for purposes of its stock options was scheduled for May 2017, and given how much Rad had obsessed about this event, there was no way this calm could continue.  Starting in late March, Blatt began meeting with Rad and Rad's financial and legal advisors trying to agree upon a value for Tinder.  If they could agree, there was no need to go through the contractually-defined appraisal process, because Rad had the contractual right under the option arrangement to negotiate on behalf of all option holders, even though he was no longer an executive at the company.

6870235v1/016409

45.     But not surprisingly, there was a large gap between Rad's fantastical view of valuation and reality.  The agreement called for Tinder to be valued as it would be by the public markets as a standalone company at that moment in time.  Yet Rad was arguing for a valuation that was comparable to, or larger than, what the stock market was putting on Match as a whole, which encompassed 100% of Tinder and many other businesses much larger than Tinder.  Rad could not separate his view of what Tinder would be worth in the future from the contractual requirement to value Tinder as the actual stock market would at that time.  In fact, the exercise did not require much speculation, given the market was, in fact, valuing Tinder every day as the most focused-on element of Match's stock.  Given Rad's unrealistic view, the valuation discussions fell apart on April 25.  What Blatt did not know at the time was that Rad had already switched strategies more than a week before.

46.     Rad had always been known for his emotional volatility: high highs and low lows.  And since Tinder's founding, when IAC had refused to turn over control of the business to him, he had lived in a paranoid state, profoundly believing that everything was rigged against him.  When Rad concluded that Blatt would not simply concede a Tinder valuation that Blatt deemed unsupported by the facts, and would instead engage in a full appraisal process with investment banks to try to determine a fair value for the business, something inside of Rad snapped.  He came to view the process to value Tinder as an existential contest and the possibility that he would not receive what he wanted apocalyptic.  Toward the "end" of securing his desired payout, all "means" would be justified.

47.     Accordingly, on April 18, 2017, Rad confirmed his plan to seek retribution against Blatt as a means of advancing his valuation objectives: "***Fuck him. We're at war.  We will destroy him.***  This is going to be the biggest lesson of his life. He will be a changed man … excited for him ☺."  *See* Exhibit 22 (emphasis added). At the same time, he reached out to the law firm of Alston & Bird to begin drafting a complaint for the lawsuit against IAC and Match that would follow the appraisal,

1   regardless of the outcome.  Rad had made the determination.  He would "win" the

2   valuation fight at any cost, and the more damage he could inflict on his perceived

3   enemies in the process, the better.

4       48.    On May 3, 2017, Blatt was called into a meeting with IAC's General

5   Counsel and a senior IAC litigator.  They told him they had received a complaint and

6   wanted to know what had occurred at the Tinder holiday party six months prior.  Blatt

7   conveyed his account of the evening.  But something wasn't right.  Blatt had adhered

8   to Pambakian's wishes and never discussed that evening with anybody.  He also knew

9   Pambakian viewed the evening as he had – a mutual lapse in judgment – and would

10  therefore have never made a complaint about it.  So he asked, "Who made the

11  complaint?"  The lawyers said they couldn't disclose that information, but Blatt, at

12  risk of losing all credibility, said, "I'll bet anything it wasn't [Pambakian]."

13      49.    Ultimately, Blatt learned that he had been right and that Pambakian had

14  not made the complaint against him.  Instead, it had been Rad.  On April 27, 2017,

15  just two days after negotiations with Blatt over the value of Tinder broke down, and

16  nine days after Rad declared war against Blatt, Rad called Match's General Counsel

17  and asserted that Blatt had committed sexual harassment at the holiday party five

18  months earlier and had created a hostile atmosphere at the company, especially to

19  women.

20      50.    Rad acknowledges in the Valuation Lawsuit that he believed Blatt's

21  removal would lead to a higher valuation of Tinder in the appraisal process.  And

22  multiple Tinder employees, including Pambakian, have confirmed that Rad intended

23  to use the false harassment claim to improve the valuation outcome for himself and

24  other Tinder employees.

25      51.    For example, on May 23, 2017, in Blatt's office at Tinder, Pambakian

26  said to Blatt:

27          [Rad] came to me and said Greg is out to kill our valuation.  We need

28          to do something about it  .  .  .  Sean said he wanted to use [the holiday

18

1    party] against you to help valuation.  I told him he can't . . . I begged

2    him not to.  I cried.  But he wouldn't listen.

3         52.    And on July 22, 2017, at the Tinder summer party, a Tinder executive

4    familiar with the situation confirmed what a frenzy Rad had stirred himself into in

5    order to destroy Blatt and drive a higher valuation.  He told Blatt:

6         [Rad] was crazy . . . You don't know.  I had to stop him.  I stopped it

7         from going crazy . . . You did nothing wrong.  I know you did nothing

8         wrong.  We all know you did nothing wrong . . .

9         53.    Later, after Pambakian entered into the litigation funding agreement and

10   the Valuation Lawsuit was filed, Rad and Pambakian attempted to paint a false portrait

11   of two people committed to pulling back the curtain on Blatt's and Match's

12   wrongdoing, whatever the cost.  Unfortunately for them, their electronic footprints

13   from the time reveal a different reality.

14        54.    For example, Rad claimed in the Valuation Lawsuit that he learned about

15   what happened at the holiday party in "mid-2017" and "immediately reported Blatt's

16   conduct."  However, on February 11, 2017, nearly three months prior to the time he

17   actually made his complaint to the board, Rad received a text from his good friend

18   and co-plaintiff in the Valuation Lawsuit, Justin Mateen, stating: "Forgot to tell you.

19   The dokhtar[1] actually did make out etc with greg Blatt."  *See* Exhibit 7.  This timeline

20   demonstrates that Rad knew about what had happened at the holiday party for months

21   and remained silent.  Rad chose to report the incident only when his valuation

22   negotiations with Blatt broke down.  Notably, the message makes no mention of

23   assault or harassment.  Instead it says Pambakian "did make out etc" with Blatt, hardly

24   the wording one would expect to convey that Pambakian, his good friend, had been

25   violently assaulted.  Similarly, Mateen presents the information as an afterthought,

26   having forgotten earlier to pass on the news.  Finally, Rad's reaction is not one of

27   alarm.  None of this is consistent with having just discovered that a sexual assault

28

---

[1] "dokhtar" means "girl" in Persian.

19

occurred.

55.     In the Pambakian Lawsuit, Pambakian claims that she reported the assault to her then boss, with the expectation that he would report it to Human Resources on her behalf.  However, to the extent Pambakian did report it to her then boss, she certainly did not do so in the hopes that he would seek some sort of official redress.  She makes this clear in a May 15, 2017, email in which she expresses her regret that Rad made the complaint against Blatt and commenced the internal investigation.  In the email, she states:  "I never wanted anyone to know about that incident and why [my boss] thought it appropriate to tell Sean about it I'll never understand.  But he did and here we are."  *See* Exhibit 8.

56.     Pambakian also claims she told Rad about the holiday party with the intention of his reporting it through the proper channels.  However, in truth, Pambakian was horrified when she learned that Rad had found out about what happened, as evidenced by a lengthy text chain from March 1, 2017, in which she tries to determine how Rad found out and expresses concern that Rad will "use it against" Blatt.  *See* Exhibit 9.  Then, on April 27, the day Rad would ultimately make the complaint against Blatt, Pambakian writes a friend saying:  "I need your help talking him out of it."  *See* Exhibit 10.

57.     Similarly, Pambakian claims she told the company's investigators that Blatt had assaulted her, but Mandy Ginsberg, CEO of Match, wrote Pambakian in an email, "you were interviewed on at least two separate occasions [during the investigation] and you never alleged sexual harassment."  *See* Exhibit 1.  Indeed, in an email written for Blatt on May 15, 2017, while the Board's investigation was ongoing, Pambakian stated, "My attempt to fix this seemingly unfixable situation might seem feeble, but I needed to try . . . We both know what's happening here.  I just hope that everyone who has been brought into this can see it for what it is and move on."  *See* Exhibit 8.  At the time of the investigation, rather than trying to implicate Blatt, Pambakian was trying to save him from Rad.

20

58.     In response to Rad's complaint, the Match Board promptly commenced a thorough investigation of the allegations, first internally, and then with the assistance of two nationally recognized law firms.  Blatt cooperated fully with the investigation, conveying his account of the relevant events, acknowledging his poor judgment that evening, and expressing genuine regret at what had occurred.  When the investigation concluded, the Board determined that Blatt had not committed sexual harassment or violated any other company policy or law.  The Board did, however, agree with Blatt that he had exercised poor judgment.  As a result, the Board determined that an appropriate reprimand was to cancel an option grant Blatt had been scheduled to receive in early May worth millions of dollars.  Blatt accepted his punishment without objection.  But the Board otherwise considered Blatt an executive in good standing.

59.     The timing of Rad's allegations against Blatt make clear this was all just a tactic to achieve a greater payout, rather than an attempt to serve justice.  Rad had learned about the holiday party in February 2017 but did nothing about it for months.  Then, beginning on April 27, 2017, precisely when the valuation process started, to July 13, 2017, when the valuation process was completed, Rad and/or his attorneys reached out to Match and its representatives dozens of times to argue Blatt was dangerous to the company and should be removed.  However, once the valuation was completed, Rad dropped the matter entirely, despite the fact that Blatt continued as CEO for another five months, supervising Pambakian.  The claim was only raised again more than a year later, the day that Rad initiated his second pursuit of a higher valuation for Tinder in the Valuation Lawsuit.

### IV.    Rad Reacts to Tinder's Valuation and Offers a Hollow Mea Culpa

60.     The appraisal process relating to Tinder's options was completed in mid-July 2017, determining Tinder's value to be approximately $3.0 billion, far below the level Rad had been clamoring for, but entirely consistent with Match's market valuation of approximately $5.0 billion, which included all of Tinder plus a host of other well-known businesses.

61.     In August 2017, Rad did not sue Tinder for an unfair valuation.  Instead, he elected to sell all his options related to Tinder at the price he now claims was so unfair and went on vacation to Mykonos.  But Tinder had launched a new product feature at the end of July which quickly exceeded everyone's expectations, including Rad's.  When Rad returned from vacation in September, Tinder's financial prospects were improving more than expected.  By selling his options instead of holding onto them a little longer, as he could have, Rad gave up hundreds of millions of dollars of additional compensation. Rad was fuming.

62.     Pambakian and another Tinder executive reported to Blatt that Rad was considering litigation against Tinder and Match.  However, Pambakian and the other executive did not want Rad to sue Tinder.  They met with him repeatedly to diffuse his anger and reported to Blatt on Rad's volatile state of mind.  Pambakian and the executive finally called Blatt one evening in September saying Rad needed to meet with Blatt that evening.  Blatt tried to put it off, but Rad texted Blatt demanding that they meet immediately.  (In an example of Rad's and Pambakian's willingness to lie about matters big and small, they contend in the Valuation Lawsuit that Blatt and Rad met at Blatt's urging, when the text messages make clear that the opposite is true.)

63.     Blatt met with Rad at a local hotel for several hours.  Rad was varyingly disconsolate and indignant, rehashing the panoply of grievances that had driven him since the beginning: a supposed lack of respect, alleged stolen ownership of Tinder, and an unfair valuation of Tinder options.  Rad was emotionally volatile, cycling from anger, to remorse, to hostility, to a desire for reconciliation.  Rad  demanded a new, undefined role at Tinder and significant new equity ownership in the business.  Blatt informed Rad that given his behavior over the last months, he thought it was highly unlikely that the company would be willing to re-engage with him.

64.     At that meeting, which occurred long after the investigation into the holiday party had concluded, Blatt and Rad discussed for the first and only time the harassment allegations Rad had made against him.  Blatt expressed his shock and

1  disappointment that Rad had stooped so low as to make the false allegations.  Rad

2  responded: "The one thing I regret is coming after you like that.  At the time I thought

3  I had to do it.  But I realize I didn't.  I'm sorry about that.  And I promise you I will

4  never come after you or hurt you like that again."  After making the apology, Rad

5  followed Blatt into the men's room and attempted to give him what he seemed to think

6  was a conciliatory hug.  It was clear that Rad was not stable at the time.  At a regularly

7  scheduled Match Board meeting a few days later, Blatt described his meeting with

8  Rad and Rad's apology, naively asserting that whatever Rad's next move, he believed

9  the days of false allegations of sexual misconduct were behind them.

10      65.    As Blatt had long planned, he left the company in December 2017,

11  replaced by Elie Seidman.  Then, in spring of 2018, Pambakian was told that Seidman

12  had decided to hire a new Chief Marketing Officer, to whom Pambakian would report.

13  Pambakian was upset; she had wanted that position.  As a result of this perceived

14  slight, she quickly grew unhappy with her situation at Tinder, and nervous about her

15  prospects under her fourth boss in approximately a year.  Pambakian's

16  communications with Rad increased, and she became more withdrawn from the group

17  of Tinder employees with whom she had previously spent the most time.  This was

18  the opportunity for which Rad had been waiting.

19  **V.    Rad Finally Recruits Pambakian**

20      66.    On August 14, 2018, Rad finally brought his lawsuit against Match and

21  IAC.  This time, however, unlike the last time, Pambakian conspired with him, joining

22  the lawsuit as a co-plaintiff.  Of course, Pambakian did not do so until she entered into

23  the litigation funding arrangement that paid her millions of dollars, regardless of the

24  outcome, and which would pay her meaningfully more in the event of a successful

25  suit than she would have received by virtue of her option holdings.

26      67.    Nonetheless, as Rad had desired for so long, he now had a lawsuit that

27  contained allegations of "sexual harassment and groping" against Blatt, even though

28  such claims had no legal relevance to the central claim that Tinder had been

23

undervalued.  Instead, it was a brazen attempt to gain publicity for what would otherwise be a run-of-the-mill financial lawsuit, to apply pressure to settle the lawsuit in an era where most companies would be afraid to challenge assertions of sexual misconduct, and to tar the character of the person who would likely be the central witness on behalf of the defendants: Blatt.

68.     Rad and Pambakian shared the same lawyer, and over a span of two days Rad, Pambakian, and the lawyer conducted a series of coordinated interviews on CNN to promote the lawsuit, in which Blatt was defamed in multiple ways.  Rad, who had by far the largest option stake of any Tinder employee, orchestrated and directed, and was the primary beneficiary of, the coordinated legal and public relations campaign.

69.     Finally, the Pambakian Lawsuit was filed, in which Pambakian's false rendition of the holiday party and the claimed injustices she suffered under Blatt's management became even more sensational.  This drove another round of press coverage intended to weaken Blatt and further promote Pambakian's and Rad's interests in the Valuation Lawsuit.

**VI.   Pambakian Attempts to Recast Her Relationship with Blatt**

70.     In order to bolster her false claims about what happened at the Tinder holiday party, Pambakian felt compelled to falsely paint Blatt in a negative light and to misrepresent the nature of their professional and personal relationship.  For example, she now claims that "Blatt was a notorious bully, known for violent outbursts and vindictive retribution."  However, she does not offer a single example to support her contentions.  She also asserts that she endured Blatt's "inappropriate behavior throughout their working relationship, culminating in December 2016."  Another falsehood.  In reality, Blatt and Pambakian had a strong working and personal relationship, incompatible with her current assertions against Blatt, as made clear by dozens and dozens of written communications from Pambakian herself.

71.     For example, on December 7, 2016, after years of what Pambakian now alleges was Blatt's inappropriate behavior, Pambakian wrote a text message to James

Kim, who would later become a co-plaintiff in the Valuation Lawsuit.  In it, she wrote, *"I love Greg Blatt."*  Kim responded, "He's a great business leader."  Pambakian replied, "Well I don't know about that.  Lol.  *I just love him."  See* Exhibit 4 (emphasis added).  This was just two days before the holiday party.

72.    Later, in the midst of the investigation into Rad's complaint against Blatt, Pambakian wrote an email to Blatt.  In it, she states "Maybe I haven't made it obvious enough but *I absolutely adore you* – I admire and respect you and I would never intentionally or maliciously do anything that would jeopardize your reputation or your job – not for anything.  *You've been good to me over the years and I'll always be grateful to you for that."  See* Exhibit 8 (emphasis added).

73.    Pambakian's warmth toward Blatt cannot be explained away as just cover because Pambakian needed to keep Blatt happy as her boss.  Even after Pambakian learned Blatt was leaving Tinder and would no longer be her boss, and even after Blatt had, in fact, left Tinder, Pambakian continued to express her admiration and affection for Blatt, and her desire to socialize and maintain a close relationship with him.  These sentiments are reflected in literally dozens of written exchanges, only a few of which are included here, but all of which, especially in totality,  are inconsistent with the current allegations.

74.    For example, in July 2017, months after the holiday party and weeks after Pambakian learned Blatt would soon be leaving Tinder, Blatt was at a Tinder event that had been organized by Pambakian.  Pambakian playfully wrote to Blatt:

> Already seeing posts on Instagram from influencers  .  .  .  Instagram is an app where you can upload photos and share with all of your friends and followers.  Influencers are people with a high number of followers.  (Sorry. Couldn't help myself)  Have some more frosè pops for me.  That shade of blue looks nice on you.

*See* Exhibit 11.

75.     In early August 2017, Blatt wrote: "in a crowning achievement of an awesome few weeks I spontaneously developed an eye infection on Tuesday which has progressed to the point that it is now swollen shut and itchy as Hell." Pambakian responded, "I'm sure you're still gorgeous, even with an itchy swollen eye." *See* Exhibit 12.

76.     Indeed, in direct response to Blatt's announced departure from Tinder, Pambakian repeatedly praised his leadership and expressed her sadness at his impending departure, writing:

- ***"You'd literally have to resurrect Steve Jobs and make him ceo for anyone to be excited about this***."

- "***If you didn't know already, everyone has a lot of respect for you. You're crazy smart and talented and you care. We are lucky to have you. Just wish we can keep you longer.***"

- "I'm with [another Tinder employee] right now drinking tequila and ***talking about how much we love you."***

- "I don't even want to think about [you leaving the company].   So depressing.  Nothing to look forward to anymore."

*See* Exhibits 13, 14, & 15 (emphasis added).

77.     Pambakian also repeatedly asked Blatt, who she now alleges had forcibly assaulted her earlier, to change his mind about leaving the company.  In early August, they shared this email exchange, in which Pambakian explicitly references Rad's recent attempt to get Blatt fired:

Pambakian:  But you can cut through the bullshit.  End of the day, what's right is right.  Take everyone's emotions and personal agendas out of it.  There's still just one right direction to go in.  And you know what that is.

Blatt:  Absolutely.  (What is it?)

1

2     Pambakian:  Hahaha.  ***Stay.***  Get rid of the people who don't put what's

3     best for the company first. . . . we're all on the same page. Things aren't

4     perfect but it's not difficult to make it better. ***Various external forces***

5     ***were causing chaos. They shouldn't be an issue anymore. Everyone***

6     ***just had a reality check and has put their heads back on straight,***

7     ***finally (except for you know who).***

8

9     Anyway, more to say in person one day.

10 *See* Exhibit 3 (emphasis added).

11     78.    In November 2017, just a few weeks prior to his departure, Pambakian

12 and another Tinder employee invited Blatt for drinks in LA.  Pambakian wrote in her

13 text:  ***"[Greg] - don't say no.  Our fragile hearts can't take any more rejection."***

14 After going out to dinner with Pambakian and other employees the next night,

15 Pambakian asked Blatt in a text: "***Can you keep coming out to LA so we can do that***

16 ***at least once a month?***"  Blatt responds, ***"Yes***." and Pambakian replies, ***"Yay!!!"***  *See*

17 Exhibit 15 (emphasis added).  Similarly, in the same time frame, Pambakian emailed

18 Blatt and another marketing employee stating she was thinking about doing a

19 marketing junket to Sundance Film Festival in Park City, and wrote, "Greg you should

20 come," even though she knew Blatt would be departing his job at Tinder in a few

21 weeks, long before the Sundance Film Festival would occur.  *See* Exhibit 21.

22     79.    Just before Blatt's final day at Tinder, Pambakian expressed her respect

23 for Blatt and desire to maintain a relationship with him after he departed the company.

24 Blatt wrote her:  "I've asked [] to schedule time together tomorrow so that I can walk

25 you through what I walked him through and impart to you a few tidbits of wisdom

26 from an old has-been."  She replied, "30 years from now you still won't be an old has-

27 been.  And we'll all still be coming to for advice."  Blatt wrote, "30 years from now

28

I'll be a dead has-been." Pambakian quipped, "Ok. We'll call the Long Island medium." *See* Exhibit 16.

80.     Finally, on December 30, 2017, weeks after Blatt had ceased to be Pambakian's boss, she wrote: "I hope you've already started planning your first LA trip of 2018." *See* Exhibit 17. And then in April of 2018, four months since Blatt's last day at Tinder, she texted him an invitation to a party in New York, saying "You should come." Blatt responded, "Unfortunately I can't change my plans. Next time you're in NY putting on a nice event maybe send an invitation in advance?" Pambakian pressed, "You should just make an executive decision and change your plans." Blatt replied, "Unfortunately, can't." *See* Exhibit 18. Blatt didn't hear from Pambakian directly ever again. The next time he heard from her indirectly was when the Valuation Lawsuit was filed, days after Pambakian entered into the agreement that would guarantee her millions of dollars, and she first made allegations against him.

