1  DEBORAH L. STEIN (SBN 224570)
   DStein@gibsondunn.com
2  MICHAEL H. DORE (SBN 227442)
   MDore@gibsondunn.com
3  GIBSON, DUNN & CRUTCHER LLP
   333 South Grand Avenue
4  Los Angeles, CA 90071
   Telephone: (213) 229-7164
5  Facsimile: (213) 229-6164

6  ORIN SNYDER (*pro hac vice* application forthcoming)
   OSnyder@gibsondunn.com
7  GIBSON, DUNN & CRUTCHER LLP
   200 Park Avenue
8  New York, NY 10166-0193
   Telephone: (212) 351-2400
9  Facsimile: (212) 351-6335

10 GRETA B. WILLIAMS (SBN 267695)
   GBWilliams@gibsondunn.com
11 GIBSON, DUNN & CRUTCHER LLP
   1050 Connecticut Avenue, N.W.
12 Washington, D.C. 20036
   Telephone: (202) 887-3745
13 Facsimile: (202) 530-4230

14 Attorneys for Defendants Rosette Pambakian
   and Sean Rad
15

16            **UNITED STATES DISTRICT COURT**

17            **CENTRAL DISTRICT OF CALIFORNIA**

18

| | |
|---|---|
| GREG BLATT, | Case No. 2:19-CV-07046-MWF-FFM |
| Plaintiff, | Hon. Michael W. Fitzgerald |
| v. | **ROSETTE PAMBAKIAN'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO COMPEL ARBITRATION AND STAY LITIGATION** |
| ROSETTE PAMBAKIAN and SEAN RAD; and DOES 1-10, inclusive, | |
| Defendants. | Hearing Date: November 4, 2019<br>Hearing Time: 10:00 a.m.<br>Courtroom: 5A |

19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

Page

I.     INTRODUCTION ..................................................................................1

II.    RELEVANT FACTUAL BACKGROUND ...........................................3

       A.    Before Match Duped Her into "DocuSigning" an Arbitration
             Agreement, Pambakian Declined to Sign a Non-Disclosure
             Agreement ("NDA") .................................................................3

       B.    Immediately After Blatt Resigned, Match Sent Pambakian a
             "Policy Recertification" Email Burying a Brand New
             Arbitration Agreement ..............................................................3

       C.    In August 2018, Pambakian (And Others) Filed A Valuation
             Case Against Tinder and Match in New York—Which Included
             Allegations Detailing Blatt's 2016 Sexual Assault of
             Pambakian ..................................................................................5

       D.    After Filing The New York Complaint, Pambakian and Rad
             Made Statements To The Press Discussing The Sexual Assault
             Allegations.................................................................................6

       E.    Blatt Sues Pambakian in Federal Court Despite Now Claiming
             That His Claims Against Her Should Be Arbitrated............................7

III.   ARGUMENT.........................................................................................8

       A.    Blatt May Not Enforce the ADR Program Because He Is Not a
             Signatory or a Third Party Beneficiary ................................................8

             1.    The Court, not an arbitrator, must decide if Blatt can
                   force Pambakian to arbitration....................................................9

             2.    Blatt fails to establish that Match and Pambakian entered
                   into an agreement for the purpose of "benefiting" Blatt.............9

             3.    Blatt has presented no evidence that the alleged
                   contracting parties expressly intended him to "benefit"
                   from arbitration with respect to his individual claims,
                   outside his capacity as CEO (or "agent") of Match.................12

       B.    The Enforceability of the Summary Agreement And ADR
             Program Is An Issue For The Court To Decide ................................14

       C.    The Court Should Deny The Motion Because The Summary
             Agreement and ADR Program Are Procedurally and
             Substantively Unconscionable, Rendering Them Unenforceable ......16

# TABLE OF CONTENTS
### (continued)

<u>Page</u>

        1.    The Summary Agreement and ADR Program Are Procedurally Unconscionable ....................................................16

        2.    The Summary Agreement and ADR Program Are Substantively Unconscionable ...................................................20

  D.    Blatt Cannot Enforce The ADR Program Because He Is In Breach..............................................................................................23

  E.    Blatt Waived His Right To Enforce The Summary Agreement .........24

IV.    CONCLUSION................................................................................25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Armendariz v. Foundation Health Psychcare Services, Inc.*,
   24 Cal. 4th 83 (2000) ........................................................16

*Armstrong v. Michaels Stores, Inc.*,
   2018 WL 6505997 (N.D. Cal. Dec. 11, 2018).......................16

*Aviles v. Quik Pick Express, LLC*,
   2015 WL 9810998 (C.D. Cal. Dec. 3, 2015), *vacated on other
   grounds,* 703 F. App'x 631 (9th Cir. 2017)........................15

*Badie v. Bank of Am.*,
   67 Cal. App. 4th 779 (1998) ...............................................14

*Benaroya v. Willis*,
   23 Cal. App. 5th 462 (2018) ..................................................9

*Brennan v. Opus Bank*,
   796 F.3d 1125 (9th Cir. 2015) ............................................22

*Brown v. Dillard's, Inc.*,
   430 F.3d 1004 (9th Cir. 2005) ............................................23

*Carbajal v. CWPSC, Inc.*,
   245 Cal. App. 4th 227 (2016) .............................................23

*Chastain v. Union Sec. Life Ins. Co.*,
   502 F. Supp. 2d 1072 (C.D. Cal. 2007) .............................2, 9

*Chavarria v. Ralphs Grocery Co.*,
   733 F.3d 916 (9th Cir. 2013) ..................................16, 17, 18

*Circuit City Stores, Inc. v. Adams*,
   279 F.3d 889 (9th Cir. 2002) ..............................................18

*City of Indio v. Solomon*,
   2012 WL 12888854 (C.D. Cal. Jul. 24, 2012)...................9, 10

*Comer v. Micor, Inc.*,
   436 F.3d 1098 (9th Cir. 2006) ..........................................9, 12

# TABLE OF AUTHORITIES
(continued)

Page(s)

*De La Torre v. CashCall*,
  5 Cal. 5th 966, 976 (2018) ...................................................................17

*Eiess v. USAA Fed. Sav. Bank*,
  2019 WL 3997463 (N.D. Cal. Aug. 23, 2019) ....................................15

*Farhang v. Indian Institute of Technology*,
  2010 WL 519815 (C.D. Cal. Jan. 26, 2010) ........................................10

*Ferguson v. Countrywide Credit Indus., Inc.*,
  298 F.3d 778 (9th Cir. 2002) ...............................................................17

*Fitz v. NCR Corp.*,
  118 Cal. App. 4th 702 (2004) ...............................................18, 20, 22

*Flores v. Nature's Best Distrib., LLC*,
  7 Cal. App. 5th 1, 10-11 (2016) ...........................................................19

*Goldman, Sachs & Co. v. City of Reno*,
  747 F.3d 733 (9th Cir. 2014) ...............................................................16

*Gutierrez v. Autowest, Inc.*,
  114 Cal. App. 4th 84 (2003) .................................................................20

*Harper v. Ultimo*,
  113 Cal. App. 4th 1402 (2003) .......................................................19, 20

*Hess v. Ford Motor Co.*,
  27 Cal. 4th 516 (2002) ........................................................................9, 10

*Ingle v. Circuit City Stores, Inc.*,
  328 F.3d 1165 (9th Cir. 2003) .............................................................21

*Letizia v. Prudential Bache Secs., Inc.*,
  802 F.2d 1185 (9th Cir. 1986) ........................................................12, 13

