DEBORAH L. STEIN (SBN 224570)
    DStein@gibsondunn.com
MICHAEL H. DORE (SBN 227442)
    MDore@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071
Telephone:   (213) 229-7164
Facsimile:    (213) 229-6164

ORIN SNYDER (*pro hac vice* application forthcoming)
    OSnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  (212) 351-2400
Facsimile:  (212) 351-6335

GRETA B. WILLIAMS (SBN 267695)
    GBWilliams@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone:  (202) 887-3745
Facsimile:  (202) 530-4230

Attorneys for Defendants Rosette Pambakian
and Sean Rad

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREG BLATT,<br><br>                            Plaintiff,<br><br>        v.<br><br>ROSETTE PAMBAKIAN and SEAN RAD; and DOES 1-10, inclusive,<br><br>                            Defendants. | Case No. 2:19-CV-07046-MWF-FFM<br><br>Hon. Michael W. Fitzgerald<br><br>**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S FIRST AMENDED COMPLAINT (PURSUANT TO CAL. CODE CIV. PROC. § 425.16)**<br><br>Hearing Date:   November 4, 2019<br>Hearing Time:  10:00 a.m.<br>Courtroom:       5A |

Gibson, Dunn &
Crutcher LLP

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT
OF DEFENDANTS' SPECIAL MOTION TO STRIKE
CASE NO. 2:19-CV-07046-MWF-FFM

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................1

II.    ARGUMENT ......................................................................................3

  A.  California's—Not New York's—Anti-SLAPP Protections Apply Here ......3

  B.  The Court Is Fully Empowered To Strike The First Amended Complaint That Blatt Filed In Federal Court ..................................................................6

  C.  The Anti-SLAPP Law Covers The Alleged Defamatory Statements ..........8

    1.  Blatt cannot avoid SLAPP by challenging allegations made in the New York Complaint as "irrelevant and erroneous." ..............................8

    2.  Blatt cannot credibly contest that the alleged defamatory statements concerned a matter of public interest ..................................................10

    3.  Blatt cannot plead around anti-SLAPP by casting aspersions on Defendants' motives. ......................................................................12

  D.  Blatt Fails to Demonstrate a Probability of Prevailing on the Merits ........14

    1.  The fair and true reporting privilege bars Blatt's claims ........................14

      a.  Reviewing the entirety of the news reports containing the allegedly defamatory statements shows they relate to the Valuation Lawsuit as a matter of law ..................................................14

      b.  The allegedly defamatory statements include background and details of allegations in the Valuation Lawsuit that are covered by the fair and true reporting privilege ..................................................20

    2.  Blatt concedes that California law does not recognize civil conspiracy as a stand-alone cause of action ............................................................24

III.    CONCLUSION ................................................................................25

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baker v. Los Angeles Herald Examiner*,
42 Cal. 3d 254 (1986) .......................................................................17

*Block v. First Blood Associates*,
691 F. Supp. 685 (S.D.N.Y. 1988) ....................................................4

*Braun v. Chronicle Publishing Co.*,
52 Cal. App. 4th 1036 (1997) ...........................................................24

*Briarwood Capital, LLC v. KBR Group, LLC*,
2010 WL 1525453 (S.D. Cal. Apr. 14, 2010) ...............................7, 8

*Cardenas v. United States*,
826 F.3d 1164 (9th Cir. 2016) ..........................................................25

*Century 21 Chamberlain & Associates v. Haberman*,
173 Cal. App. 4th 1 (2009) .............................................................6, 7

*Church of Scientology v. Wollersheim*,
42 Cal. App. 4th 628 (1996) .............................................................12

*Cline v. Reetz-Laiolo*,
329 F. Supp. 3d 1000 (N.D. Cal. 2018) ..............................................5

*Colt v. Freedom Commc'ns, Inc.*,
109 Cal. App. 4th 1551 (2003) .........................................................20

*CRS Recovery, Inc. v. Laxton*,
600 F.3d 1138 (9th Cir. 2010) ............................................................3

*Dawe v. Corrections USA*,
2009 WL 1420969 (E.D. Cal. May 20, 2009) .....................................5

*Doe v. Capital Cities*,
50 Cal. App. 4th 1038 (1996) ...........................................................21

*Dorsey v. National Enquirer, Inc.*,
973 F.2d 1431 (9th Cir. 1992) ........................................ 2, 14, 21-23

ii

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT
OF DEFENDANTS' SPECIAL MOTION TO STRIKE
CASE NO. 2:19-CV-07046-MWF-FFM

Gibson, Dunn &
Crutcher LLP

*eDrop-Off Chicago LLC v. Burke*,
    2013 WL 12131186 (C.D. Cal. Aug. 9, 2013) .................................................... 3

*Flatley v. Mauro¸*
    39 Cal. 4th 299 (2006) ..................................................................................... 13

*Francis v. Wynn Las Vegas*,
    557 F. App'x 662 (9th Cir. 2014) ....................................................................... 4

*GOLO, LLC v. Higher Health Network, LLC*,
    2019 WL 446251 (C.D. Cal. Feb. 5, 2019) ................................................. 3, 4, 5

*Guzman v. Finch*,
    2019 WL 1877184 (S.D. Cal. Apr. 26, 2019) ............................................. 11, 12

*Hawran v. Hixon*,
    209 Cal. App. 4th 256 (2012) ........................................................................... 13

*Hayward v. Watsonville Register-Pajaronian*,
    265 Cal. App. 2d 255 (1968) ............................................................................ 24

*Healthsmart Pacific, Inc. v. Kabateck*,
    7 Cal. App. 5th 416 (2016) ...............................2, 10, 14, 15, 16, 20, 23

*Heller v. NBCUniversal, Inc.*,
    2016 WL 6573985 (C.D. Cal. Mar. 30, 2016) ........................................... 11, 12

*Liberty Synergistics Inc. v. Microflo Ltd.*,
    718 F.3d 138 (2d Cir. 2013) ............................................................................... 3

*Maloney v. T3Media, Inc.*,
    853 F.3d 1004 (9th Cir. 2017) ......................................................................... 12

*Marsh v. Burrell*,
    805 F. Supp. 1493 (N.D. Cal. 1992) .................................................................. 3

*McClatchy Newspapers, Inc. v. Superior Court*,
    189 Cal. App. 3d 961 (1987) ...................................................................... 13, 14

*Paul v. Friedman*,
    95 Cal. App. 4th 853 (2002) ................................................................... 9, 10, 14

*Rand Resources, LLC v. City of Carson*,
    6 Cal. 5th 610 (2019) .............................................................................. 9, 11, 12

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT
OF DEFENDANTS' SPECIAL MOTION TO STRIKE
CASE NO. 2:19-CV-07046-MWF-FFM

Gibson, Dunn &
Crutcher LLP

*Renewable Resources Coalition, Inc. v. Pebble Mines Corp.*,
218 Cal. App. 4th 384 (2013) ........................................................................13, 14

*Rivero v. Am. Fed. of State, Cty., and Mun. Emps.*,
105 Cal. App. 4th 913 (2003) .............................................................................12

*Sarver v. Chartier*,
813 F.3d 891 (9th Cir. 2016) .......................................................................3, 4, 5

*Sheppard v. Lightpost Museum Fund*,
146 Cal. App. 4th 315 (2006) ...............................................................................6

*Silva v. U.S. Bancorp*,
2011 WL 7096576 (C.D. Cal. Oct. 6, 2011) ....................................................25

*Wilson v. Parker, Covert & Chidester*,
28 Cal. 4th 811 (2002) ..........................................................................................7

**Statutes**

Civ. Code § 47(d)............................................................................................23

Code Civ. Proc. § 425.16 ........................................................................3, 6

Gibson, Dunn &
Crutcher LLP

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT
OF DEFENDANTS' SPECIAL MOTION TO STRIKE
CASE NO. 2:19-CV-07046-MWF-FFM

# I.    INTRODUCTION

Defendants' moving brief demonstrated that this is a textbook case for anti-SLAPP dismissal.  Recognizing that he has pled himself out of court, Blatt now says this Court should not apply California law (despite pleading otherwise) and should not rule on the anti-SLAPP motion at all.  These arguments smack of desperation and collide with controlling Ninth Circuit law.  When Blatt finally gets around to addressing the merits, he fares no better, saying the allegations in the Valuation Lawsuit concerning the sexual assault and subsequent cover-up are not worthy of protection because, in Blatt's view, they are "irrelevant and erroneous."  But the law is clear.  What matters for purposes of Defendants' anti-SLAPP motion is that Pambakian's and Rad's allegedly defamatory statements related to allegations that were expressly pled in a publicly filed complaint in a pending lawsuit.  This is obvious to anyone who read the articles or watched the broadcast about the lawsuit that Blatt claims included defamatory statements. California's anti-SLAPP law bars Blatt's claims.

