1                    UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3           HONORABLE MICHAEL W. FITZGERALD, U.S. DISTRICT JUDGE

4

5

6    ROSETTE PAMBAKIAN,                )
                                       )
7             Plaintiff,               )
                                       )
8                  vs.                 )
                                       )  2:CV-19-7053-MWF (FFMx)
9    GREGORY BLATT, et al.,            )
                                       )  2:19-CV-7046-MWF (FFMx)
10            Defendants.              )
                                       )
11   GREGORY BLATT,                    )
                                       )
12            Plaintiff,               )
                                       )
13   vs.                               )
                                       )
14   ROSETTE PAMBAKIAN, et al.,        )
                                       )
15            Defendants.              )
     _____

16

17

18              REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                    Los Angeles, California

20                   Monday, November 4, 2019

21          _____

22

23                 AMY DIAZ, RPR, CRR, FCRR
                   Federal Official Reporter
                   350 West 1st Street, #4455
24                  Los Angeles, CA 90012

25
     *Please order court transcripts here:  www.amydiazfedreporter.com*

```
 1          APPEARANCES OF COUNSEL:

 2
            For Rosette Pambakian:
 3

 4                      GRANT & EISENHOFER, PA
                        By:  Kimberly Evans, Attorney at Law
 5                           Paige Alderson, Attorney at Law
                        123 Justison Street
 6                      Wilmington, Delaware 19801

 7                      GRANT & EISENHOFER, PA
                        By:  Elizabeth Graham, Attorney at Law
 8                      One Market Street
                        Spear Tower, Suite 3600
 9                      San Francisco, California 94105

10                      GIBSON DUNN
                        By:  Deborah Stein, Attorney at Law
11                           Adam Yarian, Attorney at Law
                        333 South Grand Avenue
12                      Los Angeles, California 90071

13

14
            For Gregory Blatt:
15
                        SUSMAN GODFREY, LLP
16                      By:  Lora Krsulich, Attorney at Law
                        1900 Avenue of the Stars, Suite 1400
17                      Los Angeles, California 90067

18                      SUSMAN GODFREY, LLP
                        By:  Vineet Bhatia, Attorney at Law
19                      1000 Louisiana Street, Suite 5100
                        Houston, Texas 77002
20

21
                        WACHTELL LIPTON ROSEN & KATZ
22                      By:  Marc Wolinsky, Attorney at Law
                        51 West 52nd Street
23                      New York, New York 10019

24

25
```

```
 1        Appearances, continued:

 2        For Defendants Match and IAC:

 3
                          MUNGER TOLLES & OLSON LLP
 4                        By:  John Spiegel, Attorney at Law
                          350 South Grand Avenue
 5                        50th Floor
                          Los Angeles, California 90071
 6

 7                                *   *   *

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                   THE CLERK:  Calling items number one and two, case

 2        numbers CV-19-7053-MWF, Rosette Pambakian vs. Gregory Blatt,

 3        et al., and CV-19-7046-MWF, Greg Blatt vs. Rosette Pambakian.

 4                   Counsel, please rise and state your appearance.

 5                   MS. EVANS: Good morning, Your Honor.  Kim Evans with

 6        Grant & Eisenhofer on behalf of Plaintiff Rosette Pambakian.

 7                   THE COURT:  Good morning.

 8                   MS. GRAHAM: Good morning, Your Honor.  Elizabeth

 9        Graham for Plaintiff Rosette Pambakian.

10                   THE COURT:  Good morning.

11                   MS. ALDERSON: Good morning, Your Honor.  Paige

12        Alderson on behalf of Plaintiff Rosette Pambakian.

13                   THE COURT:  Good morning.

14                   MR. SPIEGEL: Good morning, Your Honor.  John

15        Spiegel, Munger Tolles & Olson, on behalf of Defendants Match

16        and IAC.

17                   MR. BHATIA: Good morning, Your Honor.  Vineet Bhatia

18        representing Defendant Greg Blatt and Plaintiff Greg Blatt.

19        And Mr. Blatt is in the courtroom with me today.

20                   THE COURT:  Good morning, counsel.  Good morning,

21        Mr. Blatt.

22                   MS. KRSULICH: Good morning, Your Honor.  My name is

23        Lora Krsulich, also representing Defendant Greg Blatt and

24        Plaintiff Greg Blatt.

25                   THE COURT:  Good morning, counsel.
```

```
 1              Counsel, I apologize for the confusion about the
 2     courtroom this morning.  The whole courthouse was closed down
 3     for testing over the weekend, and somehow the breaker that
 4     served my courtroom and chambers was damaged when it --
 5     everything was started up again last night.
 6              So here we are.  Let's proceed first with the motion
 7     of IAC and Match to compel arbitration.  And after hearing
 8     argument on that, we'll move to the two motions in 7046, the
 9     Blatt vs. Pambakian case.
10              All right.  Counsel?
11              MR. SPIEGEL: Thank you, Your Honor.  John Spiegel on
12     behalf of moving parties Match and IAC.  And Mr. Blatt also
13     joins in our motion to compel arbitration of Pambakian's
14     claims.
15              Let me start, Your Honor, by thanking you for your
16     tentative.  We are fine bypassing the issue that the Court
17     indicated some question about having to do with delegation of
18     the issue of arbitrability, and proceeding to have Your Honor
19     decide those issues.  And we think that decision is guided by
20     the persuasive ruling by Judge Birotte on exactly the same
21     agreement, also with the plaintiff raising the same claims of
22     sexual harassment.
23              I note, just to start, that our argument includes --
24     our argument to compel arbitration by Match and IAC includes
25     our right to compel Pambakian to arbitrate with Mr. Blatt,
```

1       former director, former CEO.  That is part of the arbitration

2       agreement.  And I note that Pambakian did not contest that,

3       as we point out in our reply at page 10.

4               So we don't even have to address the third-party

5       beneficiary issue, although very happy to do that, and it's

6       been well-briefed by the parties.

7               So let me take the issues in the order that Judge

8       Birotte did, starting first with retroactivity.  As Judge

9       Birotte pointed out, the language in connection with the

10      application for employment is really impossible to read,

11      other than as including claims that predate the signing of

12      the arbitration agreement.  And we fully adopt and support

13      Judge Birotte's reasoning in that regard.

14              As Your Honor suggested in the tentative, the

15      *Sanfilippo* conclusion that in connection with is inconsistent

16      with the limitation of the future claims is, I think as Judge

17      Birotte said, virtually self-evident.

18              So I'm going to move from retroactivity, unless Your

19      Honor has further questions to the issue of

20      unconscionability.  And I find it stunning, Your Honor,

21      that --

22              THE COURT:  And I guess just maybe this ties into

23      the unconscionability, though, given that we are dealing with

24      a layperson here.  And regardless of how sophisticated Ms.

25      Pambakian is as a businesswoman, or highly compensated, it

```
 1      would -- it might seem that way to a district judge parsing

 2      language after the fact, it wouldn't necessarily seem that

 3      way to a layperson on thinking, you know, after you've been

 4      there and after you've had all this stuff, here is this thing

 5      given to you of one could be forgiven for thinking, well,

 6      going forward, this is the way this is going to work.

 7           So I -- you know, like I said, maybe this ties into

 8      the unconscionability argument that you are just about to

 9      make, but while recognizing of why Sanfilippo ruled the way

10      it did, and of course it's not binding on me in any way, it

11      does seem somewhat unfair to Ms. Pambakian.

12           MR. SPIEGEL: Well, let me respond to that.

13           THE COURT:  I mean, there is other things that are

14      unfair, too.  This whole thing of saying it's the ADR

15      requirement instead of saying it's arbitration, yes, when you

16      get to the actual language, arbitration is up front, but it

17      clearly was crafted in a way to deceive her.  I mean, it

18      really was.  If they had truly wanted to alert her to what

19      was going on here, they could have done it in such a better

20      way.  But at some point, arguably, as the briefs made clear,

21      those policy concerns, especially after Concepcion, are just

22      things that are just that.  It's a matter of policy.

23      Congress could take it up if it wished and amend Title IX,

24      but in the meantime, we are stuck with it.

25           But I do just want to point out here that even if I
```

 1       do send this to arbitration, I'm going to do it with a

 2       certain sense that Ms. Pambakian was not dealt with fairly by

 3       her employer.