## VII.   **Pambakian Lies About Retaliation Against Her and Misrepresents Match's Workplace Culture**

81.     In further effort to boost her false accusations, Pambakian decided to lie about supposed retaliation she experienced as a result of what happened at the holiday party and to misrepresent the workplace culture at Match.

82.     For example, Pambakian now claims that when Blatt and his "team" (which consisted solely of two seasoned female executives) arrived at Tinder they brought with them Match's "misogynistic culture." However, far from misogynistic, Match's record under Blatt on matters of gender equality was a rare achievement in the tech world.

83.     When Blatt left Tinder and Match at the end of 2017, more than 75% of all Match employees reported up to a female executive in the senior most ranks of the company. At Tinder, when Blatt departed, two-thirds of Blatt's direct reports were women, with over 80% of the company's employees reporting up to these female direct reports of Blatt's. During Blatt's last five years at Match, the percentage of

female vice presidents increased from 30% to 44%.  Upon departing Match, Mandy Ginsberg succeeded Blatt as CEO, and Sharmistha Dubey became President, two accomplished female executives who had worked closely and successfully with Blatt for nearly a decade.  And shortly after Blatt departed Match, Ginsberg undertook a third-party audit of pay equity that determined women were "100% equally paid" as men.  Rather than the misogynistic culture Pambakian claims, Match had a culture where women's careers thrived.

84.    Pambakian recognized that Match had achieved superlative gender equality under Blatt's leadership, and that part of his mission at Tinder was to address certain gender issues that had plagued Tinder in the past while Rad had managed day-to-day operations.  Writing to Blatt about addressing those lingering issues, she said, "I'm not sure if there is anyone else more qualified or up for the challenge of being CEO of Tinder than you."  *See* Exhibit. 8.  And Blatt did, in fact, take meaningful steps to improve Tinder's culture after Rad was removed.  Pambakian was well aware of these efforts and resulting improvements in Tinder's culture when she made her false accusations.

85.    In the Pambakian Lawsuit, Pambakian claims that her "career was on the rise until she was sexually assaulted" by Blatt.  She claims that after the complaint was made against Blatt she was "marginalized" and "disparaged."  Rather than offer specific examples to support these accusations, however, she oddly chooses to instead admit that none of these allegations are, in fact, accurate.  In the same breath that she asserts her career tumbled after the holiday party, she states that at the time of the holiday party, she "held the position of Vice President of Global Communications and Brand."  She then admits "her role eventually expanded to Head of Marketing and Communications, managing an in-house group of more than 40 people."  In other words, after the time at which she claims her career suffered, and that she was marginalized and disparaged, she acknowledges getting a substantial increase in responsibilities.  Blatt was CEO when Pambakian received this promotion.

86.    In fact, Pambakian, contrary to her assertions, did not report to Blatt during most of their time at Tinder together.  Then, in May 2017, months after the holiday party, Pambakian's boss left the company.  Blatt wanted to give her the opportunity to take on many of her former boss' responsibilities, but this would mean she would report to him for the first time.  Because Rad had recently made false allegations against Blatt that related to Pambakian, the HR department was sensitive to any discomfort Pambakian might have in regard to a new reporting arrangement. Accordingly, Lisa Nelson, the head of HR, spoke with Pambakian and informed her that if she was uncomfortable, her job could be structured to avoid Pambakian having to report to Blatt.   Nelson emailed Blatt after their conversation, writing that Pambakian says "she is fine working with you [Blatt] and has always had a good relationship and just wants to get back to business as usual." *See* Exhibit 19.

87.    Later, when Blatt completed a reorganization that effectively finalized this promotion, including an associated increase in her compensation, Pambakian wrote to Blatt:  "Thank you for everything – for helping me so much.  It means a lot and I know there was a much easier route that would have resulted in much less work for you.  I realize that and I appreciate what you've done for me.  I promise I'll do my best to make you not regret it."   Blatt responded, "It's a good investment for the company.  You're going to do great." *See* Exhibit 20.  She claims that Blatt didn't take her seriously, and treated her differently because she was a woman, but it was Blatt who promoted her and increased her compensation.  Blatt took those steps because he respected Pambakian professionally and took her seriously.

88.    On April 28, 2017, months after she now claims her career began to crumble as a result of Blatt's inappropriate behavior, Pambakian expresses her regret to a friend that Rad is about to make the complaint against Blatt.  In that text, she doesn't convey her belief that she is being treated poorly because she is a woman, or because of what happened after the holiday party.  Instead, she laments that Rad is

6870235v1/016409

1   about to make an unsolicited complaint when "[t]hings were finally going well with
2   work."  *See* Exhibit 2.

3       89.    Pambakian offers no support for her many assertions about Blatt
4   "behaving inappropriately toward women."   To the contrary, during Blatt's entire
5   career, including the 14 years he spent at IAC, Match and Tinder, the only complaint
6   that was ever made against Blatt for sexual misconduct was the false  allegation made
7   by Rad.   Unlike in so many other of the instances in which an executive has been
8   alleged to have engaged in sexual misconduct, not a single additional allegation has
9   been  made  against  Blatt  since  Pambakian  and  Rad's  assertions  were  first  widely
10  publicized, more than one year ago.  (And this is not for lack of trying.  Rad and
11  Pambakian hired private investigators to scour Blatt's past in search of other alleged
12  "victims" with no success.)

13  **VIII.   The Damage to Blatt**

14      90.    The false allegations against Blatt completely blindsided him.  Blatt and
15  Pambakian had always had a close relationship, both professionally and personally.
16  How, he thought naively, could this be happening, when the last time he heard from
17  Pambakian, just a few months before, she was asking him to join her at a party?   But
18  the new reality quickly set in.  Pambakian had provided a detailed and sensational,
19  but fundamentally false, account of events, creating a false narrative that was – as it
20  was intended to be – hungrily consumed by the media.  The truth is that two people
21  who knew each other well and had become good friends forgot their work relationship
22  for a brief moment after two in the morning following a holiday party.  Then  Blatt
23  apologized to Pambakian; Pambakian said, "Please, it was as much me as it was you";
24  and  they  went  back  about  their  business  with  their  good  working  and  personal
25  relationship intact.

26      91.    But that moment created an opportunity for Rad.  His blind lust for
27  money and revenge drove him to chip away at Pambakian over many months, finally
28  getting her to make false allegations against Blatt in the wake of corrupt, possibly

31

illegal, payments of millions of dollars.   Then, they went on the attack, falsely transforming a momentary lapse of judgment into a violent sexual crime as a tactic designed to enhance the odds of winning an unrelated lawsuit.   There is a vast gulf between what actually happened, for which Blatt apologized unprompted and received an appropriate reprimand, and the current, false allegations against him.   Blatt's reputation and career – a twenty-five-year record of working with, hiring and promoting women that he believed was second to none in the tech industry – were shattered so that Rad, who had just been paid hundreds of millions of dollars, could try to get hundreds of millions more.   As Pambakian had so presciently lamented to her friend about Rad's initial attempts to attack Blatt: "Money really is the root of all evil." *See* Exhibit 2.

92.    As a result of Defendants' defamatory conduct, Blatt has suffered damages in the form of harm to his professional and personal reputation.   Blatt has also suffered damages of the type that are a fair and natural consequence of the Defendants' tortious conduct, including humiliation, embarrassment, and ostracism, and the deprivation of social relationships.

## **FIRST CAUSE OF ACTION**

### **(Defamation Against Pambakian & Rad)**

93.    Blatt repeats and incorporates the allegations set forth in Paragraphs 1 through 92 as though fully set forth herein.

94.    Rad and Pambakian either directly or through agents, proxies and co-conspirators, have caused to be published numerous defamatory statements of fact about Blatt.   Defendants' defamatory statements include false statements that Blatt among other things:

        a.    Sexually harassed Pambakian;

        b.    Sexually assaulted Pambakian;

        c.    Kissed and groped Pambakian without her consent;

32

d.   Created an atmosphere of fear for her at the holiday party, causing Pambakian to flee to an upstairs hotel room;

e.   Pushed Pambakian down on the bed and climbed on top of her and in so doing had engaged in improper sexual misconduct; and

f.   Threatened Rad with retribution for reporting the false claim of sexual harassment to the Match board.

95.   Rad made the initial defamatory statements in a CNN interview that aired on August 14, 2018.  That interview was widely viewed, and other news outlets in-turn published Rad's defamatory statements.  Following Rad's CNN interview, Pambakian made further defamatory statements about Blatt in an article published by CNN on August 16, 2018.  The article was widely read, and other news outlets in-turn published Pambakian's defamatory statements.  On December 18, 2018, a fresh wave of news articles published by, among others, CNN and the Verge, contained additional allegations against Blatt.  Rad's and Pambakian's false and defamatory accusation of sexual assault received significant media attention and was widely read.  Other news outlets published these defamatory statements.  The transcript of Rad's CNN interview, the August 16, 2018 CNN article, and the December 18, 2018 articles published by CNN and the Verge are attached as Appendix A to this Amended Complaint.

96.   In particular, Rad defamed Blatt by, among other things, falsely stating in his interview with CNN on August 14, 2018 that Blatt had committed sexual harassment and that Rad had "reported that misconduct" to the Match Board.  Rad also accused Blatt of corruption, claiming that Blatt was kept on at Match so "he can finish the job of corrupting the valuation."  Rad also falsely stated that Blatt "threatened" Rad in connection with the false harassment claim and warned Rad that "[i]f you take me down, I'm going to take you down with me."

97.   In particular, Pambakian defamed Blatt by, among other things, falsely stating in the August 16, 2018 CNN article that Blatt behaved inappropriately toward

33

her at the 2016 holiday party. Specifically, Pambakian falsely stated that Blatt caused Pambakian to flee to an upstairs hotel room and falsely stated that Blatt entered the hotel room and, without her consent, "pushed [Pambakian] back onto the mattress, climbed on top of her, and began kissing and fondling her." Pambakian further falsely claimed that Blatt's conduct "wasn't consensual." Pambakian continued making defamatory statements in the same CNN article by falsely stating that Blatt had committed sexual harassment and that Blatt's conduct "wasn't an isolated incident." Pambakian falsely stated that there was "pervasive sexual harassment and misogyny by Match executives" and, given her other statements in the CNN article, a reader would understand that Pambakian was stating that Blatt was one of those Match executives.

98.    The Defendants further defamed Blatt by directing the circulation of emails containing defamatory statements about Blatt to news organizations so that those news organizations would publish the defamatory statements. Such emails include emails authored by Pambakian and published by The Verge on December 18, 2018, stating that Pambakian was "subjected to ongoing intimidation and retaliation" by Match, that Blatt engaged in sexual "assault" toward Pambakian, and that Blatt, without her consent, "grop[ed] [Pambakian] in front of other employees . . ." The same email was sent to other news organization, including CNN. In an article published by CNN on December 18, 2018, CNN quotes Pambakian's allegation of "sexual assault" contained in a second email from Pambakian to Mandy Ginsberg, which Pambakian provided to CNN.

99.    The statements are false and defamatory because they tend to expose Blatt to public contempt, hatred, ridicule, aversion or disgrace.

100.    The Defendants, either directly or through agents, proxies, and co-conspirators, have assisted in the publication of additional defamatory statements and continue to do so.

34

101.   Every statement about Blatt described above is categorically false and untrue.

102.   The Defendants, either directly or through agents, proxies, and co-conspirators, published these false statements to multiple third persons in California and across the world on television, in newspapers, on the radio, and through the Internet.

103.   The audience for these false statements of fact reasonably understood them to be about Blatt because each statement specifically names Blatt or taken as a whole clearly identifies Blatt.

104.   Defendants' publication of these false and defamatory statements concerning Blatt was not privileged.

105.   Defendants published these false and defamatory statements concerning Blatt, or caused them to be published, without justification.

106.   The Defendants acted with actual malice in making the statements.  At the time the statements were made, Defendants knew they were false or acted with reckless disregard for truth or falsity.

107.   The Defendants also acted with common law malice in making the statements.   Defendants harbor spite, ill will and animus toward Blatt, and the Defendants have evil and sinister motivations in causing the publication of the statements above.

108.   As a result of Defendants' defamatory conduct, Blatt has suffered damages in the form of harm to his professional and personal reputations, damages of the type that are a fair and natural consequence of the Defendants' tortious conduct; specifically, humiliation, embarrassment, and ostracism, and the deprivation of social and relationships and professional opportunities.

109.   Because the Defendants acted with malice in making their statements about Blatt, this Court should award punitive damages.

## SECOND CAUSE OF ACTION

### (Defamation Per Se Against Pambakian & Rad)

110.   Blatt repeats and incorporates the allegations set forth in Paragraphs 1 through 92 as though fully set forth herein.

111.   Rad and Pambakian either directly or through agents, proxies and co-conspirators, have caused to be published numerous defamatory statements of fact about Blatt.  Defendants' defamatory statements include false statements that Blatt among other things:

        a.      Sexually assaulted Pambakian;

        b.      Kissed and groped Pambakian without her consent;

        c.      Pushed Pambakian down on the bed and climbed on top of her and in so doing had engaged in improper sexual misconduct; and

        d.      Threatened Rad with retribution for reporting the false claim of sexual harassment to the Match board; and

        e.      Stated that Blatt corrupted the valuation process.

112.   Rad made the initial defamatory statements in a CNN interview that aired on August 14, 2018.  That interview was widely viewed, and other news outlets in-turn published Rad's defamatory statements.  Following Rad's CNN interview, Pambakian made further defamatory statements about Blatt in an article published by CNN on August 16, 2018.  The article was widely read, and other news outlets in-turn published Pambakian's defamatory statements.  On December 18, 2018, a fresh wave of news articles published by, among others, CNN and the Verge, contained additional allegations against Blatt.    Rad's and Pambakian's false and defamatory accusation of sexual assault received significant media attention and was widely read.  Other news outlets published these defamatory statements.  The transcript of Rad's CNN interview, the August 16, 2018 CNN article, and the December 18, 2018 articles published by CNN and the Verge are attached as Appendix A to this Amended Complaint.

Case 2:19-cv-07046-MWF-FFM   Document 23-2   Filed 10/15/19   Page 39 of 148   Page ID
#:695
Case 2:19-cv-07046-MWF-FFM   Document 18   Filed 10/03/19   Page 38 of 43   Page ID #:84

113.   In particular, Rad defamed Blatt by, among other things, falsely stating in his interview with CNN on August 14, 2018 that Blatt had committed sexual harassment and that Rad had "reported that misconduct" to the Match Board.  Rad also accused Blatt of corruption, claiming that Blatt was kept on at Match so "he can finish the job of corrupting the valuation."   Rad also falsely stated that Blatt "threatened" Rad in connection with the false harassment claim and warned Rad that "[i]f you take me down, I'm going to take you down with me."

114.   In particular, Pambakian defamed Blatt by, among other things, falsely stating in the August 16, 2018 CNN article that Blatt behaved inappropriately toward her at the 2016 holiday party.  Specifically, Pambakian falsely stated that Blatt caused Pambakian to flee to an upstairs hotel room and falsely stated that Blatt entered the hotel room and, without her consent, "pushed [Pambakian] back onto the mattress, climbed on top of her, and began kissing and fondling her."  Pambakian further falsely claimed that Blatt's conduct "wasn't consensual."   Pambakian continued making defamatory statements in the same CNN article by falsely stating that Blatt had committed sexual harassment and that Blatt's conduct "wasn't an isolated incident." Pambakian falsely stated that there was a "pervasive sexual harassment and misogyny by Match executives" and, given her other statements in the CNN article, a reader would understand that Pambakian was stating that that Blatt was one of those Match executives.

115.   The Defendants further defamed Blatt by directing the circulation of emails containing defamatory statements about Blatt to news organizations so that those news organizations would publish the defamatory statements.   Such emails include emails authored by Pambakian and published by The Verge on December 18, 2018, stating that Pambakian was "subjected to ongoing intimidation and retaliation" by Match, that Blatt engaged in sexual "assault" toward Pambakian, and that Blatt, without her consent, "grop[ed] [Pambakian] in front of other employees . . ."  The same email was sent to other news organization, including CNN. In an article

37

published by CNN on December 18, 2018, CNN quotes Pambakian's allegation of "sexual assault" contained in a second email from Pambakian to Mandy Ginsberg, which Pambakian provided to CNN.

116.   The statements are per se defamatory because they accuse Blatt of serious criminal wrongdoing.

117.   These statements are libelous per se because their defamatory content appears on their face and they tend to expose Blatt to public contempt, ridicule, aversion, or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society.

118.   The Defendants, either directly or through agents, proxies, and co-conspirators, assisted in the publication of additional defamatory statements and continue to do so.

119.   Every statement about Blatt described above is categorically false and untrue.

120.   The Defendants, either directly or through agents, proxies, and co-conspirators, published these false statements to multiple third persons in California and across the world on television, in newspapers, on the radio, and through the Internet.

121.   The audience for these false statements of fact reasonably understood them to be about Blatt because each statement specifically names Blatt or taken as a whole clearly identifies Blatt.

122.   Defendants' publication of these false and defamatory statements concerning Blatt was not privileged.

123.   Defendants published these false and defamatory statements concerning Blatt, or caused them to be published, without justification.

124.   The Defendants acted with actual malice in making the statements. At the time the statements were made, Defendants knew they were false or acted with reckless disregard for truth or falsity.

38

125.   The Defendants also acted with common law malice in making the statements. Defendants harbor spite, ill will, and animus towards Blatt, and the Defendants had evil and sinister motivations in causing the publication of the statements above.

126.   Because the statements are defamatory per se, Blatt is presumed to have been injured by their utterance. Defendants' tortious conduct has also caused Blatt to suffer special damages in an amount in excess of $1 million, including, but not limited to, attorneys' fees and other related professional consulting fees to investigate, monitor, and mitigate the effects of the defamatory statements.

127.   As a result of Defendants' defamatory conduct, Blatt has also suffered damages in the form of harm to his professional and personal reputations, damages of the type that are a fair and natural consequence of the Defendants' tortious conduct; specifically, humiliation, embarrassment, and ostracism, and the deprivation of social relationships and professional opportunities.

128.   Because the Defendants acted with malice in making their statements about Blatt, this Court should award punitive damages.

## THIRD CAUSE OF ACTION

### (Civil Conspiracy Against Pambakian, Rad & the Doe Defendants)

129.   Blatt repeats and incorporates the allegations set forth in Paragraphs 1 through 92 as though fully set forth herein.

130.   The Defendants, either directly or through agents, proxies, and co-conspirators, each committed the torts of defamation and defamation per se.

131.   The Defendants each knowingly and intentionally combined, conspired, and agreed together and with others to engage in this course of conduct.

132.   The Defendants entered into this conspiracy when Rad offered and Pambakian accepted millions of dollars in exchange for Pambakian joining the Valuation Lawsuit and making false allegations of sexual harassment against Blatt. Rad offered the payment under the guise of a litigation funding agreement, but the

agreement provided that Pambakian would be paid regardless of whether the Valuation Lawsuit succeeded, and Pambakian remained entitled to the payout even if she dropped out of the Valuation Lawsuit.  Additionally, she would receive further payments in the event of victory in the lawsuit which, together with the upfront payments, would yield a far greater payout than she would have received as an ordinary plaintiff.  Rad arranged the payment mechanism through a third-party funder Bench Walk Capital, whose founding partner is also the founding partner of the law firm representing Pambakian in the Pambakian Lawsuit, and who stands to be paid handsomely if the Valuation Lawsuit is successful.  The clear object of the conspiracy is to tarnish Blatt's reputation and credibility and to extract billions of dollars of additional compensation in the Valuation Lawsuit the largest portion of which would go to Rad.

133.   The Defendants have taken numerous acts in furtherance of their corrupt agreement, including engaging in a coordinated media strategy to damage Blatt's reputation and credibility, as set forth herein.   In the course of the conspiracy, Defendants have caused substantial damage to Blatt's personal and professional reputation.

134.   Numerous tortious activities occurred within the State of California in furtherance of the conspiracy.

135.   Defendants are actively engaged in an unlawful conspiracy to defame Blatt thus entitling Blatt to monetary and punitive damages.

## **PRAYER FOR RELIEF**

Blatt requests entry of judgment in his favor and against Defendants as follows:

> a.   Awarding Blatt money damages in accordance with the evidence, together with interest thereon, to compensate Blatt for Defendants' tortious conduct, including for damage to Mr. Blatt's personal and professional

40

reputations, in an amount not less than $50 million;

b.  Awarding Blatt punitive damages sufficient to punish and deter the conduct complained of herein in an amount not less than $50 million;

c.  Awarding Mr. Blatt attorneys' fees and costs of suit herein;

d.  Granting such other and further relief as the Court may deem just and proper.

Dated:  October 3, 2019                    VINEET BHATIA
                                           DAVIDA BROOK
                                           SUSMAN GODFREY L.L.P.