*Magno v. College Network, Inc.*,
  1 Cal. App. 5th 277 (2016) ...................................................................20

*Martin v. Yasuda*,
  829 F.3d 1118 (9th Cir. 2016) .............................................................25

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Med. Staff of Doctors Med. Ctr. in Modesto v. Kamil*,
132 Cal. App. 4th 679 (2005) ...................................................................13

*Mercuro v. Superior Court*,
96 Cal. App. 4th 167 (2002) ....................................................................22

*O'Hanlon v. JPMorgan Chase Bank, N.A.*,
2015 WL 5884844 (C.D. Cal. Oct. 7, 2015)............................................16

*Oracle Am., Inc. v. Myriad Grp. A.G.*,
724 F.3d 1069 (9th Cir. 2013) .................................................................15

*OTO, L.L.C. v. Kho*,
447 P.3d 680 (Cal. 2019) .......................................................16, 18, 21

*Peleg v. Neiman Marcus Grp., Inc.*,
204 Cal. App. 4th 1425 (2012) ................................................................21

*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC*,
55 Cal. 4th 223 (2012) ............................................................................17

*Ronay Family Limited Partnership v. Tweed*,
216 Cal. App. 4th 830 (2013) ...........................................................11, 14

*Schneider Moving & Storage Co. v. Robbins*,
466 U.S. 364 (1984).................................................................................11

*Smith v. Microskills San Diego L.P.*,
153 Cal. App. 4th 892 (2007) ..................................................................18

*Steiner v. Horizon Moving Sys., Inc.*,
2008 WL 4822774 (C.D. Cal. Oct. 30, 2008) .........................................25

*Victoria v. Superior Court*,
40 Cal. 3d 734 (1985) .......................................................................10, 14

**Statutes**

Cal. Civ. Code § 1559 ..................................................................................9

Cal. Civ. Code § 1647 ................................................................................11

OPPOSITION TO MOTION TO COMPEL ARBITRATION
CASE NO. 2:19-CV-07046-MWF-FFM

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES
(continued)

Page(s)

Cal. Civ. Code § 1648 ................................................................................12

**Other Authorities**

Wright & Miller, 9A Fed. Prac. & Proc. Civ. § 2382 (3d ed.) ...............................24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

OPPOSITION TO MOTION TO COMPEL ARBITRATION
CASE NO. 2:19-CV-07046-MWF-FFM

## I.   INTRODUCTION

Greg Blatt's motion to compel arbitration compounds his abuse of process and should be summarily denied.  Despite bringing his personal defamation claims against Rosette Pambakian in this Court, Blatt now says the claims ***he*** filed in court should be sent to arbitration based on a workplace arbitration agreement between Match and Pambakian that Blatt did not sign and to which Blatt is not a party or third-party beneficiary.  What is more, Blatt's defamation claims—which target statements Pambakian made in connection with a separate New York lawsuit—arose outside of the workplace, and months after Blatt left Match.  We are not aware of a single court that has allowed a non-signatory, former senior executive to compel arbitration of personal tort claims concerning conduct that happened outside the workplace after the executive left the company.

What makes Blatt's motion all the more troubling is his motive in filing his defamation lawsuit in the first place.  Despite now proclaiming that arbitration is the appropriate forum (it is not), Blatt says he filed his claims against Pambakian in court "out of an abundance of caution" because the statute of limitations was about to expire.  Mot. at 5-6.  But Blatt's stated motive is belied by what Blatt did next: six weeks after filing his first complaint—after the statute of limitations was tolled, but before he even moved to compel arbitration—Blatt filed an amended complaint in this Court against Pambakian and Rad, and then launched an all-out media assault against them the same day based on the juiced-up pleading.  Days later, having achieved his media objectives (by peddling a fictional, victim-blaming narrative), Blatt told the Court his claims against Pambakian should be litigated in a private arbitration rather than the public forum he himself selected—not once, but twice.  Blatt's tactics should not be condoned, and his motion to compel must be denied.

***First,*** Blatt has not presented the Court with a valid arbitration agreement, let alone one to which he is a party.  This Court, not an arbitrator, must decide "the

OPPOSITION TO MOTION TO COMPEL ARBITRATION
CASE NO. 2:19-CV-07046-MWF-FFM

merits of th[is] non-signatory enforcement issue," and in deciding it, "the federal policy favoring arbitration falls away." *Chastain v. Union Sec. Life Ins. Co.*, 502 F. Supp. 2d 1072, 1075, 1076 (C.D. Cal. 2007). Especially where a presumption in favor of arbitrability does not apply, Blatt cannot credibly claim that he was an intended "third party beneficiary" of a workplace arbitration agreement that went into effect *after he left the workplace*. At best, Blatt is an incidental beneficiary of the "ADR Program's" definition of "Company," which lumps together categories of entities and individuals who might be sued for conduct attributable to Match.

**Second**, Blatt has not pointed to any principles that warrant deviating from the rule that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Chastain*, 502 F. Supp. 2d at 1075. The purportedly ongoing alleged conspiracy to undermine Blatt's credibility in a New York lawsuit has nothing to do with the cited workplace arbitration agreement. Nor is there any evidence that Pambakian intended to provide any benefit to Blatt in January 2018, months after he was reported for assaulting her, after she had told Match that she intended to get counsel, and after Match had told her that there was "no need at all to talk to anyone else in the company about this matter."

**Third**, the agreement Blatt seeks to enforce is invalid as a matter of law because it is procedurally and substantively unconscionable. It is the paradigmatic contract of adhesion, cloaked in surprise, that unfairly benefits the powerful drafting party and conflicts with the other party's reasonable expectations.

**Fourth**, even if an agreement was formed, Blatt has breached it by pursuing this action in federal court and simultaneously pursuing a consolidated arbitration in violation of the arbitration agreement's clear terms. His pursuit of this action in court has prejudiced Pambakian and amounts to a waiver of the right to arbitration.

Accordingly, Pambakian respectfully requests that the Court enter an order denying Blatt's motion and precluding Blatt from proceeding with the arbitration that he improperly commenced after filing suit in this Court.

## II.  RELEVANT FACTUAL BACKGROUND

### A.  Before Match Duped Her into "DocuSigning" an Arbitration Agreement, Pambakian Declined to Sign a Non-Disclosure Agreement ("NDA")

In late April 2017, Match's Chief Human Resources Officer, Lisa Nelson, approached Pambakian regarding a report that Blatt sexually assaulted Pambakian at a holiday party in December 2016.  Declaration of Rosette Pambakian ("Pambakian Decl.") ¶ 3.  But as it became clear that Match sought to protect Blatt with a sham investigation, on May 4, 2017, Pambakian wrote to Nelson that, "I'm not comfortable talking about this further until I get some counsel from a lawyer." *Id.* ¶ 5, Ex. A.  Shortly thereafter, Nelson wrote back "[t]here's no need at all to talk to anyone else in the company about this matter unless you want to." *Id.* ¶ 6, Ex. B.

In or around October 2017, Nelson approached Pambakian with a proposed NDA and an offer of increased compensation to "put this terrible ordeal behind us." *Id.* ¶ 7.  Pambakian declined to sign.  *See id.*  Blatt resigned shortly thereafter.  FAC ¶ 65 (alleging that Blatt "left the company in December 2017"); *id.* ¶ 83 (same).