*First*, Blatt incorrectly argues that Pambakian's allegations about Blatt sexual assault at a Tinder holiday party are not "under consideration" in the Valuation Lawsuit pending in New York.  These allegations have been part of the case since it was filed in August 2018.  And, at a hearing just last month, the Court made clear those allegations will remain in the case.  When Match/IAC's counsel tried to challenge Pambakian's credibility and urged the court to "knock out" the sexual harassment allegations from the case, the New York court responded: "***Not happening.  I'm not doing it.***"  Supp. RJN, Ex. C at 012.[1]  Those allegations unquestionably remain a part of the Valuation Lawsuit and are relevant to show both Match's motive for disregarding a sexual assault committed by a CEO and their intent

---

[1]  Unless otherwise noted, all emphasis is added and all internal quotation marks and citations are omitted.

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT
OF DEFENDANTS' SPECIAL MOTION TO STRIKE
CASE NO. 2:19-CV-07046-MWF-FFM

Gibson, Dunn &
Crutcher LLP

1    to do anything necessary to execute their scheme to deprive Tinder's founders and

2    early employees of billions of dollars.

3          *Second*, California's fair and true reporting privilege clearly applies to the

4    alleged defamatory statements here because any reasonable viewer or reader who saw

5    the entirety of the news reports at issue, and viewed the alleged defamatory statements

6    in the context they were made, would understand they were providing a report of

7    allegations in a pending lawsuit.  Over and over, the news reports expressly refer to the

8    lawsuit and state they are referring to "allegations" or "claims," several include IAC's

9    statement that it would vigorously defend the suit, and Rad and Pambakian themselves

10   refer to the litigation.  Under extremely similar circumstances, the California Court of

11   Appeal in *Healthsmart Pacific, Inc. v. Kabateck*, 7 Cal. App. 5th 416, 434 (2016),

12   affirmed the grant of an anti-SLAPP motion even though not every challenged

13   statement was couched as an allegation.  *Healthsmart* provides a template for how the

14   Court should approach the issue here.  The news reports plainly relate information at

15   issue in the Valuation Lawsuit.  *Healthsmart* establishes that the Court should review

16   the entirety of those publications and should conclude as a matter of law that they are

17   absolutely protected under the fair and true reporting privilege.

18         *Third*, to the extent any allegedly defamatory statements do not match up

19   exactly with the allegations in the Valuation Lawsuit that Blatt groped and sexually

20   harassed Pambakian in front of colleagues at a Los Angeles Tinder holiday party, they

21   merely provide background and detail regarding those allegations.  As the Ninth

22   Circuit held in *Dorsey v. National Enquirer, Inc.*, 973 F.2d 1431, 1437 (9th Cir. 1992),

23   the fair and true reporting privilege provides absolute protection over such statements

24   describing the facts underlying allegations in a judicial proceeding.  Thus, every

25   statement at issue here is absolutely protected.

26         Defendants' anti-SLAPP motion to strike should be granted without leave to

27   amend, and Defendants should be awarded attorneys' fees and costs for having to

28   oppose Blatt's clear attempt to chill protected speech.

2

Gibson, Dunn & Crutcher LLP

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT
OF DEFENDANTS' SPECIAL MOTION TO STRIKE
CASE NO. 2:19-CV-07046-MWF-FFM

## II.     ARGUMENT

### A.     California's—Not New York's—Anti-SLAPP Protections Apply Here

Recognizing that his claims die on the vine under California's anti-SLAPP law, Blatt wishfully contends that New York's narrower anti-SLAPP law applies.  But this Court need not engage in a conflict-of-law analysis because Blatt's claims are common law claims brought in a court in California, and thus there is "no prospect that anything other than California's anti-SLAPP statute would apply." *eDrop-Off Chicago LLC v. Burke*, 2013 WL 12131186, at *12-13 (C.D. Cal. Aug. 9, 2013); *accord Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 154 (2d Cir. 2013) (holding that California's anti-SLAPP rule "applies to California courts regardless of which source of law governs a plaintiff's claim").

In any event, there is no reason to deviate from the "default" rule that "the law of the forum state will be invoked" in a choice-of-law analysis, *CRS Recovery, Inc. v. Laxton*, 600 F.3d 1138, 1142 (9th Cir. 2010), because Blatt has failed to overcome the "presumption that California law applies" by showing "a compelling reason to displace" California's anti-SLAPP statute.  *See Marsh v. Burrell*, 805 F. Supp. 1493, 1496 (N.D. Cal. 1992).  "California has expressed a strong interest in enforcing its anti-SLAPP law," which specifically "instruct[s] [courts] to construe" the law "broadly" in order to protect Californians who exercise their free speech rights—like Defendants—from "abuse of the judicial process." *Sarver v. Chartier*, 813 F.3d 891, 899 (9th Cir. 2016); Cal. Civ. Proc. Code § 425.16(a); *GOLO, LLC v. Higher Health Network, LLC*, 2019 WL 446251, at *13 (C.D. Cal. Feb. 5, 2019) (California anti-SLAPP law reflects California's "acute interest in protecting the speech of its own citizens").

Under the Ninth Circuit's decision in *Sarver*, California's anti-SLAPP law should apply because California has a greater interest than New York in providing the broader protections afforded by California law.  In *Sarver*, the Ninth Circuit applied California's law rather than New Jersey's because, "[w]hereas California would appear

3

Gibson, Dunn &
Crutcher LLP

to object strongly to the absence of a robust anti-SLAPP regime, New Jersey's interests would be less harmed by the use of California law." 813 F.3d at 899-900.  By Blatt's own admission, New York's anti-SLAPP law does not protect nearly as much constitutional speech as California's anti-SLAPP law.  *See* Opp. at 10 (New York's law "applies to a narrow set of conduct"); *Francis v. Wynn Las Vegas*, 557 F. App'x 662, 664 (9th Cir. 2014) (applying California anti-SLAPP law because "applying Nevada's law would improperly limit California's expansive defendant-friendly policy."); *GOLO, LLC*, 2019 WL 446251, at *12 (applying California anti-SLAPP law instead of narrower Pennsylvania and Delaware laws).  Moreover, the Court should apply California law because "California has a great interest in determining how much protection to give California speakers" like Defendants.  *Id*.  The cases show that the state that affords *broader* protections has a greater interest in enforcing its anti-SLAPP law.[2]

The record is also clear that the speech at issue has a far greater nexus to California than New York.  The Defendants are California residents, the alleged assault addressed in the purportedly defamatory statements took place in California, and Blatt himself alleges "a substantial part of the events that give rise to [his] claim occurred in the Central District of California."  FAC ¶ 26; *see also* ¶ 134 ("Numerous tortious activities occurred within the State of California").  Tinder is also Los Angeles-based (which is why its holiday party was here and Blatt—as CEO—was in Los Angeles for the party).  In fact, while Blatt now argues for New York law, his arbitration demand concedes that Los Angeles is the "county in which the dispute arose."  Dkt. 19-3 at 052, 097 (Blatt's arbitration demand states "Los Angeles" should be hearing locale).  This is a far cry from Blatt's sole case applying New York law, *Cline v. Reetz-Laiolo*, in which the plaintiff alleged that "all of the conduct relevant to

[2] *Block v. First Blood Associates* (Opp. at 11) is not an anti-SLAPP case, and Blatt conspicuously omits from his quote of *Block* that the tortious conduct at issue allegedly was committed by a *New York attorney* (not California residents like Defendants).  *See* 691 F. Supp. 685, 698 (S.D.N.Y. 1988).