 4              MR. SPIEGEL: Well, let me respond to that, if I may,

 5       Your Honor.

 6              There is no evidence in the record of any intent by

 7       Match to deceive anybody here.  Ms. Pambakian was, as Your

 8       Honor noted, a highly, highly compensated senior executive

 9       who was asked in the materials that she was sent to sign, was

10       told, It's your responsibility to please read this.  It's

11       very important.  And the agreement is actually labeled Mutual

12       Agreement to Arbitrate Claims on an Individual Basis.  I

13       think it's really hard to see any attempt to conceal there.

14              In addition, as we point out, Ms. Pambakian had

15       already asked to consult a lawyer about these very claims

16       here.  She's obviously smart enough and sophisticated enough

17       to do what an executive is supposed to do when you are given

18       a set of policies that ask you to sign off on the agreement

19       to arbitrate.

20              But let me then get to the issue, which Your Honor

21       rightly points out under *Concepcion*, a party to an

22       arbitration agreement is actually supposed to read it.  There

23       is no excuse for not reading the agreement.  And if you read

24       the agreement, you see that you are being asked to arbitrate

25       claims in connection with an application for employment.

 1          Now, Your Honor, you don't have to be a lawyer to

 2    know about applications for employment.  In fact, Ms.

 3    Pambakian was an expert on negotiating a complicated set of

 4    deals that made her a wealthy person based on her employment.

 5    She was no unsophisticated truck driver, like the case where

 6    Your Honor -- where Your Honor ruled about incorporation of

 7    AAA rules, *Quick Pick*, I think it was.

 8          So you've got a sophisticated executive who is

 9    planning an employment arrangement that took a lot of time

10    and attention, and she spent -- she is charged with reading

11    an agreement that says, You are going to arbitrate claims in

12    connection with your application for employment.

13          Now, you don't have to -- you don't need to go to

14    law school, you don't even need a college education to know

15    what an application for employment is.  And that is what

16    Judge Birotte was saying when he said you can't read that in

17    any way other than saying claims that arise before the

18    agreement.

19          Now, alternative unconscionability, unless Your

20    Honor has other questions on the retroactivity side of

21    things, I want to be sure that I've covered that thoroughly.

22          THE COURT:  So on the unconscionability, what do

23    you -- it seems to me there is a stronger argument for

24    procedural than substantive, but why in your view is there no

25    substantive unconscionability?

1          MR. SPIEGEL: Well, Your Honor, I am amazed that two

2     very fine law firms could file 50 pages in opposition to our

3     motion to compel arbitration and never discuss the Ninth

4     Circuit case from 2017 by Judge Ikuta which deals directly,

5     directly with these unconscionability issues.  And the reason

6     they don't talk about it is they have nothing to say about

7     it, because Judge Ikuta there lays out in a very similar

8     factual scenario why under controlling, controlling recent

9     Ninth Circuit authority there is simply no unconscionability

10    here.

11          Let's start with -- I think Your Honor asked me to

12    talk about substantive rather than procedural.

13          THE COURT:  Yeah.  Let's just get substantive out of

14    the way.  Obviously, if there is no substantive

15    unconscionability, then that is that.  But I would like you

16    to address that, and then -- but I do want also to talk about

17    procedural because I think that is a much closer call.

18          MR. SPIEGEL: And of course, as Your Honor I think is

19    suggesting, you have to have lots of procedural

20    unconscionability, you know, to compensate for weak

21    substantive unconscionability.  So, you know, in our view,

22    Your Honor, we briefed the *Poublon* case and other California

23    and federal authorities very thoroughly.

24          The arguments that plaintiff raised have all been

25    rejected by controlling authority.  They raise

 1    confidentiality.  Judge Ikuta wrote two or three pages about

 2    that in *Poublon*.  They raised the idea of unilateral

 3    amendment.  Same.  Judge Ikuta dealt with that issue, because

 4    under California law, as Judge Ikuta points out, you can't

 5    unilaterally amend in a way that would violate the covenant

 6    of good faith and fair dealing.  So there is no substantive

 7    unconscionability there.

 8          The argument sort of halfheartedly made that there

 9    was special ability to go to court for injunctive relief,

10    again, the only emergency relief authorized in the

11    arbitration agreement is the relief provided by the Code of

12    Civil Procedure, and it's mutual.

13          So I don't know how anybody can find substantive

14    unconscionability unless they just pretend that *Poublon* was

15    never decided, along with all the other authorities that

16    *Poublon* relies on.

17          So procedural unconscionability.  Again, I say where

18    is *Poublon*?  Where is *Poublon*?  Judge Ikuta dealt with

19    exactly this issue of when somebody signs an arbitration

20    agreement and says, Oh, it's unconscionable procedurally

21    because I was going to get fired if I didn't sign it.  Well,

22    you know what?  You can't just say that to try to get out of

23    an arbitration agreement.  You have to have some evidence in

24    the record that you tried to do something about it, and after

25    all, this is a plaintiff who actually went to a lawyer about

1          this same harassment issue before she signed the agreement.

2                  So as Judge Ikuta said, for a unanimous panel, you

3          can't just make it up after the fact when you want to get out

4          of an arbitration agreement.  You have to have some actual

5          indicia that you tried to negotiate it.  You said, you know,

6          I really feel uncomfortable signing it.  I would like to talk

7          about it.  Go to the lawyer that she said she wanted to

8          consult with.  There has to be some indication of that.  You

9          can't just make it up.

10                 Now again, I think Judge Birotte hit the nail on the

11         head in his discussion of unconscionability.  He points out

12         that the terms of the agreement were explicit, bold-faced

13         highlights that the agreement is to arbitrate disputes

14         between plaintiff and defendant.  The request, direction to

15         Pambakian was, It's your responsibility as an executive to

16         read this and understand it.

17                 Now, I don't know how you get to procedural

18         unconscionability there, unless you just say, millionaires

19         have no requirement to even read anything when they sign it.

20         I mean, this is -- this is so far from the kinds of

21         unconscionability cases that have been decided for many years

22         in our State Court system.  We have all litigated them.  The

23         pizza truck delivery guy, the truck driver.  You know, I

24         understand that context, the procedural unconscionability,

25         but that is not this case.

1          So, Your Honor, I would like to reserve a few

2     minutes in response.

3          THE COURT:  Let me ask you this:  This rose I guess

4     most prominently in the briefs in regard to the issue of

5     delegation, but I do think it has a bearing also on

6     unconscionability, and that is this issue of what rules

7     apply? And there is two things on that:

8          One is that it isn't necessarily the AAA rules.  And

9     let's say I agreed with you under the Ninth Circuit case law,

10    that could be forgiven.  What about the fact that, as I

11    understand it, there is no  -- you know, AAA has a number of

12    different rules and the assumption it, at least that is what

13    was set forth in the declaration, was that it would be the

14    employment rules.

15         But at what point does it -- you know, here you are

16    expecting a layperson, regardless of how sophisticated or how

17    well-paid she is, I'm going to go and do this.  I'm going to

18    try to wade through all of this, with all this Hall of

19    Mirrors from Versailles, where everything is going back on

20    each other.  But, I'm going to go to this step, and then I'm

21    going to go to this step, and then I'm going to go to this

22    step, and this step, that she would accurately get to those

23    rules and grasp them?  You know, at what point is it just too

24    much?  Or do you feel that the case law just says that there

25    is never too much or there can't be too much?

1          MR. SPIEGEL: Well, Your Honor is correct, the case

2     law basically says that you are charged with living with what

3     you -- what the agreement says you have incorporated.

4          THE COURT:  But what if it said you have to click 20

5     links and accurately understand link number 2 to get to link

6     number 3? I mean, at some point isn't it just too much?