                                    By:  /s/ *Vineet Bhatia*
                                           Vineet Bhatia
                                           Attorneys for Plaintiff Greg Blatt

41

## JURY DEMAND

Plaintiff believes that all claims against Defendant Rosette Pambakian should be resolved in a contractually-mandated arbitration.  In light of the fact, however, that Pambakian is challenging that reality, and given that the Court will not have an opportunity to resolve that issue for some time, out of an abundance of caution, pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

Dated:  October 3, 2019

VINEET BHATIA
DAVIDA BROOK
SUSAN GODFREY L.L.P.


By:  /s/ *Vineet Bhatia*
Vineet Bhatia
Attorneys for Plaintiff Greg Blatt

6870235v1/016409

# APPENDIX A



# TRANSCRIPTS

## QUEST MEANS BUSINESS

**The Economic Chickens Are Coming Home To Roost, And Certainly When It Comes To The Emerging Markets, Fantasy Football Season Is About To Begin In The United States, And A New League Says Blockchain Can Make People Care About Fantasy Sports Like They Were The Real Thing, One Of President Trump's Cabinet Members Is Under Close Scrutiny For Alleged Conflicts Of Interest. Aired: 4-5p ET**

Aired August 14, 2018 - 16:00   ET

THIS IS A RUSH TRANSCRIPT. THIS COPY MAY NOT BE IN ITS FINAL FORM AND MAY BE UPDATED.

[16:00:59] RICHARD QUEST, CNN INTERNATIONAL HOST: Closing bell ringing on Wall Street. Coca-Cola ringing the closing bell, I'm not quite sure why.

The Stock Exchange doesn't what the honor is, it's the global transformation or something similar, but Coke ringing the closing bell.

One -- yes, good solid fizz. I think we'll call it our fizzy gavel for Tuesday, it's August the 14th.

Tonight, Turkey versus US debt. President Erdogan is calling for a boycott of Apple. Tinder's co-founder is suing his own bosses, our exclusive

interview on what's gone wrong and we'll talk to Sean Rad and Tesla's board says, "not so fast," it's still not ready to approve going private.

I'm Richard Quest live tonight in London where of course, I mean business.

Good Evening, appropriate that I'm in Europe because most of the breaking news tonight comes from this side of the Atlantic. We begin with breaking

news from Northern Italy where rescuers in Genoa are scrambling through the rubble of a massive bridge collapse.

At least 23 people are dead, dozens are injured, and the number of people who have died is expected to rise as the search continues. The bridge

crumbled in a violent storm. In doing so, at least 30 vehicles including several heavy trucks plunged from the high bridge on the highway that

connects Italy to France.

Genoa's mayor says the collapse was, in his words, not absolutely unexpected, which makes one to wonder what he meant. The bridge dates back

to the 1960s and was undergoing maintenance. We'll catch up with the latest details from Nic Robertson who is in Genoa in just a moment.

First, let's watch and listen to his report as he sets the scene at the bridge.

(BEGIN VIDEO TAPE)

NIC ROBERTSON, INTERNATIONAL DIPLOMATIC EDITOR: The rescue effort has been going on all afternoon. Rescue vehicles, fire trucks, ambulances, police

vehicles lined up at the side of the road, where you can see where the bridge just sheared off, debris hanging from the side there. And at the

other end of the bridge, several hundred yards away, that truck just close to the drop-off, a driver there who had a hugely lucky escape. The road

was busy, nose-to-tail traffic, torrential rain, thunder and lightning, water rushing down the road.

The bridge itself had a road sign showing road repairs at this, no indication yet why it actually collapsed. Dozens of vehicles feared to

have careened off, down into this valley here. It spans the canal and several rail lines linking to the port.

This, of course, a tremendously busy highway at a very, very busy time of year. National holidays in Italy, national holidays in nearby France.

This -- the main highway that connects along the Mediterranean France and Italy, a very busy day, a terrible, terrible tragedy for this city.

(END VIDEO TAPE)

QUEST: Nic Robertson, much to talk about. But please update me on the number. I realized of course that it's going to change. We thought it was

in the 30s, and the Prime Minister advised and that's creeping up again, do they believe there are many more bodies to be found?

ROBERTSON: The expectation here seems to be that there are potentially more bodies to be found, that there are potentially more vehicles

underneath all that rubble. The recovery efforts continues into the night. There are sections that the crumbled concrete are illuminated by huge

search lights. You can hear the occasional sound of a mechanical digger in that area. Although, one of the heavy lifting equipment would be seen as

dusk fell, that heavy lifting equipment was brought to today, it rather gives the impression that this is really recovery, not rescue, and that

whomever may be under that rubble sadly, it is not a positive outcome.

QUEST: Nic, I referred in the introduction earlier to the calling from the Genoa mayor that said this was not -- this was actually not unexpected. Do

we know what he meant by that?

ROBERTSONL He said it was his responsibility as mayor to keep the city functioning and the government's responsibility is to provide financial

wherewithal to keep the country's infrastructure running. It smelled a little bit of a whiff of political differences there, but I think at this

stage it really is hard to say, but what's very clear is even at this very early stage, the state of repair or disrepair of that bridge, particularly

when you talk to locals here who feel that it's been in a state of disrepair for too long ...

[16:05:13]

ROBERTSON: ... that is going to be central to this investigation. But the mayor seemed to imply -- seemed to imply from his whole sentence when

he spoke there that there were issues about the maintenance and the maintenance of the upkeep of this bridge.

QUEST: Nic, thank you. Nic Robertson in Genoa tonight. And so to Turkey where the President is vowing to boycott all electronics made in the United

States. He did so as the lira was stabilizing, which is still down 40% on the year.

In the face of Donald Trump's tariffs, President Erdogan says Turkey doesn't need any American imports.

(BEGIN VIDEO CLIP)

RECEP TAYYIP ERDOGAN, PRESIDENT OF TURKEY (Through a translator): We will produce every products we are importing from abroad with foreign currency

here and we will be the ones exporting these products. We will impose a boycott on US electronic products. If they have iPhones, there is Samsung

on the other side.

(END VIDEO CLIP)

QUEST: And he didn't just recommend Samsung as an alternative. He also suggested the Vestel Venus, it's the Turkish made smart phone though even

he -- if he does persuade the Turks to give up their iPhones, the tech boycott won't be easy. Now, let's just take this so-called Vestel Venus

5000, that runs on android software. Who makes Android or who owns Android, it's made by Google, although it is open source.

Then there's the Venus v5. That runs using American Qualcomm chips. So, it remains to be seen if President Erdogan will even impose an official

boycott or even if the ordinary Turks are worried.

(BEGIN VIDEO CLIP)

UNIDENTIFIED MALE (Through a translator): I am thinking the dollar rises because this country has not been governed. The economy is managed badly,

because of that the dollar rises.

UNIDENTIFIED MALE (Through a translator): I think the Turkish government does not know about economy because there are no real economists within the

government. The administration is based on family relations.

(END VIDEO CLIP)

QUEST: John Defterios is on the ground in Istanbul joins me now. This idea of a boycott of American technology, it's politics and it's hyperbole.

It doesn't stand much chance of reality.

JOHN DEFTERIOS, EMERGING MARKETS EDITOR: Yes in fact, Richard, we had major cross currents today. The first rally in the lira in three days and

we have the hard line for President Erdogan calling for the boycott and this was followed up by his son-in-law, now Finance Minister taking a swipe

at the dollar at the same time.

He suggested even though the dollar is rising and he's starting to lose its luster and that role as the reserved currency. He spoke at the 17th

anniversary of the party, his father-in-law founded, the AK Party, today in Ankara. Let's take a listen.

(BEGIN VIDEO CLIP)

BERAT ALBAYRAK, FINANCE MINISTER OF TURKEY (Through a translator): The dollar has lost its credibility. We will ensure that steps will be taken

to continue to do business with our own money. We will see that our Turkish lira will strengthen. If one country's economy does not overcome

the difficulty that it faces, it will have a butterfly effect and this has the potential to shake all global trade, foremost in Europe.

(END VIDEO CLIP)

DEFTERIOS: And a little bit of a threat there, Richard, saying if we don't solve this problem in Turkey which represents 1% of global GDP, it could

particularly spill over to Europe right now because of the exposure of the European banks of course to Turkey, about $150 billion. No word on

interest rates. No word about the International Monetary Fund. The finance Minister following the line of the President saying, "We'll tough

it out on our own."

QUEST: And isn't that the problem? Because even if they do attempt to tough it out on their own, the underlying economics are against them. And

as we've talked about on this program last week, that is the biggest issue. They have a balance account that they can no longer be sustained. They've

got a falling currency, and they have very high inflation. That's the problem.

DEFTERIOS: And Richard, this is a problem that's been surfacing for the last two years and President Erdogan thinks he can ride it out on his own.

A $57 billion current account deficit is what you're referring to, inflation nearly at 16%. I'm starting the think about this as the sleeper

event that could creep up on emerging markets because of the vulnerability of Turkey, but there's five other emerging markets that have been

identified.

We've seen the initial contagion of this with Russia and the South African rand losing 10%. But we have 30 emerging markets analyzed by the Institute

of International Finance suggesting that their overall debt to GDP is running at 200%. It's crept up since the last financial crisis, Richard.

So we have to watch this carefully and find a common ground, and not have the arguments between Trump and Erdogan, where we are today.

[16:10:11]

QUEST: John Defterios in Istanbul tonight. Thank you. And why we are reminding Turkey as US political risks are very real in this economy, the

sun is shining on the German economy. GDP is up 0.5% on the last quarter. It beat estimates and it shrugs off Trump and trade fears. Carsten Brzeski

is in Frankfurt. The Chief Economist ING Germany. These numbers taken on the back of the US numbers are also good, but if we look at the rest of the

Eurozone, we know there that there has been a slowdown. So is Germany once again having to do all the heavy lifting?

CARSTEN BRZESKI, CHIEF ECONOMIST, ING GERMANY: Well, together with the Netherlands right now because the Dutch also outperformed the rest of the

Eurozone. But yes, I think Germany remains the powerhouse of the Eurozone. And normally you would have expected the other countries actually to

overtake the German growth numbers. They haven't. So, actually it's still up on the German shoulders to push on the Eurozone recovery.

QUEST: Now, of course, Europe and the union reports quarter on quarter on quarter as opposed to annualized, which always makes it difficult when you

see a 0.5% versus a 4.1% or 4.2%. What do you expect in Germany will grow in 2019?

BRZESKI: I think for the rest of this year and also for 2019, I'm expecting Germany to grow around 2%, which is not the 4% you see in the US,

but which is taller than -- which is actually more than the so-called potential growth rate of the German economy because Germany currently is

really benefiting from low interest rates. The ECB's monetary policy, strong domestic demand.

And then everything above 2% would depend on how the entire trade tensions will play out. Will we get a trade war between the US and the EU? Maybe

we'd also have to realize downwards driving growth numbers. If we won't get it, I think Germany could end up with anything north of 2% over the

next couple years.

QUEST: And at the moment, it's too difficult or uncertain to factor in the trade tariffs, the effect at the moment, we know, but the longer-term

effect if the situation gets worse, can't be accounted for yet.

BRZESKI: Not exactly what the second quarter GDP numbers showed. Right now, we only have a kind of confidence impact on the German economy which

is extremely small. The only tariffs that are there are on aluminum and steel. That's everything. So, therefore, if we get a sentiment- a

negative sentiment loop in the next couple of months, yes, it could leave its marks on the German and also the European economy, but right now -- and

that's the interesting -- right now, all these trade tensions have not had any impact, any significant impact on the entire Eurozone.

QUEST: In terms of Angela Merkel, with this sort of economic performance, does it take the pressure off her? Under huge enormous pressure because of

migration and the internal disputes within her coalition, but does it take that pressure off that the economy is doing so well?

BRZESKI: Somehow, not entirely. Because the funny thing right now, when you look at the numbers, Germany is almost enjoying a golden decade. So

this is -- they are now go into the tenth year of almost consecutive growth. Never ever before had so many people a job, wages are increasing,

the economy is really booming, but somehow most people do not feel as if they are in the middle of an extremely booming economy.

So therefore, other issues like migration, like integrating the refugees, but also like the lack of structural reforms, clearly running behind in

terms of digitalization, is also feeding into this entire political debate right now in Germany. So, therefore, I'm afraid that the strong economic

numbers do not really take the pressure off Mrs. Merkel.

QUEST: Right, but Carsten, in your role as Chief Economist, if you look at the whole Eurozone and put it into that wider context, the ability of the

Eurozone, do you feel that they have put in place sufficient fiscal macro potential measures that the -- obviously, it's safer than it was in 2008

and 2009, but what about things like fiscal deficits? What about the way they run it on an annual basis?

BRZESKI: I think, this is -- you're right, the most sensitive point, what the Eurozone does need as a whole is more investment. More investment

always is contradicting the rules of the annual growth, namely not running fiscal deficit. I think Germany is the best example.

[16:15:11]

BRZESKI: So Germany is running a fiscal surplus, at the same time there's a high need for further investments to maintain the strong role of Germany

in the European and global economy. So, therefore, I think European politicians, yes, they have made the Eurozone -- the monetary union much

more crisis resistant, but to go ahead -- they would need to open more possibilities for investments.

QUEST: Good to see you, sir. Thank you for the perspective. Please, you always have an invitation to come and talk here on "Quest Means Business."

Thank you. As we look at European stock markets that finished the day mostly flat, bank stocks remained under pressure. UK unemployment fell to

a 43-year low. And the Dow is in triple digits higher with the S&P snuffing a four-day losing streak.

The Tapestry -- I always feel the need when you mention companies like Tapestry which of course is the old Coach, it still has Coach as part of

it, but it's now called Tapestry had strong earnings boosting other consumer stocks.

As we continue tonight, taking a swipe at Tinder, the co-founders of the dating site say they've been stood up for billions of dollars.

QUEST: Let's go to Elon Musk's attempt to take Tesla private where the board of directors seems to be saying well, maybe not quite so fast. The

board itself has set up a committee to study Elon Musk's plans to go private and it says more than one hand must be on the wheel for such a

momentous move.

Claire Sebastian is here to put that perspective. Clare, the board haven't obviously said no, they want more

details. They know now that it's the

Saudis with the Saudi sovereign fund, so what is the board's reticence here?

CLARE SEBASTIAN, CORRESPONDENT, CNN: Well, Richard, I have to say this is about the first normal thing that has happened in this whole process.

Today, we got the first SEC filing which is an 8K filed and that was the one announcing that the board set up a special committee to evaluate this

deal. Well, they did say though is that nothing else so far has been decided. I want to read you a quick statement from that quote, they said,

"The special committee has not yet received a formal proposal from Mr. Musk regarding any going private transaction, nor has it reached any conclusion

as to the advisibility or feasibility of such a transaction."

[16:20:03]

SEBASTIAN: So, obviously, it's become increasingly clear, you could say glaringly obvious from the statements we've heard from Musk over this past

week that he doesn't actually have a proposal. He said that he's talking to the Saudis. He says that he is talking to other investors. He said he

wants to keep existing shareholders. It's not exactly clear how he's going to do that. So now we have that confirmed by the board.

So, the next step is for him to come up with a proposal, then they have to negotiate. The board might want more money, for example, they might want a

higher premium for shareholders and then we have to go to a shareholder vote, which sets up a whole wealth of other complexities in there, so it

could be a long process.

QUEST: And at the same time, he owns about 20%, I think, of Tesla. So he's a major shareholder in his own right, but if and when his does come

forward with a bid, his dual roles as shareholder or multiple roles as shareholder, Chairman, CEO, whatever other roles he may have, they would

all be in conflict and he would be recused in many of the debates at the board level.

SEBASTIAN: Well, certainly, there have been reports about that. I think it's interesting that he's been saying in several of his statements that

he's doing this in his capacity as a bidder for Tesla, not the CEO. It's unclear at that point whether that was something that was advised by his

lawyers after his initial tweet, but he'll be looking to see how many of the other shareholders, obviously not his stake and perhaps not that of his

brother which we think makes up about 25% of the total, how many other shareholders will come on board. That is entirely unclear at this point

whether index funds will actually be able to do this, whether non- accredited shareholders will be able to do this.

There's a lot that's still unclear about this and I think that's why, Richard, you saw the stock price dip today about 2.5% after a couple of

flat days. People are less confident at this point that they are going to see a good deal or at least see one through.

QUEST: Okay, but Clare, with the short passage of time since the tweet and since the announcement, what's the feeling in the markets and amongst

investors? Does it make sense for Tesla to go private?

SEBASTIAN: I think it's interesting with Tesla, Richard, because you saw this time a week ago and you still see now that the investor community is

deeply polarized. There are those who still believe deeply in Elon Musk. They are willing to stay with him. They want to keep their shares and move

over to a private company if that's what he sets up. There are those who are increasingly frustrated.

You see Elon Musk is someone who keeps trying to fly in the face of the regulations on wall street and who can't seem to get this process off the

ground in a way that inspires confidence.

QUEST: Clare, you're going to have your work cut out for you in the days, weeks and months ahead as we watch this one if it goes forward. Thank you.

Clare Sebastian is in New York. Let's stay in New York.

We're all familiar with the dating app, Tinder, in some shape or form. Well, now the co-founders of Tinder and others are suing the parent

company, Match, for billions. They're also leveling serious charges against Tinder's former Chief Executive. Match has fallen more than 3% on

the news.

Laurie Segall has been doing some exclusive investigative work on this. Laurie, who's suing who and for why?

LAURIE SEGALL, CORRESPONDENT, CNN: It's very interesting. It's an explosive lawsuit. I think you have to remember that Tinder wasn't just

founded as Tinder as a separate company. It was founded under IAC. So, there's always been this complicated relationship between the founders and

the early employees at Tinder and IAC, especially as it exploded. And now these founders are saying that they are victims of corporate greed and that

they are owed billions of dollars. Check it out.

(BEGIN VIDEO TAPE)

(BEGIN VIDEO CLIP)

SEAN RAD, CO-FOUNDER, TINDER: This contract said that if we work hard and if we build a successful company, which we did, that we would be

compensated with the value that we created.

(END VIDEO CLIP)

SEGALL: It's an explosive lawsuit. At the center of it, major media giant IAC, which owns, Match Group, the parent company of Tinder.

(BEGIN VIDEO CLIP)

RAD: They violated their promise to us. They manipulated financial information. They lied and essentially paid employees billions less than

they actually owed them.

(END VIDEO CLIP)

SEGALL: Sean Rad co-founded Tinder in 2012 while working at an incubator owned by IAC. Now, he along with former and current employees are suing

IAC alleging they purposely lowered the value of Tinder.

(BEGIN VIDEO CLIP)

SEGALL: Why do you think IAC, Match, tried to undervalue the company privately?

RAD: Because they wanted to pay us less. There is a contract here that says that they have to pay us based on the fair value of Tinder, and they

just did the most egregious, insane things to fabricate that valuation, corrupt it and get a valuation that objectively is ridiculous.

(END VIDEO CLIP)

SEGALL: The suit says IAC installed Greg Blatt as Tinder CEO ahead of the valuation process. His role according to Rad and the lawsuit, to purposely

paint a pessimistic view of Tinder to the banks valuing the company. That included downplaying new feature and withholding financial data.

(BEGIN VIDEO CLIP)

RAD: At one point, there was even a revised financial projection internally that far surpassed the projections that were given to the banks

and they ignored that and they ignored that that even existed. The banks just had to go off of the information that they were given.

SEGALL: Did you ever try to go to them and say, "I don't think you have all the data," or "I think this is being undervalued. Here are the facts?"

[16:25:13]

RAD: The executives who are part of this lawsuit attempted to tell the truth to the banks, and when they did they were threatened to get fired.

(END VIDEO CLIP)

SEGALL: In a statement to CNN, IAC called the suit meritless and said that it would vigorously defend against it. It said Match went through a

rigorous valuation process with two independent banks and that Rad and other executives who left the company may not like the fact that Tinder jas

experienced enormous success following their respective departures, but sour grapes alone do not a lawsuit make.

IAC valued Tinder at $3 billion in 2017. That valuation relied on the information provided to the banks.

(BEGIN VIDEO CLIP)

ORIN SNYDER, ATTORNEY, GIBSON, DUNN & CRUTCHER: Two years before the correct valuation, the defendants themselves valued tinder at $3 billion.

Fast forward two years, 600% growth in revenue and the defendants say it's still valued at $3 billion. It's absurd.

SEGALL: Some would argue that in that time, you had all of these different apps doing similar things that Tinder was doing and gaining in popularity

and that could have been a part of slowing in growth.

SNYDER: Anyone who said that would be wrong. Everyone who looked at this company understood that in 2017, Tinder was the number one product in its

category and it was going to the moon as it continues to grow today.

(END VIDEO CLIP)

SEGALL: The lawsuit seeks at least $2 billion in damages, suggesting the company was undervalued by at least $9 billion. The suit also alleges that

soon after Blatt was named Tinder's CEO in late 2016, he groped and sexually harassed Tinder Vice President of Marketing and Communications,

Rosette Pambakian at a company holiday party.

(BEGIN VIDEO CLIP)

RAD: I actually reported that misconduct to the company and the board -- and the board had a choice. They could either do the right thing and

properly investigate and take the right action, or they can keep that executive in a place where he can finish the job of corrupting the

valuation.