### B.  Immediately After Blatt Resigned, Match Sent Pambakian a "Policy Recertification" Email Burying a Brand New Arbitration Agreement

On January 17, 2018, one month after Blatt resigned, Pambakian received a company email entitled "Please DocuSign: Match Group Policy Recertification" that stated the following:

> MatchGroup requires that ALL employees annually certify their familiarity and compliance with MatchGroup/IAC's policies, including certain critically important policies. We ask that you read through the policies (accessible via the link below) and answer two quick questions at the end of each policy. After you read through and answer two questions per policy, you'll be prompted to sign to certify acknowledgement of your review of the policies. This will submit your recertification to HR and you will receive a PDF confirmation via email from Adobe Sign. Your certification is due by no later than Wednesday, February 28, 2018. In addition, we have included the new alternative dispute resolution program at the end of the document. Please review and sign the summary. Thank you for your prompt attention.

Dkt. 19-3, Ex. 1 at 036.  The email did not mention "arbitration."  *Id.*

The email contained a link to a DocuSign file that directed Pambakian to an electronic document that contained a number of different Match Group/IAC[1] policies.  Pambakian Decl. ¶ 9.  As she worked her way through these various policies, Pambakian was prompted at the end of some of them to answer questions before she could move on to the next one.  *See id.*  Instead of simply including the short five-page ADR Program policy in this document, Match instead included a two-page summary entitled, "Mutual Agreement to Arbitrate Claims on an Individual Basis and Summary of the Alternative Dispute Program for California" (the "Summary Agreement").  *See id.* ¶ 13.; Dkt. 19-3, Ex. 1 at 028.

The Summary Agreement is a hybrid of an agreement to arbitrate and a summary of the ADR Program, which the Summary Agreement says it "incorporate[s] by reference."  Dkt. 19-3 Ex. 1 at 027-28.  Excluding section headings, the only bolded text contained in the Summary Agreement was found on the second page, and said nothing about agreeing to arbitrate or waiving a jury trial right.  *Id.* at 028.  Rather, the bold print stated:

> **ASSOCIATE ALSO UNDERSTANDS THAT IT IS HIS/HER RESPONSIBILITY TO REVIEW THE MATCH GROUP, INC. ALTERNATIVE DISPUTE RESOLUTION PROGRAM WHICH CONTAINS ALL OF THE TERMS UNDER WHICH DISPUTES WILL BE RESOLVED UNDER THE PROGRAM.  THE PROGRAM DOCUMENT IS INCORPORATED BY REFERENCE INTO THIS AGREEMENT.  A COMPLETE COPY OF THE PROGRAM CAN BE OBTAINED AT THE COMPANY'S HUMAN RESOURCES' OFFICE OR BY ACCESSING MATCHGROUP POLICIES EXTERNAL LINK IN WORKDAY THROUGH A PERSONAL COMPUTER.  THE PROGRAM CAN BE FOUND IN THE "Policies" SECTION OF THE WORKDAY DASHBOARD.**

*Id.* at 028.

---

[1]  IAC is the parent company of both Tinder and Match Group.  Tinder merged into Match on July 13, 2017.

Match never explained to Pambakian that the ADR Program was an arbitration agreement; nor did Match ever provide her any opportunity to ask questions about the ADR Program or negotiate any of its terms.  Pambakian Decl. ¶¶ 12, 13.  In fact, Pambakian *did not even know* that she was signing an arbitration agreement, or that an alternative dispute resolution policy was related to arbitration, at the time she apparently affixed her DocuSign acknowledgement to the two-page Summary Agreement.  *Id.* ¶¶ 12, 17.  She only knew that as a condition of her continued employment at Tinder, she was required to sign all of the electronic documents that were contained in the DocuSign file.  *Id.* ¶¶ 9, 13, 14.

### C.   In August 2018, Pambakian (And Others) Filed A Valuation Case Against Tinder and Match in New York—Which Included Allegations Detailing Blatt's 2016 Sexual Assault of Pambakian

Seven months later, on August 14, 2018, a group of former and then-current executives and employees of the online dating startup Tinder (the "Tinder Plaintiffs")—including Defendants Pambakian and Rad—brought an action against Tinder's parent companies, IAC and Match, in New York Supreme Court for, among other things, breach of contract and interference with contractual relations.  *See* FAC ¶ 2; Dkt. 21, Ex. A, Pambakian Decl. ¶ 17.  In that complaint, *Rad, et al. v. IAC, et al.*, No. 654038/2013 (N.Y. Sup. Ct.), Docket No. 2, (the "New York Complaint"), the Tinder Plaintiffs allege that IAC and Match schemed to undervalue and eliminate the Tinder Plaintiffs' stock options in Tinder for the parent companies' own benefit.  Dkt. 21, Ex. A ¶¶ 7–9; Pambakian Decl. ¶ 17.  ***At the time the New York Complaint was filed, Blatt was not a director, officer, or even employee of Match (or any affiliate).***

The New York Complaint alleges that IAC and Match, in furtherance of their scheme, removed Tinder's executive leadership and installed their own at the highest levels of Tinder management—including by removing Rad, a Tinder cofounder and its CEO between 2012 and December 2016, and replacing him with

Plaintiff Greg Blatt, who at the time was Match's Chairman and CEO. Dkt. 21, Ex. A ¶ 12.  Once installed as Tinder's CEO, Blatt worked with IAC and Match to devalue Tinder on paper and flood the market with disinformation about its financial performance.  *Id*. ¶¶ 8, 13.  The New York Complaint alleges that IAC/Match then merged Tinder out of corporate existence, cancelling the Tinder Plaintiffs' options in the process.  *Id*. ¶ 8.

Further, the New York Complaint alleges that IAC/Match's scheme was threatened in December 2016—shortly after Blatt had been named CEO of Tinder—when Blatt "groped and sexually harassed Rosette Pambakian" at Tinder's holiday party.  *Id*.  ¶¶ 14, 127–33.  According to the New York Complaint, IAC and Match refused to conduct an independent investigation of the alleged workplace misconduct "and covered up Blatt's conduct instead."  *Id*. ¶ 132.  Match/IAC "kept Blatt in place as Tinder's 'interim' CEO long enough to complete the private valuation and secret merger of Tinder," only to announce Blatt's "retirement" two weeks after their scheme was concluded.  *Id*. ¶ 14.

### D.   After Filing The New York Complaint, Pambakian and Rad Made Statements To The Press Discussing The Sexual Assault Allegations

Within 48 hours of filing the New York Complaint, Pambakian and Rad made statements to the press concerning their allegations, including those concerning Blatt's sexual assault of Pambakian.  In December 2018 (one year after Blatt stepped down as CEO), The Verge and CNN published articles disclosing emails between Pambakian and Mandy Ginsburg, who replaced Blatt as CEO of Match.  FAC App'x A at 27-34.  These articles are addressed in detail in the Memorandum of Points and Authorities in Support of Defendants' Special Motion to Strike Plaintiff Blatt's First Amended Complaint, Dkt. 20-2 at 7-14.

**E.     Blatt Sues Pambakian in Federal Court Despite Now Claiming That His Claims Against Her Should Be Arbitrated**

On August 5, 2019, Pambakian filed a lawsuit against Blatt, IAC, and Match in L.A. Superior Court alleging, among other things, sexual battery, retaliation, and wrongful termination of her employment.  Dkt. 19-2, ¶ 2.  On August 13, Blatt and his co-defendants removed that suit to this Court.  *Id*.  The same day, Blatt filed this action against Pambakian and Rad for defamation and civil conspiracy.  *Six weeks later*, Blatt filed a First Amended Complaint ("FAC").  Dkt. 18.