4

Gibson, Dunn & Crutcher LLP

the anti-SLAPP issue . . . occurred in New York."  329 F. Supp. 3d 1000, 1028 (N.D. Cal. 2018).

In arguing for New York law, Blatt speculates that it "appears" Los Angeles resident Rad was in New York when he made his allegedly defamatory statements, Opp. at 10 n.7, but that allegation appears nowhere in his complaint.  And Blatt does not even bother to argue that Los Angeles resident Pambakian was anywhere other than Los Angeles when she allegedly made the defamatory statements.  Blatt also relies on the filing of the Valuation Lawsuit in New York court, but (1) fails to explain why that has anything to do with the choice of law analysis, and, in any event, (2) ignores that 90% of the plaintiffs who filed that suit—including Pambakian and Rad— are Los Angeles residents.  *See* Dkt. 21, Ex. A. ¶¶ 28-37.  Blatt's own allegations put California at the center of this lawsuit, and make clear that California's anti-SLAPP law applies.

That Blatt once lived in New York (including while he was the CEO of a Los Angeles company) does not change this analysis.  Opp. at 11.  Multiple courts have applied California's law notwithstanding that the plaintiff was domiciled elsewhere. *See, e.g.*, *Sarver*, 813 F.3d at 900 (holding "California has the most significant relationship to this litigation, which is sufficient to overcome any presumption of Sarver's domicile, wherever that may be."); *GOLO, LLC*, 2019 WL 446251, at *13 (applying California anti-SLAPP law because applying the law of plaintiff's domicile in Delaware "would improperly limit California's expansive defendant-friendly policy"); *Dawe v. Corrections USA¸* 2009 WL 1420969, at *8 (E.D. Cal. May 20, 2009) (applying California anti-SLAPP law rather than law of Wyoming—"the site of the likely injury to plaintiffs" and where plaintiff Dawe resided—because "[t]hrough enacting the Anti-SLAPP statute," California had "indicated a stronger interest than Wyoming" in adjudicating the defamation claims).

In sum, Blatt has shown no compelling reason to divert from the default rule applying California's anti-SLAPP law.

5

Gibson, Dunn & Crutcher LLP

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE CASE NO. 2:19-CV-07046-MWF-FFM

**B.      The Court Is Fully Empowered To Strike The First Amended Complaint That Blatt Filed In Federal Court**

Blatt's motion to compel arbitration does not immunize the First Amended Complaint from anti-SLAPP's purview.  As Blatt's own cited authority makes clear, "pleadings that have been filed in court"—like Blatt's own pleadings here—are "subject to a motion to strike" under the anti-SLAPP law.  *Sheppard v. Lightpost Museum Fund*, 146 Cal. App. 4th 315, 323 (2006).  This follows from the plain language of the anti-SLAPP statute, which "makes a 'cause of action' in a 'complaint,' . . . 'subject to' a motion to strike."  *Id.* at 322 (quoting Cal. Code Civ. Proc., § 425.16).  Defendants' Motion expressly seeks an order "striking [Blatt's] First Amended Complaint . . . in its entirety, and each individual claim referenced therein."  Dkt. 20.  Thus, under the plain language of the anti-SLAPP statute, this Court has jurisdiction to decide the Motion.

Blatt nevertheless argues that the statute's language must be disregarded because "California's anti-SLAPP statute does not apply to claims subject to arbitration."  Opp. at 12.  But the cases Blatt cites in support (*Sheppard* and *Century 21 Chamberlain & Associates v. Haberman*) say nothing of the sort.  *Sheppard* holds that the anti-SLAPP statute "does not authorize a superior court to grant a motion to strike an arbitration claim *filed only in an agreed arbitral forum* and *not asserted by the claimant in any complaint*, cross-complaint or petition *filed in court*."  146 Cal. App. 4th at 318; *see id.* at 324 ("*Sheppard*'s motion to strike did not target any cause of action in a complaint, cross-complaint or petition filed . . . in the superior court.").  Of course, Blatt *did* assert claims "in a[] complaint . . . filed in court" (not once but twice), *did not* "file[] only in an [] arbitral forum," and Defendants' Motion *does* "target [] cause[s] of action in a complaint." *Id*.  *Sheppard* therefore does not apply here.

*Century 21* is even further afield.  In that case, defendant moved to strike a claim seeking a declaration that plaintiff did not have to arbitrate a negligence claim asserted in an arbitration demand.  173 Cal. App. 4th 1, 7 (2009).  The court denied the

Gibson, Dunn & Crutcher LLP

1    motion, holding "the anti-SLAPP statute does not protect the act of initiating private

2    contractual arbitration" because the statute "protects statements made in, or concerning

3    issues under review by, a 'judicial proceeding, or any other official proceeding

4    authorized by law' . . . [and] [p]rivate contractual arbitration is neither." *Id.* at 5.

5    Because Defendants moved to strike the First Amended Complaint that Blatt filed in

6    court—not Blatt's arbitration demand or motion to compel arbitration—*Century 21* has

7    no bearing here.

8            Finally, Blatt's argument that the Court should rule on his motion to compel

9    arbitration before Defendants' Motion because his motion "may change the issues

10   properly before this Court" is completely backwards.  Opp. at 13.  An order

11   compelling arbitration would ***not*** moot these anti-SLAPP issues; the First Amended

12   Complaint would remain a live pleading with respect to each and every alleged

13   defamatory statement because Blatt: (i) does not seek to compel arbitration against

14   Rad; (ii) seeks to hold Rad liable for all of Pambakian's statements under Blatt's

15   conspiracy theory; and (iii) does not seek dismissal of his claims against Pambakian,

16   only a stay.  Dkt. 19 at 2 n.1, 11; Dkt. 23 at 25.  By contrast, if the Court grants

17   Defendants' Motion then this action would be closed.

18           Blatt made a tactical decision to bring his defamation claims in court.  He cannot

19   avoid the consequences of his decision—and the protections California's anti-SLAPP

20   statute affords to Defendants—by moving to compel arbitration and trying to dictate

21   the order in which the motions are heard.  This Court should rule on Defendants' anti-

22   SLAPP motion before Blatt's motion to compel arbitration, and provide the "speedy

23   and low-cost" remedy contemplated by the anti-SLAPP statute.  *See Wilson v. Parker,*

24   *Covert & Chidester*, 28 Cal. 4th 811, 826 (2002).[3]

25

26   [3]  *Briarwood Capital, LLC v. KBR Group, LLC*, 2010 WL 1525453 (S.D. Cal. Apr.
     14, 2010), which Blatt cites with a telling "*Cf.*" cite, in no way changes the
27   analysis.  In *Briarwood*, the court allowed the plaintiff to amend because doing so
     would eliminate every federal claim and warrant remand to the state court that had
28   "already expended tremendous time and effort adjudicating other issues between
     the parties in related state court actions."  *Id.* at *3.  The *Briarwood* court thus

Gibson, Dunn &
Crutcher LLP

## C. The Anti-SLAPP Law Covers The Alleged Defamatory Statements

### 1. Blatt cannot avoid SLAPP by challenging allegations made in the New York Complaint as "irrelevant and erroneous."

Blatt argues that the sexual assault allegations in the New York Lawsuit are not covered by the anti-SLAPP statute because they are just allegations and not related to that lawsuit or under consideration by the presiding court. Opp. at 13-14. This argument is ludicrous—and belied by the very cases Blatt cites in support.