7          MR. SPIEGEL: Well, if you look on the AAA website,

8     you will see the employment rules.  All of the AAA rules,

9     whether it's comprehensive commercial, international, they

10    all provide for delegation.  Of course, that is the way AAA

11    operates.  So the notion that you would have to pick and

12    choose between --

13         THE COURT:  Well, that's become a moot point.  I

14    mean, I'm just offering now in this general sense of still

15    there is a sense of, well, she knew what the rules were going

16    to be.  And what I'm asking is, is that in fact the case,

17    given that there is this double step of assuming it would be

18    the AAA, when it could have been anything else, and then

19    going from there to saying, Oh, here is all these rules, I

20    guess it's, you know, I guess it's employment.  And then, you

21    know, instead of saying, Well, what if I have a dispute about

22    my stock options, you know, or what about -- or on that.

23         So what -- I guess that is what I'm asking here is

24    at what point does the level of uncertainty here, which is

25    certainly not her fault, at what point does that just become

1    too much? Or is it the position of the defendants that

2    nothing is ever too much?

3             MR. SPIEGEL: Well, I would certainly not say nothing

4    is ever too much.

5             In this case we have a sophisticated executive who

6    has put in no evidence whatsoever of any lack of

7    sophistication, other than, we got it, she didn't go to law

8    school.  We have the adoption of a highly respected, probably

9    the most common arbitration process.  This isn't some trick

10   to sneak something past somebody.  It's like saying, take

11   your dispute to United States District Court.  Now, that

12   doesn't mean -- and yes, of course, the Federal Rules of

13   Civil Procedure are incorporated into that.

14            But the point is, it's a respected alternative

15   dispute forum with rules to protect both sides.  That is why

16   AAA has been going on successfully as long as it has.  So

17   incorporating those rules is not some sort of trick.  And,

18   yes, if you are a senior executive dealing with your

19   employment, which is a very, very substantial amount of

20   financial investment for you, it's a good idea to actually

21   read what you are signing.

22            And I think fundamentally, Your Honor, you are

23   raising the question, do we really hold people to what they

24   sign?  And that is the most fundamental principle of contract

25   law.  You can't just say, I didn't read it, I was too busy.

1    And we've seen nothing from Pambakian to say, You know, I

2    tried to get through this, but I couldn't open the link, it

3    was very confusing.  No.  Her position basically is she

4    didn't bother to read it, even though she was told to do it.

5             So the notion that by suggesting the forum for the

6    resolution of disputes, whether it's before Your Honor in

7    United States District Court or before AAA, there is

8    something wrong about incorporating the procedural rules that

9    guide that, that I think the defendants just do not agree

10   with.

11            THE COURT:  Thank you.

12            Let me hear from the plaintiff.

13            MR. SPIEGEL: Thank you, Your Honor.

14            THE COURT:  You are welcome, Mr. Spiegel.

15            MS. EVANS: Good morning, Your Honor.  Kim Evans,

16   Grant Eisenhofer, on behalf of the Plaintiff Rosette

17   Pambakian in her sexual assault case against Greg Blatt,

18   Match Group and IAC.

19            Defendant's motion to compel arbitration should be

20   denied.  We can understand that there are some policy

21   considerations surrounding employment arbitration agreements,

22   particularly in the sense where certain employers would like

23   to save the cost and burden of being hauled into court for

24   every little employee grievance, and it could be beneficial

25   for employees who are seeking a speedy and private resolution

1    of employee employment disputes.  But this is not an

2    employment dispute, this is a sexual assault case.

3          Defendants cannot seriously claim that Mr. Blatt was

4    acting within the scope of his employment and his duties as

5    CEO of Tinder and Match when he sexually assaulted Ms.

6    Pambakian in a hotel room after a holiday party.

7          And all of the claims that have been alleged against

8    Match and IAC arose as a direct consequence of those -- of

9    that sexual assault and stem directly from Mr. Blatt's

10   conduct.  These are simply not employment-related claims and

11   they should be heard before a court; not an arbitrator.

12         THE COURT:  Well, then I take it you are

13   comfortable, then, with accepting the invitation of the

14   defendants that the matter should be determined by me, then,

15   instead of by the arbitrator.

16         Look, I think the assumption is of everybody if it's

17   determined by the arbitrator, you are going to lose.  But who

18   knows, maybe there is an arbitrator out there who says, Oh,

19   no, this is outside the scope of this, I don't know.

20         But in any event, I just want that clear on whether

21   you do, in fact, want me to accept that this is a dispute for

22   me to determine now as to the scope of this agreement?

23         MS. EVANS: Yes, Your Honor.  We think that that is

24   appropriate.

25         THE COURT:  And in that case, let me ask you, then

1     in connection with -- I mean, there is some really broad

2     language there.  It's -- yes, this is a sexual harassment --

3     these are sexual harassment issues, as opposed to say what

4     was going on in New York, or is going on in New York as to

5     other parties, but what -- to say it's not in connection

6     with, I mean, it was a work-related party.  It was a holiday

7     party.  They knew each other because of work.  I mean, if

8     they had been lovers like in college and then they met up

9     again and they happened to be working in the same place and

10    something happened, then maybe I could see that.

11          But what is your best argument for saying that these

12    claims is not something which is in connection with the

13    workplace here?

14          MS. EVANS: So, Your Honor, you are focusing on the

15    language, the in connection with language.  And we assert

16    here that that is not the appropriate language that needs to

17    be focused on.  That is going back to the *Sanfilippo* case

18    versus Tinder, where they didn't even review, let alone

19    analyze, the actual terms of the agreement itself.  They were

20    looking at the summary of the terms.  And the language

21    between those two documents differed substantially.

22          If we look at the specific language that was in

23    there, Section 2 of the arbitration agreement uses the

24    phrasing involving or in any way concerning the associate's

25    employment; whereas, the summary focuses on arising out of or

1     in connection with.

2                 And the --

3                 MR. SPIEGEL: Counsel is misreading the language.

4                 THE COURT:  Mr. Spiegel, first of all, you are

5     addressing the Court without rising.

6                 Second, you cannot interrupt like that.  I'm going

7     to give you a little time, assuming we have some of that --

8                 MR. SPIEGEL: Apologies.

9                 THE COURT:  You can't interrupt like that.  Please,

10    you were an AUSA, you know better than that.

11                Counsel, go ahead.

12                MS. EVANS: To be fair to Mr. Spiegel, I was

13    paraphrasing those provisions.

14                But the *Sanfilippo* Court specifically honed in on

15    the in connection with language and found that because it

16    modified that initial phrase arising out of, it seemed to

17    broaden the scope beyond the present or future disputes.  So

18    that decision specifically focused and turned on that in

19    connection with language.

20                But this in connection with language appears nowhere

21    in the actual agreement itself, which creates an inherent

22    conflict.  And defendants have cited to no case that supports

23    the notion that plaintiffs are bound by the language in both

24    an arbitration agreement and the summary of the terms when

25    the language in those two documents are not the same.

1          THE COURT:  I grant it's -- the summary agreement

2     Section 1 has the arising out of or in connection, and the

3     actual ADR agreement, Section 2, has involving or in any way

4     concerning, but involving or in any way concerning is also

5     really broad language.

6          What -- let's say then that is the language, then

7     in -- what is your argument that the claims here of the

8     plaintiff are not involving or in any way concerning her

9     employment with or termination from the company?

10          MS. EVANS: Because, Your Honor, the situation that

11     gave rise to all of these claims was the sexual assault of

12     Ms. Pambakian at an after-hours party in a hotel room, and

13     had nothing to do with the CEO's role as, you know, the CEO

14     of Tinder.

15          And quite frankly, if that is what the defendants

16     are trying to tell us, that that is within the scope of a

17     CEO's duty, I think that is an even bigger problem here.

18          So what we have to realize here, and I think the

19     defendants point to the language that it was going towards

20     the application with her employment phrase, we have to

21     remember that Match wasn't even in existence yet when Ms.