SEGALL: Did you specifically talk to Blatt about these allegations?

RAD: Yes, I did.

SEGALL: And what was that conversation like?

RAD: I was threatened. I believe it was, "If you take me down, I'm going to take you down with me."

(END VIDEO CLIP)

SEGALL: CNN has reached out to Blatt and IAC for comment and has not heard back. It's not the first time Tinder has been wrapped up in a sexual

assault lawsuit. In 2014, former Tinder VP Whitney Wolfe sued Tinder, Match and IAC. Wolfe accused co-founder Justin Mateen of sexual harassment

at Tinder and Rad not stopping it. That lawsuit was settled out of court with no admission of wrongdoing.

(BEGIN VIDEO CLIP)

SEGALL: We can't ignore that someone who was accused of sexual harassment is now part of a lawsuit that's claiming sexual harassment . How do you

negotiate the two?

RAD: Look, Justin, along with all the employees, was also made a promise. As far as, you know, the past and his breakup with Whitney and his conduct

there, he's paid the consequences for that. He was fired from the company. That's not relevant to the fact that this company made promises to all the

Tinder employees including Justin and reneged on those promises and overlooked the contracts they had with us.

(END VIDEO CLIP)

(END VIDEO TAPE)

SEGALL: And Richard, we've heard IAC and Match respond to many of these allegations but we didn't hear back from them when it came to the sexual

harassment allegations. I am told, we will have a statement coming soon. As you can see, some very serious allegations against this company.

QUEST: Very serious and extremely interesting and almost voyeuristic as one listens. I mean, it's got it all. It's got sex, money, the whole lot.

One question though. Tinder itself -- how successful does it continue to be bearing in mind all the other apps and the segmenting of the dating app

market?

SEGALL: Earnings just came out last week and it showed tremendous success and so much so that it gives them a little bit more of a case when you're

looking at it on -- looking at these numbers now which show that Tinder accounts for much of Match's success and it's a number that's only growing.

So you had years ago in the private valuation some of these executives saying, "Well, growth is going to stall, it's not going to do well." It

was the most popular app according to Facebook in all of July. So, that's just not true.

It will be a who's who and it will be interesting to see how they defend this. You can expect a lot to come out. The attorney that's representing

Sean Rad and these plaintiffs is very well known in the tech world, Richard. He represented Facebook. He's represented Apple and Uber and

he's done so successfully, so it will be interesting to see these guys go up against this major media company.

QUEST: And you will be there to watch every step of the way and to report back to us in great detail. Thank you. Laurie Segall with me. As we

continue tonight on "Quest Means Business" coming from London, gaining strength, losing respect, the dollar's summer time rally continues and some

believe its dominance will not last. But that begs the question of what's pushing the dollar higher and the ability of it to continue.

Hello, I'm Richard Quest. There of course is more "Quest Means Business" in just a moment. When Russia's Foreign Minister says countries will start

abandoning the dollar if Washington doesn't change course, and when a former White House staffer has dominated newscasts worldwide, her book is

only now starting to move its way at the bestseller list.

As you and I continue, this is CNN. And here on this network, I promise you, facts always come first.

The Italian authorities have revised the number of people who died from the shocking bridge collapse in Genoa. It now says 26 people were killed and

15 people have been wounded. A section of the Morandi Bridge crumbled at about noon local time during thunderstorms. Crews are still searching for

survivors and bodies and the bridge that was built in 1968, was undergoing maintenance.

Police have searched three addresses in the English midlands after a suspected terror attack outside Westminster in Parliament. Two people were

hurt when a man drove a car into cyclists and pedestrians. Officials says the suspect is a British citizen who originally came from another country.

Five European countries have agreed to take migrants rescued off the coast of Libya by the Aquarius ship. France, Germany, Portugal, Spain and

Luxembourg will take in the 104 migrants on board. Malta and Italy have refused the ship dock on Monday.

Dozens of cars were burned in Sweden in what officials are calling an organized act of vandalism. Most of the vehicles were torched in and

around Gothenburg, which is Sweden's second largest city. The police have made two arrests so far.

[16:35:16]

QUEST: A recent uptick in the violence comes ahead of national elections next month.

The White House Press Secretary Sarah Sanders, said she could not guarantee that President Trump has ever used the "N" word. Mr. Trump has denied ever

using the word. His former aide, Omarosa Manigault-Newman, claims she heard a tape of him saying it. Sanders says she had never heard the

President use the term.

So, the economic chickens are coming home to roost, and certainly when it comes to the emerging markets. The Indian rupee has hit a record low

against the US dollar, as the fallout of the Turkish currency crisis continues, and now, some emerging markets are starting to question the role

of the US dollar and thereby the United States plays in the global economy.

And as we discuss this, keep in mind, the dollar is the world's number one reserve currency by a long measure. It's a petro currency, it's the one

used as the backbone of trade. So, now factor in the idea that for example Turkey, Turkey's Finance Minister saying that the dollar has lost

credibility and Turkey's large debt in dollars is of not really much concern. Then of course you get to the point that it becomes more

expensive to repay these debts as the lira goes down, so the dollar of course goes up. If your debts are in dollars, you need more liras to pay

them off.

And so to Russia where Russia is also suggesting that the dollar could shift its move into the currency market as the reserve currency of the

world. Sergey Lavrov is visiting Istanbul at the moment and he corrected and he talked about and criticized the US sanctions.

(BEGIN VIDEO CLIP)

SERGEY LAVROV, FOREIGN MINISTER OF RUSSIA, (Through a translator): I'm certain that with such abuse, the role of the American dollar as the world

reserve currency will weaken and more countries, even countries not affected by the American sanctions, will get away from dollars.

(END VIDEO CLIP)

QUEST: It's not just Russia, wherever you look, China as well, trade tensions are starting to show. New data in the case of China is showing

investment at a two-decade low. And the common thread throughout all of these is without a doubt the US dollar.

Joining me now is Eswar Prasad, he is a senior fellow at the Brookings Institute and author of the "The Rise of the Renminbi," joins me now.

Let's talk about this in some detail. Is the dollar under threat in any shape or form as the reserve currency as a result of what we're seeing at

the moment?

ESWAR PRASAD, SENIOR FELLOW AT THE BROOKINGS INSTITUTION: There is much talk, Richard, about shifting away from the dollar and many countries are

frustrated by the dominance of the US dollar and the fact that they have to rely on a dollar-based financial system to conduct international

transactions, but the reality is that there isn't much of an alternative.

As you pointed out, the dollar remains the dominant currency in international trade and finance. About two-thirds of the world's foreign

exchange reserves are handled in US dollars and since the financial crisis, that share has barely budged. There are certain currencies like the

Chinese renminbi trying to make a move, but the chances they will supplant the dollar are pretty slim, again, because there really is not much of an

alternative to the US dollar right now.

QUEST: If there's no alternative, what purpose does it serve for these countries to criticize, and more crucially, bearing in mind their own

economies are in trouble. Certainly the case of turkey and Russia, then you ask the question, well, they just stand to make a bad situation worse.

PRASAD: What they're trying to do is basically send a message domestically - they have said their economies face maybe not the result of their own

policies, but perhaps because of these inimical policies undertaken by the US, that's of course very easy for some to maintain when the US continues

to take actions that might be interpreted as hurting those economies.

When turkey's lira was falling, Mr. Trump decided to impose tariffs, interpreting the move in the lira as somehow being directed against the US,

which it certainly was not. So it will have Mr. Erdogan in Turkey to make a plausible argument to his populace that in fact, the US is kicking Turkey

when it is down.

So the US is not helping its case right now, but these countries are not helping themselves either.

[16:40:07]

QUEST: Right, now, on that point where Turkey is concerned, at the end of the day, it doesn't really - the battle with the US to some extent is a

side show in that if Turkey doesn't change its macroeconomic policies, it becomes a little bit academic because the policies themselves are driving

the currency down and making a bad situation worse.

PRASAD: What is really driving the lack of investor confidence, both domestic and foreign investors in Turkey, is the fact that Mr. Erdogan

since his re-election in June took steps to appoint his brother-in-law as the head of the Treasury and Finance Ministry and has made it very clear

that he's not going to support the Central Bank if it wants to raise interest rates in order to preserve the currency's value and to fight

inflation which is now about 15%.

In fact, he's referred to interest rates as the mother and father of all evil, giving foreign investors no confidence at all that he is going to

allow the Central Bank to hike rates, and indeed, in July, the Central Bank should have raised interest rates, it did not. That I think is the key

issue.

Now, of course the fact that the US Federal Reserve is on the rate- tightening cycle at this stage and Mr. Trump has imposed sanctions and tariffs on Turkey is adding fuel to the fire and it allows Mr. Erdogan to

argue that what is happening in Turkey and to the lira is a consequence of US actions, not Turkish policies, but the reality is much as you point out,

it's really Turkish policies that are the key factors here.

QUEST: Finally and briefly, Ken Rogoff speaking to us last week, Ken said that this was all going to add - and I'm paraphrasing - it was all going to

end somewhat badly and probably with the IMF having to come into pick up some of the wreckage. Do you

think that, too?

PRASAD: If Mr. Erdogan is not willing to do what is needed with domestic policies, especially with interest rates, there's going to be no recourse

back to Turkey. Mr. Erdogan has talked about looking for friends and allies abroad, but I think it's unlikely that Russia, Turkey, Qatar, China

are going to be able to help Turkey in this case. It's really going to be up to the IMF to bring Turkey back on its feet and help restore investor

confidence if Turkey cannot do it itself.

QUEST: Eswar Prasad, thank you for joining us. Still ahead, a former White House aide tell-all book has been slow to climb the bestseller list,

Omarosa may not be getting the reception that she had hoped for.

[16:45:00]

QUEST: Fantasy football season is about to begin in the United States, and a new league says blockchain can make people care about fantasy sports like

they were the real thing. The Crown League as it's called says it will let fantasy players go pro. Fans will each own a part of a professionally run

fantasy football team and share the prize money afterwards. The whole thing will use blockchain to keep tabs on all the results.

Dan Nissanoff is the founder of the Crown League and joins me now from New York. I love the idea and I love the way it's been put together, but I

have a natural cynicism at the moment when anybody starts saying they're about to use blockchain as if it's sort of a panacea for every ill. So

tell me what does blockchain give you?

DAN NISSANOFF, FOUNDER AND CEO, CROWNTHROWN INC.: Richard, that's a great question. Blockchain gives us the opportunity to allow the public, massive

amounts of people, to actually become owners of a professional sports team.

Before blockchain, you could only do that by taking a company public. Blockchain essentially now allows us to take the league and 12 franchises,

12 teams public, and offer opportunities for the public to invest in the Crown League.

QUEST: If they invest in you, what do they get?

NISSANOFF: They get three things. They get the right to governance, so they get to vote on critical matters associated with the league and

associated with the teams, they also get to participate in the profits of the Crown League.

So, in traditional sports entertainment platforms, you make money by aggregating fans around entertainment and then selling sponsorships,

advertising, merchandise, live event tickets, we offer all of that and will instead of that money going to the owners of a traditional sports team, it

will go to the public, which are not only the owners, but the fans of these teams.

QUEST: This is again another enterprising idea and one of many in a time - I guess, at the end of the day, is this an investment or is this something

for the fans? If it's an investment then - you'll probably tell me it's both, but I suggest there needs to be an element of love of what you're

doing rather than necessarily worrying about the EPS and the PE and ratio and the amount you're going to get back.

NISSANOFF: So, we actually call this investment gaming. We've coined that term. The Crown League allows you actually to invest in something that is

also entertaining, that you have a passion for. When you buy stock in a company like Amazon, the way you consume that investment is by going onto a

site and tracking the graph to see if you're making money or losing money.

Here you get to consume your investment by actually watching football, by watching the game you love. The better your team does, the more money you

make.

QUEST: All right, what sort of sums are we talking about here, A, in terms of the investment, and B, the possible return?

NISSANOFF: So, the Crown League launches its public offering of its tokens where you can invest in the league for as little as a dollar. Once we

launch the actual sale of the teams at the end of this year, the entry point will be fairly minimal. We haven't published the starting price of

our tokens, but it will be accessible to the average person.

QUEST: I feel a small investment coming your way from "Quest Means Business." No, no, we'll go for the least amount we can so that we can

follow our investment and our teams and see and put it to the test and in 12 months time or two years time, and see how we've done. Anyway, good to

see you, sir.

NISSANOFF: We'll look forward to that. Thank you so much.

QUEST: I want my money back. Thank you. It was a rough day for crytocurrencies. Bitcoin fell below $6,000.00. It's now just a smidgen

above it, but as you can see it's off 2.5%, 165 down, that's some 6,000.

Investors dumped other crytocurrencies as well. Ethereum was off 8%, Litecoin coin fell 7% and Ripple dropped over 4%.

You want to keep on top of the day's business headlines in just 90 seconds, then try our Daily Briefing Podcast. It's updated twice a day, before and

after the closing bell - the opening bell on Wall Street. Alexa, and your Google home device, cnnmoney/briefing is all you need to say to hear our

dulcet tones. We'll be back in a moment.

[16:50:00]

QUEST: One of President Trump's Cabinet members is under close scrutiny for alleged conflicts of interest. A government watch dog says the

Commerce Secretary, Wilbur Ross, should have recused himself from working on policies that directly impact his assets. CNN's Cristina Alesci has the

details.

(BEGIN VIDEO TAPE)

(BEGIN VIDEO CLIP)

DONALD TRUMP, PRESIDENT OF THE UNITED STATES: We have the legendary wall street genius, Wilbur Ross here. He's our Secretary of Commerce.

(END VIDEO CLIP)

CRISTINA ALESCI, CORRESPONDENT, CNN: He's a Wall Street wiz with the kind of wealth the President finds appealing.

(BEGIN VIDEO CLIP)

TRUMP: In those particular positions, I just don't want a poor person. Does that make sense?

(END VIDEO CLIP)

ALESCI: But while Commerce Secretary Wilbur Ross has kept a low profile, quietly keeping away from the presidential spotlight, reports of ethnically

questionable dealings are piling up. Now a government watch dog group is calling for the tycoon turned Cabinet member to be investigated.

In a 100-page report to the Inspector General obtained by CNN, the Campaign Legal Center lays out several cases in which it says Ross appeared to

engage in criminal conflicts of interest.

(BEGIN VIDEO CLIP)

BRENDAN FISCHER CAMPAIGN LEGAL CENTER: We're hoping that the Inspector General will investigate Commerce Secretary Ross to preserve the public's

trust in government and to demonstrate that ethics still matter.

(END VIDEO CLIP)

ALESCI: After Ross joined the administration in 2017, he was either supposed to part ways with investments that may influence his work or

recuse himself from matters that presented conflict. For example, he'd need to divest from a company called Invesco which planned to invest in

steel before he worked on a policy affecting the steel business.

(BEGIN VIDEO CLIP)

WILBUR ROSS, COMMERCE SECRETARY OF THE UNITED STATES: The tariff actions taken by the President are unnecessary to revive America's essential steel

and aluminum industries.

(END VIDEO CLIP)

ALESCI: One of Invesco's subsidiaries posted a multi-billion dollar Chinese steel deal soon after Ross took office. As for Ross, he claims he

had divested, filling out this form and signing on the dotted line for the government ethics office. The only problem is ...

(BEGIN VIDEO CLIP)

FISCHER: He maintained tens of millions of dollars in investments in assets that potentially posed an ongoing conflict of interest.

(END VIDEO CLIP)

ALESCI: Still, Ross says everything he's done is on the up and up.

(BEGIN VIDEO CLIP)

ROSS: Everything that's been done has been done in compliance with the office of government ethics.

(END VIDEO CLIP)

(END VIDEO TAPE)

QUEST: Cristina Alesci with this story of Wilbur Ross, there will be those who will say that such issues and conflicts of interest were inevitable

when you had so many wealthy people going into the highest echelons of government.

[16:55:11]

QUEST: Now to the markets, let me take you over and show you exactly what's been happening. The markets, the Dow Jones Industrials, interesting

today for us today just to take a look at it because it opens higher. We had a wobble right about 10:00 in the morning, but it stays up for the

course of the day. And, arguably you could say, a half a percent gain, 112 points, arguably, you can say middle of the summer, low volumes, but I

think it is interesting that it does hold up rather than go in the opposite direction.

Because for example, the S&P 500 also was up and in doing, so snapped a four-day losing streak. You will also look at Europe where there was a

whole host of different issues taking place in European markets. London had a frolic of its own with some results, XETRA DAX, I'm not quite sure

why it is showing that, but the only one that's actually showing up overall was Zurich and that these sorts of numbers in August, it pretty much means

flat. We will have a "Profitable Moment" after the break.

Tonight's "Profitable Moment," so the dollar rises and other currencies are feeling the effect. Well, South Africa's currency has fallen very sharply.

India's rupee is at an all-time low against the US currency. And you've got Turkey and Russia where leaders are both saying that the dollar is no

longer - or should no longer be a reserve currency.

The interesting part about all of this is that the dollar has the position it does as a position of strength even at a time when Donald Trump is

talking up the dollar. Remember, he said he wants a higher dollar. He wants a more value dollar. Well, that would have a problem in terms of

trade. It would make those US exports even more expensive.

So whilst he's got at the moment in the United States this issue of tariffs and trade on one side and a rising dollar on the other, what it ends up

doing for exports, we'll see in just a few months' time. A rising dollar is not necessarily good for the United States.

And that's "Quest Means Business" for tonight. I'm Richard Quest in London. Whatever you're up to in the hours ahead, I hope it's profitable.

I'll see you tomorrow.

END

# Tinder exec: I had to protect the company from my own story

by Laurie Segall  @LaurieSegallCNN

August 16, 2018: 11:25 AM ET

Tinder co-founders and early employees sue dating app's owners for billions

A lawsuit filed by ten current and former Tinder executives accuses former CEO Greg Blatt of groping and sexually harassing a vice president of the company. The suit also claims that Tinder's corporate parent did nothing about the incident because Blatt was a key figure in its plan to minimize Tinder's valuation and deny early employees billions of dollars in stock options.

The lawsuit accuses Blatt of groping and sexually harassing Rosette Pambakian, Tinder's vice president of marketing and communications, at a company holiday party in 2016. In a statement to CNN, Pambakian said she felt conflicted about reporting the incident, because, as the head of communications since 2012, her job was to protect the company's reputation.

"My biggest nightmare had come to life in that moment ... and my job as Tinder's head of communications was to protect the company and make sure we were always portrayed positively in the press," she said. "The irony that I had to now protect the company from myself was not lost on me."

The allegation appears in a lawsuit brought by Tinder co-founder Sean Rad, Pambakian, and eight other early employees of the popular dating app. They are suing the service's current owners, alleging that they manipulated the valuation of the company to deny them of billions of dollars they were owed.

The suit, filed Tuesday in state court in New York, seeks at least $2 billion in damages from Match Group (MTCH) and its parent company, IAC/InterActiveCorp (IAC). The plaintiffs are represented by Orin Snyder of Gibson Dunn, who has represented some of the biggest companies in tech, including Facebook (FB), Apple (AAPL) and Uber.

Pambakian and the three other plaintiffs in the suit who still work at Tinder were put on paid administrative leave by the company on Tuesday, according to a source familiar with the matter.

Related: Tinder co-founders and 8 others sue dating app's owners, claiming they're owed $2 billion

IAC denied the claims and issued a statement calling the suit "meritless" and saying it would "vigorously defend" itself against it.

A spokesperson for Match Group said in a statement, "The Match Group Board takes allegations of workplace misconduct extremely seriously. We investigate reports of misconduct, including sexual harassment, promptly and thoroughly, and take appropriate action, including swift termination of those responsible for such behavior.

"As it relates to the matter alleged in the lawsuit, an incident occurred in late 2016 and was reported at the end of April 2017. The Match Group Board -- with the assistance of experienced outside counsel from two nationally recognized law firms -- promptly conducted a careful and thorough investigation under the direction of independent Board members, concluded, among other things, that there was no violation of law or company policy, and took appropriate action."

## Accuser says says outside investigator never questioned her

Pambakian said she was never questioned by an outside firm, only Match executives, and believes Blatt was protected as part of the alleged "scheme" to deny early employees millions of dollars.

CNN has learned more details surrounding the alleged incident, which occurred during Tinder's 2016 holiday party at the SLS Hotel in Los Angeles.

According to Pambakian, the party coincided with Blatt being named CEO. She said Blatt started behaving inappropriately, including saying at one point, "I get hard every time I look at you."

According to Pambakian, Blatt then said, "let's get out of here."

"In that moment, I thought, 'My boss actually thinks I'm going home with him,'" she said. "I basically bolted, found two people I knew and said, 'Hey, let's go up to your room.'"

They gathered in that hotel room, one of several the company had booked for the evening.

Pambakian said Blatt showed up soon after, although she does not know if he was aware she was there.

She said she was sitting on the bed when Blatt entered the room and, without saying anything to anyone else in the room, pushed her back onto the mattress, climbed on top of her, and began kissing and fondling her.

Blatt did not respond to a CNN request for comment.

A source familiar with the matter told CNN the allegation was investigated and found that Blatt had been invited to the room by one of the people there and that "this was a one-off consensual error in judgment."