The FAC alleges that, "[a]s part of their scheme to extract billions of dollars from IAC/InterActiveCorp ('IAC') and Match Group, Inc. ('Match'),"—a clear reference to the New York valuation case—"Pambakian and Rad have conspired to make false allegations of sexual harassment and sexual assault against Blatt with the specific intent to damage Blatt's good name, personal and professional reputation and credibility."  *Id*. ¶ 1 (alleging "false accusations in cynical pursuit of a $2 billion windfall").  According to the FAC, "[d]amaging Blatt's credibility and tarnishing his character are important elements of Pambakian's and Rad's *litigation strategy in [the New York] action*."  *Id.* ¶ 2.

Blatt claims that "under the guise of a litigation funding agreement, Rad promised millions to Pambakian in exchange for her joining the Valuation Lawsuit and making false allegations of sexual harassment against Blatt."  *Id.* ¶ 3.  He further alleges that "Pambakian did not know anything about the central claims of the Valuation Lawsuit; the only way Pambakian's participation could increase the chances of winning the suit was through the addition of the false allegations concerning sexual harassment against Blatt, allegations that Pambakian was only willing to make after receiving the upfront payment.  Securing Pambakian's false allegations *was the driving motive* behind these payment arrangements."  *Id.* ¶ 13.

The FAC further alleges that, "as Rad had desired for so long, he now had a lawsuit that contained allegations of 'sexual harassment and groping' against Blatt,

Gibson, Dunn & Crutcher LLP

even though such claims had no legal relevance to the central claim that Tinder had been undervalued.  Instead, it was a brazen attempt to gain publicity for what would otherwise be a run-of-the-mill financial lawsuit, to apply pressure to settle the lawsuit in an era where most companies would be afraid to challenge assertions of sexual misconduct, and to tar the character of the person who would likely be the central witness on behalf of the defendants: Blatt." *Id.* ¶ 67.  Blatt insists that Defendants (including unnamed "Does") conspired "to tarnish Blatt's reputation and credibility and to extract billions of dollars of additional compensation in the Valuation Lawsuit the largest portion of which would go to Rad." *Id.* ¶ 132.

Blatt claims that "Defendants have taken numerous acts in furtherance of their corrupt agreement, including engaging in a coordinated media strategy to damage Blatt's reputation and credibility." *Id.* ¶ 133.  The FAC alleges that "Rad, who had by far the largest option stake of any Tinder employee, orchestrated and directed, and was the primary beneficiary of, the coordinated legal and public relations campaign." *Id.* ¶ 68.  It further alleges ongoing (but unidentified) misconduct outside the workplace (where neither Blatt nor Defendants remain), claiming that "Defendants ***are actively engaged*** in an unlawful conspiracy to defame Blatt . . . ." *Id.* ¶ 135 (emphasis added).

## III.   ARGUMENT

### A.   Blatt May Not Enforce the ADR Program Because He Is Not a Signatory or a Third Party Beneficiary

The only party seeking to compel arbitration—plaintiff Blatt, who initially filed suit in this Court and then amended that complaint more than one month later—did not sign the arbitration agreement on which he relies.  He is not a party to the agreement and instead claims to be a "third-party beneficiary."  Mem. in Support of Plf's Mot. to Compel Arbitration ("Mot.") at 10.  As a threshold matter, that dooms Blatt's argument that the Court should presume arbitrability under the FAA.  As the Ninth Circuit has recognized, where the question is whether a

particular party is bound by an arbitration agreement, "the liberal federal policy regarding the scope of arbitrable issues is inapposite." *Comer v. Micor, Inc.*, 436 F.3d 1098, 1104 n.11 (9th Cir. 2006).  Contrary to Blatt's claims, to determine whether the nonsignatory Blatt can compel Ms. Pambakian to arbitrate, "the Court is not bound by any stated policy encouraging arbitration." *Chastain v. Union Sec. Life Ins. Co.*, 502 F. Supp. 2d 1072, 1075 (C.D. Cal. 2007).

### 1.   The Court, not an arbitrator, must decide if Blatt can force Pambakian to arbitration.

It is the Court—and not any arbitrator—who decides "the merits of the non-signatory enforcement issue" in the absence of the FAA presumption of arbitrability.  *Chastain*, 502 F. Supp. 2d at 1076; *see id.* (noting that the party opposing arbitration "never agreed to submit to the arbitrator the question of arbitrability of claims against" the nonsignatory); *accord Benaroya v. Willis*, 23 Cal. App. 5th 462, 469 (2018) ("The question of whether a nonsignatory is a party to an arbitration agreement is one for the trial court in the first instance."). In making this determination, the default is that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Chastain*, 502 F. Supp. 2d at 1075 (quotations omitted).

### 2.   Blatt fails to establish that Match and Pambakian entered into an agreement for the purpose of "benefiting" Blatt.

"A contract, ***made expressly for the benefit*** of a third person, may be enforced by him at any time before the parties thereto rescind it."  Cal. Civ. Code § 1559 (emphasis added).  However, "[a] putative third party's rights under a contract are predicated upon the contracting parties' intent to benefit" it.  *Hess v. Ford Motor Co.*, 27 Cal. 4th 516, 524 (2002) (citation omitted).  "Whether a third party is an intended beneficiary ***or merely an incidental beneficiary*** to the contract involves construction of the parties' intent, gleaned from reading the contract as a whole in light of the circumstances under which it was entered." *City of Indio v.*

Gibson, Dunn & Crutcher LLP

*Solomon*, 2012 WL 12888854, at *7 (C.D. Cal. Jul. 24, 2012) (citation and internal quotation marks omitted) (emphasis added).

Here, Blatt fails to meet his "burden of showing that the contracting parties intended to confer a direct benefit to [him,] the alleged third party beneficiary." *Farhang v. Indian Institute of Tech.*, 2010 WL 519815, at *5 (C.D. Cal. Jan. 26, 2010) (citing *Alling v. Universal Manuf. Corp.*, 5 Cal. App. 4th 1412, 1439 (1992)). Blatt argues that because the terms of the Summary Agreement and ADR Program include Match's agents within the definition of "Company," that Blatt is automatically a third party beneficiary. Blatt's rudimentary analysis skips over the core question of whether the "contracting parties" entered the agreement with the express design of benefiting Blatt (as opposed to themselves). Notably, even if "literal contract interpretation would result in a benefit to the third party," that "is not enough to entitle that party to demand enforcement." *Hess*, 27 Cal. 4th at 524; *see Farhang*, 2010 WL. 519815, at *5 ("[T]he mere fact that performance of the contract would inure to the benefit of the third party is insufficient to make the third party an intended beneficiary.").

In determining parties' intent to arbitrate, courts must consider both "the contractual language and ***the circumstances under which the agreement was made***." *Victoria v. Superior Court*, 40 Cal. 3d 734, 744 (1985) (emphasis added). Pambakian did not expressly intend to confer any benefits on Blatt. Pambakian Decl. ¶ 15. Months before signing the Summary Agreement, Pambakian told Match that she wanted to "get some counsel from a lawyer" about Blatt's assault. *Id.* Ex. A. Match acknowledged her request for counsel, and responded the next day that "[t]here's no need at all to talk to anyone else in the company about this matter unless you want to." *Id.*, ¶ 6, Ex. B. In this context, it is inconceivable that Pambakian (or even Match) intended for the Summary Agreement to permit Blatt to force Pambakian into arbitration—let alone for claims based on alleged "coordinated tactics to tarnish Blatt's reputation to drive an anticipated $2 billion

payday in the Valuation Lawsuit."  FAC ¶ 15. *See* Cal. Civ. Code § 1647 ("A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates.").  These claims are based on events that occurred outside of the workplace, long after Blatt left Match—undermining any assertion that the contracting parties intended the claims to be subject to arbitration.