*First*, there is no question that the allegations concerning sexual misconduct and subsequent cover-up are under review by the New York court. Blatt cannot dispute that these are part of the complaint in that case. *See* RJN, Ex. A ¶¶ 14, 127-33. And, just last month, Match tried to get those very allegations dismissed, arguing to Judge Scarpulla at a hearing that "this sideshow about the holiday party and a cover up, that the board of directors supposedly participated in, should be knocked out of the case." Supp. RJN, Ex. C at 012. The Court's response was unequivocal: "***Not happening. I'm not doing it.***" *Id.*

> There are plenty of things that I could do. That is not one of them. ***I'm not going to silence someone in that way.*** I'm just not doing it. And I know you know what I mean, so don't ask me again.

*Id.* at 40-1. Needless to say, Blatt's argument that the sexual misconduct and cover-up allegations are not under review by the New York court is not in good faith. The New York court expressly ***rejected*** Match's attempt to remove those allegations from the case. They remain a part of that lawsuit, as they have since the New York action was filed 14 months ago. Even Blatt argues that an issue related to the sexual harassment allegations is the subject of an "ongoing" challenge in the Valuation Lawsuit. Opp. at 2.

---

refrained from ruling on the anti-SLAPP motion because "judicial comity and courtesy require[d] the state court to decide the issues pending before it." *Id.* at *4. That is a far cry from this case.

Gibson, Dunn & Crutcher LLP

***Second***, the sexual misconduct allegations are plainly relevant to the Valuation Lawsuit.  The complaint in that case alleges that Match and IAC "executed [a] scheme to systematically deprive the Tinder Plaintiffs of their rights as optionholders" by artificially devaluing Tinder.  RJN, Ex. A ¶ 8.  It further alleges that "[b]ecause a credible investigation—let alone a firing in public view—would have derailed their scheme, [IAC/Match] whitewashed Blatt's misconduct" and "kept Blatt in place as Tinder's 'interim' CEO long enough to complete the private valuation and secret merger of Tinder."  *Id.* ¶ 14; *id.* ¶ 133 ("Defendants covered up Blatt's misconduct in part because he was essential to the execution of Defendants' scheme to deprive the Tinder Plaintiffs of their rights as optionholders—and to save Defendants billions of dollars in the process.").  In short, Blatt's bosses needed him in control of Tinder to execute their multi-billion dollar valuation scheme, so they swept his misconduct under the rug even though it would have doomed any other CEO.

The cases that Blatt cites do nothing for his argument.  In *Rand Resources, LLC v. City of Carson*, 6 Cal. 5th 610, 620 (2019), the court ruled that statements were not made "in connection with" an issue "under review" in a proceeding because the statements and the issue were about different things.  It was not a matter of a litigant arguing that a statement should not be a part of the proceeding; as a factual matter, they were about two different topics.  Specifically, the Carson City Council reviewed, considered, and voted on whether to ***extend*** an exclusive agreement with a contracting party.  *Id.* at 623.  That was very different from the subject of the statements—***who*** should represent the City in the ***original term*** of the agreement—which the legislative body "did not separately consider."  *Id.*

Likewise, in *Paul v. Friedman*, the case Blatt says "is on all fours," Opp. at 14, the disclosures about the plaintiff "had nothing to do with the claims under consideration in the arbitration" because they were not asserted as part of the arbitration claims.  95 Cal. App. 4th 853, 866 (2002).  The "issues actually under review by the arbitrators bore no relationship" to the disclosures (which arose in the

9

arbitration over the course of ten minutes out of 26 days of hearings). *Id.* at 867 n.2. The opposite is true here. The allegation that Blatt "sexually harassed and groped" Pambakian is in the operative New York complaint. In *Paul* "[t]he statement of claim in the arbitration ma[de] no allegations of 'impaired judgment' or 'distractions' causing damage to the claimants." *Id.* at 868. The sexual assault allegations here have been before the New York court—which has rejected Match's efforts to remove them from the case—for that case's full 14-month life.

*Third*, Blatt cites no authority to support his argument that a court should not consider allegations the plaintiff deems "erroneous" in an anti-SLAPP analysis. To the contrary, an inquiry into whether the underlying allegations are "erroneous" would end-run anti-SLAPP's protections. As the California Court of Appeal noted in applying the fair and true reporting privilege to affirm the grant of an anti-SLAPP motion, "'[f]air and true' in this context does not refer to the truth or accuracy of the matters asserted in the judicial proceedings, but rather to the accuracy of the challenged statements with respect to what occurred in the judicial proceedings." *Healthsmart Pac., Inc. v. Kabateck*, 7 Cal. App. 5th 416, 434 (2016).[4]

### 2. Blatt cannot credibly contest that the alleged defamatory statements concerned a matter of public interest.

Blatt concedes that sexual assault by a high-powered media executive—*i.e.*, precisely what Defendants allege Blatt did to Pambakian—is a matter of public interest. Opp. at 15 ("Blatt agrees that the #MeToo movement is a matter of public interest."). But Blatt then argues that Defendants' statements fall outside the protection of the anti-SLAPP statute because they are not "related to a broader issue of

---

[4]  Blatt's mischaracterization of Pambakian's opposition to his motion to compel arbitration in her assault case fares no better. The statement he cherry-picks addresses the arbitrability of Pambakian's claims, not whether the allegations that indisputably are a part of the New York lawsuit are "under consideration" by that court. Indeed, Blatt ignores the statement on the same page of Pambakian's brief that the New York complaint describes "Blatt's alleged misconduct—and Defendants' sham investigation into it—as part of alleging the extent of Defendants' scheme to devalue Tinder." Dkt. 24-1 at 13 of 31.

Gibson, Dunn & Crutcher LLP

public importance"—i.e., the #MeToo movement.  Opp. at 16 (quoting *Rand*, 6 Cal. 5th at 625).  In *Rand* the statements at issue addressed "who should be responsible for day-to-day functions associated with representing the City" in negotiating with the NFL, which unsurprisingly were not made "in connection with" a public issue.  *Id.* at 626, 623-25.  By contrast, the challenged statements here relate to the #MeToo movement that Blatt admits is a matter of public interest.  The statements *themselves* address issues at the heart of the #MeToo matter that Blatt admits is a matter of public interest.  *See Heller v. NBCUniversal, Inc.*, 2016 WL 6573985, at *8 (C.D. Cal. Mar. 30, 2016) (holding that music manager's work with N.W.A. was "patently a topic of public interest" in part because it reflected dynamics that "permeate our society . . . as shown by the recent #OscarsSoWhite controversy") (Fitzgerald, J.).

Blatt's argument that the challenged statements are not about the #MeToo movement but instead relate to him as a "private individual" fare no better.  Opp. at 16. The court in *Guzman v. Finch*, 2019 WL 1877184 (S.D. Cal. Apr. 26, 2019), rejected this precise argument in a strikingly similar case.  There, the defendant made Facebook posts about, *inter alia*, "sexual harassment in the workplace" allegedly suffered at the hands of plaintiff.  *Id.* at *6.  Like Blatt, plaintiff argued that while this "may be a matter of public interest generally, the content of the statement is merely between private persons regarding a private matter."  *Id*.  The Court rejected this argument, holding that the anti-SLAPP law "governs even private communications" and does not require that statements "contribute to a public debate and concern a large number of people."  *Id*.  Blatt's argument therefore fails.