22     Pambakian had joined Tinder in 2014.  So it can't reasonably

23     be argued that the agreement was intended to reach back in

24     time to preapplication at a company that she never applied to

25     and that didn't even exist.

1          Now, we can't -- and also, we can't just arbitrarily

2     take away a person's right to a jury trial without their

3     express agreement to do so.  And that is what the defendants

4     here are trying to do.  And that would be going against the

5     very fabric of our Constitution.  And certainly claims

6     arising from a sexual assault that happened more than a year

7     before the agreement was ever even contemplated does not

8     involve or concern any aspect of Ms. Pambakian's employment

9     with Tinder.

10          THE COURT:  What is the best case, federal or

11     California, that you believe supports the precise argument

12     that you just made?

13          MS. EVANS:  Well, with respect to the retroactivity

14     argument?

15          THE COURT:  Well, not so much even that, but no,

16     rather more the scope argument on that this conduct, which

17     took place between the CEO and another executive in a hotel

18     room following a work-related party, which was shocking, it's

19     alleged, because it was in the presence of other employees,

20     that that is not involving or in any way concerning her

21     employment with the company?  "The company" being defined

22     very broadly to specifically include Mr. Blatt.

23          MS. EVANS:  So, Your Honor, to be fair, there is no

24     case that is specifically on point to this issue.  However,

25     you have to look at, you know, agency principals when you are

1    thinking about this situation.  Sure, we can agree that

2    Mr. Blatt is a former employee of Match.  We can agree that

3    IAC is an affiliate of Match, but these particular claims and

4    what is being alleged is not in any way related to either --

5    well, particularly Mr. Blatt acting within the scope of his

6    role as a CEO of a company.  These are not -- these are not

7    even close to being claims that relate to his role as leading

8    the company as a CEO.

9          THE COURT:  All right.  What is -- you've mentioned

10   one way in which you believe *Sanfilippo* is not that

11   persuasive.  What else in regard to *Sanfilippo*? Why is it not

12   as persuasive as to what the defendants are arguing?

13         MS. EVANS: In addition to the fact that *Sanfilippo*

14   was not even analyzing the appropriate agreement in that

15   case, the Court in that -- or the plaintiffs in that case

16   only alleged two different pieces of unconscionability in

17   seeking to hold that agreement unenforceable.

18         First, they claim simply that it was a contract of

19   adhesion with no other facts.  And they also claimed

20   substantive unconscionability with respect to the

21   retroactivity argument.

22         Here, we obviously, as I'm sure you've read, we

23   allege far more -- the circumstances here are completely

24   different.  We have an arbitration agreement that was

25   arguably created for the very purpose of dealing with the

```
1   Rosette Pambakian problem.  And that is completely separate
2   and aside from what the facts were in *Sanfilippo*.
3              THE COURT:  All right.  And what is the plaintiff's
4   argument in regard to substantive unconscionability?
5              MS. EVANS:  Okay.  So we have a few different
6   arguments about substantive unconscionability.
7              First, we believe that the defendants have attempted
8   to backdoor a confidentiality provision into the agreement by
9   virtue of their purported incorporation of the AAA rules. As
10  Your Honor pointed out, we don't think that those rules were
11  expressly incorporated, and I think that that is a huge
12  problem here.
13             Despite the defendant's comments to the contrary,
14  while Rosette Pambakian was very good at her job, she was not
15  a lawyer.  She was, you know, a journalism major, and she
16  received her degree from, I think it was the University of
17  California.  She's very good at her job, but she's not a
18  lawyer.  She's not sophisticated in legalese, and to impute
19  on her a knowledge that this is -- this incorporation of AAA
20  rules is somehow going to bind her to confidentiality, that
21  she has no means by which to know about in advance, nor did
22  she get a copy of these rules, is a huge problem here.
23             THE COURT:  All right.  Thank you.
24             And in regard to, you've touched on it to a degree,
25  but in regard to procedural unconscionability, as well, what
```

```
 1    would you say is your strongest argument on procedural
 2    unconscionability?
 3           MS. EVANS: Well, Your Honor, I mean, the procedural
 4    aspect here, I believe is, you know, the strongest piece of
 5    the unconscionability analysis.
 6           There are a couple pieces to it.  The first is that
 7    we believe that this is a standard contract of adhesion.  We
 8    have a standardized contract that was, you know, negotiated
 9    by the defendant, not even negotiated, drafted by the
10    defendants.  Ms. Pambakian had no say in the actual
11    negotiation or drafting of it.  She was not assisted by any
12    lawyers.  She was just given it to her and it was a take it
13    or leave it kind of situation.
14           The second piece is that, as I mentioned, the
15    circumstances surrounding the development and implementation
16    of this agreement indicates that the whole purpose of this
17    agreement was to deal with Rosette's claims.  We have a woman
18    who made allegations that her boss has sexually assaulted her
19    in front of witnesses at a hotel after a holiday party.
20           Match is supposed to be investigating this
21    situation, which turns out to be kind of a sham.  They do
22    their own investigation, which they only -- they only
23    questioned one of the eyewitnesss to the assault.  Mr. Blatt
24    is permitted to confront that witness to try and get her to
25    keep quiet.  They didn't even talk to the other one.  And
```

1    then after Ms. Pambakian learns about all of this, they

2    inform, or she informs them that she won't discuss the

3    situation without a lawyer present.

4          So after she refuses to sign an NDA in exchange for

5    some compensation, they decide two months later to adopt an

6    ADR policy, but they don't really tell anybody about it.  And

7    they wanted to keep this agreement as low profile as

8    possible, because it was their backdoor way of trying to

9    manage Ms. Pambakian.  If they couldn't get her to sign the

10   NDA, then the next best thing is to keep her from presenting

11   the details of the situation in open court.

12         So they send an e-mail that has some boilerplate

13   language, asking her to recertify her compliance and

14   familiarity with Match's corporate policies.  At the end,

15   they talk about a new alternative dispute resolution program

16   and asked that she sign the summary.  But the e-mail didn't

17   use the word arbitration, it didn't caution Ms. Pambakian

18   that the summary was, in fact, an agreement and that it would

19   cause her to waive significant constitutional rights.  Ms.

20   Pambakian wasn't given a choice as to whether she wanted to

21   sign it or not, and she was specifically told in the e-mail

22   that she was supposed to sign it by a certain date.

23         So she did what we all do when we receive these

24   types of things at work:  She signed it and completed the

25   document. And that is exactly what defendants expected her to

1  do.

2          Now, the Ninth Circuit has found these circumstances

3  to rise to the level of procedural unconscionability.  The

4  Saltani (ph) case, the *Ferguson* case, these are all

5  situations like the one we have here.

6          Now, it also has procedural unconscionability

7  aspects because of the uncertain and hidden terms in the

8  agreement, and we discussed some of these a little bit

9  earlier.

10          The agreement says that the arbitration will be

11  governed by either the applicable AAA rules or another ADR

12  provider's rules, and it doesn't identify which AAA rules

13  would be the applicable rules or what that means.  This

14  confusion is compounded by the fact that Ms. Pambakian was

15  never provided with any set of rules that were purported to

16  be governing their agreement.

17          Now, taking all of these circumstances together as a

18  whole, we feel that this agreement in particular was fraught

19  with procedural unconscionability.

20          THE COURT:  All right.  Thank you, counsel.

21          Mr. Spiegel, briefly.

22          MR. SPIEGEL: Thank you, Your Honor.  Again, I

23  apologize for my interjection.

24          THE COURT:  The apology is certainly accepted.

25          Now that you have the chance to respond, how would

1    you like to respond?

2          MR. SPIEGEL: I was reacting to what seems to me to

3    be an egregious misstatement of the language in the

4    alternative dispute program, that if you are going to

5    criticize Judge Birotte, at least deal with the argument that

6    you made.  The language is, All claims or controversies

7    involving or in any way concerning associate's application

8    with -- that's what Judge Birotte focused on -- employment or

9    termination from the company.  And counsel inadvertently, or

10   whatever, omitted to say the word application.  So of course

11   that is quite -- that would be quite a difference, it's just

12   a difference that doesn't exist in the language.