"From what we understood from interviews and investigations, there was consensual cuddling taking place," the source said.

Pambakian strongly disagrees. "It wasn't consensual -- there was no opportunity, no 'hi,' 'hello,' before I even knew it, Greg Blatt was on top of me in a hotel room," she said.

Word of the incident soon spread among Tinder employees, according to Pambakian. Because she reported directly to Blatt, she reported the incident to executives at Match.

Two sources who spoke to Pambakian within days of the alleged incident said she appeared visibly distraught over it. "She was crying when she told me," one source told CNN. "She

genuinely seemed upset."

Pambakian, who has led Tinder's communications since 2012 and joined the company full time in 2014, told CNN she felt conflicted about how to handle the alleged incident. Her role leading the company's communication strategy required her to protect the company's image, not make herself the story.

## Hesitant to discuss incident

Pambakian said she was hesitant to discuss the matter publicly because she didn't want it to define her. She also worried that it would stall her career. But she found that position increasingly untenable as word of the incident spread and journalists -- including me -- started asking questions and rumors began circulating at the company.

"The self-loathing that followed was almost unbearable, and frankly, indescribable," Pambakian said. "I couldn't understand why I was protecting a company that did not protect me when I needed it most."

Pambakian was reluctant to share details of the incident publicly at the time, she said, because "I didn't want any public attention the incident received to overshadow my contributions and achievements to building a massively successful brand."

Rad, who attended the party but didn't witness any interactions between Pambakian and Blatt, said he learned of the allegations months later and asked Pambakian about them. According to the suit, he reported the incident to Jared Sine, Match's general counsel. According to the suit, Sine told Rad that Match's board of directors -- of which Blatt was Chairman -- "would run its own investigation."

"Defendants refused and covered up Blatt's conduct," the suit states. "Defendants even allowed Blatt to contact Pambakian and one of the eyewitnesses directly, whom Blatt then pressured to conceal his misconduct."

Rad said he alerted IAC officials to the allegations in mid-2017; the suit alleges that they did nothing and kept Blatt on as CEO because he was key to their plan to downplay the company's valuation. Rad also told CNN that he confronted Blatt. "I was told, 'If you take me down, I'm going to take you down with me,'" Rad said.

Pambakian said she received sympathy from senior executives at the company who heard about the incident but nothing was ever done.

"No outside firm questioned me," she said. "Multiple IAC and Match executives apologized profusely to me for Greg Blatt's conduct on the night of the holiday party." According to Pambakian, she was also asked to sign an NDA that would have required her to never speak publicly about the incident in exchange for compensation, but she refused.

## Allegations that harassment not isolated incident

Pambakian says Blatt's behavior wasn't an isolated incident. According to her, many other women were subjected to "pervasive sexual harassment and misogyny by Match executives."

Pambakian said that when she asked about a budget for activities to boost company morale, an executive relayed a message from Blatt, who said the company didn't need a budget for that because she and and two other women on her team were "company morale." The executive said another woman on the team wasn't included in that category because she "had peaked," Pambakian told CNN.

That same executive, according to Pambakian, told her it was "strategic that a woman on her team was wearing a skirt the day she asked her boss for a raise, and said he also told her he was sweating looking at her. According to Pambakian, that executive also referred to a female colleague at a Match Group party as a "bathroom bang."

A source described her own experience with that executive, who was her senior. She said that at a company happy hour, after she rejected his advances, he called her "unattractive" and said she looked like a "Russian prostitute."

According to that source, the executive resigned a year later after HR conducted an investigation.

"As it relates to the Tinder executive, we completed a thorough investigation into his behavior within days of it being reported, after which he was promptly removed from the Company," a Match Group spokesperson said.

## Not first allegation of harassment

This is not the first time there have been allegations of sexual harassment at the executive level at Tinder.

The plaintiffs in the lawsuit also include Tinder co-founder Justin Mateen, who was accused of sexual harassment by former employee Whitney Wolf in 2014, claiming he harassed her and that Rad allowed the harassment to take place. It settled without an admission of wrongdoing by any of the parties. CNN has reached out to Mateen and Wolf for comment.

Although Blatt resigned as Tinder's CEO in in 2017, he is vice chairman of the Match Group board of directors.

The suit alleges that IAC and Match allowed Blatt to continue as CEO until the Wall Street banks completed their valuation, which placed Tinder at $3 billion. Blatt left the company with a "golden parachute" worth "hundreds of millions of dollars," the suit states.

As to why she's speaking up now, Pambakian said she feels an obligation to the 40 people, most of them young women, she leads. "I absolutely cannot allow them to be subjected to the things I experienced," she said.

Despite being placed on leave after the suit was filed Tuesday, Pambakian is still an employee of Tinder.

"Why should I be the one to leave my job that I love when I did nothing wrong?," she said in a statement to CNN ahead of being placed on leave. "Why is it that the men responsible for this type of behavior are allowed to quietly resign with a hefty severance package while no one is the wiser? Why are they being protected while I fear for my future and reputation for blowing the whistle?"

*-- CNN's Chris Isidore contributed reporting.*

CNNMoney (New York)
First published August 15, 2018: 9:35 PM ET

**THE VERGE**

# Tinder fires its head of comms, following her participation in a $2 billion lawsuit against Match

*The Verge obtained an email exchange between her and Match's CEO*

By Ashley Carman | @ashleyrcarman | Dec 18, 2018, 4:31pm EST



Photo by Ben A. Pruchnie/Getty Images for #Grazia10

Multiple Tinder employees who sued the dating app's parent company, Match Group, for $2 billion were fired this week, a source close to the employees tells *The Verge*. Among them is Rosette Pambakian, VP of marketing and communications, who, in the original lawsuit, claimed that former Tinder CEO Greg Blatt sexually assaulted her. Match spokeswoman Justine Sacco wouldn't confirm the names of the employees affected, but did say a "number" of employees, including Pambakian, were let go because they were "unable to fulfill their job responsibilities."

The company initially placed these employees on administrative leave in August, which meant they weren't allowed to work, but continued being paid. Since being fired, Pambakian sent an email to Match Group CEO Mandy Ginsberg and Tinder CEO Elie

Seidman, saying she was subjected to "ongoing intimidation and retaliation" designed to "pressure [her] into resigning." *The Verge* received a copy of this email from a source close to Pambakian, which we've published at the bottom of this article.

The email also says the firing had to do with Pambakian's sexual harassment claims against Blatt and that she was never interviewed about those claims. She writes, "You told the world that a sham investigation (in which I was never even interviewed) determined the assault was some sort of 'consensual cuddling'—as if there could by anything consensual about a CEO groping his subordinate in front of other employees after making sexually explicit comments throughout the evening of a company holiday party." She also claims that Match fired her a day before her options vested. She mentions an arbitration agreement, which forced her to withdraw from Tinder co-founder Sean Rad's lawsuit, and that she "refused to sign a non-disparagement agreement presented to me by HR, which would have prevented me from speaking publicly about my experience in exchange for compensation."



**Do you have more to say about what's happening with Match or Tinder?** Reach out to me at ashley.carman@theverge.com or through Twitter DM @ashleyrcarman. You can also always use

SecureDrop or Signal to securely send messages and files to *The Verge* without revealing your identity.

Ginsberg responded to Pambakian's email in her own email, which we've also published below. In it, she rejects Pambakian's retaliation allegations and reiterates that the company investigated Blatt and prior sexual harassment claims. Pambakian, she says, never filed a sexual harassment claim in the first place. "I was not the CEO at the time, but I know you were interviewed on at least two separate occasions and you never alleged sexual harassment," she writes.

She goes on to say that Pambakian's options "have already been accelerated, and should be exercisable in your account, along with the other equity awards that have vested since August," and says that the arbitration agreement is standard and "there is no NDA in them and we never tried to force you to sign a non-disparagement agreement. You're free to talk about anything publicly that you'd like."

Much of this correspondence has already played out in public. Match responded to Pambakian's sexual harassment allegations in the lawsuit around the time of filing and said it "conducted a careful and thorough investigation under the direction of independent Board members, concluded, among other things, that there was no violation of law or company policy, and took appropriate action."

The lawsuit itself centers on the allegation that Match purposely undervalued Tinder in an effort to avoid paying lots of cash to the original team, but it's unclear what involvement Pambakian will have going forward as she had to withdraw.

Rosette's email:

> Dear Mandy,
>
> Six years ago I wrote the very first press release for Tinder. Since then, I've poured my heart and soul into this company and helped grow it into a global phenomenon and top-grossing app. I was the youngest and longest-standing female executive at the company. I love Tinder. And I love my colleagues. But you have now fired me from a company I was so proud to build in blatant retaliation for joining a group of colleagues and Tinder's original founding members in a lawsuit against Match and IAC, standing up for our rights, calling out the company's CEO Greg for sexual misconduct, and confronting the company about covering up what happened to me.

9/25/2019 Tinder's Letter From Matte Pambakian following per resignation of CEO in assault against Match Group Chage Page ID
Case 2:19-cv-07046-MWF-FFM Document 28-2 Filed 10/03/19 Page 99 of 108 Page ID
#:730

While I truly hoped that decency and professionalism would prevail and that you would let me return to work, I knew that was probably unlikely when I was placed on leave the very day the lawsuit was filed and you continued to defend the actions of the executive that I spoke out against. Rather than acknowledge the truth and condemn his actions, you chalked it up it to "bad judgment." To make matters worse, you told the world that a sham investigation (in which I was never even interviewed) determined the assault was some sort of "consensual cuddling"—as if there could by anything consensual about a CEO groping his subordinate in front of other employees after making sexually explicit comments throughout the evening of a company holiday party. No company that has faced allegations like this has gone to such lengths to protect one of its own – it's truly despicable.

Since being placed on leave, I've been subjected to ongoing intimidation and retaliation clearly designed to pressure me into resigning—from immediately removing my name from my office and converting it into a conference room, to trying to coerce me into turning over my private and personal data on my phone. Though I can think of no other company that has actually *fired* the woman who made sexual assault allegations against an executive—the company's actions here, including firing me just one day before my remaining options vest, are totally consistent with the way you have circled the wagons around him from day one.

Was the board aware that the company would publicly blame the victim?

When I refused to sign a non-disparagement agreement presented to me by HR, which would have prevented me from speaking publicly about my experience in exchange for compensation, Match snuck an arbitration clause into its employees' most recent compliance acknowledgements, causing me, Jonathan, James and Josh to have to withdraw from the lawsuit. Know that my former Tinder colleagues and I still vigorously support that lawsuit — IAC and Match cheated us out of what we were promised and rightfully earned in exchange for building Tinder into Barry Diller's most valuable business. As the lawsuit progresses the evidence will emerge and the world will see how IAC and Match plotted against their employees and rewarded misconduct.

I never imagined that I'd be pushed out of my company for standing up for what is right. But if that is the cost of being on the right side of history, I'll pay it. As a woman CEO, I truly hope that you reconsider the safety of your remaining female workforce and allow Tinder and other Match owned companies to follow in the footsteps of Uber, Facebook and Google in eliminating forced arbitration for sexual misconduct claims. We deserve better.

Rosette

Mandy's email:

Dear Rosette,

I'm glad you reached out to me directly and I would like to take this opportunity to clarify a few points, because there seems to be a very real disconnect here that I truly want to fix.

You were not terminated because you reported Greg for sexual harassment. You couldn't have been, as you never reported Greg for sexual harassment. When Sean Rad brought the subject up nearly five months later, right after the valuation process commenced, it was immediately and thoroughly investigated by the Board, independently without any involvement from Greg, which concluded that no sexual harassment occurred. I was not the CEO at the time, but I know that you were interviewed on at least two separate occasions and you never alleged sexual harassment.

On the topic of sexual harassment at Tinder, you know how seriously reports are taken. You yourself reported two other male colleagues, whom Sean Rad hired, and they were very quickly dismissed. Clearly, it was taken very seriously given the company terminated those individuals. More importantly though, Greg is no longer here. I am. And I promise you, we do not retaliate against anyone who reports sexual harassment. Your position was never at risk due to any sexual harassment complaints. I wanted to find a way to keep you employed at Tinder.

As explained in the letter we sent you, you were terminated because it was not possible for you to fulfill the duties and responsibilities of your role as Tinder's spokesperson for a number of reasons, including your public position against the company over a valuation process. We also recently asked you to come to the office for a meeting with the HR department to discuss work-related activities and policies and were told that we can only contact you through your attorneys. Unfortunately, it's impossible for you to do your work at Tinder if all communications related to your job have to go through your lawyers. As it relates to your personal information, any suggestion that we have been trying to access it is just not true. Like any company, we've asked for you, and all other employees involved, to return company laptops, phones and other devices to us. And unfortunately, we couldn't retrieve a number of company devices from you and the others since you claimed that they were coincidentally all lost or damaged just before you decided to sue the company.

There are two last points I want to make: on the point about your equity, those options have already been accelerated, and should be exercisable in your account, along with the other equity awards that have vested since August. However, on the arbitration agreements, there is no NDA in them and we never tried to force you to sign a non-disparagement agreement. You're free to talk about anything publicly that you'd like. You have already done so and that's

https://www.theverge.com/2018/12/18/18146668/tinder-lawsuit-match-rosette-pambakian-fired

your prerogative. But the arbitration agreement is attached again. As you already know from when you signed it, it's clearly labeled "Agreement to Arbitrate."

I am a strong female advocate and have said to the women in the organization that as a female CEO in charge, I have zero tolerance for bad behavior and I am very much invested in every single employee's success. If you'd like to discuss any of the above, or have a productive dialogue, I am here and will make myself available for an in person meeting. Just let me know.

Mandy

# Tinder fires employees who sued its parent companies

By Ahiza Garcia, CNN Business

Updated 10:04 PM ET, Tue December 18, 2018

**San Francisco (CNN Business)**Tinder this week fired multiple employees who were part of a $2 billion lawsuit against the dating app's parent companies, Match Group and IAC/InterActiveCorp. Among the fired employees was Rosette Pambakian, who was Tinder's vice president of marketing and communications.

The lawsuit was brought in August by the co-founders of Tinder and several other employees. It alleged that current owners manipulated the company's valuation to deny them millions. The suit also alleged that Tinder's former CEO, Greg Blatt, sexually harassed Pambakian.

Pambakian sent an email to Match Group CEO Mandy Ginsberg and Tinder CEO Elie Seidman on Tuesday, claiming she was fired in "blatant retaliation" for her involvement in the suit, which she has since withdrawn from due to an arbitration clause.

Match spokeswoman Justine Sacco confirmed to CNN Business that a number of employees were terminated for, she said, being "unable to fulfill their job responsibilities." The employees were initially placed on paid administrative leave in August. The Verge was the first to report the news of the firings.

Blatt was named CEO of Tinder in late 2016. The lawsuit alleges Blatt groped and sexually harassed Pambakian at a company holiday party shortly after taking on the role. The suit also alleges that when Tinder co-founder Sean Rad informed IAC of Blatt's conduct, it was covered up and Blatt was kept as CEO.

"To make matters worse, you told the world that a sham investigation (in which I was never even interviewed) determined the assault was some sort of 'consensual cuddling,'" Pambakian said in her email, which was obtained by CNN Business.

Blatt did not comment when the initial lawsuit was filed and could not be reached for comment for this story.

Pambakian wrote that she was put on leave immediately after filing the suit and faced continued pressure from within the company to resign. She was fired the day before her remaining stock options vested, she said. The company and Ginsberg denied this.

The other central allegation in the suit is that Match Group and IAC manipulated Tinder's valuation in order to deny the plaintiffs millions of dollars in stock options.

The suit alleges executives worked to have two Wall Street banks undervalue Tinder in 2017 at $3 billion. That was the same as a valuation done two years earlier, despite rapid growth in revenue and subscribers, according to the plaintiffs' original filing in the case. If the valuation was downplayed, it would negatively affect how much money the co-founders and early employees received.

Tinder asked a judge to throw out the suit in October, claiming the co-founders had taken too long to file the suit.

Match Group CEO Ginsberg responded to Pambakian on Tuesday with an email of her own, which was also obtained by CNN Business. In it, she claimed Pambakian never filed a complaint about Blatt and was interviewed twice for the investigation into the harassment allegations. Ginsberg said Pambakian wasn't fired for speaking out against Blatt.

"You were terminated because it was not possible for you to fulfill the duties and responsibilities of your role as Tinder's spokesperson for a number of reasons, including your public position against the company over a valuation process," Ginsberg wrote.

In a follow-up email to Ginsberg, obtained by CNN Business, Pambakian said she did report the alleged "sexual assault" to HR.

Pambakian said she was also asked to sign a non-disparagement agreement in "exchange for compensation." She said a representative from human resources described what Blatt had done as a "terrible ordeal." Pambakian said she refused in writing to sign the NDA. The company denied trying to force her to sign an NDA.

*Laurie Segall and Chris Isidore contributed reporting.*

# Exhibit 1



**From:** Mandy Ginsberg
**Sent:** Tuesday, December 18, 2018 2:33 PM
**To:** 'rosette.pambakian@gmail.com' <rosette.pambakian@gmail.com>
**Cc:** Elie Seidman <Elie.Seidman@gotinder.com>
**Subject:** RE: Termination

Dear Rosette,

I'm glad you reached out to me directly and I would like to take this opportunity to clarify a few points, because there seems to be a very real disconnect here that I truly want to fix.

You were not terminated because you reported Greg for sexual harassment. You couldn't have been, as you never reported Greg for sexual harassment. When Sean Rad brought the subject up nearly five months later, right after the valuation process commenced, it was immediately and thoroughly investigated by the Board, independently without any involvement from Greg, which concluded that no sexual harassment occurred. I was not the CEO at the time, but I know that you were interviewed on at least two separate occasions and you never alleged sexual harassment.

On the topic of sexual harassment at Tinder, you know how seriously reports are taken. You yourself reported two other male colleagues, whom Sean Rad hired, and they were very quickly dismissed. Clearly, it was taken very seriously given the company terminated those individuals. More importantly though, Greg is no longer here. I am. And I promise you, we do not retaliate against anyone who reports sexual harassment. Your position was never at risk due to any sexual harassment complaints. I wanted to find a way to keep you employed at Tinder.

As explained in the letter we sent you, you were terminated because it was not possible for you to fulfill the duties and responsibilities of your role as Tinder's spokesperson for a number of reasons, including your public position against the company over a valuation process. We also recently asked you to come to the office for a meeting with the HR department to discuss work-related activities and policies and were told that we can only contact you through your attorneys. Unfortunately, it's impossible for you to do your work at Tinder if all communications related to your job have to go through your lawyers. As it relates to your personal information, any suggestion that we have been trying to access it is just not true. Like any company, we've asked for you, and all other employees involved, to return company laptops, phones and other devices to us. And unfortunately, we couldn't retrieve a number of company devices from you and the others since you claimed that they were coincidentally all lost or damaged just before you decided to sue the company.

There are two last points I want to make: on the point about your equity, those options have already been accelerated, and should be exercisable in your account, along with the other equity awards that have vested since August. However, on the arbitration agreements, there is no NDA in them

and we never tried to force you to sign a non-disparagement agreement. You're free to talk about anything publicly that you'd like. You have already done so and that's your prerogative. But the arbitration agreement is attached again. As you already know from when you signed it, it's clearly labeled "Agreement to Arbitrate."

I am a strong female advocate and have said to the women in the organization that as a female CEO in charge, I have zero tolerance for bad behavior and I am very much invested in every single employee's success. If you'd like to discuss any of the above, or have a productive dialogue, I am here and will make myself available for an in person meeting. Just let me know.

Mandy

**From:** Rosette Pambakian [mailto:rosette.pambakian@gmail.com]
**Sent:** Tuesday, December 18, 2018 10:17 AM
**To:** Mandy Ginsberg <Mandy@match.com>
**Cc:** Elie Seidman <elie.seidman@gotinder.com>
**Subject:** Termination

Dear Mandy,

Six years ago I wrote the very first press release for Tinder. Since then, I've poured my heart and soul into this company and helped grow it into a global phenomenon and top-grossing app. I was the youngest and longest-standing female executive at the company. I love Tinder. And I love my colleagues. But you have now fired me from a company I was so proud to build in blatant retaliation for joining a group of colleagues and Tinder's original founding members in a lawsuit against Match and IAC, standing up for our rights, calling out the company's CEO Greg for sexual misconduct, and confronting the company about covering up what happened to me.

While I truly hoped that decency and professionalism would prevail and that you would let me return to work, I knew that was probably unlikely when I was placed on leave the very day the lawsuit was filed and you continued to defend the actions of the executive that I spoke out against. Rather than acknowledge the truth and condemn his actions, you chalked it up it to "bad judgment." To make matters worse, you told the world that a sham investigation (in which I was never even interviewed) determined the assault was some sort of "consensual cuddling"—as if there could by anything consensual about a CEO groping his subordinate in front of other employees after making sexually explicit comments throughout the evening of a company holiday party. No company that has faced allegations like this has gone to such lengths to protect one of its own – it's truly despicable.