It is far more likely that Match intended its "ADR Program" to benefit Match itself.  Indeed, the "ADR Program's" use of the term "Company" demonstrates that Match was focused more on the company itself than on others incidentally implicated by the definition of "Company."  *See* Dkt. 19-5, Ex. 3, at 151 § 3 (articulating when "Company" may seek injunctive relief to prevent disclosure of trade secrets); *Id.* § 4.1 (acknowledging that "Company" is engaged in interstate commerce); *id.* § 5 ("Company" waiving any and all rights under law to trial before judge or jury); *id.* § 9 (requiring "Company" to pay arbitration costs).[2]

In advancing his third party beneficiary claim, Blatt relies exclusively on *Ronay Family Limited Partnership v. Tweed*, 216 Cal. App. 4th 830 (2013), to argue that "the arbitration clause was intended to benefit Blatt."  Mot. at 11.  To the extent *Ronay* applies here at all, it is for its recognition of the well-established principle that "[t]he general rules governing the rights of agents and third party beneficiaries under contracts between other parties 'should not be applied so inflexibly as to defeat the intention of the parties.'"  *Ronay*, 216 Cal. App. 4th at 840 (quoting *Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 370-71 (1984)).  Indeed, as the Ninth Circuit has made clear "[t]o sue as a third-party

---

[2]  In fact, Sean Rad also is a former Tinder officer, but rather than argue that Rad "gets the benefit" of the arbitration agreement, Blatt directs his motion to compel solely to Ms. Pambakian because "Defendant Rad is not a party to the arbitration agreement."  Mot. at 2 n.1.  Blatt seeks to include himself in the agreement he did not sign because today it suits him.  But he surely would oppose it as nonsensical and unfair under almost any other circumstances.

beneficiary of a contract, the third party must show that the contract reflects the express or implied *intention of the parties* to the contract to benefit the third party." *Comer*, 436 F.3d at 1102 (emphasis added). Blatt fails to show that Ms. Pambakian intended to give Blatt rights to pursue non-workplace claims that did not even exist when she purportedly entered into the arbitration agreement. *See* FAC ¶¶ 15, 135.

> ### 3. Blatt has presented no evidence that the alleged contracting parties expressly intended him to "benefit" from arbitration with respect to his individual claims, outside his capacity as CEO (or "agent") of Match.

Blatt has no basis to claim that Match and Pambakian intended to contract about arbitrating a former CEO's individual claims arising outside of the workplace and after the CEO left the company. *See* Cal. Civ. Code § 1648 ("However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract."). Blatt alleges that in August and December 2018, *when Blatt was no longer employed by Match or on its board*, Pambakian and Rad hurt Blatt's reputation and led to "deprivation of [his] social relationships" (FAC ¶ 92) by making allegedly defamatory statements in furtherance of a purported conspiracy that began *after* Blatt left the company. Blatt is asserting these claims in his *individual capacity*—completely divorced from his role as CEO. There is simply no rational argument, let alone evidence, supporting the notion that the alleged contracting parties expressly intended to confer a former officer with the "benefit" of arbitrating personal claims that post-dated his employment and occurred outside the workplace.

Blatt relies on *Letizia v. Prudential Bache Secs., Inc.*, 802 F.2d 1185, 1188 (9th Cir. 1986), but *Letizia* hurts his cause. In that case, the arbitration agreement covered "any dispute arising out of or relating to Letizia's securities account," and the defendants' allegedly wrongful acts "related to their handling of Letizia's securities account." *Id.* at 1186, 1188. But Blatt does not allege that Pambakian

was—like the brokers in *Letizia*—acting in the scope of her employment when she allegedly conspired with Mr. Rad and others to defame Blatt.  The alleged conspiracy is not a part of her employment at all.  Rather, Blatt alleges it is in furtherance of a "litigation strategy" for a case 3,000 miles away.  Blatt's core theory of this case thus takes it outside the scope of an agreement that by its terms relates to "workplace" disputes.  *See Med. Staff of Doctors Med. Ctr. in Modesto v. Kamil*, 132 Cal. App. 4th 679, 684 (2005) ("The defamation complained of here no more concerns the terms of the agreement, than would a punch in the nose during a dispute over a medical billing.").

Indeed, the Summary Agreement states in its first sentence: "We understand that problems can occur even ***in*** the best workplaces."  Dkt. 19-3, Ex. 1 at 027 (emphasis added).  The ADR Program itself only covers "claims or controversies involving or in any way concerning [Pambakian's] application with, employment with, or termination from, the Company."  Dkt. 19-3, Ex. 3 at 151, § 2.  But as Blatt repeatedly alleges, this action is about a supposed conspiracy in furtherance of the New York valuation case—not a workplace dispute.  *See* FAC ¶ 2 (alleged defamation is part of "litigation strategy in that action"); *id.* ¶¶ 1, 13, 15, 67, 132-33.  Indeed, Blatt identifies Rad (not Pambakian) as the central figure in the "conspiracy," demonstrating that this case is not about *Pambakian's* "application with, employment with, or termination from" Tinder.  *Id.* ¶ 68 (alleging Rad "orchestrated and directed, and was the primary beneficiary of, the coordinated legal and public relations campaign" on which Blatt premises this lawsuit); *id.* ¶ 59 ("The timing of Rad's allegations against Blatt make clear this was all just a tactic to achieve a greater payout, rather than an attempt to serve justice.").

Similarly, Blatt's naming of 10 Doe defendants as part of a conspiracy that only *started* "when Rad offered and Pambakian accepted millions of dollars in exchange for Pambakian . . . making false allegations of sexual harassment against Blatt" further confirms that this case does not arise out of a workplace dispute.  *Id.*

¶ 132.  Blatt was long gone from Tinder both when the supposed conspiracy was formed *and* when the Summary Agreement was supposedly entered into in 2018.  *See id.* ¶ 83 (Blatt "left Tinder and Match at the end of 2017").  In fact, according to Blatt, "Defendants are ***actively*** engaged in an unlawful conspiracy to defame Blatt . . . ."  *Id.* ¶ 135 (emphasis added).

In contrast to *Ronay*, where the nonsignatory seeking to compel arbitration was a broker who opened the account at issue and did so as an "agent" of the signatory company, this case more resembles the California Supreme Court's decision in *Victoria*, which involved an alleged sexual assault by an employee.  In that case, "the employee's alleged misconduct was entirely outside the scope of his employment."  40 Cal. 3d at 745.  According to the *Victoria* court, "[s]urely it was not contemplated, let alone expected, by either party to the Agreement that this sort of attack would befall petitioner while she was hospitalized under Kaiser's care."  *Id.*  Thus, it was "difficult to conclude that the parties intended and *agreed* that causes of action arising from such an attack would be within the scope of the arbitration clause."  *Id.* (emphasis in original).  The same is true here, where Blatt alleges a conspiracy outside the workplace that did not exist until months after the arbitration agreement allegedly was signed.[3]

## B.   The Enforceability of the Summary Agreement And ADR Program Is An Issue For The Court To Decide

Even if Blatt did have third party beneficiary status (he does not), the Court should not enforce the Summary Agreement and ADR Program because they are unconscionable, Blatt breached their terms, and Blatt waived his right to enforce them.  These all are enforceability issues that must be ruled upon by this Court

---

[3]  Moreover, the alleged arbitration agreement should be interpreted against Match and its self-described "agent," Blatt.  *See Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 801 (1998) (If uncertainty is not removed by application of other rules of interpretation, "a contract must be interpreted most strongly against the party who prepared it.");  Mot. at 11.  Indeed, this rule "is applied with particular force in the case of adhesion contracts" such as this one.  *Badie*, 67 Cal. App. 4th at 801;  *Victoria*, 40 Cal. 3d at 742.

because, under the ADR Program, *only* questions about the "scope and application" of the ADR Program—***not its enforceability***—are arbitrable.  Dkt. 19-5, Ex. 3 at 153, §13.