Blatt also fails to rebut Defendants' argument that the Valuation Lawsuit is a matter of public interest.  To the contrary, Blatt's whole complaint *is premised* on the idea that the Valuation Lawsuit is a matter of public interest.  Blatt alleges that CNN decided to interview Rad about the Valuation Lawsuit, and that a "wave of news articles" were published about the Valuation Lawsuit (including by CNN and the Verge).  FAC ¶ 95.  Blatt's own allegations therefore establish that the Valuation

Lawsuit is matter of public interest as "evidenced by [this] media coverage" by prominent outlets. *See Church of Scientology v. Wollersheim*, 42 Cal. App. 4th 628, 628 (1996), *disapproved on other grounds by Equilon Enterprises v. Consumer Cause, Inc.*, 29 Cal. 4th 53 (2002). In fact, Blatt admits the public was intensely interested in this issue, with the CNN interview allegedly "widely viewed" and the articles "widely read." FAC ¶ 95. Blatt's own allegations therefore establish that the Valuation Lawsuit is a public issue. *See Guzman*, 2019 WL 1877184, at *5 (issue of public interest is "any issue in which the public is interested"); *Maloney v. T3Media, Inc.*, 853 F.3d 1004, 1010 n.3 (9th Cir. 2017) ("California defines 'an issue of public interest' broadly.").

Finally, Blatt is wrong that he is not "in the public eye" because he is now retired. Opp. at 15. Blatt does not cease being "in the public eye" merely because he no longer is a top media executive. *See Heller*, 2016 WL 6573985, at *8 (holding that plaintiff was "in the public eye" based on his management of N.W.A. nearly twenty years before the lawsuit). Regardless, the Court does not even need to reach this issue to determine that the challenged statements are about public interest matters because the "in the public eye" category of statements is just one of "three *nonexclusive* [] categories of statements within the ambit" of the anti-SLAPP law. *See Rand*, 6 Cal. 5th at 621 (citing *Rivero v. Am. Fed. of State, Cty., and Mun. Emps.*, 105 Cal. App. 4th 913 (2003)); *see also Rivero*, Cal. App. 4th at 924 (using "or"—not "and" like Blatt—in discussing three categories). It is not part of a three-part "test," as Blatt advocates. Opp. at 14-15.

### 3. Blatt cannot plead around anti-SLAPP by casting aspersions on Defendants' motives.

Blatt argues that the First Amended Complaint is not subject to anti-SLAPP protection because it alleges "[s]peech in furtherance of an unlawful scheme," and the Court must accept the truth of those allegations. Opp. at 16:11-18. Of course, no such rule is found in the anti-SLAPP statute or in the case law Blatt cites. And, Blatt makes

12

Gibson, Dunn &
Crutcher LLP

1  no attempt to address the multiple cases that Defendants cited and hold that the fair-

2  and-true reporting privilege applies "regardless of the defendants' motive for reporting

3  it." *Hawran v. Hixon*, 209 Cal. App. 4th 256, 278 (2012); *see also McClatchy*

4  *Newspapers, Inc. v. Superior Court*, 189 Cal. App. 3d 961, 975 (1987) (holding that

5  "the privilege provided a report of a judicial proceeding" applies even to "a conspiracy

6  designed to introduce defamatory materials into judicial proceedings"); *see generally*

7  Dkt. 20-2 at 21.

8        Instead, Blatt argues that Defendants "overlook a line of cases, under prong one,

9  where motive is, in fact, a relevant factor." Opp. at 17 n.10. But the only case Blatt

10  cites for this proposition is *Flatley v. Mauro¸* 39 Cal. 4th 299 (2006), which did not

11  involve a situation anything like the one here. Rather, in *Flatley*, the anti-SLAPP

12  movant sought protection of a purported prelitigation settlement offer (***not statements***

13  ***relating to pending litigation***), but that supposed settlement offer was found as a

14  matter of law to be criminal extortion and thus not protected. *Id. Flatley* thus stands

15  for the unremarkable proposition that the anti-SLAPP law does not apply where "the

16  defendant concedes, or the evidence conclusively establishes, that the assertedly

17  protected speech or petition activity was illegal as a matter of law." *Id.* at 320. There

18  is no such concession here, nor is there "uncontroverted and conclusive evidence" of

19  illegality "as a matter of law." *Id.*

20        Finally, Blatt seeks to apply a "broader lens" (Opp. at 17:8) to this inquiry in

21  citing *Renewable Resources Coalition, Inc. v. Pebble Mines Corp.*, 218 Cal. App. 4th

22  384 (2013), but that case was not about speech at all. The *Renewable* plaintiffs did not

23  bring defamation claims, but rather asserted causes of action against the Pebble

24  defendants for interference with contract and interference with prospective economic

25  advantage. *Id.* at 389. A "fair reading of Coalition's complaint" was that the Pebble

26  defendants "were being sued for wrongfully purchasing Coalition's confidential

27  documents." *Id.* at 398. "Said purchase was not an act by the Pebble defendants in

28  furtherance of their right of petition or free speech, making the anti-SLAPP procedure

13

Gibson, Dunn &
Crutcher LLP

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT
OF DEFENDANTS' SPECIAL MOTION TO STRIKE
CASE NO. 2:19-CV-07046-MWF-FFM

1   inapplicable." *Id.* at 397.  By contrast, here, Blatt alleges defamation and "an unlawful

2   conspiracy to defame Blatt."  FAC ¶ 135.  Blatt's apparent contention that the basis for

3   filing his defamation, defamation *per se*, and conspiracy-to-defame claims is

4   something other than speech is nonsensical.[5]

5   ### D.   Blatt Fails to Demonstrate a Probability of Prevailing on the Merits

6   #### 1.   The fair and true reporting privilege bars Blatt's claims.

7   ##### a.   Reviewing the entirety of the news reports containing the
8   allegedly defamatory statements shows they relate to the
    Valuation Lawsuit as a matter of law.

9   Where, as here, "'there is no dispute as to what occurred in the judicial

10  proceeding reported upon or as to what was contained in the report,' the question is

11  one of law." *Healthsmart*, 7 Cal. App. 5th at 431 (quoting *McClatchy*, 189 Cal. App.

12  3d at 976); *Dorsey v. Nat'l Enquirer, Inc.*, 973 F.2d 1431, 1435 (9th Cir. 1992)

13  ("When there is no dispute about the material facts, the 'fair and true' issue is

14  generally one of law . . . .").  Blatt's attempt to avoid court review by claiming that this

15  is a "question of fact for a jury," Opp. at 18, is wrong.  The parties have both presented

16  the same, objective evidence of what is alleged in the New York complaint, and there

17  likewise is no dispute as to what is contained in the articles and broadcast that Blatt has

18  submitted as exhibits in this proceeding.  These are straightforward issues that can be

19  easily resolved by reading the news articles and watching the CNN video.  *See Dorsey*,

20  973 F.2d at 1435 (finding no dispute over what occurred in the judicial proceeding or

21  in the contents of the National Enquirer article, and concluding that "the district court

22  could determine, as a matter of law, whether the article was a 'fair and true' report").

23  *Healthsmart* shows why the privilege applies with full force here.  In that case,

24  the plaintiffs filed defamation and other claims against lawyers who had appeared on a

25

26  ─────────────
    [5]   The *Paul* case Blatt cites likewise provides no support for the anti-SLAPP carve-
27  out that Blatt seeks.  In *Paul*, the court simply found that a lawsuit seeking redress
    for a harassing investigation concerning topics unrelated to those under
28  consideration in an official proceeding did not fall within the scope of anti-SLAPP
    protection.  *See* 95 Cal. App. 4th at 861.