13         On confidentiality, I just remind the Court that the

14   provision that plaintiff is complaining about is the

15   confidentiality provision in the AAA rules that only binds

16   the arbitrator, it doesn't bind the parties.

17         THE COURT:  And you made that point in the briefs.

18         MR. SPIEGEL: And then lastly in response to Your

19   Honor's questions about cases, again stunningly, I never

20   heard the *Poublon* case being discussed, and it's dispositive.

21         Thank you.

22         THE COURT:  The matter is taken under submission.

23         Let's move on to the next two motions in case number

24   19-7406.

25         MR. BHATIA: Your Honor, would you like to take the

```
 1        arbitration motion first or would you like to take the fair
 2        reporting?
 3               THE COURT:  I would like to take the arbitration
 4        motion first.  As I said, we are going to have to get to the
 5        anti-SLAPP anyway for obvious reasons.
 6               MR. BHATIA: Yes, Your Honor.  Ms. Krsulich from my
 7        firm will be arguing the arbitration motion, and I'll be
 8        arguing the anti-SLAPP motion.
 9               THE COURT:  Counsel, I think I've heard a lot about
10        unconscionability.  And as to delegation, that's become a
11        moot point.
12               So what -- why is it that Mr. Blatt can claim the
13        benefits of this agreement when he was not a direct signatory
14        of the arbitration agreement?
15               MS. KRSULICH: Your Honor, the first paragraph of the
16        agreement contemplates that Mr. Blatt is a third-party
17        beneficiary.  The terms of the agreement actually say that
18        they cover former, current and future officers, directors and
19        employees of Match Group and all of its affiliated entities.
20               At the time Ms. Pambakian signed the agreement,
21        Mr. Blatt was former CEO, but he was a current director of
22        Match Group.  So the expressed terms of the agreement cover
23        him as a third-party beneficiary.
24               And it cannot be the case that the subjective intent
25        of the parties would vary with what the contract language
```

would say.  And we cited those cases in our brief, they

include *Jensen*, which is a California Court of Appeal case,

and also *Fuentes*, which is also another California Court of

Appeal case.

Your Honor, I would like to briefly touch on the

question of third-party beneficiary for the purposes of

delegation.  There is a CD Cal decision that we cited in the

briefs, *Chastain*, and after *Schein*, there was another

California Court of Appeal decision that said that this court

could decide the issue of third-party beneficiary status.

Though courts after *Schein* have looked at this issue

closely given *Schein's* preference for if there is an

arbitrability delegation, that the arbitrator should decide.

And I just wanted to briefly point the Court to a Second

Circuit decision in *Contec Corp.*, it's C-O-N-T-E-C, Corp.,

it's 398 F.3d 205 at 211, and it explains the difference

between cases where the signatory is trying to compel

arbitration versus where the nonsignatory is trying to

compel.  And the Second Circuit at least makes a distinction

after *Schein*.

So I think the rest of the arguments are covered by

Mr. Spiegel's argument, and I'm happy to just reserve for

rebuttal.

THE COURT:  Thank you.

Let me hear from the plaintiff.

1          MS. STEIN: Good morning, Your Honor.  We didn't

2     state our appearances because we are only counsel in matter

3     number 2.  I am Deborah Stein from Gibson Dunn on behalf of

4     Sean Rad and Rosette Pambakian.

5          MS. WILLIAMS: I'm Greta Williams from Gibson Dunn on

6     behalf of Sean Rad and Rosette Pambakian.

7          MR. YARIAN: Adam Yarian, Gibson Dunn, on behalf of

8     the same parties.

9          THE COURT:  Good morning.

10         MS. STEIN: Good morning, Your Honor.

11         I think it sounds like everyone is in agreement now

12    that Your Honor may decide whether Mr. Blatt is a third-party

13    beneficiary.  So if that is the correct understanding, then I

14    can move on to why he is not a third-party beneficiary.

15         THE COURT:  And that is the real issue I think in

16    front of me now in light of this.

17         As I said, I, you know, my tentative view, after

18    looking at the briefs, is that the language seems -- is very

19    broad, it's part of the definition.  You know, if you carve

20    out that issue from delegation and retroactivity, what you

21    are left with is this broad definition.  And, you know, there

22    is kind of this gut sense that you've got a good position,

23    but like I said, when you take out the arbitrability, the

24    delegation and the retroactivity, what you are left with is

25    something that seems kind of black and white.

1          But so here is your opportunity to explain to me why

2     it's not.

3          MS. STEIN: Sure, Your Honor.

4          Well, I hope I change your mind why, in the

5     context -- and I'm speaking in the context of the defamation

6     case here.

7          And I think it's important to remember that the

8     defamation case, the allegations that gave rise to it, the

9     alleged defamatory statements, all took place when Mr. Blatt

10    was neither an officer nor a director of Match.  He was

11    former for both.

12         And this was a workplace agreement, and Mr. Blatt

13    did not sign this agreement.  Mr. Blatt is relying on the

14    fact that the definition of company was broad and included

15    former officers and directors.

16         But I think what is important to remember here is

17    that the only way that Match could have bound any of the

18    sweeping numbers of agents and other individuals within the

19    definition of company is if they were acting as agents for

20    the company, right?  So if the tables were turned here and

21    Mr. Blatt were the one who did not want to go to arbitration,

22    he could easily say, There is no way that the company

23    intended for me to be bound there because my individual tort

24    claims that happened after I left the company were certainly

25    not having anything to do with anything that I was acting on

1    behalf of the company because I wasn't even there. So he's

2    obviously not a party, and he's certainly not a third-party

3    beneficiary.

4            And what is important in this analysis, Your Honor,

5    is that it has to be -- it's a very high standard that there

6    has to be very clear circumstances and express intent that

7    the parties intended him to be a third-party beneficiary.

8            And putting anything aside with respect to

9    subjective intent, what was Match's intent when Match used

10   this language here?  It's completely irrational to think that

11   Match expressly intended to confer Mr. Blatt with an

12   arbitration of rights or obligations beyond the scope of his

13   agency, because they couldn't do that as a matter of law.

14           And I love the *Jensen* case on this, Your Honor, that

15   Mr. Blatt cites, because the *Jensen* case addresses at length

16   how a nonsignatory agent can only be bound to an arbitration

17   agreement if the signatory principal, so here that would be

18   Match, had implied authority to bind the agent.  And here,

19   there is no world in which Match, when it was creating that

20   definition in this arbitration agreement, that it was

21   intending to bind all -- and wasn't just officers and

22   directors, it was fiduciaries and all different -- pardon me

23   if it wasn't expressly fiduciaries -- but of that nature,

24   anyone who ever could be viewed as an agent for the company.

25           And the obvious reason for that is when companies

1    create arbitration agreements, they want to make sure that if

2    they get sued for something and there is another defendant

3    who is going to come after them for indemnity, who is going

4    to say, Huh-uh, you are paying for this because the only

5    reason why I got sued here is because I was working for you,

6    because I was an officer, I was a director, I was an

7    employee, that is the reason why a company has to be so broad

8    in the context of making sure that anyone who is being sued

9    in their agency for a company is included within the scope of

10   arbitration.

11          But that is not this case here.  This case here

12   involves Mr. Blatt's individual tort claims that arose when

13   he was not an officer, he was not a director, and has nothing

14   to do -- if he were to win the claims, the money goes into

15   his pocket.  There is no indemnity here.

16          And as I indicated, Your Honor, if Mr. Blatt, if the

17   tables were turned, there is -- and he didn't want

18   arbitration, there is no world in which he would be able to

19   bind Ms. Pambakian to arbitration because he could raise his

20   hands and say, Are you kidding me, how could they bind me to

21   arbitration in my individual defamation claims?  They don't

22   have the right to do that.  They had no implied authority.

23          And again, the *Jensen* case discusses that.  And I

24   mean, if Your Honor is interested in the fact that Ms.