Since being placed on leave, I've been subjected to ongoing intimidation and retaliation clearly designed to pressure me into resigning—from immediately removing my name from my office and converting it into a conference room, to trying to coerce me into turning over my private and personal data on my phone. Though I can think of no other company that has actually *fired* the woman who made sexual assault allegations against an executive—the company's actions here, including firing me just one day before my remaining options vest, are totally consistent with the way you have circled the wagons around him from day one.

Was the board aware that the company would publicly blame the victim?

When I refused to sign a non-disparagement agreement presented to me by HR, which would have prevented me from speaking publicly about my experience in exchange for compensation, Match snuck an arbitration clause into its employees' most recent compliance acknowledgements, causing me, Jonathan, James and Josh to have to withdraw from the lawsuit. Know that my former Tinder colleagues and I still vigorously support that lawsuit — IAC and Match cheated us out of what we were promised and rightfully earned in exchange for building Tinder into Barry Diller's most valuable business. As the lawsuit progresses the evidence will emerge and the world will see how IAC and Match plotted against their employees and rewarded misconduct.

I never imagined that I'd be pushed out of my company for standing up for what is right. But if that is the cost of being on the right side of history, I'll pay it. As a woman CEO, I truly hope that you reconsider the safety of your remaining female workforce and allow Tinder and other Match owned companies to follow in the footsteps of Uber, Facebook and Google in eliminating forced arbitration for sexual misconduct claims. We deserve better.

Rosette

DocuSign Envelope ID: 5E45AF5B-3D74-4F27-A9CD-DB2BEDCA3A5D
Case 2:19-cv-07046-MWF-FFM Document 28-2 Filed 10/05/19 Page 85 of 108 Page ID #:730

## MUTUAL AGREEMENT TO ARBITRATE CLAIMS ON AN INDIVIDUAL BASIS AND
## SUMMARY OF THE ALTERNATIVE DISPUTE PROGRAM FOR CALIFORNIA

### A Better Way to Resolve Disputes

We understand that problems can occur even in the best workplaces.    In recognition of the fact that differences may arise between the Company and the undersigned ("Associate"), and in recognition of the fact that resolution of any differences in the courts is rarely time or cost effective for either party, the Company has instituted an Alternative Dispute Resolution Program for California (the "Program"), with an effective date of February 1st, 2018. In connection with the Program, the Company and the Associate each agree to enter into this Mutual Agreement to Arbitrate Claims on an Individual Basis ("Agreement") to gain the benefits of a speedy, impartial and cost-effective dispute resolution procedure. This Agreement also contains a summary of certain of the Program terms.

1.     **Agreement to Arbitrate: Claims Covered by Agreement**  The parties hereto agree that all references to the "Company" in this Agreement will include Match Group, Inc., and all of its related, subsidiary and affiliated entities, and the former, current and future officers, directors and employees of all such entities; all benefit plans and their fiduciaries and administrators; and all successors and assigns of these individuals and entities. Except as provided in Section 3 of the Program or as otherwise required by law, the Company and the Associate hereby consent to the resolution by arbitration on an individual basis of all claims or controversies arising out of or in connection with Associate's application with, employment with, or termination from, the Company. The Company and the Associate agree that arbitration shall proceed on an individual basis without the right for any claims to be arbitrated as a class, consolidated, collective or representative action. Nothing within this Agreement or the Program constitutes a waiver or prohibition of an Associate's right to file a charge or complaint with the EEOC, NLRB or similar agency. This Agreement is mutual, encompassing all claims the Associate may have against the Company or that the Company may have against the Associate, except as explicitly stated in the Program. The claims covered by this Agreement include, but are not limited to, claims for wages or other compensation due; claims for breach of any contract, express or implied; tort claims; claims for discrimination, harassment or retaliation of any kind; and claims for violation of any federal, state or other statute, ordinance, regulation, or common law.

2.     **Governing Law**  The parties agree that the Company is engaged in transactions involving interstate commerce. Except as provided or under the Program, or as required by law, the Federal Arbitration Act shall govern the interpretation, enforcement and all proceedings pursuant to this Agreement; and all arbitrations covered by this Agreement shall be adjudicated in accordance with the state or federal law for the jurisdiction where the Associate was employed when the dispute arose.

3.     **Waiver of Right to Jury**  By entering into this Agreement, the Company and Associate each knowingly and voluntarily waive any and all rights they have under law to a trial before a jury or judge in a court of law for a covered claim. The Company and Associate each understand that they are giving up no substantive rights, and that this Agreement simply governs forum.

4.     **Exclusive Remedy**  For claims covered by this Agreement, arbitration on an individual basis is the parties' exclusive remedy. The arbitrator's authority to resolve claims and make written awards is limited to claims between the Company and the Associate only. Only a court can interpret the scope and application of the class, consolidated, collective or representative action waiver. Only an arbitrator can interpret the scope and application of the remainder of the Program. The decision of an arbitrator on any claims submitted to arbitration as provided by this Agreement shall be final and binding upon the parties, except for the limited right to appeal as set forth in the Program.

5.     **Summary**  This is only a summary of the Program. The Program can only be amended, modified,  or revoked with 14 days prior notice to Associate, which amendment, modification or revocation will not affect claims which have already been submitted under the Program or claims where a charge has been filed

to satisfy the federal and/or state conditions precedent for employment-related claims prior to submission of a claim under this Program. In the event of any conflicts between this Summary and the Program, the Program will control.

ASSOCIATE ALSO UNDERSTANDS THAT IT IS HIS/HER RESPONSIBILITY TO REVIEW THE MATCH GROUP, INC. ALTERNATIVE DISPUTE RESOLUTION PROGRAM WHICH CONTAINS ALL OF THE TERMS UNDER WHICH DISPUTES WILL BE RESOLVED UNDER THE PROGRAM.  THE PROGRAM DOCUMENT IS INCORPORATED BY REFERENCE INTO THIS AGREEMENT.   A COMPLETE COPY OF THE PROGRAM CAN BE OBTAINED AT THE COMPANY'S HUMAN RESOURCES' OFFICE OR BY ACCESSING MATCHGROUP POLICIES EXTERNAL LINK IN WORKDAY THROUGH A PERSONAL COMPUTER. THE PROGRAM CAN BE FOUND IN THE "Policies" SECTION OF THE WORKDAY DASHBOARD..

ASSOCIATE Signed by:

*Rosette Pambakian*     1/20/2018 | 7:32 PM PST

Signature

Rosette Pambakian     Date

Printed Name

## MATCH GROUP, INC.
## ALTERNATIVE DISPUTE RESOLUTION PROGRAM FOR CALIFORNIA

### A BETTER WAY TO RESOLVE DISPUTES

This Dispute Resolution Program is the dispute resolution program adopted by the Company on December 27th, 2017, and as updated from time to time. In recognition of the fact that, from time to time, differences may arise between the Company and its associates (each, an "Associate") before, during, or after, each Associate's employment, and in recognition of the fact that resolution of differences in the courts is rarely time or cost effective for either party, the Company has instituted this Alternative Dispute Resolution Program (the "Program"). In furtherance of the Program, the Company and each of its Associates have entered into a Mutual Agreement to Arbitrate Claims on an Individual Basis ("Agreement") as an efficient, impartial and cost-effective dispute resolution procedure.

### 1.    Mutual Agreement to Resolve Disputes Through Arbitration

This Program is mutual, covering all claims that each Associate may have against the Company or that the Company may have against an Associate, except as explicitly stated below. All references to the "Company" in this Agreement shall include Match Group, Inc., and all of its respective related, parent, subsidiary, and affiliated entities, including all former, current and future officers, directors and employees of all such entities, all benefit plans and their fiduciaries and administrators, and all successors and assigns of these individuals or entities. All references to "Associate" include each associate and his/her spouse, representative, successor, or any person or entity making a claim by, through or on behalf of an Associate.

### 2.    Claims Covered by This Agreement

Except as otherwise provided in this Program or as otherwise required by law, the Company and the Associate consent and agree to the resolution by arbitration of all claims or controversies involving or in any way concerning Associate's application with, employment with, or termination from, the Company. The Company and the Associate further agree that arbitration shall proceed solely on an individual basis without the right for any claims to be arbitrated as a class, consolidated, collective or representative action. Claims may not be joined or consolidated unless agreed to by all parties in writing. Nothing within this Agreement constitutes a waiver or prohibition of an Associate's right to file a charge or complaint with the Equal Employment Opportunity Commission, National Labor Relations Board or state or federal agency of a similar nature.

The claims covered by this Program include, but are not limited to, claims for standard wages, overtime wages, benefits, equal pay, or other compensation due; claims for breach of any contract, express or implied; personal injury or employment related tort claims (including claims for negligence, gross negligence, intentional harm); claims for discrimination, harassment or retaliation of any kind - including without limitation discrimination, harassment or retaliation based on gender, race, nationality, ethnicity, disability, religion, age or any other status protected under applicable law; and claims for violation of any federal or state statute or common law or regulation.

### 3.    Claims Not Covered by This Agreement

The Program does not apply to or cover claims for workers' compensation or unemployment compensation benefits; any criminal complaint or related criminal proceeding; or claims based upon an associate pension or benefit plan that contains an arbitration or other non-judicial resolution procedure, in which case the provisions of that plan shall apply. Also, this Program will not apply to any claims that are expressly covered by a collective bargaining agreement, in which case the terms, conditions and procedures of that collective bargaining agreement will control.

Either party may, at their option, seek emergency injunctive relief under California Code of Civil Procedure Section 1281.8 in a court of competent jurisdiction for any claim or controversy arising out of or related to the unauthorized use, disclosure or misappropriation of the confidential and/or proprietary information of either party. For example the Company may use the court system to seek emergency injunctive relief to prevent disclosure of its confidential or propriety information or trade secrets. Similarly, the Associate may elect to use the court system to seek emergency

Case 2:19-cv-07046-MWF-FFM Document 28-2 Filed 10/05/19 Page 88 of 148 Page ID #:733

injunctive relief to protect the Associate's own inventions or trade secrets, or to stop the Company from allegedly interfering with the Associate's employment with another company or other lawful activity after employment.

Nothing in this Program will preclude the parties from agreeing to resolve claims that are otherwise not covered by the Agreement pursuant to the provisions of the Agreement.

## 4. Governing Law and Damages Recoverable under the Program

### 4.1. Interstate Commerce and the Federal Arbitration Act

Associate acknowledges that the Company is engaged in transactions involving interstate commerce. Except as provided elsewhere in this Program, or as required by law, the Federal Arbitration Act shall govern the interpretation, enforcement and all proceedings pursuant to this Program.

### 4.2. Applicable Law for Resolving Claims

All arbitrations covered by this Program shall be adjudicated in accordance with the applicable state or federal law which would be applied by a United States District Court sitting in the city where the dispute arose or, if the dispute involves a dispute over a contract that designates jurisdiction or venue, the location designated by the contract at issue.

### 4.3. Obligation to Satisfy Federal and State Conditions Precedent on Claims

Both parties must comply with any applicable conditions precedent to filing a claim under state or federal law. For example, an Associate must comply with the applicable deadlines for filing a charge of discrimination with any federal, state or local agency (such as the Equal Employment Opportunity Commission or the Fair Employment and Housing Commission, or other comparable State or Municipal agencies); and filing such a charge is a prerequisite to filing a claim under this Program for any claim in which the applicable law requires a charge to be filed with a federal, state or local commission. Similarly, if any such prerequisite applies to a claim filed by the Company, then Company must satisfy it before filing a claim under this Program.

### 4.4. Remedies and the Statute of Limitations

The arbitrator shall apply the same substantive law, with the same statutes of limitations and same remedies that would apply if the claims were brought in a court of law.

## 5. Waiver of Right to Jury

By entering into the Agreement under this Program, the Company and Associate each knowingly and voluntarily waive any and all rights they have under law to a trial before a jury or before a judge in a court of law. The Company and Associate each understand that they are giving up no substantive rights.

## 6. The Arbitration Process

Arbitration under this Program shall be before a single arbitrator in the county in which the dispute arose and will be administered in accordance with the applicable arbitration rules and procedures of the American Arbitration Association (AAA) or another alternative dispute resolution (ADR) provider selected by the parties (except where the AAA or other ADR provider's rules are contrary to applicable state or federal law), and California Code of Civil Procedure Section 1280 *et seq*.

## 7. Procedures For Selecting an Arbitrator

The parties shall use one arbitrator only. The ADR provider shall provide the parties with a list of proposed arbitrators. Upon receiving the first list of proposed arbitrators, the parties will strike those arbitrators they do not want to hear the dispute and ADR provider can choose an arbitrator from those on the list not stricken by one of the parties. In the

FILED: NEW YORK COUNTY CLERK 09/19/2019 10:00 AM INDEX NO. 654038/2018
NYSCEF Doc. No. Case 2:19-cv-07046-MWF-FFM Document 28-2 Filed 10/05/19 Page 89 of 148 Page ID RECEIVED NYSCEF: 09/19/2019
#:735

event the parties cannot agree to an arbitrator from the first list presented by the ADR provider, the parties will request a second list from which to make their strikes and attempt to choose an arbitrator. If no arbitrator is selected after the parties have made their strikes on the second list, the ADR provider shall appoint an arbitrator.

If, after arbitration commences, an arbitrator cannot serve for whatever reason, then the ADR provider will present the parties a new list from which to make their strikes so that a replacement can be chosen and the same procedure as detailed in the preceding paragraph shall be followed to select the replacement.

### 8. Representation

Each party may be represented by an attorney at any arbitration covered by this Program.

### 9. Fees and Costs

The Company shall pay all costs uniquely attributable to arbitration, including the administrative fees and costs of the arbitrator (unless the Associate voluntarily opts to pay up to one-half of the fees and expenses). Each party shall pay their own costs (including without limitation expert witness fees) and attorney fees, if any, unless the arbitrator rules otherwise. If the law applicable to the claim(s) being arbitrated, or any agreement, affords the prevailing party attorneys' fees and costs, then the arbitrator shall apply the same standards a court would apply to award such attorneys' fees or costs. Associates shall not be required to pay any fee or cost that they would not be required to pay in a state or federal court action.

### 10. Discovery

The parties will be entitled to engage in the full range of discovery that would be available under applicable state or federal law.

### 11. Dispositive Motions

The arbitrator will have the authority to consider and grant motions dispositive of all or part of any claim, using the standards governing such motions under the Federal Rules of Civil Procedure or applicable state law. This includes motions of summary judgment, which, if granted, allow a party, prior to the arbitration, to either (1) have all or part of the other party's claim dismissed or (2) obtain an affirmative finding on a claim brought by that party.

### 12. Venue

Arbitration under this Program will be in the county where the Associate worked at the time the dispute arose. The arbitration will be conducted at a site mutually agreed upon by the parties after due consideration of issues such as convenience to the parties and witnesses and costs of the facilities. If the parties cannot agree on such site, the ADR provider shall designate a location after giving due consideration of issues such as convenience to the parties and witnesses and costs of the facilities.

### 13. Exclusive Remedy

For claims covered by this Program, arbitration on an individual basis is the parties' exclusive remedy. The arbitrator's authority to resolve claims and make written awards is limited to claims between the Company and the Associate only. Only a court can interpret the scope and application of this class, consolidated, collective or representative action waiver. In the event that the waiver is found to be unenforceable or unlawful, the only forum for such an action is the federal or state court in that jurisdiction. Other than the waiver, only the arbitrator can interpret the scope and application of the remainder of this Program and the Agreement. The arbitrator shall have no power to vary or ignore the terms of this Program or the Agreement and shall be bound to follow the applicable federal or state law in rendering a decision and, when appropriate, devising a remedy on the arbitrated claim.

Case 2:19-cv-07046-MWF-FFM Document 28-2 Filed 10/05/19 Page 90 of 148 Page ID #:736

The arbitrator's award is to be in writing, with reasons given and evidence cited for the award. The opinion should be issued within 30 days from the later of the date on which the arbitration hearing concludes or the date on which post-hearing briefs (if applicable) are received. Any court of competent jurisdiction may enter judgment upon the award, either by (1) confirming the award, or (2) vacating, modifying, or correcting the award on any ground referred to in the Federal Arbitration Act or California Code of Civil Procedure Section 1286 *et seq*.

## 14. Appeal

Subject to the limitations set forth in Section 13 above, the parties retain their right to appeal the arbitrator's decision in a court of law according to the standard for appellate review set forth in the Federal Arbitration Act or applicable state arbitration law.

## 16. Miscellaneous Terms

### 16.1. Consideration

In addition to any other consideration that may exist for the agreement to arbitrate on an individual basis, each party's mutual promise to resolve claims and controversies by arbitration on an individual basis in accordance with the provisions of this Program and the Agreement between the parties constitutes consideration for the Agreement. Likewise, Associate acknowledges that his/her continued employment with the Company after receiving notice of this Program (and any amendments to the Program) will also constitute consideration for the Agreement (and any modifications to the Agreement) and such continued employment will demonstrate acceptance of the provisions of this Program.

### 16.2. Not an Agreement of Continued Employment

The agreement to arbitrate (as set forth in the Program and the Agreement) is not, and shall not be construed to create, a contract of continued employment, express or implied, nor shall this Program or the Agreement be construed in any way to alter the Associate's status as an employee at will, permitting either the Associate or the Company to terminate the employment relationship at any time, with or without cause or advance notice.

### 16.3. Term, Modification and Revocation

The parties' agreement to arbitrate shall survive the employer-employee relationship between the Company and the Associate and shall apply to any covered claim whether it arises or is asserted during or after termination of the Associate's employment with the Company or the expiration of any benefit plan. No employee of Company can orally amend, modify or change the terms of this Program. This Program can be modified or revoked in writing only by the Company's corporate general counsel or chief human resources officer. Such modification or revocation will only take place with 14 days' notice to the Associates. Further, any modification or revocation will not apply to any claim that has already been filed under this Program or any charge that has been filed with any federal, state or local agency to satisfy the federal and/or state conditions precedent for employment-related claims. The parties specifically agree that the Company will not be considered to have knowledge of any actual, potential, or prospective claim unless such claim has been filed under this Program or a charge has been filed to satisfy the federal and/or state conditions precedent for employment-related claims.

### 16.4. Severability

If any provision of this Program or the Agreement is adjudged to be void or otherwise unenforceable, in whole or in part, such adjudication shall not affect the validity of the remainder of the Program or Agreement.

### 16.5. Sole and Entire Agreement

This Program document and the Agreement constitute the complete agreement of the parties on the subject of arbitration of disputes, except for any arbitration provision contained in any pension plan, benefit plan, or

Case 2:19-cv-07046-MWF-FFM   Document 28-2   Filed 10/05/19   Page 91 of 108   Page ID
#:737

collective bargaining agreement. This Program document and the Agreement supersede any prior or contemporaneous oral or written agreement or understanding on the subject.

### 16.6.  Effective Date

This Dispute Resolution Program is effective as of February 1st, 2018.

# Exhibit 2

## Pambakian, Rosette



2017-04-28 17:13:22

How are you? I am worried about you.

2017-04-28 17:17:01

I'm ok I guess

2017-04-28 17:17:20

Everyone is losing it

2017-04-28 17:17:47

I'm just super scared of how this could play out for me

2017-04-28 17:18:19

Things were finally going well with work.

2017-04-28 17:18:23

And then this happens

2017-04-28 17:18:49

Money really is the root of all evil



2017-04-28 17:21:10

Understandably so (that you are scared for how this will play out). When is this all supposed to happen?

2017-04-28 17:21:26

I am so sorry, Rosette.

2017-04-28 17:23:02

Let me know how I can support you through this.

CONFIDENTIAL

# Exhibit 3

FILED: NEW YORK COUNTY CLERK 09/19/2019 10:00 AM

INDEX NO. 654038/2018

NYSCEF DOC. NO. 172

Case 2:19-cv-07046-MWF-FFM   Document 28-2   Filed 10/05/19   Page 95 of 148   Page ID
#:750

RECEIVED NYSCEF: 09/19/2019

**Date:**    Thu, 3 Aug 2017 6:47:39 PM (UTC)

**Sent:**    Thu, 3 Aug 2017 6:47:38 PM (UTC)

**Subject:**  Re: RE:

**From:**    Rosette Pambakian <rosette.pambakian@gotinder.com>

**To:**      Greg Blatt

**BCC:**     rosette.pambakian@gotinder.com

Hahaha.
Stay. Get rid of the people who don't put what's best for the company first. ██████████ ..we're all
on the same page. Things aren't perfect but it's not difficult to make it better. Various external forces were
causing chaos. They shouldn't be an issue anymore. Everyone just had a reality check and has put their heads
back on straight, finally (except for you know who).
Anyway, more to say in person one day.
On Aug 3, 2017, at 2:25 PM, Greg Blatt <Greg.Blatt@match.com> wrote:

Absolutely.

(What is it?)

**From:** Rosette Pambakian [mailto:rosette.pambakian@gotinder.com]
**Sent:** Thursday, August 3, 2017 1:23 PM
**To:** Greg Blatt <Greg.Blatt@match.com>
**Subject:** Re:

I bet. But you can cut through the bullshit. End of the day, what's right is right. Take everyone's emotions and personal
agendas out of it. There's still just one right direction to go in. And you know what that is.

On Aug 3, 2017, at 1:04 PM, Greg Blatt <Greg.Blatt@match.com> wrote:

I wish I could share with you some of the emails.  It's all just so incomprehensible.