Moreover, this Court's authority does not change merely because of the ADR Program's supposed "invocation of the rules of AAA."  Mot. at 9 n.3.  While incorporation of AAA rules ***may*** constitute "clear and unmistakable evidence that the parties agreed to arbitrate arbitrability" under certain circumstances, this is not one of those circumstances.  *See Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013).  First, the ADR Program does not incorporate the AAA rules; it merely notes that the "applicable" but unidentified AAA rules are ***one of many*** ADR rules that ***may*** apply at the discretion of the parties.  Dkt. 19-5, Ex. 3 at 152 § 6.[4]  Second, under standard contract interpretation principles, the express delegation of issues about the "scope and application" of the ADR Program bars any implication that the broader AAA delegation rules somehow apply.  Finally, as this Court—along with "the majority of district courts in the Ninth Circuit," *Eiess v. USAA Fed. Sav. Bank*, 2019 WL 3997463, at *7 (N.D. Cal. Aug. 23, 2019)—has held, even ***express*** incorporation of specific rules does not constitute "clear and unmistakable" evidence of delegation where the party against whom enforcement is sought is an "inexperienced individual[], untrained in the law."  *Aviles v. Quik Pick Express, LLC*, 2015 WL 9810998, at *6 (C.D. Cal. Dec. 3, 2015) (Fitzgerald, J.), *vacated on other grounds,* 703 F. App'x 631 (9th Cir. 2017).

Given the clear "***presumption*** that courts will decide which issues are arbitrable," the ADR Program's mere reference to AAA rules that ***may*** apply in a contract that already expressly delineates the scope of delegation does not constitute "clear and unmistakable" evidence that Pambakian—a woman not

---

[4] For the avoidance of doubt that the ADR Program does not expressly incorporate AAA rules, the ADR Program references the "ADR provider" elsewhere in the ADR Program—***not*** the AAA.  *See, e.g.,* Dkt. 19-5, Ex. 3 at 152 §7.

OPPOSITION TO MOTION TO COMPEL ARBITRATION
CASE NO. 2:19-CV-07046-MWF-FFM

Gibson, Dunn & Crutcher LLP

sophisticated in legalese and unfamiliar with alternative dispute resolution at the time—agreed to delegate the disputes raised in this Opposition to an arbitrator.  *See Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 738 (9th Cir. 2014) (emphasis added) (citation omitted); *Armstrong v. Michaels Stores, Inc.*, 2018 WL 6505997, at *8 (N.D. Cal. Dec. 11, 2018) (the "clear and unmistakable standard is a high bar, and in the face of ambiguity, courts should be reluctant to find delegation to the arbitrator"); Pambakian Decl. ¶¶ 12-14.

### C.   The Court Should Deny The Motion Because The Summary Agreement and ADR Program Are Procedurally and Substantively Unconscionable, Rendering Them Unenforceable

"Because unconscionability is a reason for refusing to enforce contracts generally, it is also a valid reason for refusing to enforce an arbitration agreement . . . ." *Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal. 4th 83, 114 (2000).  "In California, unconscionability has two elements: procedural unconscionability and substantive unconscionability." *O'Hanlon v. JPMorgan Chase Bank, N.A.*, 2015 WL 5884844, at *2 (C.D. Cal. Oct. 7, 2015).  For a contract to be unconscionable, both elements (procedural *and* substantive) must be present, but they "need not be present to the same degree — there is a sliding scale between the two where more of one can make up for less of the other." *Id.*  Thus, where there is "substantial procedural unconscionability…even a relatively low degree of substantive unconscionability may suffice to render the agreement unenforceable." *OTO, L.L.C. v. Kho*, 447 P.3d 680, 693 (Cal. 2019).

For the reasons set forth below, the Summary Agreement and ADR Program are both procedurally and substantively unconscionable.

### 1.   The Summary Agreement and ADR Program Are Procedurally Unconscionable

The Ninth Circuit articulated the standard for procedural unconscionability as concerning "the manner in which the contract was negotiated and the respective circumstances of the parties at that time, focusing on the level of oppression and

OPPOSITION TO MOTION TO COMPEL ARBITRATION
CASE NO. 2:19-CV-07046-MWF-FFM

surprise involved in the agreement." *Chavarria v. Ralphs Grocery Co*., 733 F.3d 916, 922 (9th Cir. 2013).  "Oppression" involves "the weaker party's absence of choice and unequal bargaining power that results in 'no real negotiation.'"  *Id.* "Surprise" addresses "the extent to which the contract clearly discloses its terms as well as the reasonable expectations of the weaker party."  *Id.*  In other words, procedural unconscionability "addresses the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power."  *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC*, 55 Cal. 4th 223, 246 (2012); *id.* at 247 ("'Oppression occurs where a contract involves lack of negotiation and meaningful choice, surprise where the allegedly unconscionable provision is hidden within a prolix printed form.'").  Here, the Summary Agreement and ADR Program are procedurally unconscionable for a host of reasons, including the following:

*First*, the timing and circumstances by which Pambakian was forced to sign the Summary Agreement make it procedurally unconscionable.  The Summary Agreement was signed only *after* Pambakian reported Blatt's sexual assault to Match, *after* she refused to sign an NDA, and *after* she told Match she wanted to consult a lawyer about Blatt's assault.  Pambakian Decl. ¶¶ 3-7, 8, 12.  In this context, the Summary Agreement is unconscionable.  *See De La Torre v. CashCall*, 5 Cal. 5th 966, 976 (2018) (unconscionability analysis considers "process by which the contractual parties arrived at the agreement and the larger context surrounding the contract").

*Second*, the Summary Agreement is a contract of adhesion.  *See Ferguson v. Countrywide Credit Indus., Inc.*, 298 F.3d 778, 784 (9th Cir. 2002).  It was a standardized form document, prepared by Match, and circulated "to [Pambakian] and other California employees" to sign without any opportunity for negotiation. Dkt. 19-3, Ex. 1 at 024 (Alcala Decl. ¶ 7); *id.* at 036.  As her employer, Match had superior bargaining power over Pambakian, and she believed that to stay employed

she had no choice but to sign the stack of electronic documents which included the Summary Agreement.  Pambakian Decl. ¶ 9.  Pambakian had no opportunity to negotiate terms.  *Id.* ¶¶ 12-13.