14

Gibson, Dunn &
Crutcher LLP

television news broadcast and radio program and described the facts underlying a lawsuit they had filed alleging medical billing fraud.  7 Cal. App. 5th at 422-24. In their respective interviews, the lawyers made numerous statements that they did not attribute to the lawsuit.  *See, e.g.*, *id.* at 423 (Attorney 1: "They were fabricating the costs, they were billing the insurance companies and as a result of it, they were receiving millions of dollars."); *id.* at 425 (Attorney 2: "Patients had counterfeit or knock off screws that were not FDA approved used in their spinal fusion cases . . . ."). But the *Healthsmart* court found that every statement by the attorneys—including those that did not explicitly reference a lawsuit—was protected by the fair and true report privilege.  *Id.* at 436.

Much like the news reports here, even for specific statements where the defamation defendants did not reference the lawsuit, the broadcasts in *Healthsmart* included "images of the complaint" and repeated references by the journalists to the "lawsuit," the "complaint," and "allegation[s]."  7 Cal. App. 5th at 422-24. This context was dispositive.  According to the *Healthsmart* court, while "some statements, when viewed in isolation, could be understood to communicate the allegedly defamatory matter as facts, not mere allegations of facts, when the media reports are viewed ***in their entirety*** and ***in the context in which they were made,*** the ***only*** reasonable conclusion is that the statements refer to the allegations made in the . . . complaint."  *Id.* at 436.

The same analysis applies here, leading to the "only reasonable conclusion" as a matter of law: the allegedly defamatory statements were made in reference to the Valuation Lawsuit.  Even a cursory review of the four news reports compels this conclusion (*see* Dkt. 20 at 7-14 (comparing alleged defamatory statements with contents of the broadcast and articles Blatt cites in his FAC)):

(1) August 14, 2018 CNN Broadcast:  The CNN anchor introduces the report by saying: "We're all familiar with the dating app, Tinder, in some shape or form.  Well, now the co-founders of Tinder and others are ***suing*** the parent company, Match for

1   billions.  They're also leveling serious charges against Tinder's former Chief

2   Executive."  Dkt. 23-2 at 54.  The correspondent then notes that "It's an explosive

3   *lawsuit*."  *Id.*  Her first words of the recorded report again are, "It's an explosive

4   *lawsuit*."  *Id.* at 55.

5         Interspersed throughout clips of an interview with Sean Rad, the correspondent

6   states that Rad "along with former and current employees are ***suing*** IAC"; describes

7   Blatt's role in the alleged scheme, "according to Rad and the ***lawsuit***"; and says that

8   "[t]he ***lawsuit*** seeks at least $2 billion in damages."  *Id.* at 56.  The report includes an

9   interview clip with Defendants' attorney in the Valuation Lawsuit, who refers multiple

10  times to "the ***defendants***."  *Id.*  It even includes a statement from one of those

11  defendants, IAC, which "called the ***suit*** meritless," said it would "vigorously ***defend***

12  against it, and asserted "sour grapes alone do not a ***lawsuit*** make."  *Id.*

13        The CNN report explicitly states that, "[t]he ***suit*** also ***alleges*** that soon after

14  Blatt was named Tinder's CEO in late 2016, he groped and sexually harassed Tinder

15  Vice President of Marketing and Communications, Rosette Pambakian at a company

16  holiday party.  *Id.*  The correspondent later notes, in posing a question directly to Rad,

17  that the New York lawsuit "is a ***lawsuit that's claiming sexual harassment***."  *Id.* at 57.

18  At 3:14 of the video, CNN even displays on the screen a paragraph of the complaint

19  alleging Blatt's sexual misconduct.  Less than forty seconds later, it displays a

20  statement from Match saying, in part, that "[t]he Match Group Board takes allegations

21  of sexual harassment extremely seriously."

22        In an aired portion of his interview, ***Rad*** himself references "[t]he executives

23  who are part of ***this lawsuit***."  *Id.* at 56.  This itself is a far more explicit reference to a

24  legal proceeding than what the *Healthsmart* court found to be covered by the fair and

25  true reporting privilege.  7 Cal. App. 5th at 436 (affirming anti-SLAPP motion where

26  defendant made multiple statements of fact and only uttered the word "alleged" "[n]ear

27  the end of the interview").

28

16

Gibson, Dunn &
Crutcher LLP

1         (2) <u>August 16, 2018 CNN Article</u>:  The very first sentence of the CNN article

2    states, "A *lawsuit* filed by ten current and former Tinder executives accuses former

3    CEO Greg Blatt of groping and sexually harassing a vice president of the company."

4    Dkt. 23-2 at 67.  It continues, "The *suit* also claims that Tinder's corporate parent did

5    nothing about the incident because Blatt was a key figure in its plan to minimize

6    Tinder's valuation and deny early employees billions of dollars in stock options."  *Id*.

7    The second paragraph begins, "The *lawsuit* accuses Blatt of groping and sexually

8    harassing Rosette Pambakian . . . ."  *Id*.  It later states that "[t]he *allegation* appears in

9    a *lawsuit*"; that Rad, Pambakian, and others are "*suing*" Tinder's owners; and that the

10   "*suit*" seeks $2 billion in damages.  *Id*.

11        The report notes that "Pambakian and the three other plaintiffs in the *suit* who

12   still work at Tinder were put on paid administrative leave by the company . . . ."  *Id.* at

13   67.  Again, the report includes an IAC statement in response to the filing, calling "the

14   *suit* 'meritless' and saying it would 'vigorously *defend*' itself against it."  *Id.* at 68.

15   Immediately after that statement, the report includes a statement from Match, saying,

16   "As it relates to *the matter alleged in the lawsuit*, an incident occurred in late 2016

17   and was reported at the end of April 2017."  *Id.*

18        The report then states that "CNN has learned more details surrounding the

19   *alleged* incident, which occurred during Tinder's 2016 holiday party at the SLS Hotel

20   in Los Angeles."  *Id.*  Against this clear backdrop of detailing an allegation made in

21   court, the report then quotes Pambakian about that incident.  The article then

22   repeatedly quotes allegations from "the *suit*," which states that "*Defendants* . . .

23   covered up Blatt's conduct."  *Id.* at 69.  The article says that "[d]espite being placed on

24   leave after the *suit* was filed . . . Pambakian is still an employee of Tinder."  *Id.* at 70.

25        A speaker has no control over what portions of an interview will be used in a

26   news report, or how a news report will be structured.  Rather than viewing in isolation

27   the statements attributed to Pambakian that CNN elected to include in its piece, the

28   focus must be on the entirety of the article itself.  *See Baker v. Los Angeles Herald*

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT
OF DEFENDANTS' SPECIAL MOTION TO STRIKE
CASE NO. 2:19-CV-07046-MWF-FFM

*Examiner*, 42 Cal. 3d 254, 261 (1986) (in defamation analysis, "the publication in question must be considered in its entirety; it may not be divided into segments and each portion treated as a separate unit.  It must be read as a whole in order to understand its import and the effect which it was calculated to have on the reader . . . .") (brackets omitted).  As with the CNN broadcast, no reasonable person could conclude anything other than that Pambakian's statements referred to the allegations in the Valuation Lawsuit.