25   Pambakian never would have intended -- you know, again,

34

1    third-party beneficiary, that analysis has to have -- the

2    agreement has to demonstrate the express intent that the

3    parties to the agreement thought that this party would be a

4    third-party beneficiary.

5            And here, you know, maybe in the other case someone

6    could say it was incidental beneficiary, but the idea that in

7    this context that he was intended to be a third-party

8    beneficiary for his individual tort claims makes no sense.

9            And Mr. Blatt's only argument here is that the

10   literal terms, the literal definition here, includes me.

11   Well, the Courts have been very clear that the literal

12   argument is not enough to bind.  You have to look at what the

13   expressed intent is, and that is what the cases hold as well,

14   Your Honor, because of the importance of showing that this

15   was part of the party's intent.

16           And the idea of depriving Ms. Pambakian of her

17   Seventh Amendment right to a trial by jury because there was

18   a definition that, you know, clearly couldn't have bound

19   someone who was former employee to arbitrate, it just makes

20   no sense here, Your Honor.

21           THE COURT:  All right.  Thank you.

22           Let me hear briefly from the defense again in

23   rebuttal.

24           Frankly, counsel, you stated your -- not that the

25   briefs weren't very good, of course they were, they

1   represented a huge amount of work.  But frankly, you've

2   stated your argument more clearly here in the briefs, because

3   I think it's less -- you know, with having that Mr. Blatt had

4   the waiver and all of that when -- I thought that argument

5   was just very unfair to him.  What was he supposed to do?

6        Here when you just stated this point in a sense more

7   clearly and in a more uniform fashion, I think it carries

8   more weight than it did in the briefs.

9        So let me hear from counsel for Mr. Blatt.

10       MS. KRSULICH: Your Honor, just briefly.

11       Counsel indicates that there is no indication that

12   the parties intended to include Mr. Blatt as the third-party

13   beneficiary.  But of course, Your Honor, it's in the very

14   first paragraph of the agreement.  And the best reflection of

15   the parties' intent is the words of the agreement.

16       Three other points I would like to make just about

17   scope.  We cite cases in our motion on page 11 that include

18   defamation cases, as covered by an agreement like this.

19   Defendant offers no retort to those cases.

20       Pambakian was an employee when she signed the

21   agreement, and that is what matters here, as she was an

22   employee when she made the statements, and that also matters.

23   She is clearly bound by this agreement.  She is a signatory.

24   And Ms. Pambakian is covered in the agreement in the first

25   paragraph.

1          THE COURT:  Thank you, counsel.  The matter is taken

2     under submission.

3          Counsel, would you like to address the anti-SLAPP?

4          MR. BHATIA: Yes, Your Honor.

5          THE COURT: No, it's taken under submission.  I'll

6     think about it.  Thank you.

7          Let's move on to the anti-SLAPP.

8          MS. STEIN: The anti-SLAPP motion is our motion.

9          THE COURT:  I know, but I want to hear from the

10     defense first.

11          MS. STEIN: Absolutely, Your Honor.

12          MR. BHATIA: Thank you, Your Honor.

13          THE COURT:  Look, I think I made this clear in the

14     tentative, I think it's pretty clear from your briefs really,

15     what this ultimately comes down to is the privilege, because

16     otherwise, regardless of the other arguments, there is just

17     no way that you could ever say that this could be determined

18     at this point that it would fall beneath the standard that

19     has to be shown, because obviously, Mr. Blatt can just say,

20     It didn't happen that way, it's a lie.  That is the essence

21     of the lawsuit.

22          So here, if the privilege doesn't apply, then the

23     motion does -- the motion shouldn't be granted.  On the other

24     hand, if it does apply, then that is -- I believe that most

25     if not all of the other requirements are met.  So I do think

1    it comes down to that.  And I do think there seems -- you

2    know, and I'm sure all of you know this, even if you didn't

3    want to put it in the briefs, there is a spectrum here of

4    which the August 14th utterances are most arguably within the

5    statute, and that the August 16th utterances are most -- are

6    most arguably not within the statute. So that is -- having

7    read your briefs, that is the way I'm looking at it right

8    now.

9         So counsel, let me hear from the defense, and then

10   I'll hear from -- I mean, excuse me, the defense, I'll hear

11   from Mr. Blatt in regard to the motion, and then I'll hear

12   from the moving parties.

13        MR. BHATIA: Yes, Your Honor.  And I'm going to be, I

14   think, direct to the point.  This is Vineet Bhatia from

15   Susman Godfrey.

16        And I want to be direct to the point you just

17   raised.  We are going to reserve our arguments concerning

18   choice of law and whether prong 1 is satisfied, and we'll

19   rest on our papers.  But at the end of the day, the issue is

20   going to come down, whether it's on an anti-SLAPP motion or

21   later in the case, to this question of the fair report

22   privilege.

23        And I think Your Honor has hit the nail squarely on

24   the head.  The statements are not all the same and they have

25   to be analyzed separately under the case law.  You can't just

1   lump them into one pot and then say they are all treated the

2   same.  And the motion does that, the anti-SLAPP motion does

3   that to some degree.

4            Our response tried to decouple those issues.  Just

5   to briefly put things in context, the only judicial

6   proceeding that exists at the time the statements at issue

7   are made is the Valuation Complaint in New York.  It is filed

8   in early August 2018.  The media campaign immediately

9   follows.

10           And in that Complaint, which really sets it apart

11  from cases like *Dorsey* and *HealthSmart*, it is the barest of

12  allegations concerning what later becomes the subject of a

13  very larger media campaign.  The only allegation is, in that

14  Complaint, is -- that is relevant to this issue is that

15  Mr. Blatt sexually harassed and groped Ms. Pambakian at the

16  holiday party.  We deny that, but for these purposes that is

17  what you are testing the fair and true report against.

18           The fair and true reporting privilege is not a

19  license to make a narrow statement in a Complaint and then

20  later, months later even, embark upon a media campaign that

21  is disconnected from the Complaint, but just says bad things

22  about Mr. Blatt.  And then you point back and say, Oh, but I

23  had a Complaint that has one clause in one sentence that

24  references him; and as a result, the gist and sting of all my

25  later statements are now covered by the fair report

1    privilege.

2         Essentially, what the motion does, in the context of

3    the anti-SLAPP motion, is it guts defamation law.  It

4    basically says you have a license to say whatever you want,

5    whenever you want, as long as you have a Complaint that you

6    can point to, which now Ms. Pambakian's counsel in the sexual

7    harassment and assault case concedes is not even the subject

8    of a claim in that case.  It was simply, as we alleged in the

9    defamation action, it was -- it was just added in order to

10   sensationalize what was a run-of-the-mill dispute over money

11   between Match and Mr. Rad, in which Ms. Pambakian was drawn

12   along with these allegations being added.

13        There are three articles that we focus on; Your

14   Honor mentions two:  August 14th, August 16th, and then you

15   have the December 18th article, which isn't mentioned.  If

16   you look at the continuum, my view is the anti-SLAPP should

17   not apply in any way -- sorry, the fair and true reporting

18   privilege does not apply in any way to the December 18th

19   article.  I mean, there Ms. Pambakian is no longer a

20   plaintiff in the case.  She's been dismissed from the -- she

21   voluntarily drops out of the Valuation Complaint.  Articles

22   are written about e-mails that she sends to Match, which as

23   we allege in our Complaint at paragraphs 98 and at paragraph

24   115, were part of this coordinated media campaign in which

25   she forwards the -- defendants collectively forward the

1    e-mails which contain defamatory statements.

2         The e-mails are attached to the *Verge* article, which

3    is again one of the articles cited in Appendix A of our

4    Complaint, and it makes no mention, virtually no mention of

5    the lawsuit.

6         The August 16th article, we think again favors our

7    side, because of the detail in which Ms. Pambakian goes in

8    the article, and she goes far beyond the minimal allegations

9    that appear in the Valuation Complaint.