MAT_RAD00090673

# Exhibit 4

## Pambakian, Rosette



█████████ James Kim; ██████████████████████████ Rosette;

2016-12-07 01:59:27

How did your meeting with Greg go?

**James Kim** ████████   2016-12-07 02:02:08

Fine. Just board slide stuff.

2016-12-07 02:13:10

I love Greg Blatt

**James Kim** ████████   2016-12-07 02:15:39

He's a great business leader

2016-12-07 02:16:37

Well I don't know about that. Lol. I just love him

**James Kim** ████████   2016-12-07 02:16:52

I know. I'm totally not joking.

**James Kim** ████████   2016-12-07 02:17:03

I hope I am him one day

2016-12-07 02:17:28

I hope I'm him one day too

**James Kim** ████████   2016-12-07 02:17:43

I don't doubt you will

# Exhibit 5

**BlattGreg@gmail.com**

| | |
|---|---|
| **From:** | Rosette Pambakian <rosette.pambakian@gotinder.com> |
| **Sent:** | Saturday, December 10, 2016 10:35 PM |
| **To:** | Greg Blatt |
| **Cc:** | ██████████ |
| **Subject:** | Re: |

Well I don't know about you two but I just had a 90 minute massage and I feel amazing

--

Rosette Pambakian
VP Communications & Branding, Tinder
rosette@tinder.com
██████████

On Dec 10, 2016, at 3:48 PM, Greg Blatt <Greg.Blatt@match.com> wrote:

Not fun when everyone wants to do a shot with the boss.

> On Dec 10, 2016, at 11:33 AM, Rosette Pambakian <rosette.pambakian@gotinder.com> wrote:
>
> Sounds a bit drastic. This is nothing a Bloody Mary can't fix ;)
>
> --
>
> Rosette Pambakian
> VP Communications & Branding, Tinder
> rosette@tinder.com
> ██████████
>
>
>
>
> On Dec 10, 2016, at 10:51 AM, Greg Blatt <Greg.Blatt@match.com> wrote:
>
> Checking into an institution.
>
>> On Dec 10, 2016, at 10:08 AM, Rosette Pambakian <rosette.pambakian@gotinder.com> wrote:
>>
>> Same. I literally can't get out of bed.
>>
>> --
>>
>> Rosette Pambakian
>> VP Communications & Branding, Tinder

1

>> rosette@tinder.com
>> ████████████
>>
>>
>>
>>
>> On Dec 10, 2016, at 9:49 AM, Greg Blatt <Greg.Blatt@match.com> wrote:
>>
>> My head hurts.

# Exhibit 6

**From:** Rosette █████████████
**Sent:** Saturday, December 10, 2016 6:01 PM
**To:** Voice Mail ██████████████████████, Rosette █████████
**Subject:**

Good morning! Hope no one is as hung over as I am. About last night...we should keep the hotel room antics to ourselves. It would be bad if word got out that greg came back to the room. So for his sake and ours let's keep that in the vault. But by all means we can rehash it amongst ourselves as often as possible 😊👍

Confidential

MAT_RAD00288782

# Exhibit 7

**Rad, Sean**

███████████  Justin Mateen; ████████████

Justin Mateen ████████████                                    2017-02-11 21:28:19

Forgot to tell you. The dokhtar actually did make out etc with greg Blatt. Wasn't just groping

███████████                                                    2017-02-11 21:28:49

Wow

Justin Mateen ████████████                                    2017-02-11 21:29:34

On the bed

███████████                                                    2017-02-11 21:41:57

Unbelievable

███████████                                                    2017-02-11 21:41:59

Driving

CONFIDENTIAL                                                          PLS0008589

# Exhibit 8

FILED: NEW YORK COUNTY CLERK 09/19/2019 10:16 AM
NYSCEF DOC. NO. 491

Case 2:18-cv-07354-MWF-FFM   Document 19-1   Filed 05/05/19   Page 106 of 108   Page ID
#:762

INDEX NO. 656026/2019
RECEIVED NYSCEF: 09/19/2019

.

| | |
|---|---|
| **From:** | Rosette Pambakian <rosette.pambakian@gmail.com> |
| **Sent:** | Monday, May 15, 2017 5:14 PM |
| **To:** | ███████████████ |
| **Subject:** | Email to GB |
| | |
| **Bcc:** | rosette.pambakian@gmail.com |

My attempt to fix this seemingly unfixable situation might seem feeble, but I needed to try...

The last two weeks I've been living in my own personal hell - it's been difficult and embarrassing and stressful for me. A lot of people across IAC and Match Group who probably didn't know of me before know of me now, and for all the wrong reasons. I won't be able to recover from that, but I'll deal with it. I never wanted anyone to know about that incident and why ████████ thought it appropriate to tell Sean about it I'll never understand. But he did and here we are.


We both know what's happening here. I just hope that everyone who has been brought into this can see it for what it is and move on. Maybe I haven't made it obvious enough but I absolutely adore you - I admire and respect you and I would never intentionally or maliciously do anything that would jeopardize your reputation or your job - not for anything. You've been good to me over the years and I'll always be grateful to you for that. And unfortunately even though the damage may already be done, hopefully it's not completely irreparable. Just let me know how I can help.

If one good thing can come out of this it's to bring to light the systemic sexual harassment issue that seems to have bubbled up in this company the past year with the hire of the last batch of executives. If I'm correct, there isn't one that doesn't have a sexual harassment complaint against them. And the problem is that women at this company don't feel safe or protected when reporting these incidents, myself included. And for that reason, employees will start (they already have) to become more vocal about it in inappropriate forums. The last thing I want is for Tinder to become embroiled in another sexual harassment scandal because this time we won't be able to recover from it. It's important that you find a solution for that.

And for what it's worth, I'm not sure if there is anyone else more qualified or up for the challenge of being CEO of Tinder than you.


Sent from my iPhone

PLS0007267

# Exhibit 9

FILED: NEW YORK COUNTY CLERK 09/19/2019 03:32 PM
NYSCEF DOC. NO. 523

Case 2:18-cv-07343-JMF-FFM Document 32-1 Filed 09/19/19 Page 64 of 108 Page ID
#:764

INDEX NO. 656038/2019
RECEIVED NYSCEF: 09/19/2019



Rosette Pambakian     2017-03-01 19:34:26

Hi

Rosette Pambakian     2017-03-01 19:35:22

Did you tell Sean and Justin about the whole GB thing? They know and I don't know how, and I'm worried it's going to be a problem and they might bring it up to greg and it's going to make me look bad.

Rosette Pambakian     2017-03-01 19:35:33

They both recently told me that they knew about it

Rosette Pambakian     2017-03-01 19:36:08

I really don't want it getting out so please don't tell anyone. I just told you and ███ in confidence

2017-03-01 19:46:48

I didn't tell anyone

2017-03-01 19:47:11

Did you tell anyone else

Rosette Pambakian     2017-03-01 19:47:11

Thanks

2017-03-01 19:47:13

███ or I wouldn't

Rosette Pambakian     2017-03-01 19:47:28

No. Just you two

CONFIDENTIAL



Well how else would they know 2017-03-01 19:47:43

GB 2017-03-01 19:47:45

Who was there 2017-03-01 19:48:02

Rosette Pambakian 2017-03-01 19:48:21

I asked ▮▮▮ and she said she has no idea and that Justin came up to her at ▮▮▮ bday and asked her about it. So he already knew before talking to her

Rosette Pambakian 2017-03-01 19:49:56

I assuming Sean told Justin

Rosette Pambakian 2017-03-01 19:50:08

But I don't now how sean found out if ▮▮▮ didn't tell him

Rosette Pambakian 2017-03-01 19:50:14

It doesn't matter

I can find out 2017-03-01 19:50:23

Rosette Pambakian 2017-03-01 19:50:23

I just don't want anyone bringing it up

CONFIDENTIAL

If u want

2017-03-01 19:50:25

Somehow

2017-03-01 19:50:35

But like I wouldn't continue talking about it

2017-03-01 19:50:43

People talk tho

2017-03-01 19:51:18

Did u tell

2017-03-01 19:51:26

Rosette Pambakian

2017-03-01 19:51:54

Yea. He's the one who told me to never tell Sean bc Sean would probably use it against greg

Rosette Pambakian

2017-03-01 19:52:01

So why he would tell Sean I don't know

Rosette Pambakian

2017-03-01 19:52:04

Makes no sense

Idon't know

2017-03-01 19:52:15

2017-03-01 19:52:18

Then prob not



2017-03-01 19:52:29

That's annoying



2017-03-01 19:53:33

Anyway



2017-03-01 19:53:38

What did Sean say

CONFIDENTIAL

PLS0003115

# Exhibit 10

**Pambakian, Rosette**

2017-04-27 18:14:16

I'm going to need a lawyer

2017-04-27 18:14:21

Can you recommend one?

2017-04-27 18:14:48

I am so sorry.

2017-04-27 18:15:02

What type of law? Employment?

2017-04-27 18:15:13

I don't even know

2017-04-27 18:15:17

My head is spinning

2017-04-27 18:15:56

I have 15 min now. Do you want to talk?

2017-04-27 18:21:18

I can ask my lawyer for a rec; if it's employment law, I've done research and have a rec.

2017-04-27 18:29:10

Breathe. Sending you love. There is nothing you can't get through. I am here to love and support you. xx

2017-04-27 19:42:18

My schedule freed up. I can meet you at 5pm in BH. I'd have an hour. Let me know if that works for you xx

CONFIDENTIAL

PLS0008346

NYSCEF DOC. NO. 524

██████████████   2017-04-27 19:42:35

We could do Wally's.

2017-04-27 19:42:38

Ok let's do that.

██████████████   2017-04-27 19:44:04

Sg xx

2017-04-27 23:47:05

On my way

2017-04-27 23:52:57

Hey I really need your help. The shit is about to hit the fan and Sean won't stop calling me. I told him I was meeting you and he said he wanted to come. I need your advice on what he's about to do and if you think it's a bad idea I need your help talking him out of it. My job, career, everything is literally on the line.

CONFIDENTIAL                                                                                                    PLS0008347

# Exhibit 11

**BlattGreg@gmail.com**

| | |
|---|---|
| **From:** | Rosette Pambakian <rosette.pambakian@gotinder.com> |
| **Sent:** | Saturday, July 22, 2017 6:12 PM |
| **To:** | Greg Blatt |
| **Subject:** | Re: |

Praise be. Already seeing posts on Instagram from influencers at the Surf Lodge. Instagram is an app where you can upload photos and share with all of your friends and followers. Influencers are people with a high number of followers.

(Sorry. Couldn't help myself)

Have some more frosè pops for me. That shade of blue looks nice on you.

On Jul 22, 2017, at 2:59 PM, Greg Blatt<Greg.Blatt@match.com> wrote:

All coming together.

> On Jul 22, 2017, at 5:41 PM, Rosette Pambakian <rosette.pambakian@gotinder.com> wrote:
>
> We call it swag.
>
> On Jul 22, 2017, at 2:37 PM, Greg Blatt <Greg.Blatt@match.com> wrote:
>
> Got my handouts.
>
> On Jul 22, 2017, at 5:05 PM, Rosette Pambakian
> <rosette.pambakian@gotinder.com<mailto:rosette.pambakian@gotinder.com>> wrote:
>
> My spies at surf lodge tell me you're having a great time talking to the attractive brand ambassadors. I expect that's the reason you haven't responded to my email yet ;)
>
> Heard great things so far. Pics are giving us good content for social. Go enjoy yourself and let me know if anything bad happens.
>
>
> On Jul 22, 2017, at 1:50 PM, Rosette Pambakian
> <rosette.pambakian@gotinder.com<mailto:rosette.pambakian@gotinder.com>> wrote:
>
> Too late. Already yelled.

From Lauren:

So Surf Lodge is very strict about what activations we can and cannot have at Tinder Beach. Here's what we were able to negotiate:

- Tinder Beach Flag

- Tinder Jenga

- Tinder Connect Four

- Tinder Rose Pops Cart

- Tinder Post Card photo activation

- Tinder Boat photo opp

- Tinder Tandem Bike Photo opp (back Beach)

- Tinder Swag (Hats / Shirts) handed out

- Tinder Pashminas handed out

This sound right to you? All of these things there?

On Jul 22, 2017, at 1:41 PM, Greg Blatt <Greg.Blatt@match.com<mailto:Greg.Blatt@match.com>> wrote:

Um ... there are two little branded carts off in a corner. I'll take pictures. But don't yell at anyone because they're being very nice to me.

--

Rosette Pambakian

Head of Marketing & Communications

8833 Sunset Blvd. | Los Angeles, CA 90069<x-apple-data-detectors://1/0>

rosette@tinder.com<mailto:rosette@tinder.com>

███████████████████

On Jul 22, 2017, at 4:38 PM, Rosette Pambakian <rosette.pambakian@gotinder.com<mailto:rosette.pambakian@gotinder.com>> wrote:

How so?

On Jul 22, 2017, at 1:30 PM, Greg Blatt <Greg.Blatt@match.com<mailto:Greg.Blatt@match.com>>
wrote:

Not much Tinder at Tinder Beach.

# Exhibit 12

**BlattGreg@gmail.com**

| | |
|---|---|
| **From:** | Rosette Pambakian <rosette.pambakian@gotinder.com> |
| **Sent:** | Friday, August 4, 2017 12:03 AM |
| **To:** | Greg Blatt |
| **Subject:** | Re: |

Daylight is overrated. I missed my flight. Still in NYC. Currently shutting down Lure after my 4th tequila soda. You are in much better shape than I.

On Aug 3, 2017, at 11:49 PM, Greg Blatt <Greg.Blatt@match.com> wrote:

Honestly I don't think I'll ever show my face in the daylight again.

> On Aug 3, 2017, at 10:34 PM, Rosette Pambakian <rosette.pambakian@gotinder.com> wrote:
>
> You're only allowed in the video if you still have pink eye while we are shooting the scenes (and I'm sure you're still gorgeous, even with an itchy swollen eye).
>
>
> On Aug 3, 2017, at 10:29 PM, Greg Blatt <Greg.Blatt@match.com> wrote:
>
> Although in a crowning achievement of an awesome few weeks I spontaneously developed an eye infection on Tuesday which has progressed to the point that it is now swollen shut and itchy as Hell. Looking good. Feeling good.
>
>> On Aug 3, 2017, at 10:23 PM, Rosette Pambakian <rosette.pambakian@gotinder.com> wrote:
>>
>> Do we own the building that Tinder is in? Or are we leasing? Need to know for filming purposes for the Tinder Reactions shoot.
>>
>>

# Exhibit 13

**Date:**      Tue, 1 Aug 2017 7:41:50 PM (UTC)

**Sent:**      Tue, 1 Aug 2017 7:41:49 PM (UTC)

**Subject:**   RE: Initial Comments for Tinder all Hands

**From:**      Greg Blatt <Greg.Blatt@match.com>

**To:**        Rosette Pambakian

2003?

**From:** Rosette Pambakian [mailto:rosette.pambakian@gotinder.com]
**Sent:** Tuesday, August 1, 2017 12:41 PM
**To:** Greg Blatt <Greg.Blatt@match.com>
**Subject:** Re: Initial Comments for Tinder all Hands

You'd literally have to resurrect Steve Jobs and make him ceo for anyone to be excited about this.


On Aug 1, 2017, at 3:35 PM, Greg Blatt <Greg.Blatt@match.com> wrote:

Are you being serious?

**From:** Rosette Pambakian [mailto:rosette.pambakian@gotinder.com ]
**Sent:** Tuesday, August 1, 2017 12:35 PM
**To:** Greg Blatt <Greg.Blatt@match.com>
**Subject:** Re: Initial Comments for Tinder all Hands

She's freaking me out. You might want to call off the search.

--

**Rosette Pambakian**
Head of Marketing & Communications
8833 Sunset Blvd. | Los Angeles, CA 90069
rosette@tinder.com
818.314.8226


On Aug 1, 2017, at 3:28 PM, Greg Blatt <Greg.Blatt@match.com> wrote:

Great. Thanks, ███

**From:** ██████████████████████
**Sent:** Tuesday, August 1, 2017 12:26 PM
**To:** Greg Blatt <Greg.Blatt@match.com>; Rosette Pambakian <rosette.pambakian@gotinder.com >
**Subject:** Re: Initial Comments for Tinder all Hands

I think we can change the tone a bit in this.

Frankly, I read it multiple times and still time the message a bit confusing. I guess you are trying to accomplish multiple goals in this message, maybe you could focus on one and move out some others to be communicated later.

If this message to Tinder internal only, I suggest you focus on Tinder. Maybe you could you start with the history of Tinder. How you believed in them, when no one else did. How you gave all Tinder has needed, either it is capital or anything else, ultimately to your devotion full time as CEO of Tinder. And now you are feeling

it is capital or anything else, ultimately to your devotion full time as CEO of Tinder. And now you are feeling more positive than ever about Tinder and you want to give yourself a little break that you so deserve...

Our biggest concern and main objective is to minimize risks of destabilizing the team at this moment from this shocking announcement. We've all worked so hard and came so far, it would traject to see destabilization of a strong but still fragile team, even an exodus exists, in the worst case scenario. Snap is calling every single developer on our Android team. Riot Games and Tesla in LA have also started targeting our engineering team. We need to instill confidence and stability to our still newly formed and transformed team. You, as the leader, need to instill that confidence and conviction at this moment.

Please feel free to call me if you would like to discuss further.

█████████

On Tue, Aug 1, 2017 at 11:51 AM Greg Blatt <Greg.Blatt@match.com> wrote:

Yup. I agree.

Is there anything else I'm missing? ███████

**From:** Rosette Pambakian [mailto:rosette.pambakian@gotinder.com ]
**Sent:** Tuesday, August 1, 2017 11:34 AM
**To:** Greg Blatt <Greg.Blatt@match.com>
**Cc:** ████████████████████████████
**Subject:** Re: Initial Comments for Tinder all Hands

It's good. Strong finish. They'll probably ask what type of person you're looking for. It's important to stress that you aren't leaving until the optimal situation presents itself, and that you will get buy-in from the exec team. Otherwise it's going to be Operation Chris Payne Ejection Plan 2.0

**Rosette Pambakian**
Head of Marketing & Communications
8833 Sunset Blvd. | Los Angeles, CA 90069
rosette@tinder.com
818.314.8226

On Aug 1, 2017, at 2:25 PM, Greg Blatt <Greg.Blatt@match.com> wrote:

See attached. Still refining. ██████ your thoughts would be welcome.

<Tinder All Hands Remarks 8-1-17.docx>

# Exhibit 14

FILED: NEW YORK COUNTY CLERK 09/19/2019 10:00 AM          INDEX NO. 654038/2018

NYSCEF DOC. NO. 741          Case 2:19-cv-07046-MWF-FFM   Document 23-21   Filed 10/03/19   Page 125 of 148   Page ID   RECEIVED NYSCEF: 09/19/2019
                                                                                         #:730

| | |
|---|---|
| **Date:** | Tue, 1 Aug 2017 11:52:07 PM (UTC) |
| **Sent:** | Tue, 1 Aug 2017 11:52:05 PM (UTC) |
| **Subject:** | RE: RE: RE: RE: |
| **From:** | Greg Blatt <Greg.Blatt@match.com> |
| **To:** | Rosette Pambakian |

OK.  On earnings prep call right now.  Will call when I'm off.

**From:** Rosette Pambakian [mailto:rosette.pambakian@gotinder.com]
**Sent:** Tuesday, August 1, 2017 4:51 PM
**To:** Greg Blatt <Greg.Blatt@match.com>
**Subject:** Re: RE: RE: RE:

Can you call me when you leave the office today. No big rush. Just ███ being weird and saying weird things.

On Aug 1, 2017, at 7:35 PM, Rosette Pambakian <rosette.pambakian@gotinder.com> wrote:

Haha. Perfect. I'm in.

On Aug 1, 2017, at 7:34 PM, Greg Blatt <Greg.Blatt@match.com> wrote:

Keep talking.  We'll break off and start a business where we rent out nice houses and have parties.

**From:** Rosette Pambakian [mailto:rosette.pambakian@gotinder.com ]
**Sent:** Tuesday, August 1, 2017 4:33 PM
**To:** Greg Blatt <Greg.Blatt@match.com>
**Subject:** Re: RE: RE:

I'm back in the office Friday. I'm with ███ right now drinking tequila and talking about how much we love you.

On Aug 1, 2017, at 7:24 PM, Greg Blatt <Greg.Blatt@match.com> wrote:

I doubt it.  I think I have too much to do here.  But I'm so tired.  And I haven't even started to focus on earnings yet.  When are you back here?

**From:** Rosette Pambakian [mailto:rosette.pambakian@gotinder.com ]
**Sent:** Tuesday, August 1, 2017 4:23 PM
**To:** Greg Blatt <Greg.Blatt@match.com>
**Subject:** Re: RE:

Thank God for that. Are you coming back to NYC tomorrow?

On Aug 1, 2017, at 7:17 PM, Greg Blatt <Greg.Blatt@match.com> wrote:

But you'll never really be rid of me.