The Ninth Circuit has repeatedly held that "take-it-or-leave-it" employment arbitration agreements are procedurally unconscionable.  *See, e.g.*, *Chavarria*, 733 F.3d at 922 (finding adhesive take-it-or-leave-it employment arbitration agreement procedurally unconscionable); *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 893 (9th Cir. 2002) (finding arbitration agreement procedurally unconscionable because it was a "take or leave it" prerequisite to employment, and job applicants could not modify the agreement's terms).  Indeed, "[f]ew employees are in a position to forfeit a job and the benefits they have accrued … solely to avoid the arbitration terms that are forced upon them by their employer." *Fitz v. NCR Corp.*, 118 Cal. App. 4th 702, 722 (2004); *see OTO, L.L.C.*, 447 P.3d at 691 ("economic pressure" in "post-hiring settings" means court should be "particularly attuned" to procedural unconscionability issues).

***Third,*** the Summary Agreement did not make clear that, by signing, Pambakian was agreeing to binding arbitration and waiving her jury rights.  Match sent Pambakian a link to the Summary Agreement in an email titled "Please DocuSign: Match Group Policy Recertification," in which the opening sentence asked employees to "certify their familiarity and compliance with MatchGroup/IAC's policies."  Dkt. 19-3, Ex. 1 at 036.  In the Summary Agreement itself, Match falsely stated that employees were "giving up no substantive rights" and "this Agreement simply governs forum." *Id.*, Ex. 3 at 149 ¶ 3.  This misstatement of the law to minimize the adhesive document's effect further shows its gross unfairness. *See Smith v. Microskills San Diego L.P.*, 153 Cal. App. 4th 892, 896 (2007) (California courts "recognize that the right to pursue claims in a judicial forum is a substantial right and one not lightly to be deemed waived.").  Moreover, the only bold and all caps section of the Summary Agreement merely stated that Pambakian

had the "**responsibility to review** [the ADR Program]," Dkt. 19-5, Ex. 3 at 150 (emphasis added), omitting any mention that, by signing, she would be committing to binding arbitration and waiving her jury trial right.

*Fourth*, the ADR Program is procedurally unconscionable because of the uncertain and hidden nature of the applicable rules. Where there is either ambiguity regarding "which set of arbitration rules govern[]" or the applicable rules are "artfully hidden" because they are "not attach[ed]" to the agreement, then the agreement is procedurally unconscionable. *See Harper v. Ultimo*, 113 Cal. App. 4th 1402, 1405-07 (2003). Both problems are present here. The ADR Program provides that any arbitration will proceed "in accordance with the applicable arbitration rules and procedures of the American Arbitration Association (AAA) or another alternative dispute resolution (ADR) provider selected by the parties." Dkt. 19-5, Ex. 3 at 152, § 6. Thus, on its face, the ADR Program does not disclose "which set of arbitration rules govern[]." *Harper*, 113 Cal. App. 4th at 1406-07; *see also Flores v. Nature's Best Distrib., LLC*, 7 Cal. App. 5th 1, 10-11 (2016) (agreement to arbitrate voided because no meeting of the minds on rules).

Moreover, the applicable rules are "artfully hidden." Blatt argues that the AAA Employment Rules govern his dispute with Pambakian—even though the ADR Program does not identify which AAA rules (there are many sets) and alternatively suggested another set of rules entirely could apply. Dkt. 19-3, Ex. 1 at 096. This matters because arbitration rules can have substantive impact: the AAA Employment Rules, for example, require the parties to submit to a confidential arbitration, even though the ADR Program itself imposes no such requirement. AAA Employment Rule 23. This is procedurally unconscionable, especially because Match told Pambakian in bold, all caps text that the ADR Program "**contains all of the terms under which disputes will be resolved**." Dkt. 19-5, Ex. 3 at 150.

Given that the parties did not have a meeting of the minds as to which arbitration rules applied, Match never provided Pambakian with a copy of the full set of arbitration rules under which she would be bound.  Pambakian Decl. ¶ 11. Instead, the Agreement directed Pambakian to go outside that document to review the full terms of the ADR Program, Dkt. 19-5, Ex. 3 at 150, which in turn—Blatt argues—directed Pambakian to undefined AAA rules.  Courts have routinely held arbitration agreements to be procedurally unconscionable where the plaintiff was not provided with a copy of the arbitration rules to which the employee will be bound.  *See, e.g.*, *Fitz v. NCR Corp.*, 118 Cal. App. 4th 702, 702, 721 (2004) (NCR's "employee-dispute resolution policy" incorporated "arbitration rules that were not attached and require[d] the other party to go to another source in order to learn the full ramifications of the arbitration agreement"); *Harper*, 113 Cal. App. 4th at 1406 ("inability to receive full relief is artfully hidden by merely referencing the Better Business Bureau arbitration rules, and not attaching those rules to the contract for the customer to review[,]" which forced the customer to go to another source); *Gutierrez v. Autowest, Inc.*, 114 Cal. App. 4th 77, 84 (2003) (Gutierrez "never given or shown a copy of the arbitration rules of the American Arbitration Association (AAA), the designated arbitration provider").

Because the ADR Program is a "take it or leave" contract full of hidden and misleading terms, and because the circumstances under which it was presented to Pambakian—after she had alleged Blatt assaulted her, after she told Match she was consulting a lawyer, and after she refused to sign an NDA—the ADR Program is procedurally unconscionable.

### 2. The Summary Agreement and ADR Program Are Substantively Unconscionable

"Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided." *Magno v. College Network, Inc.*, 1 Cal. App. 5th 277, 284 (2016).  Terms are

substantively unconscionable when they "'contravene the public interest or public policy'" or "undermine the nondrafting party's reasonable expectations." *OTO, L.L.C.*, 447 P.3d at 693 (citation omitted).  Crucially, "[a] contract's substantive fairness 'must be considered in light of any procedural unconscionability' in its making." *Id.* at 690 (citation omitted).  "[G]iven the substantial procedural unconscionability here, even a relatively low degree of substantive unconscionability may suffice to render the agreement unenforceable." *Id.* at 693. The ADR Program on which Blatt seeks to rely is substantively unconscionable because it is biased and provides Match with unilateral powers that are not reciprocated to Pambakian.  *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003) ("Unconscionability refers to 'an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'").

*First*, the ADR Program provides a unilateral right for Match to amend or revoke the agreement without providing Pambakian any corresponding right. Section 16.3 states that the "Program can be modified or revoked in writing ***only by the Company's corporate general counsel or chief human resources officer***[,]" while "***[n]o employee*** of the Company can orally amend, modify or change the terms of this Program." Dkt. 19-5, Ex. 3 at 154 (emphasis added).  This provision is unconscionable because it proscribes Pambakian's ability to terminate or modify the contract.  *Ingle*, 328 F.3d at 1179 ("the provision affording Circuit City the unilateral power to terminate or modify the contract is substantively unconscionable."); *Peleg v. Neiman Marcus Grp., Inc.*, 204 Cal. App. 4th 1425, 1462 (2012) (provision unconscionable "regardless of whether or not the employer has *exercised* its unilateral right to amend, modify, or terminate the agreement; it is the *ability* to do so that matters.") (emphasis in original).

*Second*, any delegation of questions concerning the ADR Program's enforceability to an arbitrator is unconscionable.  Blatt argues that the ADR

Program's "invocation of the rules of AAA…'constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.'" Mot. at 9 n.3.  Blatt's reading of the ADR Program suggests that an arbitrator must determine the "existence, scope or validity of the arbitration agreement," including the enforceability of the ADR Program, because of the supposed incorporation of AAA rules.  *See* AAA Employment, Rule 6(a); *Brennan v. Opus Bank*, 796 F.3d 1125, 1133 (9th Cir. 2015) ("incorporation of the AAA rules [] delegates enforceability questions to the arbitrator").  But the ADR Program ***does not*** "clearly and unmistakably" delegate questions about the validity and enforceability of the ADR Program to an arbitrator because the ADR Program's explicit delegation provision only puts questions about the "scope and application" of the ADR Program—not its enforceability—before an arbitrator.  Dkt. 19-3, Ex. 3 at 153, § 13.  Thus, to the extent the ADR Program could be read to delegate all questions of arbitrability to an arbitrator, that delegation is substantively unconscionable because it would deviate from the ADR Program's express terms.