(3) <u>December 18, 2018 Verge Article</u>:  The title of the article is, "Tinder fires its head of comms, following her participation in a $2 billion ***lawsuit*** against Match." Dkt. 23-2 at 71.  The first sentence states that "Multiple Tinder employees who ***sued*** the dating app's parent company, Match Group, for $2 billion were fired this week . . . ."  *Id*.  "Among them," it continues, "is Rosette Pambakian, VP of marketing and communications, who, ***in the original lawsuit***, claimed that former Tinder CEO Greg Blatt sexually assaulted her."  *Id*.  As in the CNN reports, the Verge article includes Match's response "to Pambakian's ***sexual harassment allegations in the lawsuit***"  *Id.* at 73.

Notably, the email attributed to Pambakian at the end of the piece states explicitly to Match's CEO Mandy Ginsberg that "you have now fired me from a company I was so proud to build in blatant retaliation for joining a group of colleagues and Tinder's original founding members in a ***lawsuit*** against Match and IAC, standing up for our rights, calling out the company's CEO Greg for sexual misconduct, and confronting the company about what happened to me."  *Id.* at 73.  Pambakian's email also states, "I was placed on leave the very day the ***lawsuit*** was filed and you continued to defend the actions of the executive that I spoke out against."  *Id.* at 74. The Pambakian email refers to "sexual assault ***allegations***," and states that "[a]s the ***lawsuit*** progresses the evidence will emerge and the world will see how IAC and Match plotted against their employees and rewarded misconduct."  *Id.* at 74.

Gibson, Dunn & Crutcher LLP

1    The article includes a six-paragraph response from Match CEO Ginsberg.  In it,

2    Ginsberg herself refers to the Valuation Lawsuit, telling Pambakian that "you were

3    terminated because it was not possible for you to fulfill your duties and responsibilities

4    of your role as Tinder's spokesperson for a number of reasons, including your ***public***

5    ***position*** against the company over a valuation process."  *Id.* at 75.  According to

6    Ginsberg, "it's impossible for you to do your work at Tinder if all communications

7    related to your job have to go through your ***lawyers***."  *Id.*

8        (4) <u>December 18, 2018 CNN Article</u>:  Like the Verge article, the December

9    2018 CNN article makes clear in its title that it relates to the Valuation Lawsuit:

10   "Tinder fires employees who ***sued*** its parent companies."  Dkt. 23-2 at 77.  It, too,

11   states in the first sentence that Tinder had fired employees "who were part of a $2

12   billion ***lawsuit*** against the dating app's parent companies."  *Id*.  The article also notes

13   that "the ***lawsuit***" was filed by co-founders and other employees of Tinder accusing

14   Match and IAC of manipulating the company's valuation.  *Id*.  It further notes that

15   "The ***suit*** also alleged that Tinder's former CEO, Greg Blatt, sexually harassed

16   Pambakian."  *Id*.

17       According to the article, "Pambakian sent an email to Match Group CEO Mandy

18   Ginsberg and Tinder CEO Elie Seidman . . . claiming she was fired in 'blatant

19   retaliation' for her ***involvement in the suit*** . . . ."  *Id*.  The report states that "[t]he

20   ***lawsuit*** alleges Blatt groped and sexually harassed Pambakian at a company holiday

21   party shortly after taking on the role."  *Id*.  It continues, "The ***suit*** also alleges that

22   when Tinder co-founder Sean Rad informed IAC of Blatt's conduct, it was covered up

23   and Blatt was kept as CEO."  *Id*.  Again linking the email attributed to Pambakian with

24   the Valuation Lawsuit, the CNN article adds that, "Pambakian wrote that she was put

25   on leave immediately after filing the ***suit*** and faced continued pressure from within the

26   company to resign."  *Id.* at 78.

27       Throughout the rest of the report, CNN refers multiple times to the "***suit***," notes

28   that "Tinder asked a judge to throw out the ***suit*** in October [2018], claiming the co-

19

Gibson, Dunn &
Crutcher LLP

1   founders had taken too long to file the *suit*," and describes the suit's "central

2   *allegation[s]*." *Id.*  Like the Verge article, it refers to Ginsberg's claim that Tinder

3   fired Pambakian for reasons including "your public position against the company over

4   a valuation process." *Id.*

5                                   *      *      *

6         As in *Healthsmart*, a simple review of the "entirety" of the media reports, and

7   the "context" in which the allegedly defamatory statements were made, leads to only

8   one reasonable conclusion: those statements are fair and true reports of allegations in

9   the Valuation Complaint.  *See Healthsmart*, 7 Cal. App. 5th at 436 (examining a news

10  report and radio report and considering such things as "the reporter's frequent

11  references to the . . . lawsuit" and "images of the complaint shown in the background"

12  to conclude that the defendants' statements "constituted fair and true communications

13  to the news media about a judicial proceeding").

14             **b.      The allegedly defamatory statements include background
                         and details of allegations in the Valuation Lawsuit that are
15                       covered by the fair and true reporting privilege.**

16        Some of the alleged statements provide detail and background about the

17  Valuation Lawsuit's allegations rather than repeating those statements verbatim.  Blatt

18  concedes that the allegations in Pambakian's assault case against Blatt pending in this

19  Court, which match up almost verbatim with the more granular defamatory statements

20  he alleges against Pambakian here, are merely "*reiterating*" the lawsuit's allegations

21  with increased "*detail*."  FAC ¶ 15.  In other words, all the alleged defamatory

22  statements carry the same "gist" or "sting," despite Blatt's contention on page 20 of his

23  brief that groping a subordinate against her will is not "sexual assault" the way he

24  defines it.  Any deviation between a statement about a proceeding and a statement in

25  the underlying proceeding must be of a "substantial character" for the absolute fair and

26  true reporting privilege to be suspended." *See Colt v. Freedom Commc'ns, Inc.*, 109

27  Cal. App. 4th 1551, 1558-59 (2003) (refusing to "engage in a detailed parsing of

28  words, phrases, and sentences to note the subtle differences between [misconduct

                                            20

charged in a complaint] and that noted in the articles"). Blatt does not show the terms used have any different connotation, let alone a "substantial" one. *See Doe v. Capital Cities*, 50 Cal. App. 4th 1038, 1045–46 (1996) ("In none of the civil actions for sexual discrimination which we are aware has it been contended that groping and grabbing of another's body is not both a civil and a criminal assault, and we cannot fathom why the two claims should be mutually exclusive.").[6]

Blatt suggests that the statements constituting the background or history of a proceeding must arise from or describe the proceeding itself rather than "the underlying events that gave rise to those proceedings." Opp. at 24. According to Blatt, "Defendants have not cited a single case suggesting that an expansion to such private background information is supported by existing law." *Id.* at 25. Blatt is dead wrong. The Ninth Circuit decision in *Dorsey v. National Enquirer, Inc.¸* 973 F.2d 1431 (9th Cir. 1992), which Defendants cited repeatedly in their anti-SLAPP motion, is just such an example of what Blatt incorrectly claims would be a "perversion of the privilege." Opp. at 24.

Blatt inexplicably claims with emphasis that the Ninth Circuit in *Dorsey* "concluded that what was contained in ***prior court filings*** was fair game as 'background information under the privilege." Opp. at 24 (emphasis in original). Blatt fails to acknowledge that *Dorsey* also involved statements in an article that did not appear in any court filing. 973 F.2d at 1436-37. In *Dorsey*, entertainer Engelbert Humperdinck (née Arnold Dorsey) alleged that a National Enquirer article claiming he was "suffering from the AIDS virus" had defamed him. 973 F.2d at 1433. The article was based in part on an affidavit in family court filed by the mother of Dorsey's child. *Id.* That affidavit stated about him: "Upon information and belief, the respondent has AIDS related syndrome and has been treated at Sloan Kettering in New York." *Id.*

---

[6] Blatt's attempt to underplay the seriousness of groping a woman, Opp. at 21, is not well taken. Restraining someone and touching intimate parts of their body, including through their clothes, against their will and for the perpetrator's sexual arousal is a crime under California Penal Code § 243.4(a).