10        *HealthSmart* addresses this point directly on.  And

11   what is interesting about *HealthSmart*, I think, is that in

12   that case, you have the reverse.  You have a very detailed

13   Complaint that is filed against the later defamation

14   plaintiff.  It contains all the details about an allegation

15   of a bribery scheme, allegations of payments through

16   prostitution, allegations of kickbacks, allegations of

17   material that doesn't satisfy FDA requirements.  It's very

18   detailed.

19        THE COURT:  Well, the reason I said that I saw the

20   spectrum with the August 16th on one end, I didn't mean to

21   ignore the December statements, but I guess it's the point

22   that you are making, and I hope that it will be addressed, is

23   that it seemed to me there that just -- it was very much that

24   there was the statements that were being made, like not

25   with -- it wasn't that there was no reference to the lawsuit,

but it was rather it was just kind of like, Oh, here, yes,
there is reference to the lawsuit, but then it's the very
fact that, saying, and there is more, and there is this.

     I mean, it came across that here there are these
people who are not necessarily parties or have been involved
in a lawsuit, but they are witnesses who are asserting that
there are -- that certain factual things took place in that
hotel room.

     So I guess in that sense, it struck me that -- well,
regardless, obviously, the 14th is much more tied to the
lawsuit, but I guess that was my point there.  And maybe --
maybe under *Dorsey* and *HealthSmart* that tenor matters less
than it seems to me that it does or it should, but that was
kind of my thing there.  I'm saying like, well, what -- the
point is if the case law is the reader is -- you are supposed
to look on this on what is the effect on the reader, what is
the effect on the hearer, and I'm going, what is the effect
on me?  The point is, I'm saying it's like, yeah, we are
mentioning the lawsuit, but we are mentioning it in the way
of distinguishing it.  Like, we've got war, there is this,
like pay attention, extra, extra, hear all about it.

     MR. BHATIA: I agree completely.  The August 16th and
the December I think do not -- are not protected by the fair
report privilege.  And it is Ms. Pambakian's counsel's burden
to establish that privilege because it is a defense.

1          And *HealthSmart* addresses this issue.  One of the

2     reasons why the 16th and the 18th are not protected is they

3     are not making statements with reference to the Complaint

4     itself.  They are not saying, We alleged in a Complaint the

5     following.  Instead, they make the statements as facts.  And

6     *HealthSmart* points out that when you make statements as

7     facts, as opposed to allegations, you don't get the

8     privilege.

9          The issue in *HealthSmart* was because the way in

10    which the TV -- the TV interview went, it -- the Court

11    believed that it could determine that the TV interview was

12    very much about the Complaint.  And because there was this

13    toggling back and forth between showing the Complaint,

14    allegations in the Complaint, and then an occasional

15    statement, and so the Court looked at that and said, We

16    can -- we believe we can determine this as a matter of law.

17    As opposed to cases like *Argentieri*, and it cites *Baral* and

18    *J&M*, where it's very much a fact issue, because what is the

19    effect on the reader or the listener.  It can have a very

20    different effect.  It is not the gist and sting of the

21    essential allegation in the Complaint, which was assault and

22    groping.

23          Now, I agree with you the August 14th article -- I'm

24    sorry -- the August 14th interview is a closer question.  And

25    I think our only point there would be that they do not

 1    attribute it directly to the Complaint, but they would try to

 2    fall within *HealthSmart* that, okay, the big picture is this

 3    was essentially about the Complaint.  But that was very

 4    carefully done.

 5             And it was very carefully done by Mr. Snyder, Orin

 6    Snyder, who was the lead counsel in the Valuation case.  We

 7    didn't sue Mr. Snyder.  We didn't say that as the attorney,

 8    his statements were inappropriate, because he was very

 9    careful.  He said in the Complaint, I allege the following.

10    So I could certainly see a situation where Your Honor

11    determined later, I think, as opposed to on this SLAPP

12    motion, which I think is binary, that they will get the

13    protection of the August 14th article for purposes of the

14    fair and true report privilege, but they shouldn't get it for

15    the 16th and for the December 18th.

16             THE COURT:  All right.  Thank you, counsel.

17             Let me say for those of you here for the 10:00

18    calendar, I very much appreciate your patience.  Obviously,

19    with the confusion as to the courtrooms and that we got a bit

20    of a slow start for the 9:00 calendar, and I appreciate very

21    much the fact that you are showing such patience that we

22    aren't starting right away at 10:00.

23             Let me hear from the defendants in regard to this.

24             And, counsel, since you are at the lectern, let's

25    say I do send that -- this gets sent to arbitration despite

1   your argument to the contrary, in your view, then, what

2   happens?  Do I ignore the anti-SLAPP motion? Do I deny it as

3   moot? Do I grant it anyway before I send it?  What do you

4   think is the proper procedure in that regard?

5            MS. STEIN: So, Your Honor, first and foremost, I

6   think this anti-SLAPP issue has to be decided.  And even if

7   you ruled on the arbitration first, which I don't think is

8   the right order, and I'll get to that, Mr. Rad is a defendant

9   and a movant here.  Mr. Rad is not being asked to go to

10  arbitration.

11           And so certainly his motion --

12           THE COURT:  But we all understand that.

13           MS. STEIN: Right.

14           Now, I think the important thing here, Your Honor,

15  regardless of arbitration, is that Mr. Blatt is seeking to

16  hold Mr. Rad responsible, not only for his statements, but

17  for all of the statements of Ms. Pambakian.

18           So that means that every statement that is being

19  discussed here has to be decided as a matter of law and

20  anti-SLAPP because it pertains to Mr. Rad, as well as Ms.

21  Pambakian.

22           THE COURT:  I understand.

23           Look, of course you are right on the civil

24  conspiracy, but that doesn't mean as a matter of forum, there

25  is no extra claim or cause of action in regard to that.  But

 1    it is a legitimate basis for holding somebody vicariously

 2    liable, the same way, you know, being an agent or a principal

 3    or master and servant, or anything else.

 4         So in that regard, it's -- it definitely is, at

 5    least putatively, a legal doctrine by which Mr. Rad can be

 6    held responsible for what it was that Ms. Pambakian said.

 7         But again, I just want to note, since I didn't

 8    bother to put it in the tentative, that you are right about

 9    the point of it being a separate claim, it just isn't.

10    California law is very clear on that.

11         So anyway, go ahead.

12         MS. STEIN: So anyway, my point there, Your Honor,

13    was that irrespective of arbitration, Mr. Rad is being --

14    Mr. Blatt is trying to hold Mr. Rad responsible for all of

15    these statements, not just his own.  So we would like --

16    Mr. Rad would want to have the benefit of anti-SLAPP with

17    respect to all of these statements.

18         THE COURT:  I understand that.

19         MS. STEIN: And we also believe that the anti-SLAPP

20    issue is dispositive of the case.  And if there is a pending

21    case before Your Honor, and we would like to be heard on it,

22    and it would moot the arbitration issue entirely.

23         I can -- I'll go consecutively through the

24    statements that are at issue.  But, you know, the context

25    that I would like to give here, first of all, is that the

1    Courts in California are required by statute to apply the

2    anti-SLAPP law broadly.  And the litigation privilege in

3    Civil Code 47 is likewise construed broadly.

4         Here, the New York lawsuit alleges that Mr. Blatt

5    groped and sexually harassed Ms. Pambakian, that IAC and

6    Match covered up Blatt's misconduct, and they did so because

7    Blatt was essential to the execution of defendants' scheme to

8    deprive the Tinder Plaintiffs of their rights as option

9    holders and to save defendants billions of dollars in the

10   process.

11        Now I would like to, before I go through the

12   statements, I think it's important to look at the context of

13   this reasonable viewer idea.  And what the Courts focus on in

14   the reasonable viewer and the reasonable reader is whether

15   they understood that what was being discussed were the

16   allegations of a Complaint, and that it wasn't just some

17   separate exercise divorced from allegations in a Complaint

18   itself.