**From:** Greg Blatt
**Sent:** Tuesday, August 1, 2017 3:42 PM
**To:** 'Rosette Pambakian' <rosette.pambakian@gotinder.com >
**Subject:** RE:

Appreciate it.

**From:** Rosette Pambakian [mailto:rosette.pambakian@gotinder.com ]
**Sent:** Tuesday, August 1, 2017 3:33 PM

**To:** Greg Blatt <Greg.Blatt@match.com>
**Subject:** Re:

You did well. If you didn't know already, everyone has a lot of respect for you. You're crazy smart and talented and you care. We are lucky to have you. Just wish we can keep you longer. All will be good.

On Aug 1, 2017, at 6:25 PM, Greg Blatt <Greg.Blatt@match.com> wrote:

I feel sick.

MAT_RAD00090679

# Exhibit 15

FILED: NEW YORK COUNTY CLERK 09/19/2019 03:32 PM
NYSCEF DOC. NO. 524
INDEX NO. 654038/2018
RECEIVED NYSCEF: 09/19/2019

Case 2:19-cv-07046-MWF-FFM   Document 18-1   Filed 10/03/19   Page 84 of 104   Page ID #:173

GB_00098 (Native - Excerpt)

| Participants | Source | From | Body | Status | Timestamp: Date | Timestamp: Time | Delivered: Date | Delivered: Time | Read: Date | Read: Time |
|---|---|---|---|---|---|---|---|---|---|---|
| Greg (owner) / Rosette Pambakian | iMessage: | ▮ | Greg, Rosette and i would like to invite you to a drink this evening if You☐ aren't busy. It's a school night we know. But we'd like to. | Read | 11/15/2017 | 2:19:17 AM(UTC+0) | | | 11/15/2017 | 11/15/2017 2:21:50 AM(UTC+0) |
| Greg (owner) / Rosette Pambakian | iMessage: | 26 Rosette Pambakian | GB - don't say no. Our fragile hearts can't take any more rejection | Read | 11/15/2017 | 2:22:02 AM(UTC+0) | | | 11/15/2017 | 11/15/2017 2:22:14 AM(UTC+0) |
| Greg (owner) / Rosette Pambakian | iMessage: | 89 Greg | Unfortunately, I can't do tonight. Gladly do tomorrow night though. | Sent | 11/15/2017 | 2:32:04 AM(UTC+0) | | | | |
| Greg (owner) / Rosette Pambakian | iMessage: | 26 Rosette Pambakian | We'll take it | Read | 11/15/2017 | 2:33:45 AM(UTC+0) | | | 11/15/2017 | 11/15/2017 2:34:17 AM(UTC+0) |
| Greg (owner) / Rosette Pambakian | iMessage: | 89 Greg | Great. Only reason I always go home is no one ever asks me to do anything. It's very lonely. | Sent | 11/15/2017 | 2:35:05 AM(UTC+0) | | | | |

FILED: NEW YORK COUNTY CLERK 09/19/2019 03:32 PM
NYSCEF DOC. NO. 524
INDEX NO. 654038/2018
RECEIVED NYSCEF: 09/19/2019

Case 2:19-cv-07046-MWF-FFM   Document 23-2   Filed 10/15/19   Page 129 of 148   Page ID #:785

Case 2:19-cv-07046-MWF-FFM   Document 18-1   Filed 10/03/19   Page 85 of 104   Page ID #:174

| Participants | Source | From | Body | Status | Timestamp: Date | Timestamp: Time | Delivered: Date | Delivered: Time | Read: Date | Read: Time |
|---|---|---|---|---|---|---|---|---|---|---|
| Greg (owner)<br>Rosette Pambakian | iMessage: | 26 Rosette Pambakian | Can you keep coming out to LA so we can do that at least once a month? | Read | 11/16/2017 | 11/16/2017 4:44:51 PM(UTC+0) | | | 11/16/2017 | 11/16/2017 4:45:03 PM(UTC+0) |
| Greg (owner)<br>Rosette Pambakian | iMessage: | 89 Greg | Yes. | Sent | 11/16/2017 | 11/16/2017 4:45:21 PM(UTC+0) | | | | |
| Greg (owner)<br>Rosette Pambakian | iMessage: | 89 Greg | Week. | Sent | 11/16/2017 | 11/16/2017 4:45:28 PM(UTC+0) | | | | |
| Greg (owner)<br>Rosette Pambakian | iMessage: | 26 Rosette Pambakian | Yay!!! | Read | 11/16/2017 | 11/16/2017 4:45:41 PM(UTC+0) | | | 11/16/2017 | 11/16/2017 4:46:38 PM(UTC+0) |
| Greg (owner)<br>Rosette Pambakian | iMessage: | | That was really good fun. I laughed really really hard. "Greg, yeah this guy Greg. He calls me a genius does." 😂😂😂 Really he | Read | 11/16/2017 | 11/16/2017 4:45:59 PM(UTC+0) | | | 11/16/2017 | 11/16/2017 4:46:38 PM(UTC+0) |
| Greg (owner)<br>Rosette Pambakian | iMessage: | 89 Greg | Love that story. | Sent | 11/16/2017 | 11/16/2017 4:46:57 PM(UTC+0) | | | | |

FILED: NEW YORK COUNTY CLERK 09/19/2019 03:32 PM

NYSCEF DOC. NO. 524

INDEX NO. 654038/2018

RECEIVED NYSCEF: 09/19/2019

Case 2:19-cv-07046-MWF-FFM   Document 18-1   Filed 10/03/19   Page 86 of 104   Page ID #:175

| Participants | Source | From | Body | Status | Timestamp: Date | Timestamp: Time | Delivered: Date | Delivered: Time | Read: Date | Read: Time |
|---|---|---|---|---|---|---|---|---|---|---|
| Greg (owner), Rosette Pambakian | iMessage: | 26 Rosette Pambakian | I'm perfect | Read | 11/16/2017 | 11/16/2017 5:36:41 PM(UTC+0) | | | 11/16/2017 | 11/16/2017 5:36:47 PM(UTC+0) |
| Greg (owner), Rosette Pambakian | iMessage: | 89 Greg | What is going to protect me from complete sustained deterioration once showing up for work is no longer required? Oh my. | Sent | 11/16/2017 | 11/16/2017 5:38:15 PM(UTC+0) | | | | |
| Greg (owner), Rosette Pambakian | iMessage: | | I'll keep a scheduled VTC ... that will help you a little. But not much. | Read | 11/16/2017 | 11/16/2017 5:38:52 PM(UTC+0) | | | 11/16/2017 | 11/16/2017 5:38:55 PM(UTC+0) |
| Greg (owner), Rosette Pambakian | iMessage: | 89 Greg | Oh yeah. I'll stay sober for that. | Sent | 11/16/2017 | 11/16/2017 5:39:11 PM(UTC+0) | | | | |
| Greg (owner), Rosette Pambakian | iMessage: | 26 Rosette Pambakian | I don't even want to think about that. So depressing. Nothing to look forward to anymore. | Read | 11/16/2017 | 11/16/2017 5:39:40 PM(UTC+0) | | | 11/16/2017 | 11/16/2017 5:40:03 PM(UTC+0) |
| Greg (owner), Rosette Pambakian | iMessage: | | I am sure Ankur or Sean will wrangle into a pseudo responsibility that you'll inevitably detest and wonder why you ever committed | Read | 11/16/2017 | 11/16/2017 5:40:22 PM(UTC+0) | | | 11/16/2017 | 11/16/2017 5:40:26 PM(UTC+0) |

# Exhibit 16

**BlattGreg@gmail.com**

| | |
|---|---|
| **From:** | Rosette Pambakian <rosette.pambakian@gotinder.com> |
| **Sent:** | Monday, December 4, 2017 11:10 AM |
| **To:** | Greg Blatt |
| **Subject:** | Re: RE: |

Ok. We'll call the Long Island medium....

On Dec 4, 2017, at 7:53 AM, Greg Blatt <Greg.Blatt@match.com> wrote:

30 years from now I'll be a dead has-been.

**From:** Rosette Pambakian [mailto:rosette.pambakian@gotinder.com]
**Sent:** Monday, December 4, 2017 10:44 AM
**To:** Greg Blatt <Greg.Blatt@match.com>
**Subject:** Re:

30 years from now you still won't be an old has-been. And we'll all still be coming to for advice.

Thanks.

On Dec 4, 2017, at 7:40 AM, Greg Blatt <Greg.Blatt@match.com> wrote:

I just had a meeting with ▮ on marketing. I think he's in a very reasonable place and understands well what we have and haven't done. My understanding is he's meeting with you on Wednesday. I've asked ▮ to schedule time together tomorrow so that I can walk you through what I walked him through and impart to you a few tidbits of wisdom from an old has-been.

# Exhibit 17

**Date:**     Sat, 30 Dec 2017 5:04:27 PM (UTC)

**Subject:**  Re: ████ bonus

**From:**     Greg Blatt <Greg.Blatt@match.com>

**To:**       Rosette Pambakian <rosette.pambakian@gotinder.com >;

I figured. It's a good one.

Sent from my iPhone

> On Dec 30, 2017, at 12:01 PM, Rosette Pambakian <rosette.pambakian@gotinder.com > wrote:
>
> That's none of my business anyway. Just really wanted to use that emoji.
>
>
>
> On Dec 30, 2017, at 8:33 AM, Greg Blatt <Greg.Blatt@match.com > wrote:
>
> He hasn't asked, by the way. Just tidying up after myself.
>
> Sent from my iPhone
>
> On Dec 30, 2017, at 10:59 AM, Rosette Pambakian <rosette.pambakian@gotinder.com  wrote:
>
> That guy... ðŸ¤¦ðŸ»â€â™‚ï¸ ▢
>
> Of course, anything for you GB.
>
> I hope you've already started planning your first LA trip of 2018.
>
> --
>
> Rosette Pambakian
> Vice President, Marketing & Communications
> rosette@tinder.com <mailto:rosette@tinder.com >
> ████████
>
>
> On Dec 30, 2017, at 7:49 AM, Greg Blatt <Greg.Blatt@match.com  wrote:
>
> Hey.
>
> Hope you had a merry Christmas.
>
> I told ████ when he left that he'd be entitled to a discretionary bonus based on performance and impact of Select over rest of this past year. I don't think performance merits it, but I want to tie it up. Can you compile some basic stats - active cities, active male members, active female members, etc. I want to just be able to have Lisa give him a very dry declaration that based on current status, no bonus has been earned.
>
> No urgency, but first week back?
>
> Thanks.
>
>
>

MAT_RAD00090774

>
> Sent from my iPhone

MAT_RAD00090775

# Exhibit 18

FILED: NEW YORK COUNTY CLERK 09/19/2019 03:32 PM
NYSCEF DOC. NO. 525   Case 2:19-cv-07046-MWF-FFM   Document 18-1   Filed 10/03/19   Page 93 of 104   Page ID #:182
INDEX NO. 654038/2018
RECEIVED NYSCEF: 09/19/2019

GB_00098 (Native - Excerpt)

| Participants | Source | From | Body | Status | Timestamp: Date | Timestamp: Time | Delivered: Date | Delivered: Time | Read: Date | Read: Time |
|---|---|---|---|---|---|---|---|---|---|---|
| Greg (owner), Rosette Pambakian | iMessage: | Rosette Pambakian | | Read | 4/6/2018 | 4/6/2018 5:17:17 PM(UTC+0) | | | 4/6/2018 | 4/6/2018 5:42:45 PM(UTC+0) |
| Greg (owner), Rosette Pambakian | iMessage: | Rosette Pambakian | You should come. It'll be fun | Read | 4/6/2018 | 4/6/2018 5:17:26 PM(UTC+0) | | | 4/6/2018 | 4/6/2018 5:42:45 PM(UTC+0) |
| Greg (owner), Rosette Pambakian | iMessage: | Rosette Pambakian | Badeen will be giving the opening remarks | Read | 4/6/2018 | 4/6/2018 5:17:36 PM(UTC+0) | | | 4/6/2018 | 4/6/2018 5:42:45 PM(UTC+0) |
| Greg (owner), Rosette Pambakian | iMessage: | Rosette Pambakian | Guests will include Cher, Katie Couric, Patrick Stewart, Sophia Bush, Rebecca Minnoff, Monica Lewinsky and a bunch of other interesting people | Read | 4/6/2018 | 4/6/2018 7:23:08 PM(UTC+0) | | | 4/6/2018 | 4/6/2018 7:48:59 PM(UTC+0) |
| Greg (owner), Rosette Pambakian | iMessage: | Greg | I have a restraining order out on Katie Couric. She's not allowed within 200 yards of me. | Sent | 4/6/2018 | 4/6/2018 7:49:41 PM(UTC+0) | 4/6/2018 | 4/6/2018 7:49:36 PM(UTC+0) | | |
| Greg (owner), Rosette Pambakian | iMessage: | Rosette Pambakian | I'll make sure she doesn't touch you | Read | 4/6/2018 | 4/6/2018 7:50:20 PM(UTC+0) | | | 4/6/2018 | 4/6/2018 7:51:37 PM(UTC+0) |

FILED: NEW YORK COUNTY CLERK 09/19/2019 03:32 PM   INDEX NO. 654038/2018
NYSCEF DOC. NO. 525   RECEIVED NYSCEF: 09/19/2019

Case 2:19-cv-07046-MWF-FFM   Filed 10/03/19   Page 94 of 104   Document 18-1   Page ID #:183

| Participants | Source | From | Body | Status | Timestamp: Date | Timestamp: Time | Delivered: Date | Delivered: Time | Read: Date | Read: Time |
|---|---|---|---|---|---|---|---|---|---|---|
| Greg (owner)<br>Rosette Pambakian | iMessage: | Greg | Unfortunately I can't change my plans. Next time you're in NY putting on a nice event maybe send an invitation in advance? | Sent | 4/6/2018 | 4/6/2018 7:57:40 PM(UTC+0) | 4/6/2018 | 4/6/2018 7:57:35 PM(UTC+0) | | |
| Greg (owner)<br>Rosette Pambakian | iMessage: | Rosette Pambakian | You should just make an executive decision and change your plans | Read | 4/6/2018 | 4/6/2018 7:58:34 PM(UTC+0) | | | 4/6/2018 | 4/6/2018 7:58:35 PM(UTC+0) |
| Greg (owner)<br>Rosette Pambakian | iMessage: | Greg | Unfortunately, can't. | Sent | 4/6/2018 | 4/6/2018 9:23:47 PM(UTC+0) | 4/6/2018 | 4/6/2018 9:23:42 PM(UTC+0) | | |
| Greg (owner)<br>Rosette Pambakian | iMessage: | Rosette Pambakian | | Read | 4/7/2018 | 4/7/2018 1:42:05 AM(UTC+0) | | | 4/7/2018 | 4/7/2018 1:42:12 AM(UTC+0) |
| Greg (owner)<br>Rosette Pambakian | iMessage: | Rosette Pambakian | | Read | 4/7/2018 | 4/7/2018 1:42:21 AM(UTC+0) | | | 4/7/2018 | 4/7/2018 1:42:36 AM(UTC+0) |
| Greg (owner)<br>Rosette Pambakian | iMessage: | Greg | Looks like a blast. Let me know in advance next time. | Sent | 4/7/2018 | 4/7/2018 8:11:33 PM(UTC+0) | 4/7/2018 | 4/7/2018 8:11:37 PM(UTC+0) | | |

FILED: NEW YORK COUNTY CLERK 09/19/2019 03:32 PM
NYSCEF DOC. NO. 525

INDEX NO. 654038/2018
RECEIVED NYSCEF: 09/19/2019

| Participants | Source | From | Body | Status | Timestamp: Date | Timestamp: Time | Delivered: Date | Delivered: Time | Read: Date | Read: Time |
|---|---|---|---|---|---|---|---|---|---|---|
| Greg (owner), Rosette Pambakian | iMessage: | Rosette Pambakian | Now that I know you're not opposed to going to great events I'll let you know in advance next time | Read | 4/7/2018 | 4/7/2018 8:16:16 PM(UTC+0) | | | 4/7/2018 | 4/7/2018 8:18:48 PM(UTC+0) |
| Greg (owner), Rosette Pambakian | iMessage: | Greg | Great. | Sent | 4/7/2018 | 4/7/2018 8:19:03 PM(UTC+0) | 4/7/2018 | 4/7/2018 8:19:06 PM(UTC+0) | | |

# Exhibit 19

**BlattGreg@gmail.com**

| | |
|---|---|
| **From:** | Lisa J. Nelson |
| **Sent:** | Monday, May 15, 2017 2:39 PM |
| **To:** | Greg Blatt |
| **Subject:** | timely |

Rosette is on board to play a bigger role post ███ departure.  She said she is fine working with you and has always had a good relationship and just wants to get back to business as usual.
So we need to resolve timing/messaging to rest of team.

# Exhibit 20

**BlattGreg@gmail.com**

| | |
|---|---|
| **From:** | Greg Blatt |
| **Sent:** | Wednesday, October 18, 2017 9:57 PM |
| **To:** | Rosette Pambakian |
| **Subject:** | Re: Productive |

It's a good investment for the company. You're going to do great.

> On Oct 18, 2017, at 5:50 PM, Rosette Pambakian <rosette.pambakian@gotinder.com> wrote:
>
> They were. Thank you for everything - for helping me so much. It means a lot and I know there was a much easier route that would have resulted in much less work for you. I realize that and I appreciate what you've done for me. I promise I'll do my best to make you not regret it.
>
>
> On Oct 18, 2017, at 5:22 PM, Greg Blatt <Greg.Blatt@match.com> wrote:
>
> Those were productive meetings today.  I think.
>
>
>
>
>

# Exhibit 21

**BlattGreg@gmail.com**

| | |
|---|---|
| **From:** | Rosette Pambakian <rosette.pambakian@gotinder.com> |
| **Sent:** | Saturday, November 4, 2017 1:57 PM |
| **To:** | Greg Blatt |
| **Cc:** | ███████████ |
| **Subject:** | Re: Events - ████████ |

We did a whole thing with him at Sundance a couple years ago. He's a fun guy. Most of the opps he sends our way aren't worthwhile, but I wouldn't mind skiing at Sundance next year ;) Greg you should come this time.

On Nov 4, 2017, at 10:31 AM, Greg Blatt <Greg.Blatt@match.com> wrote:

Awesome. He's a pain in the ass. But he's my pain in the ass. And he's very funny.

On Nov 4, 2017, at 1:28 PM, ███████████@gotinder.com<mailto:███████████@gotinder.com>"
<███████████@gotinder.com<mailto:███████████@gotinder.com>> wrote:

Hey!
I've emailed with him several times over the past two years for various different opportunities and had several calls.

He emailed again yesterday, and I've responded :)

Sent while swiping...

███████████
███████████████████████████████████████

On Nov 4, 2017, at 17:08, Greg Blatt <Greg.Blatt@match.com<mailto:Greg.Blatt@match.com>> wrote:

I think you guys know my friend, ███████████?  He's been bugging me to get him involved in Tinder events.  I don't know that there is anything we do that he could be involved in, or that even if there was you guys would want to use his company.  And those decisions are totally up to you guys.  But as a favor I'd love it if you could connect with him at some point and let him know that you'll think of him, or at least bullshit about things you could do together.  Is that possible? Let me know

1

# Exhibit 22

## Re: Today's Call

**From:**

Sean Rad <sean@gotinder.com>

**To:**

Storm Duncan <storm@jefferies.com>

**Date:**

Tue, 18 Apr 2017 14:30:34 -0400

Fuck him.
We're at war.
We will destroy him.
This is going to be the biggest lesson of his life.
He will be a changed man... excited for him :).

Sean Rad
Founder & Chairman, Tinder

**From:** Storm Duncan <Storm@Jefferies.com>
**Sent:** Tuesday, April 18, 2017 11:28:18 AM
**To:** Sean Rad
**Subject:** RE: Today's Call

Fuck this is going to be painful.

**From:** Sean Rad [mailto:sean@gotinder.com]
**Sent:** Tuesday, April 18, 2017 11:08 AM
**To:** Storm Duncan <Storm@Jefferies.com>
**Subject:** Re: Today's Call

He was never on the cal invite. He's either delusional or lying.

Sean Rad
Founder & Chairman, Tinder

**From:** Storm Duncan <Storm@Jefferies.com>
**Sent:** Tuesday, April 18, 2017 11:07:31 AM
**To:** Sean Rad
**Subject:** RE: Today's Call

Also, was he ever on the calendar invite or just his assistant?

**From:** Sean Rad [mailto:sean@gotinder.com]
**Sent:** Tuesday, April 18, 2017 11:05 AM
**To:** Shiva Kumar <shiva@Jefferies.com>; Storm Duncan <Storm@Jefferies.com>; Korman, Martin <mkorman@wsgr.com>
**Cc:** jmateen1@gmail.com
**Subject:** Re: Today's Call



FILED: NEW YORK COUNTY CLERK 09/27/2019 05:11 PM
INDEX NO. 654038/2018

NYSCEF DOC. NO. 19-cv-07046-MWF-FFM   Document 28-2   Filed 10/05/19   Page 108 of 108   Page ID
#:803
RECEIVED NYSCEF: 09/27/2019



CONFIDENTIAL

JEFF00057804