*Third*, the ADR Program carves out a right to utilize the court system for claims "arising out of or related to the unauthorized use, disclosure or misappropriation of the confidential and/or proprietary information of either party." Dkt. 19-5, Ex. 3 at 151, § 3.  While the ADR Program, on paper, provides Pambakian with the same right, in practice this provision is unfairly one-sided, as Match is far more likely than Pambakian to have trade secrets or other confidential information that would benefit from this protection.  Courts have found arbitration agreements to be unfairly one-sided where, like here, they compel arbitration of claims more likely to be brought by the weaker party but exempt from arbitration the types of claims that are more likely to be brought by the stronger party. *Fitz*, 118 Cal. App. 4th at 724; *Mercuro v. Superior Court*, 96 Cal. App. 4th 167, 176 (2003) (arbitration agreement one-sided when covered "some employment-related claims including employment discrimination but excluded others such as …

equitable relief for unfair competition, unauthorized disclosure of trade secrets or violation of intellectual property rights").

Because the ADR Program is both procedurally and substantively unconscionable, the Court should not enforce it.  Although the Court may in its discretion either sever unconscionable provisions or refuse to enforce the agreement, California courts generally bar enforcement of an agreement—like the one here—that is "permeated by unconscionability."  *Carbajal v. CWPSC, Inc.*, 245 Cal. App. 4th 227, 254 (2016).  "An employment arbitration agreement can be considered permeated by unconscionability if it contains *more than one* unlawful provision."  *Id.* (internal quotation marks and citation omitted).  Thus, in *Carbajal*, the court upheld refusal to enforce an arbitration agreement that "contain[ed] three substantively unconscionable terms"—which is the same amount challenged here. *Id.*  Because it would be unjust to enforce the unconscionable ADR Program, the Court should deny the Motion.

### D.   Blatt Cannot Enforce The ADR Program Because He Is In Breach

Even if the ADR Program were enforceable against Pambakian—and it is not—the Motion should be denied because Blatt breached the program's terms.  It is "[a] bedrock principle of California contract law [] that '[h]e who seeks to enforce a contract must show that he has complied with the conditions and agreements of the contract on his part to be performed.'"  *Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1010 (9th Cir. 2005) (citation omitted).  In *Brown*, the Ninth Circuit applied this principle when an employer breached its arbitration agreement, thus "depriv[ing] it of the right to enforce that agreement."  *Id.* at 1010.

Just like the defendant in *Brown*, Blatt "clearly breached the arbitration agreement" by filing his complaint against Pambakian in federal court.  *See id.*; FAC.  Indeed, Blatt explicitly admits in his demand for arbitration that the claims asserted in the FAC are covered by the ADR Program.  Dkt. 19-2, Ex. 2, ¶ 5.  This breach has caused Ms. Pambakian tangible prejudice by ostensibly preserving

Blatt's ability to sue for damages regarding statements that otherwise would fall outside the statute of limitations.   In addition, Blatt has affirmatively used this court action to advance his legal attack on Pambakian.  Less than two weeks ago, Blatt filed a 42-page amended complaint with 104 pages of exhibits.  Dkt. 18.  Filing an amended complaint is completely unnecessary to preserve Blatt's claims.  Far from evincing an intent to arbitrate, Blatt's filing of the FAC reflects an intent to use the Court to publicly broadcast his smear campaign against Defendants.

Additionally, Blatt breached the ADR Program by filing a consolidated arbitration demand with Match and IAC against Pambakian.  The ADR Program states:  any "arbitration shall proceed solely on an individual basis without the right for any claims to be arbitrated as a class, consolidated, collective or representative action.  Claims may not be joined or consolidated unless agreed to by all parties in writing."  Dkt. 19-5, Ex. 3 at 151, § 2.  Despite this provision, Blatt filed a joint arbitration demand with Match and IAC regarding the claims in the related *Pambakian* action, *id.*, Ex. 1 at 044, and seeks to relate the claims in this action to that consolidated arbitration, *id.* at 097; *see* Wright & Miller, 9A Fed. Prac. & Proc. Civ. § 2382 (3d ed.) ("[i]n the context of legal procedure" consolidations means, *inter alia*, combining actions such as when "several actions are pending between the same parties stating claims that might have been set out originally as separate counts in one complaint"); *see generally id.* § 2384 (consolidation occurs when actions involving same parties based on overlapping facts are combined).

Finally, to the extent the ADR Program requires a confidential arbitration as Blatt claims, Blatt breached his confidentiality obligations by publicly filing his arbitration demands in connection with the Motion.  Dkt. 19-4, Ex. 2; Dkt. 19-5, Ex. 3.  Blatt's breaches require denial of the Motion.

### E.    Blatt Waived His Right To Enforce The Summary Agreement

Blatt also cannot enforce the Summary Agreement because he waived his right to arbitrate by filing suit against Pambakian in federal court.  "[A] party

seeking to prove waiver of a right to arbitration must demonstrate: (1) knowledge of an existing right to compel arbitration; (2) acts inconsistent with that existing right; and (3) prejudice to the party opposing arbitration resulting from such inconsistent acts." *Martin v. Yasuda*, 829 F.3d 1118, 1124 (9th Cir. 2016) (internal quotation marks and citation omitted).  Each of these elements is established here.

First, Blatt's arbitration demand evidences his knowledge of his supposed right to arbitrate.  Second, Blatt's filing of a court action is inconsistent with his supposed right to arbitrate.  *See Steiner v. Horizon Moving Sys., Inc.*, 2008 WL 4822774, at *3 (C.D. Cal. Oct. 30, 2008) ("The second requirement for waiver exists" due to "filing a lawsuit in lieu of seeking arbitration of [his] claims.").  Indeed, Blatt has continued litigating this case in court for two months after filing his complaint—including filing an *amended* complaint—instead of dismissing it to solely pursue arbitration.  Finally, Pambakian has suffered prejudice.

Prejudice is established when parties "have incurred costs that they would not otherwise have incurred" or when "defendants have received an advantage from litigating in federal court that they would not have received in arbitration." *Martin*, 829 F.3d at 1126.  Because of Blatt filing this action, Pambakian was forced to incur costs in drafting and filing an anti-SLAAP motion.  Dkt. 20.  Blatt has gained an unfair advantage by getting a preview of Pambakian's arguments, which he can use to craft his legal strategy in the arbitration.  Additionally, by litigating parallel actions in court and arbitration, Blatt is attempting to see which forum provides him with the best result.  This is precisely the type of unfair gamesmanship that establishes prejudice. *See Steiner*, 2008 WL 4822774, at *3-4 (prejudice based on forum shopping).

## IV.   CONCLUSION

For the foregoing reasons, the Court should deny Blatt's Motion.

Dated:  October 15, 2019

GIBSON, DUNN & CRUTCHER LLP

By: /s/ *Deborah L. Stein*
        Deborah L. Stein

*Attorneys for Defendants Rosette
Pambakian and Sean Rad*