1    According to the Ninth Circuit court, the one-page article in the National Enquirer

2    quoted the affidavit twice. *Id.*

3         Beyond the affidavit, the article also quoted the mother as saying, "I never

4    would have filed the court papers if I wasn't 100 percent convinced he has the AIDS

5    virus." *Id.* It likewise quoted an investigator hired by the mother as saying,

6         [Dorsey] is suffering from the AIDS virus. We have stated that belief in

7         court papers and it is based on an intensive investigation of the singer
            during the past five years.

8

9         He was tested positive for the AIDS virus in early 1985. As stated in the
            court documents, he has had treatment for the AIDS virus at Sloan-

10       Kettering hospital but our information is that the disease remains.

11    *Dorsey*, 973 F.2d at 1433. Beyond the statement in the affidavit, the private

12    investigator thus had claimed that Dorsey—who denied he had AIDS—had been

13    suffering from it for almost four years. *Id.*

14         Noting that the district court had both the affidavit and the article before it, and

15    that "the reasonable inferences therefrom all lead to the same conclusion," the Ninth

16    Circuit court concluded that the issue of whether the article was a "fair and true" report

17    could be decided as a matter of law. *Dorsey*, 973 F.2d at 1435. In then applying the

18    "fair and true" standard, the *Dorsey* court noted Dorsey's argument that the article was

19    not a privileged report of the article's contents because of its "inclusion of statements

20    ***elaborating*** on the affidavit's allegations." *Id.* According to Dorsey, the article went

21    "beyond the sting" of the affidavit "by including out-of-court statements made by [the

22    mother and her private investigator]." *Id.* Those statements were not about the

23    affidavit or the family court proceedings themselves (as Blatt claims—Opp. at 24);

24    they were about the underlying factual matter—that is, the degree of certainty that

25    Dorsey had AIDS and for how long he suffered from it.

26         This is clear in the Ninth Circuit court's discussion of Dorsey's comparison of

27    the gist of the affidavit and the out-of-court statements by the mother and private

28    investigator. Dorsey contended that the "gist" of the affidavit was that the mother

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT
OF DEFENDANTS' SPECIAL MOTION TO STRIKE
CASE NO. 2:19-CV-07046-MWF-FFM

"was not certain about her allegation that Dorsey had contracted the AIDS virus." 973 F.2d at 1436. "In comparison," Dorsey argued, the article included the mother's statement that she was "100 percent convinced that Dorsey had the AIDS virus," as well as the private investigator's statements (1) "without qualification that Dorsey has the AIDS virus," (2) "that Dorsey tested positive in early 1985," and (3) that the mother's belief was "based upon a five-year investigation." *Id.*

Nevertheless, the Ninth Circuit court held that none of the statements went "beyond the gist or sting of the affidavit." *Dorsey*, 973 F.2d at 1437. It concluded that the Enquirer "did not exceed the degree of flexibility and literary license accorded newspapers in making a 'fair report' of a judicial proceeding." *Id.* In support of this conclusion, the *Dorsey* court noted "California's expansive view of 'judicial proceedings,'" pointing out that under the fair and true reporting privilege, "out-of-court statements are considered part of the judicial proceeding if they comprise a history of the proceedings." *Id.*

As is clear from the *Dorsey* opinion, "history of the proceedings" includes the factual background of the allegations themselves, not simply the court proceeding in which they are made. Eliminating any doubt, the Ninth Circuit court recognized that "[i]n adopting section 47(4), California provided a certain amount of breathing room for newspapers to explain the ***basis*** of a judicial proceeding without at the same time opening themselves up to exposure for defamation liability." 973 F.2d at 1437.[7] The out-of-court statements about Dorsey were "privileged because these statements '***detail the circumstances***, and [the speakers'] ***theories based upon the circumstances***." *Id.* (quoting *Hayward*, 265 Cal. App. 2d 255, 260 (1968)). Those details of and theories based upon "the circumstances" are what the Ninth Circuit court deemed to "comprise a history of the proceedings." *Id.* In fact, it held that the fair and true reporting

---

[7] As discussed in Defendants' anti-SLAPP motion at page 21, note 6, the California legislature amended Civil Code section 47(d)—formerly codified as section 47(4)—in 1996 to include statements made *to* the press, not just statements *by* the press. *See Healthsmart,* 7 Cal. App. 5th at 431.

Gibson, Dunn & Crutcher LLP

privilege applied to those statements "***even if they go beyond the sting of [the mother's] affidavit***."  *Id.*

Blatt also misstates that facts in *Hayward v. Watsonville Register-Pajaronian*, 265 Cal. App. 2d 255 (1968), and *Braun v. Chronicle Publishing Co.*, 52 Cal. App. 4th 1036 (1997).  Opp. at 24.  In *Hayward*, the privilege claimed was that the statements were fair and true reports of a "judicial proceeding."  *Hayward*, 265 Cal. App. 2d at 259.  The court expressly noted that the plaintiff did "not contend that those portions of the article which are based upon information obtained from the criminal complaint and the arrest warrant are not privileged."  *Id.*  His libel claim was limited to the portion of the article based on information obtained from a police report and FBI rap sheet.  As with the news reports here, the statements in those documents reflected the factual basis for the filing of the criminal complaint and issuance of the arrest warrant; there was no indication they were filed in or otherwise part of the judicial proceeding.  *Id.* at 259-60.

*Braun* also involved statements made about the facts underlying the proceeding, not just the proceeding itself.  The article in question detailed not just the fact, conduct, and findings of the auditor's investigation, but also "statements made by various persons affected by or concerned with the subject of the audit" and "the substance of the background reports and charges leading up to the investigation." 52 Cal. App. 4th at 1051.  Thus, contrary to Blatt's claims, Defendants have cited at least three cases showing that the factual background and details of an allegation in a proceeding are part of what the *Braun* court also described as the "history" of that proceeding.  *Id.*

### 2.   Blatt concedes that California law does not recognize civil conspiracy as a stand-alone cause of action.

Blatt clumsily insists that his "Third Cause of Action" for "Civil Conspiracy" has a likelihood of success on the merits, even though Blatt admits (and quotes case law saying) that "conspiracy to commit a tort ***is not a separate cause of action*** from the tort itself."  Opp. at 25:9-10.  But his pleading labels civil conspiracy a "cause of

1  action" and nowhere recites that the allegations of conspiracy are being made to hold

2  Pambakian liable for defamatory statements by Rad or vice versa.  To the contrary,

3  Blatt alleges that this unlawful conspiracy "Cause of Action" entitles him to "monetary

4  and punitive damages."  FAC ¶ 135.  At bottom, Blatt simply cannot show that his

5  conspiracy cause of action is likely to succeed on the merits when, by all accounts,

6  conspiracy cannot be a separate cause of action under California law.

### III.   CONCLUSION

Defendants request that the Court strike the First Amended Complaint without leave to amend and award attorneys' fees and costs to Defendants.[8]

Dated:  October 21, 2019

GIBSON, DUNN & CRUTCHER LLP

By: /s/ *Deborah L. Stein*
Deborah L. Stein

*Attorneys for Defendants Rosette Pambakian and Sean Rad*

---

[8] Because Blatt fails to dispute Defendants' arguments that amendment would be futile or that movants who prevail on an anti-SLAPP motion are statutorily entitled to attorneys' fees and costs incurred in court to litigate the motion (Dkt. 20-2 at 15), he has waived his ability to contest these arguments.  *See Cardenas v. United States*, 826 F.3d 1164, 117 n.6 (9th Cir. 2016); *Silva v. U.S. Bancorp*, 2011 WL 7096576, at *4 (C.D. Cal. Oct. 6, 2011).