19        Here, with the CNN transcript, the CNN video of

20   Mr. Rad's interview, you know, it's very interesting that

21   Mr. Blatt's counsel referred to the *HealthSmart* case here and

22   the toggling back and forth between clips of a Complaint and

23   clips of the interview, being asked questions about the

24   Complaint, because that is exactly what happened in Mr. Rad's

25   interview.  The exact situation in *HealthSmart* where he was

1    shown a piece of a Complaint, and then the very next words

2    were, That was -- that is what I was talking about.  That was

3    the misconduct that I reported.  It couldn't be closer to the

4    *HealthSmart* case here, Your Honor. And the words he used were

5    virtually verbatim from the New York Valuation Complaint.

6    Under *HealthSmart*, this squarely fits within the Court of

7    Appeals' decision there. And, you know, I don't see how it

8    wouldn't.

9         The CNN article from August 2018, which I understand

10   Your Honor thinks is a closer call, this entire article is

11   about the lawsuit that is at the center of all of these

12   statements.  And it starts out, the very first words, A

13   lawsuit filed by ten current and former Tinder executives,

14   each paragraph talks about the lawsuit, the allegations that

15   appear in the lawsuit, the suit filed, Pambakian and three

16   other plaintiffs in the suit.  It goes paragraph by

17   paragraph, talking about the allegations in the Complaint.

18   Any reasonable reader would have known that the reporter here

19   and the discussion was, what is happening?  What is going on

20   in this Complaint?  How can we educate you more about this?

21        Ms. Pambakian's statements to CNN do nothing more

22   than detail the circumstances that were already alleged in

23   the Valuation Complaint, and any reasonable reader would have

24   known that that is what she was talking about.  It was the

25   same holiday party, the same individuals.  It was her boss

1     and her, allegations of groping.  The gist is the same, her

2     boss used his position of power at a 2016 holiday party to

3     grope Ms. Pambakian and to harass her in front of other

4     employees.

5              Now, the test, Your Honor, is whether the report

6     captures the substance, the gist or the sting of the subject

7     proceedings.  And I emphasize the subject proceedings there,

8     Your Honor, that is from the *Braun* case, the Court of Appeal

9     in California.  Because the idea is to look at what was going

10    on in the subject proceedings.  This isn't an exercise in

11    parsing words, was this word more stinging than that

12    stinging.

13             And I think the most obvious reason why that that

14    can't be the case is the Ninth Circuit's decision in *Dorsey*.

15    The Ninth Circuit expressly said that the fair and true

16    reporting privilege goes beyond what was said in the

17    Complaint, and that out-of-court statements are okay when

18    they detail the circumstances and the speaker's theories

19    based upon the circumstances in regard to the court

20    proceeding.

21             And, Your Honor, if someone is allowed to provide

22    more detail about an allegation, it's hard to imagine

23    honestly when that is not going to be more stinging.  More

24    detail is usually more stinging than less detail.  But the

25    Ninth Circuit said you absolutely, positively can do that.

1    And in that case, the allegations in the Complaint were,

2    there is a level of uncertainty as to whether an individual

3    had AIDS.  But the statements outside of the Court were much

4    more definitive, that he definitely did, they had known for

5    years, and the Ninth Circuit said that may be more --

6         THE COURT:  All of which turned out to be a lie,

7    actually.

8         MS. STEIN: And the Ninth Circuit protected it, Your

9    Honor.

10        And the Courts want to make sure that the detail has

11   a direct nexus to the proceedings.  And I take issue with

12   Mr. Blatt's counsel saying that the allegations are

13   disconnected from the New York Complaint because they are in

14   the New York Complaint.  It is -- they are expressly in the

15   New York Complaint that Mr. Blatt sexually harassed and

16   groped Ms. Pambakian.  And the New York Court has refused to

17   throw those allegations out.  Those are being heard by the

18   New York Court.

19        And the fact that Mr. Blatt seems -- the premise of

20   his argument seems to be somehow that either groping is not

21   sexual assault or there is something more stinging about

22   providing the details, groping is a reprehensible and vile

23   act that is sexual assault under California law.  It

24   humiliates, it demeans, and it subjects a victim to lifelong

25   scarring.  And to suggest that that is not a sexual assault

1       is really offensive, Your Honor.

2              And anyone who looked at these statements by Ms.

3       Pambakian to CNN, who was reporting on her allegations, and

4       said, What happened?  Why are you alleging this, Ms.

5       Pambakian? What is going on here? What happened at that

6       party? And she provided some more detail that the Court --

7       the Ninth Circuit in *Dorsey* said that you are allowed to do,

8       that is critical.

9              The Court of Appeal in the *Argentieri* case also said

10      that you are allowed to do that.  In the *Argentieri* case, the

11      allegations were a negligence standard, knew or should have

12      known that out-of-court statements said these were known

13      forged documents.  And the Court of Appeals said, I'm not

14      going to say that that is not close enough.  That is talking

15      about these allegations.  It's within what is protected.

16             And likewise, the *Greenberg* case in the Court of

17      Appeal -- excuse me -- that was a Judge Carney case, the

18      *Greenberg* case.  There Judge Carney emphasized the importance

19      of the flexibility of the standard, of allowing people to not

20      get everything 100 percent verbatim, and to provide more

21      context.  And he actually talked about a Court of Appeal

22      case, the *Jennings* case, which I think was really

23      interesting, because in the *Jennings* case, the out-of-court

24      statements, the ones that were published, they said this guy

25      was convicted of felony tax fraud.  Well, what actually what

1    happened was that he pled no contest to a misdemeanor failure

2    to file two years of tax returns, and the Court of Appeal

3    said it's protected because everyone gets it, it's what was

4    being talked about about the proceeding, it's not about

5    comparing word for word.

6         THE COURT:  Thank you, counsel.

7         I want to give a very brief chance to Mr. Blatt to

8    respond.

9         MS. STEIN: Sure.  And do you not want to hear about

10   the e-mails?

11        THE COURT:  I think I understand your position on

12   *Dorsey* and *HealthSmart*, and when I reflect on this utterance

13   by utterance, I will keep them in mind.  Thank you.

14        MS. STEIN: Thank you, Your Honor.

15        MR. BHATIA: Your Honor, I will be very brief,

16   because I recognize you have other attorneys waiting in other

17   cases.

18        I think if you go to the August 16th article -- and

19   I would refer Your Honor to the appendix to our Complaint --

20   I don't think it's a fair statement to say that it was about

21   the Complaint, because it says in the article, in a statement

22   to CNN, so we are talking about a separate statement,

23   separate from the lawsuit, Pambakian makes the following

24   statements.  And then it goes through and says a number of

25   things that don't appear anywhere in the Complaint.  So there

1    is no way to test whether what is being said is a fair and

2    true report.  And the argument, it kind of -- the fair and

3    true report privilege just cuts a wide hole in defamation law

4    if you can now make errors, mistakes, add details, say things

5    or actual facts when the cases say you can't do any of that.

6         Now, I would refer Your Honor, and I think if Your

7    Honor would look at my declaration, Exhibit B, we list the

8    allegations in the Valuation Complaint, which is the judicial

9    proceeding, and then the allegations that are actually said.

10        And I think I said in my argument, because I believe

11   the August 14th was closer because of the toggling, but when

12   you go to August 16th and December 18th, none of that

13   happens.  And so in a way, *HealthSmart* giveth and *HealthSmart*

14   taketh away.  It may help them on the 14th, the same point on

15   that case, they can't make it with respect to what happened

16   on August 16th, and what happened on December 18th.

17        Thank you, Your Honor.

18        THE COURT:  Thank you, counsel.  I appreciate the

19   effort that went into the briefs, they were excellent.  I

20   appreciate your arguments here this morning.  All three

21   motions are taken under submission.

22        Thank you.

23                  *****     *****     *****

24

25

```
 1
 2      I certify that the foregoing is a correct transcript from the
 3      record of proceedings in the above-titled matter.
 4
 5
 6
 7      --------------------------
 8
 9      Amy C. Diaz, RPR, CRR              November 6, 2019
10      S/  Amy Diaz
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER