UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No.** CV 19-7046-MWF (FFMx)          **Date:  January 9, 2020**
Title:      Gregory Blatt v. Rosette Pambakian et al.

Present:   The Honorable MICHAEL W. FITZGERALD, U.S. District Judge

        Deputy Clerk:                        Court Reporter:
        Rita Sanchez                         Not Reported

        Attorneys Present for Plaintiff:     Attorneys Present for Defendant:
        None Present                         None Present

**Proceedings (In Chambers):**          ORDER RE: PLAINTIFF'S MOTION TO
                                        COMPEL ARBITRATION [19];
                                        DEFENDANTS' MOTION TO STRIKE
                                        AMENDED COMPLAINT [20]

        Before the Court are two motions:

        First, there is Plaintiff Gregory Blatt's Motion to Compel Arbitration and Stay Litigation (the "Arbitration Motion"), filed on October 7, 2019.  (Docket No. 19).  On October 15, 2019, Defendant Rosette Pambakian filed an Opposition.  (Docket No. 26).  On October 21, 2019, Plaintiff filed a Reply.  (Docket No. 27).

        Second, there is Defendants Rosette Pambakian and Sean Rad's Special Motion to Strike Plaintiff's First Amended Complaint (Pursuant to Cal. Code Civ. Proc. § 425.16) (the "Anti-SLAPP Motion"), filed on October 7, 2019.  (Docket No. 20).  On October 15, 2019, Plaintiff filed an Opposition.  (Docket No. 23).  On October 21, 2019, Defendants filed a Reply.  (Docket No. 29).

        The Court has read and considered the papers filed in connection with the motions, and held a hearing on November 4, 2019.

        For the reasons discussed below, the two motions are ruled upon as follows:

- The Arbitration Motion is **GRANTED**.  Although Blatt is not a signatory to the ADR Agreement, he is a third party beneficiary who is entitled to enforce the agreement.  Blatt's claims also fall within the scope of the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No.** CV 19-7046-MWF (FFMx)          **Date:  January 9, 2020**
Title:      Gregory Blatt v. Rosette Pambakian et al.

arbitration agreement, and the ADR Agreement is enforceable.  Therefore, the action against Pambakian is stayed.

- The Anti-SLAPP Motion is **DENIED** *as moot* as to Defendant Pambakian.  It is **GRANTED** *in part* and **DENIED** *in part* as to Defendant Rad.  Although Rad has established that the allegedly defamatory statements were made in connection with *issues* under consideration or review by a judicial body, he has failed to demonstrate that all of the allegedly defamatory statements fall under the fair and true reporting privilege.

## I.     BACKGROUND

Plaintiff commenced this action on August 13, 2019.  (*See* Complaint (Docket No. 1)).  On October 3, 2019, Plaintiff filed a First Amended Complaint ("FAC"). (Docket No. 18).

### A.     Plaintiff's Claims

The FAC contains the following allegations:

This is an action for defamation and defamation per se.  (FAC ¶ 1).  In order to extract $2 billion from IAC/InterActiveCorp ("IAC") and Match Group, Inc. ("Match"), Defendants Pambakian and Rad have conspired to make false allegations of sexual harassment and sexual assault against Blatt.  (*Id.*).  Blatt brings this action to obtain redress for false accusations that have been leveled against him.  (*Id.*).

Pambakian and Rad are former executives at Tinder, Inc. ("Tinder").  (*Id.* ¶ 2). Tinder is wholly owned and operated by Match, and Match is a controlled subsidiary of IAC.  (*Id.*).  Blatt was the CEO and Chairman of Match Group and the CEO and Executive Chairman of Tinder at various times until December 2017, when he left the company.  (*Id.* ¶¶ 20, 65).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
<u>CIVIL MINUTES—GENERAL</u>

**Case No.  CV 19-7046-MWF (FFMx)          Date:  January 9, 2020**

Title:      Gregory Blatt v. Rosette Pambakian et al.

Beginning in July 2015, Blatt worked closely with Pambakian, even though she did not report to Blatt.  (*Id.* ¶ 33).  During the time they worked together, Blatt and Pambakian developed a productive professional relationship and a close friendship.  (*Id.*).

### 1.      The 2016 Tinder Holiday Party

On the evening of December 9, 2016, Blatt attended the Tinder holiday party.  (*Id.* ¶ 34).  During the party, Blatt and Pambakian started talking and the conversation turned flirtatious.  (*Id.*).  Neither of them indicated at any time that they took offense at the other's comments.  (*Id.*).  At some point afterward, Pambakian suggested to Blatt that when the party was over, they find a hotel room to host an after-party.  (*Id.*).  Later, unable to find any restaurants open in the hotel, Blatt suggested broadly to the people he was with, including Pambakian, that they "get out of there" to find food.  (*Id.* ¶ 35).  Blatt did not go straight up to the room with others, but instead spoke to some other Tinder employees who had not yet left the party.  (*Id.* ¶ 36).

Blatt eventually texted one of the Tinder employees for the room number and came up to the hotel room.  (*Id.* ¶ 37).  Pambakian and two other Tinder employees were there.  (*Id.*).  Blatt and Pambakian kissed; the interaction was consensual.  (*Id.*).  Room service was then delivered.  (*Id.*).  Soon after eating, Blatt departed.  (*Id.*).  While in the hotel room, Blatt and Pambakian were fully clothed at all times.  (*Id.*).  After that evening, Pambakian and Blatt never engaged in any further physical encounters.  (*Id.*).

On Monday morning, Blatt apologized to Pambakian for the night of the holiday party, saying he had used poor judgment and, given their working relationship, he had let things go too far.  (*Id.* ¶ 38).  Pambakian responded, "Please.  I'm sorry too.  It was as much me as it was you."  (*Id.*).  They agreed that they did not want anything to interfere with their good relationship, and Pambakian suggested to Blatt that they would not tell anyone Blatt had gone up to the room.  (*Id.*).  Blatt agreed.  (*Id.*).  He also apologized to the other two employees who had been in the hotel room for what had happened.  (*Id.*).  Work went on as usual for Blatt and Pambakian and their good working relationship continued.  (*Id.* ¶ 39).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No.  CV 19-7046-MWF (FFMx)            Date:  January 9, 2020**
Title:      Gregory Blatt v. Rosette Pambakian et al.

### 2.    Rad's Allegations Against Blatt

Blatt had been Rad's boss, directly and indirectly, through Rad's tenure at Tinder.  (*Id.* ¶ 3).  Over that time, Rad came to blame Blatt for a variety of perceived transgressions, including Rad's failure to obtain control of Tinder soon after its launch in 2012, Rad's demotion, and his ultimate dismissal from Tinder's management in 2016.  (*Id.*).  But it was the valuation negotiations between Blatt and Rad in April 2017 that pushed Rad over the edge.  (*Id.* ¶ 4).

The first valuation of Tinder was scheduled for May 2017.  (*Id.* ¶ 44).  Under the contractually agreed appraisal process, two investment banks were to value the Tinder stock options.  (*Id.* ¶ 4).  Hoping to avoid the process altogether, Rad and Blatt began negotiating in March to see if they could agree on a value.  (*Id.*).  However, Rad and Blatt had different perspectives regarding how Tinder should be valued.  (*Id.* ¶ 5).  As discussions began to fall apart, Rad concluded that Blatt's further participation in the valuation process would lead to a significant lower payout to Rad.  (*Id.*).  Accordingly, on April 18, 2017, Rad confirmed that he planned to seek retribution against Blatt as a means of advancing his valuation objectives.  (*Id.* ¶ 47).

On April 27, 2017, just two days after negotiations with Blatt over the value of Tinder broke down, Rad made a false accusation that Blatt had sexually harassed Pambakian at a Tinder holiday party some five months earlier.  (*Id.* ¶ 5).  As confirmed by multiple Tinder employees, including Pambakian, Rad made the complaint to obtain Blatt's dismissal or suspension from his position as Tinder's CEO in order to seek retribution against Blatt and secure a significant higher valuation of Rad's options.  (*Id.*).  At the same time, Rad also reached out to a law firm to begin drafting a complaint for the lawsuit against IAC and Match that would follow the appraisal regardless of the outcome.  (*Id.* ¶¶ 6, 47).

Rad's sexual harassment complaint against Blatt was thoroughly investigated by in-house counsel and two outside law firms.  (*Id.* ¶¶ 7, 58).  Blatt cooperated fully with the investigation, conveying his account of the relevant events, acknowledging his poor judgment that evening, and expressing genuine regret at what had occurred.  (*Id.* ¶ 58).  When the investigation concluded, the Board determined that Blatt had not committed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No.  CV 19-7046-MWF (FFMx)          Date:  January 9, 2020**
Title:      Gregory Blatt v. Rosette Pambakian et al.

sexual harassment or violated any other company policy or law.  (*Id.*).  The Board did, however, agree with Blatt that he had exercised poor judgment, and as a result, determined to cancel an option grant Blatt had been scheduled to receive in early May. (*Id.*).

### 3.  The Valuation Lawsuit and Pambakian Lawsuit

The appraisal process relating to Tinder's options was completed in mid-July 2017, and Tinder was valued at approximately $3 billion.  (*Id.* ¶ 60).  In August 2017, Rad elected to sell all his options related to Tinder.  (*Id.* ¶ 61).  Pambakian similarly elected to sell her stock options, pocketing nearly $5 million.  (*Id.* ¶ 8).  The value of Tinder subsequently increased and Rad became furious.  (*Id.*).

On August 14, 2018, Rad filed a lawsuit in New York (the "Valuation Lawsuit") claiming that IAC and Match, in large part through the actions of Blatt, failed to properly value their Tinder stock options.  (*Id.* ¶¶ 2, 14).  Specifically, the plaintiffs in the Valuation Lawsuit claim that they would be entitled to an additional $2 billion if their Tinder options were properly valued.  (*Id.* ¶ 2).  Blatt is expected to be a key witness for IAC and Match in the Valuation Lawsuit.  (*Id.*).  Damaging Blatt's credibility and tarnishing his character are important elements of Pambakian's and Rad's litigation strategy in that action.  (*Id.*).

Pambakian is one of the plaintiffs in the Valuation Lawsuit.  (*Id.* ¶ 2).  To recruit Pambakian for his scheme to sue Match and IAC, Rad promised millions to Pambakian in an exchange for joining the Valuation Lawsuit and making false allegations of sexual harassment against Blatt in the guise of a litigation funding agreement.  (*Id.* ¶ 12).  Securing Pambakian's false allegations was the driving motive behind these payment arrangements.  (*Id.*).

In the Valuation Lawsuit, Rad leveled the same allegations of sexual harassment against Blatt that he had made a year before.  (*Id.*).  Rad and Pambakian then embarked on a coordinated media campaign to ensure that their false charges against Blatt were widely-disseminated to the public, which they were.  (*Id.*).  Rad, who had by far the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 19-7046-MWF (FFMx)          Date:  January 9, 2020
Title:     Gregory Blatt v. Rosette Pambakian et al.

largest option stake of any Tinder employee, orchestrated and directed the coordinated legal and public relations campaign.  (*Id.* ¶ 68).

Months later, at a critical juncture of the Valuation Lawsuit, Pambakian brought a separate lawsuit against Blatt, Match, and IAC (the "Pambakian Lawsuit") reiterating the same false allegations against Blatt.  (*Id.* ¶ 15).  This new lawsuit – and the corresponding new round of coordinated outreach to the media – drove a fresh wave of headlines that once again tarnished Blatt's reputation.  (*Id.*).  According to Plaintiff, allegations against Blatt in the Valuation Lawsuit, the press, and the Pambakian Lawsuit, are merely coordinated tactics to tarnish Blatt's reputation to drive an anticipated $2 billion payday in the Valuation Lawsuit, the largest piece of which would go to Rad.  (*Id.*).

### 4.    Pambakian's Attempts to Recast Her Relationship with Blatt

Pambakian now claims that she was so offended by the conversations she and Blatt had at the holiday party that she fled Blatt and sought refuge from him in a friend's hotel room.  (*Id.* ¶ 40).  But Blatt alleges that Pambakian invited him up to the hotel room in front of several people, well after the allegedly offensive conversation had ended.  (*Id.*).  Pambakian also now claims that, as a way of "de-escalating the situation," she broke away from Blatt and ordered room service.  (*Id.* ¶ 41).  However, room service records and text messages establish that Pambakian actually ordered food fifteen minutes before Blatt even arrived in the room.  (*Id.*).

A flurry of friendly messages exchanged the next morning between Pambakian and Blatt also belie Pambakian's assertion that she believed she had been assaulted by Blatt just hours earlier.  (*Id.* ¶ 42).  That same morning, Pambakian sent a text message to the other two Tinder employees who had been in the hotel room with her and Blatt, stating: "About last night…we should keep the hotel room antics to ourselves.  It would be bad if word got out that greg came back to the room. So for his sake and ours let's keep that in the vault. But by all means we can rehash it amongst ourselves as often as possible."  (*Id.* at 16; Ex. 6 (Docket No. 18-1)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No.  CV 19-7046-MWF (FFMx)**          **Date:  January 9, 2020**
Title:      Gregory Blatt v. Rosette Pambakian et al.

In order to bolster her false claims about what happened at the Tinder holiday party, Blatt alleges that Pambakian felt compelled to falsely paint Blatt in a negative light and misrepresent the nature of their professional and personal relationship.  (*Id.* ¶ 70).  For example, she now claims that "Blatt was a notorious bully, known for violent outbursts and vindictive retribution."  (*Id.*).  However, Blatt contends that she does not offer a single example to support her contentions.  (*Id.*).  In fact, Pambakian wrote a text message to another Tinder employee that she "love[d]" and "adore[d]" Blatt.  (*Id.* ¶¶ 71-72).  Moreover, in direct response to Blatt's announced departure from Tinder, Pambakian repeatedly praised his leadership and expressed her sadness at his impending departure.  (*Id.* ¶ 76).

In further effort to boost her false accusations, Pambakian also decided to lie about the supposed retaliation she experienced as a result of what happened at the holiday party and to mispresent the workplace culture at Match.  (*Id.* ¶ 81).  For example, Pambakian now claims that when Blatt and his "team" arrived at Tinder they brought with them Match's "misogynistic culture."  (*Id.* ¶ 82).  However, when Blatt left Tinder and Match at the end of 2017, more than 75% of all Match employees reported up to a female executive in the senior-most ranks of the company.  (*Id.* ¶ 83).  Blatt took meaningful steps to improve Tinder's culture after Rad was removed.  (*Id.* ¶ 84).

Rad and Pambakian's primary defamatory statements against Blatt are their claims of sexual harassment and sexual assault.  (*Id.* ¶ 17).  However, in order to support these primary defamatory statements, Rad and Pambakian have made other defamatory assertions against Blatt designed to villainize him and make their claims more believable.  (*Id.*).  Specifically, Blatt challenges the following assertions: (a) Blatt routinely subjected Pambakian to inappropriate behavior; (b) Blatt made unwanted sexual advances to Pambakian at the Tinder holiday party and that Pambakian fled Blatt in horror and sought refuge in a hotel room; (c) Pambakian dutifully reported Blatt's "assault" but in turn was ignored, marginalized and disparaged; (d) Blatt threatened Rad for raising the allegations of sexual misconduct against him; (e) Pambakian's career suffered horribly as a result of Blatt demeaning her and not taking

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 19-7046-MWF (FFMx)                 Date:  January 9, 2020
Title:      Gregory Blatt v. Rosette Pambakian et al.

her seriously as a business executive; and (f) Blatt reigned over a misogynistic work culture that routinely mistreated women.  (*Id.* ¶ 18(a)-(f)).

### 5.  Damages

As a result of Defendants' defamatory conduct, Blatt has suffered harm to his professional and personal reputation.  (*Id.* ¶ 92).  He has also suffered damages of the type that are a fair and natural consequence of the Defendants' tortious conduct, including humiliation, embarrassment, and ostracism, and the deprivation of social relationships.  (*Id.*).

Based on the foregoing allegations, Plaintiff brings three claims for relief: (1) defamation; (2) defamation per se; and (3) civil conspiracy.  (*Id.* ¶¶ 93-135).

### B.    Arbitration Agreement

On August 5, 2019, Pambakian filed a related lawsuit against Blatt, Match Group, Inc. and IAC/InterActive Corp.  (*Rosette Pambakian v. Gregory Blatt et al.*, 19-cv-7053-MWF (FFMx) ("Pambakian Action")).  In that action, the defendants similarly filed a Motion to Compel Arbitration (Pambakian Action, Docket No. 30). Because the facts largely overlap, Blatt attached a copy of the motion and all supporting declarations and exhibits in this action.  (Declaration of Davida Brook ("Brook Decl.") ¶ 3 (Docket No. 19-2), Ex. 1 (Docket No. 19-3)).  The following facts are from the declarations and exhibits filed in the Pambakian Action.

In December 2017, Match adopted an Alternative Dispute Resolution Program for California (the "ADR Program").  (Declaration of Lina Alcala ("Alcala Decl.") ¶ 5 (Docket No. 30-1); *Id.* ¶ 6, Ex. B ("ADR Agreement") (Docket No. 30-2)).  The ADR Program became effective on February 1, 2018.  (ADR Agreement at 1).

On January 17, 2018, the Human Resources Department of Match Group, LLC emailed Plaintiff titled "Please DocuSign: Match Group Policy Recertification." (Alcala Decl. ¶ 8, Ex. C).  The email contained the following message:

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No.  CV 19-7046-MWF (FFMx)                Date:  January 9, 2020**
Title:      Gregory Blatt v. Rosette Pambakian et al.

MatchGroup requires that ALL employees annually certify their familiarity and compliance with MatchGroup/IAC's policies, including certain critically important policies.  We ask that you read through the policies (accessible via link below) and answer two quick questions at the end of each policy.  After you read through and answer two questions per policy, you'll be prompted to sign to certify acknowledgment of your review of the policies.  This will submit your recertification to HR and you will receive a PDF confirmation via email from Adobe Sign.  Your certification is due by no later than Wednesday, February 28, 2018.  *In addition, we have included the new alternative dispute resolution program at the end of the document.  Please review and sign the summary.*

(*Id.*) (emphasis added).  Plaintiff electronically signed the summary of the alternative dispute resolution mentioned in the email on January 20, 2018.  (Alcala Decl. ¶ 9, Ex. A (the "Summary Agreement")).

The first paragraph of the Summary Agreement that Plaintiff signed contains the following:

1. Agreement to Arbitrate; Claims Covered by Agreement  The parties hereto agree that all references to the "Company" in this Agreement will include Match Group, Inc., and all of its related subsidiary and affiliated entities, and the former, current and future officers, directors and employees of all such entities . . . *[T]he Company and the Associate hereby consent to resolution by arbitration* on an individual basis of *all claims or controversies arising out of or in connection with Associate's application with, employment with, or termination from, the Company*. . . . This Agreement is mutual, encompassing all claims the Associate may have against the Company or that the Company may have against the Associate, except as explicitly stated in the [ADR] Program.  *The claims covered by this Agreement include*, but are not limited to, claims for wages or other compensation due; claims for breach of any contract, express or implied; tort claims; *claims for discrimination, harassment or*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No.  CV 19-7046-MWF (FFMx)**          **Date:  January 9, 2020**
Title:      Gregory Blatt v. Rosette Pambakian et al.

*retaliation of any kind*; and claims for violation of any federal, state or
other statute, ordinance, regulation, or common law.

(Summary Agreement ¶ 1) (emphasis added).

The Summary Agreement additionally contains the following provisions:

2. <u>Governing Law</u>  . . . Except as provided or under the Program, or as
required by law, the *Federal Arbitration Act shall govern the
interpretation, enforcement and all proceedings pursuant to this
Agreement* . . .

5. <u>Summary</u>  This is only a summary of the Program.  The Program can
only be amended, modified, or revoked within 14 days prior notice to
Associate, which amendment, modification or revocation will not affect
claims which have already been submitted under the Program . . .

*Associate also understands that it is his/her responsibility to review the
Match Group, Inc. Alternative Dispute Resolution Program which
contains all of the terms under which disputes will be resolved under the
Program.  The Program document is incorporated by reference into this
document.*  A complete copy of the Program can be obtained at the
Company's Human Resources' office or by accessing MatchGroup policies
external link in workday through a personal computer.  The Program can
be found in the "Policies" section of the workday dashboard.

(*Id.* ¶¶ 2, 5; *Id.* at Alcala-6) (emphasis added).

The full ADR Agreement contains similar language defining the Company, the
types of claims covered by the ADR Program, and the application of the Federal
Arbitration Act ("FAA").  (*See* ADR Agreement §§ 1, 2, 4.1).  For example, the full
ADR Agreement provides that the Company and the Associate "consent and agree to
the resolution by arbitration of *all claims or controversies involving or in any way*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 19-7046-MWF (FFMx)            Date:  January 9, 2020
Title:      Gregory Blatt v. Rosette Pambakian et al.

*concerning Associate's application with, employment with, or termination from, the Company.*"  (*Id.* § 2) (emphasis added).

In addition, the ADR Agreement provides the following description of the arbitration process:

> Arbitration under this Program shall be before a single arbitrator in the country in which the dispute arose and will be administered in accordance with the applicable arbitration rules and procedures of the American Arbitration Association (AAA) or another alternative dispute resolution (ADR) provider selected by the parties (except where the AAA or other ADR provider's rules are contrary to applicable state or federal law), and California Code of Civil Procedure Section 1280 *et seq*.

(*Id.* § 6).

## II.   **ARBITRATION MOTION**

### A.   **Legal Standard**

The Federal Arbitration Act ("FAA") requires district courts to compel arbitration on all claims subject to arbitration agreements.  *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) ("By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.") (citing 9 U.S.C. §§ 3, 4).  However, every arbitration agreement is subject to generally applicable contract defenses, including waiver and unconscionability.  *See Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712, 719 (9th Cir. 2012) (stating that "the FAA's savings clause permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud, duress, or

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 19-7046-MWF (FFMx)            Date:  January 9, 2020
Title:      Gregory Blatt v. Rosette Pambakian et al.

unconscionability" or waiver, and analyzing whether the defendant waived its right to arbitration through its litigation conduct) (internal quotation marks omitted).

The Supreme Court has counseled that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration . . . ." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)).  "Thus, as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Id.*

Because the FAA favors arbitration, the burden is on the plaintiff to prove that the arbitration agreement is, in fact, not enforceable.  *See Mortensen v. Bresnan Commc'ns, LLC*, 722 F.3d 1151, 1157 (9th Cir. 2013) ("[T]hose parties challenging the enforceability of an arbitration agreement bear the burden of proving that the provision is unenforceable.").  Even if the plaintiff meets that burden, the district court has the discretion to sever the unconscionable portions of the arbitration provision, if severance would cure the unconscionability.  *See Lara v. Onsite Health, Inc.*, 896 F. Supp. 2d 831, 847 (N.D. Cal. 2012) (severing problematic portions of the arbitration provision and compelling arbitration); *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 122, 99 Cal. Rptr. 2d 745 (2000) (holding that severance is proper unless the arbitration agreement contains more than one unlawful provision and is "permeated by an unlawful purpose").

### B.      Request for Judicial Notice

In conjunction with their Reply to the Arbitration Motion, Blatt requests that the Court take judicial notice of (1) a copy of the Complaint filed in *Pambakian v. Blatt*, No. 19STCV27416 (L.A. Superior Ct. Aug. 5, 2019); (2) a copy of Plaintiff's Opposition to Defendants' Motion to Compel Arbitration and Dismiss or Stay Litigation, *Pambakian v. Blatt*, No. 2:19-cv-7053 (C.D. Cal. Sept. 25, 2019), ECF No. 45; and (3) a copy of Rosette Pambakian's LinkedIn profile, available at linkedin.com/in/rosettepambakian.  (Docket No. 28).  Plaintiff did not object to the RJN.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 19-7046-MWF (FFMx)                Date:  January 9, 2020
Title:      Gregory Blatt v. Rosette Pambakian et al.

The first two documents are filings made in two different proceedings involving the same parties.  The Court may take judicial notice of court filings and other matters of public record.  *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).  Accordingly, Defendant's RJN is granted for the first two documents.

However, the Court does not rely on the third document attached in the RJN in ruling on the Arbitration Motion and would reach the same ruling regardless of whether it considered the document.

Accordingly, Blatt's RJN is **GRANTED** *in part* and **DENIED** *in part as moot*.

## C.    <u>Discussion</u>

Through his Arbitration Motion, Blatt seeks to compel arbitration against Pambakian.

As a threshold matter, the Court must determine whether the Court or the arbitrator must decide the issue of arbitrability.  Although the parties disputed this issue in their briefings, Plaintiff at the hearing requested that the Court decide the arbitrability of the claims at issue.  Therefore, the Court examines whether Plaintiff's claims are subject to arbitration.

### 1.    **Third Party Beneficiary**

The parties dispute whether Blatt can enforce the ADR program.  Blatt did not sign the Summary Agreement.  Nonetheless, Blatt asserts that he can enforce the ADR Program because he is a third-party beneficiary of the agreement.  (Arbitration Motion at 10).  Pambakian disagrees.  She argues that Blatt is not a signatory or a third-party beneficiary.  (Opp. to Arbitration Motion at 8).

"A third party beneficiary is someone who may enforce a contract because the contract is made expressly for his benefit."  *Jensen v. U-Haul Co. of California*, 18 Cal. App. 5th 295, 301, 226 Cal. Rptr. 3d 797 (2017).  The California Supreme Court

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 19-7046-MWF (FFMx)                Date:  January 9, 2020
Title:       Gregory Blatt v. Rosette Pambakian et al.

has established the following test for determining a third-party beneficiary, where the court must examine:

> the express provisions of the contract at issue, as well as all of the relevant circumstances under which the contract was agreed to, in order to determine not only (1) whether the third party would in fact benefit from the contract, but also (2) whether a motivating purpose of the contracting parties was to provide a benefit to the third party, and (3) whether permitting a third party to bring its [] action against a contracting party is consistent with the objectives of the contract and the reasonable expectations of the contracting parties.

*Goonewardene v. ADP, LLC*, 6 Cal. 5th 817, 829–30, 243 Cal. Rptr. 3d 299 (2019). The California Supreme Court noted that, generally, "[t]he circumstances that a literal contract interpretation would result in a benefit to the third party is not enough to entitle that party to demand enforcement.  The contracting parties must have intended to confer a benefit on the third party."  *Id.* at 835 (internal quotation marks and citations omitted).  For a third-party action to go forward, all three elements must be satisfied.  *Id.* at 830.

Here, the ***express provisions*** in the ADR Program supports Blatt's argument that the agreement was intended to benefit him.  Specifically, the first paragraph of the ADR Agreement defines "company" to include its "former, current, and future officers, directors, and employees."  (ADR Agreement ¶ 1; Summary Agreement ¶ 1). Blatt was a former CEO and current director of Match at the time Pambakian signed the Summary Agreement.

Nonetheless, Pambakian argues that the ***circumstances*** under which the contract was signed demonstrates that the parties did not intend to confer a direct benefit to Blatt as an alleged third party beneficiary.  (Opp. to Arbitration Motion at 10).

***First***, she asserts that, months before signing the Summary Agreement, she told Match that she wanted to "get some counsel from a lawyer" about Blatt's assault. (Declaration of Rosette Pambakian ("Pambakian Decl.") ¶ 5, Ex. A).  Match responded

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 19-7046-MWF (FFMx)                    Date:  January 9, 2020
Title:        Gregory Blatt v. Rosette Pambakian et al.

the next day that "[t]here's no need at all to talk to anyone else in the company about this matter unless you want to." (*Id*. ¶ 6, Ex. B (Docket No. 26-1)). In this context, Pambakian argues that it is inconceivable that she (or even Match) intended for the Summary Agreement to permit Blatt to force Pambakian into arbitration, specifically for his defamation claims. (Opp. to Arbitration Motion at 10-11).

In response, Blatt argues that Pambakian's decision to talk to a lawyer eight months before signing the agreement does not mean that the parties did not intend to arbitrate Blatt's claims. (Reply to Arbitration Motion at 8-9). Blatt argues that lawyers are equally active in judicial and arbitral forums, and that dispute resolution is equally available in both forums. (*Id.* at 9).

The Court agrees with Blatt. The fact that Pambakian consulted a lawyer before signing the agreement does not indicate that the parties did not intend to keep Blatt's claims outside the scope of the arbitration agreement. In light of the express provision in the ADR Agreement, which states that "***all*** claims or controversies involving or in any way concerning Associate's application with, employment with, or termination from the Company" are arbitrable, the Court concludes that it is more likely that the parties intended to include all matters involving or concerning Pambakian's employment.

***Second***, Pambakian argues that the ADR Program's use of the term "Company" throughout the ADR Agreement demonstrates that Match was focused more on the company itself than on others incidentally implicated by the definition of the "Company." (Opp. to Arbitration Motion at 11). Specifically, she points to various provisions in the agreement, which explains certain rights and duties of the "Company." (*Id.* (citing ADR Agreement §§ 3, 4.1, 5, 9)).

Blatt challenges Plaintiff's interpretation. (Reply to Arbitration Motion at 9). The ADR Agreement defined "Company" to include former, current, and future officers, directors, and employees in the beginning. (*Id.*). According to Blatt, that Match elected to use the term "Company" as a shorthand moving forward amounts to nothing other than "Company" is a defined term in the ADR Agreement that includes parties other than Match itself. (*Id.*). The Court agrees with Blatt.

CIVIL MINUTES—GENERAL                                        15

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No.  CV 19-7046-MWF (FFMx)          Date:  January 9, 2020**
Title:      Gregory Blatt v. Rosette Pambakian et al.

*Third*, Pambakian argues that Blatt has no basis for claiming that Match and Pambakian intended to contract about arbitrating the claims at issue here.  (Opp. to Arbitration Motion at 12-14).  Blatt's claim centers around statements made by Pambakian in August and December 2018, when Blatt was no longer employed by Match or its board.  (*Id.* at 12).  Pambakian also points out that Blatt is asserting these claims in his individual capacity.  (*Id.*).  Pambakian argues that there is no rational argument or evidence supporting the notion that the contracting parties expressly intended to confer a former officer with the benefit of arbitrating personal claims that post-date his employment and occurred outside the workplace.  (*Id.*).

In response, Blatt argues that Pambakian's argument go to the scope of the Arbitration Agreement, not whether he is a third party beneficiary.  Even if the Court determines this argument to be relevant to the third party beneficiary discussion, Blatt argues that his claims are encompassed by the Arbitration Agreement, which is broad and far-reaching.  (*Id.* at 10).  Blatt also argues that his claims against Pambakian are deeply intertwined with her employment with Match because the claims are based on her scheme to enhance the value of their Tinder options – options that were issued as part of her employment with Match.  (*Id.* at 11).

Although it is a close call, the Court concludes that Blatt has the better argument regarding the parties' intent.  The Court is swayed by the fact that the Valuation Lawsuit, which Blatt alleges was the justification for the defamatory statements, arises from Pambakian's employment.  Accordingly, the dispute here reaches a dispute between the parties having a significant relationship to Pambakian's employment.  *See Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999) ("Every court that has construed the phrase 'arising in connection with' in an arbitration clause has interpreted that language broadly. We likewise conclude that the language 'arising in connection with' reaches every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract.").

At the hearing, Pambakian further argued that the Arbitration Agreement is a workplace agreement, and therefore, is intended to only cover those who were acting as agents for the company.  As support, Pambakian cited *Jensen*, 18 Cal. App. 5th 295.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 19-7046-MWF (FFMx)              Date:  January 9, 2020
Title:       Gregory Blatt v. Rosette Pambakian et al.

She argued that in *Jensen*, the California Court of Appeal held that a nonsignatory agent could be bound to an arbitration agreement only if the signatory principal had implied authority to bind the agent.  Because Blatt's tort claims arose when he was not acting as an officer or a director for Match, Pambakian argued that Match did not have implied authority to bind Blatt to the Arbitration Agreement regarding his claims.

The Court does not find Pambakian's argument to be persuasive.  In *Jensen*, the California Court of Appeal examined whether non-signatory plaintiffs should be bound by an arbitration agreement, which was signed by one of the plaintiff's supervisor.  18 Cal. App. 5th at 298-99.  The defendant contended that the plaintiffs should still be bound by the arbitration agreement based on three separate theories: third-party beneficiary, agency, or estoppel.  *Id.* at 301.  The California Court of Appeal rejected all three theories.  *Id.*  Specifically, with regard to the third-party beneficiary theory, the court concluded that "[n]othing in the terms of the agreement . . . demonstrate[d] any express intent to benefit a third party—whether [the plaintiff] specifically, or [the supervisor's] employees generally."  *Id.* at 301-02.  The court then separately examined whether the plaintiffs should be bound by the agreement entered into by his or her employer based on an agency principle; the court rejected the defendant's argument that the agency relationship sufficed to bind the plaintiff to the arbitration agreement entered into by the defendant and the plaintiff's supervisor.  *Id.* at 302.

Here, Blatt is not seeking to enforce the arbitration agreement based on an agency theory.  Therefore, Pambakian's arguments regarding the principal's implied authority to bind the agent does not change the analysis.  Rather, *Jensen* confirms that the Court should examine whether the terms and the circumstances of the agreement demonstrate "express intent to benefit a third party."  18 Cal. App. 5th at 301.  For the reasons stated above, the Court determines that the arbitration agreement intended to benefit Blatt.

In sum, the Court determines that the express provisions of the ADR Program as well as all of the relevant circumstances demonstrate that (1) Blatt would in fact benefit from the contract; (2) the motivating purpose was to provide a benefit to all former and current officers, directors, and employees, including Blatt; and (3) permitting Blatt to compel arbitration against Pambakian is consistent with the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | |
|---|---|
| **Case No.  CV 19-7046-MWF (FFMx)** | **Date:  January 9, 2020** |
| Title:        Gregory Blatt v. Rosette Pambakian et al. | |

objectives of the contract and the reasonable expectation of the contracting parties.  In similar contexts, other California cases have found that non-signatory parties can enforce a contract.  *See e.g., Ronay Family Ltd. Partnership v. Tweed*, 216 Cal. App. 4th 830, 839, 157 Cal. Rptr. 3d 680 (2013) ("By expressly requiring arbitration of claims against CapWest's agents and registered representatives, the arbitration clause was intended to benefit the nonparties such as [the defendants].").

Accordingly, as a third party beneficiary, Blatt can enforce the ADR Program against Pambakian.

### 2.        Unconscionability

Pambakian argues that the ADR Agreement is also unenforceable because it is unconscionable.  (Opp. to Arbitration Motion at 16-23).

"One common formulation of unconscionability is that it refers to an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party."  *Baltazar v. Forever 21, Inc.*, 62 Cal. 4th 1237, 1243, 200 Cal. Rptr. 3d 7 (2016) (internal quotation marks and citation omitted).  "As that formulation implicitly recognizes, the doctrine of unconscionability has both a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results."  *Id.*

"The prevailing view is that [procedural and substantive unconscionability] must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability."  *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114, 99 Cal. Rptr. 2d 745 (2000) (internal quotation marks and citation omitted).  These two elements, however, need not be present in the same degree.  *Id.*  "[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa."  *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 19-7046-MWF (FFMx)                Date:  January 9, 2020
Title:       Gregory Blatt v. Rosette Pambakian et al.

"[A] finding of procedural unconscionability does not mean that a contract will not be enforced, but rather that courts will scrutinize the substantive terms of the contract to ensure they are not manifestly unfair or one-sided." *Baltazar*, 62 Cal. 4th at 1244 (internal quotation marks and citation omitted).  "Ordinary contracts of adhesion, although they are indispensable facts of modern life that are generally enforced [citation], contain a degree of procedural unconscionability even without any notable surprises, and bear within them the clear danger of oppression and overreaching." *Id.* "[C]ourts must be particularly attuned to this danger in the employment setting, where economic pressure exerted by employers on all but the most sought-after employees may be particularly acute." *Id.*

Here, Pambakian argues that the ADR Agreement is both procedurally and substantively unconscionable.

### a.      *Procedural Unconscionability*

Procedural unconscionability "concerns the manner in which the contract was negotiated and the respective circumstances of the parties at the time." *Kinney v. United Healthcare Servs., Inc.*, 70 Cal. App. 4th 1322, 1329, 83 Cal. Rptr. 2d 348 (1999).  This element focuses on two factors: "oppression" and "surprise." *See A & M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473, 486, 186 Cal. Rptr. 114 (1982). "'Oppression' arises from an inequality which results in no real negotiation and 'an absence of meaningful choice.'" *Id.*  "'Surprise' involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms." *Id.*

Pambakian first argues that the timing and circumstances under which she and other employees were forced to sign the ADR Agreement make it procedurally unconscionable.  (Opp. to Arbitration Motion at 17).  Second, she argues that the ADR Agreement is a contract of adhesion and she had no opportunity to negotiate the terms. (*Id.* at 17-18).  Third, Pambakian asserts that the ADR Agreement did not make clear that she was agreeing to binding arbitration and waiving her jury rights by signing the agreement.  (*Id.* at 18).  Fourth, she argues that the applicable rules of the ADR Agreement are uncertain and hidden.  (*Id.* at 19).  Specifically, Pambakian points out

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No.  CV 19-7046-MWF (FFMx)          Date:  January 9, 2020**
Title:      Gregory Blatt v. Rosette Pambakian et al.

that the agreement does not specify which arbitration rules and procedures govern as it states that any arbitration will proceed "in accordance with the applicable arbitration rules and procedures of the American Arbitration Association (AAA) *or* another alternative dispute resolution (ADR) provider selected by the parties."  (*Id.*) (emphasis added).

In response, Blatt points out that when Match instituted its ADR Program, it emailed Pambakian to point out "the new alternative dispute resolution program," and asked her to sign the Summary Agreement, which included a summary of the relevant provisions of the ADR Program.  (Reply to Arbitration Motion at 12).  Above the signature block of the document, there is also language asking Pambakian to review the ADR Program and advising her where the ADR Agreement will be posted.  (*Id.* at 12-13).  Although Blatt acknowledges that Match did not attach a copy of the AAA rules, he argues that failure to attach rules that are incorporated by reference in the argument does not render the agreement procedurally unconscionable.  (*Id.* at 14-15).

The Court concludes that there is some degree of procedural unconscionability. It is undisputed that the ADR Agreement is a contract of adhesion, which was provided to Pambakian as a standardized form document with no opportunity for her to negotiate the terms.  Moreover, Match did not clearly provide the applicable procedural rules. The ADR Agreement states that "[a]rbitration . . . will be administered in accordance with the applicable rules and procedures of the American Arbitration Association (AAA) *or another alternative dispute resolution (ADR) provider selected by the parties*."  (ADR Agreement § 6) (emphasis added).  Based on the plain language of this provision, the ADR Agreement does not clearly specify what procedural rules would apply, and this lack of clarity adds to procedural unconscionability.

At the hearing, Blatt cited *Poublon v. C.H. Robinson Company*, 846 F.3d 1251 (2017) in support of his argument that the ADR Agreement was not procedurally unconscionable.  However, *Poublon* is distinguishable.  There, the ADR Agreement expressly provided that the "Employment Arbitration Rules and Mediation Procedures of the American Arbitration Association" would apply in arbitration.  846 F.3d at 1258.  In contrast, the ADR Agreement here does not specify that the AAA rules

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
<u>CIVIL MINUTES—GENERAL</u>

**Case No.  CV 19-7046-MWF (FFMx)              Date:  January 9, 2020**

Title:      Gregory Blatt v. Rosette Pambakian et al.

would apply in all arbitration cases, let alone that the AAA employment arbitration rules would apply.

However, the rest of Pambakian's arguments are not persuasive.  Pambakian appears to suggest that Match instituted the ADR Program because she refused to sign an NDA and refused to stay silent about her sexual assault allegation against Blatt.  However, there is no evidence to support this allegation.  Moreover, even if her argument were true, the Court notes that the Program was instituted across the whole firm and was not instituted only against Pambakian.

The Court also does not find that the ADR Agreement did not obscure the fact that Pambakian was agreeing to binding arbitration and waiving her jury rights.  Although the email containing the Summary Agreement contained other attachments, it concluded with the following two sentences: "In addition, we have included the new alternative dispute resolution program at the end of the document.  Please review and sign the summary."  (Alcala Decl. ¶ 8, Ex. C).  Moreover, the Ninth Circuit has held that incorporating arbitration procedure rules by reference rather than including them in or attaching them to the arbitration agreement does not affect the finding of procedural unconscionability.  *See Poublon*, 846 F.3d at 1262.

In sum, the Court determines that there is some degree of procedural unconscionability.  Therefore, the Court examines whether the agreement is also substantively unconscionable.

**b.      *Substantive Unconscionability***

"Substantive unconscionability focuses on whether the provision is overly harsh or one-sided and is shown if the disputed provision of the contract falls outside the 'reasonable expectations' of the nondrafting party or is 'unduly oppressive.'" *Gutierrez v. Autowest, Inc.*, 114 Cal. App. 4th 77, 88, 7 Cal. Rptr. 3d 267, 275 (2003) (citing *Armendariz*, 24 Cal. 4th at 113-14).

Here, Pambakian argues that the ADR Agreement is substantively unconscionable for three reasons.  (Opp. to Arbitration Motion at 21-23).  First, she

_____

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 19-7046-MWF (FFMx)                Date:  January 9, 2020
Title:      Gregory Blatt v. Rosette Pambakian et al.

cites to the ADR Agreement's provision providing Match a unilateral right to amend, modify, change, or revoke the agreement without providing her a corresponding right. (*Id.* at 21).  Second, Pambakian argues that any delegation of questions concerning the agreement's enforceability to an arbitrator is unconscionable because the agreement does not "clearly and unmistakably" delegate questions about the validity and enforceability of the agreement to an arbitrator.  (*Id.* at 21-22).  Third, the ADR Agreement carves out judicial resolution of claims that Match is more likely to possess, such as intellectual property claims.  (*Id.* at 22).

Blatt refutes all three points.  At the hearing, Blatt also emphasized that the Ninth Circuit's decision in *Poublon* forecloses most of Pambakian's arguments. The Court agrees with Blatt.

First, the ADR Agreement's provision permitting Match to unilaterally amend the agreement after giving employees 14 days' notice does not render the ADR Agreement unconscionable.  "California courts have held that the implied covenant of good faith and fair dealing prevents a party from exercising its rights under a unilateral modification clause in a way that would make it unconscionable." *Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1033 (9th Cir. 2016) (citing cases).  "Although [the Ninth Circuit has] held that a unilateral modification provision itself may be unconscionable, *see Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1179 (9th Cir. 2003), [it has] not held that such an unconscionable provision makes the arbitration provision or the contract as a whole unenforceable." *Id.*  For the same reasons articulated in *Tompkins*, Pambakian has not carried her burden in demonstrating that the unilateral modification provision renders the entire arbitration agreement unconscionable.

Second, the Court determines that the ADR Agreement does not carve out judicial resolution of claims Match is more likely to possess.  Instead, the ADR Agreement incorporates and provides examples of the right to emergency injunctive relief available under California Civil Procedure Code § 1281.8.  As Plaintiff notes, the California Court of Appeal has found similar provisions to be not substantively unconscionable.  *See Baltazar v. Forever 21, Inc.*, 62 Cal. 4th 1237, 1247-48 (2016).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 19-7046-MWF (FFMx)            Date:  January 9, 2020
Title:      Gregory Blatt v. Rosette Pambakian et al.

Finally, the Court notes that Pambakian cites no authority in support of her argument that the ADR Agreement is substantively unconscionable because it delegates enforcement questions to an arbitrator.  Indeed, as Plaintiff points out in his Reply, other courts have upheld arbitration agreements with similar provisions.  (Reply to Arbitration Motion at 17-18).

For the reasons stated above, the ADR Agreement is not substantively unconscionable.  Therefore, the Court cannot conclude that the ADR Agreement is unenforceable under the doctrine of unconscionability.

### 3.      Breach

"A bedrock principle of California contract law is that [h]e who seeks to enforce a contract must show that he has complied with the conditions and agreements of the contract on his part to be performed."  *Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1010 (9th Cir. 2005) (internal quotation marks and citation omitted).

Even if the Agreement is valid and enforceable, Pambakian argues that the Motion should be denied because Blatt breached the arbitration agreement in three ways.

First, Pambakian argues that Blatt breached the agreement by filing this complaint in federal court.  (Opp. to Arbitration Motion at 23).  Pambakian relies on *Brown v. Dillard's,* which held that the employer breached the arbitration agreement when it attempted to enforce an arbitration agreement after initially refusing the participate in the arbitration proceeding that the employee initiated.  430 F.3d at 1010.  The Ninth Circuit held that the employer's initial refusal to arbitrate constituted breach and upheld the trial court's decision to deny the employer's motion to compel arbitration.  *Id*.  In response, Blatt argues that the facts here are distinguishable from *Brown*.  Specifically, he points out that he filed a demand for arbitration on the same day he filed this lawsuit, anticipating that he would need to move to compel arbitration in court.  (Reply at 19).

CIVIL MINUTES—GENERAL                                          23

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
<u>CIVIL MINUTES—GENERAL</u>

**Case No.  CV 19-7046-MWF (FFMx)              Date:  January 9, 2020**
Title:       Gregory Blatt v. Rosette Pambakian et al.

Second, Pambakian argues that Blatt breached the agreement by filing a consolidated arbitration demand against her in the related Pambakian Action without her knowledge or consent.  (Opp. to Arbitration Motion at 24).  Pambakian argues that this consolidated demand contradicts the terms of the ADR Agreement, which states that "arbitration shall proceed solely on an individual basis without the right for any claims to be arbitrated as a class, consolidated, collective or representative action. Claims may not be joined or consolidated unless agreed to by all parties in writing." (*Id.* (citing ADR Agreement § 2)).  In response, Blatt argues that it is entirely consistent with the ADR Agreement for arbitration demands to be filed jointly.  (Reply at 21).

Third, Pambakian argues that Blatt breached his confidentiality obligations by publicly filing his arbitration demands in connection with the Arbitration Motion. (Opp. to Arbitration Motion at 24).  In response, Blatt argues that the arbitration demands were filed solely as exhibits and contain no information not already made public in the publicly filed complaints.  (Reply at 21).  Further, Blatt argues that the ADR Agreement does not even have a confidentiality provision, and that the AAA rules incorporated into the ADR Agreement impose confidentiality only on the arbitrator, not the parties.  (*Id.*).

The Court agrees with Blatt:

As to the first argument, although a party can breach the ADR Agreement by refusing to participate in the arbitration agreement, Blatt here has not done so.  While Blatt did file this defamation case in federal court, he also concurrently filed a demand for arbitration and filed this Arbitration Motion before any discovery took place. Accordingly, the Court finds that Blatt did not breach the ADR Agreement by filing this action in court.

As to the second argument, Blatt and the other defendants in the Pambakian Action did not materially breach the ADR Agreement by filing one consolidated demand for arbitration.  The ADR Agreement states that "arbitration shall proceed solely on an individual basis without the right for any claims to be arbitrated as a . . . consolidated action."  (ADR Agreement § 2).  Here, it is undisputed that Blatt, Match,

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 19-7046-MWF (FFMx)                Date:  January 9, 2020
Title:      Gregory Blatt v. Rosette Pambakian et al.

and IAC jointly filed a single arbitration demand against Plaintiff regarding the claims in the related Pambakian Action.  The Court does not determine whether the claims against the three defendants in the Pambakian Action should proceed together or individually in arbitration.  For the purpose of this analysis, the Court only determines that their decision to file one demand for arbitration for all three defendants was not a **material** breach of the contract; they filed the demand in response to Pambakian's Complaint, which named all three defendants.  Moreover, their demand for arbitration does not conclusively determine whether the claims are being arbitrated as a consolidated action or not.

As to Pambakian's third argument, she has not demonstrated that the ADR Agreement imposes confidentiality obligations on the parties for the reasons stated by Blatt.

Accordingly, the Court concludes that Blatt did not breach the ADR Agreement.

### 4.    Waiver

A written arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  But the "right to arbitration, like any other contract right, can be waived." *United States v. Park Place Assocs., Ltd.*, 563 F.3d 907, 921 (9th Cir. 2009). "[W]aiver of the right to arbitration is disfavored because it is a contractual right, and thus any party arguing waiver of arbitration bears a heavy burden of proof." *Van Ness Townhouses v. Mar Indus. Corp.*, 862 F.2d 754, 758 (9th Cir. 1988) (citations omitted). Accordingly, "[a]ny examination of whether the right to compel arbitration has been waived must be conducted in light of the strong federal policy favoring enforcement of arbitration agreements." *Fisher v. A.G. Becker Paribas, Inc.*, 791 F.2d 691, 694 (9th Cir. 1986).  In the Ninth Circuit, "[a] party seeking to prove waiver of a right to arbitration must demonstrate: (1) knowledge of an existing right to compel arbitration; (2) acts inconsistent with that existing right; and (3) prejudice to the party opposing

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 19-7046-MWF (FFMx)                    Date:  January 9, 2020
Title:      Gregory Blatt v. Rosette Pambakian et al.

arbitration resulting from such inconsistent acts." *Martin v. Yasuda*, 829 F.3d 1118, 1124 (9th Cir. 2016) (internal quotation marks and citation omitted).

Here, Pambakian argues that Blatt waived his right to enforce the agreement by filing this action against her in federal court, which she argues satisfies all three elements.  (Opp. to Arbitration Motion at 25).  Blatt does not dispute that he knew of his right to arbitrate, but disputes the existence of any inconsistent acts or any prejudice.

Pambakian argues that Blatt acted inconsistently with his right to arbitrate when he continued litigating his defamation action in court for more than a month and half after filing his complaint.  (*Id.* at 24).  Because Blatt admits in his demand for arbitration that this action is "related" to the Pambakian Action, Pambakian argues that Blatt acted inconsistently with pursuing his right to arbitrate.  (*Id.*).  In response, Blatt points out that he also filed an arbitration demand when he filed the defamation action and that he has not used the machinery of the courts to gain an unfair advantage before seeking to compel arbitration.  (Reply at 26).

"There is no concrete test to determine whether a party has engaged in acts that are inconsistent with its right to arbitrate." *Martin*, 829 F.3d at 1125.  Courts have determined that "a party's extended silence and delay in moving for arbitration may indicate a 'conscious decision to continue to seek judicial judgment on the merits of [the] arbitrable claims,' which would be inconsistent with a right to arbitrate." *Id.* (quoting *Van Ness Townhouses v. Mar Indus. Corp.*, 862 F.2d 754, 759 (9th Cir. 1988)).  Under the Ninth Circuit law, "this element is satisfied when a party chooses to delay his right to compel arbitration by actively litigating his case to take advantage of being in federal court." *Id.*  "A statement by a party that it has a right to arbitration in pleadings or motions is not enough to defeat a claim of waiver." *Id.*  "This is especially true when parties state well into the litigation that they do not intend to move to compel arbitration." *Id.*

Here, the Court determines that Blatt did not engage in acts inconsistent with his right to arbitrate.  Although Blatt filed his related defamation lawsuit in federal court and filed an amended complaint, he moved to compel arbitration before any motions

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No.  CV 19-7046-MWF (FFMx)          Date:  January 9, 2020**
Title:       Gregory Blatt v. Rosette Pambakian et al.

were filed or discovery took place.  Pambakian has not cited to any cases where a court has determined that a party has waived his right to arbitrate based on such a small amount of delay.  In contrast, Blatt has pointed to cases in which courts have found similar actions to be consistent with the right to arbitration.  *See e.g., Paxton v. Macy's W. Stores, Inc.*, No. 1:18-CV-00132-LJO (SKO), 2018 WL 4297763, at *11 (E.D. Cal. Sept. 7, 2018) (determining that a defendant did not take actions inconsistent with the right to arbitrate when it filed an answer, removed the action, and took the plaintiff's deposition for the limited purpose of engaging in discovery about the arbitration agreement before filing a motion to compel arbitration).  Accordingly, the Court concludes that Blatt has not engaged in acts that are inconsistent with its right to arbitrate.

Pambakian next asserts that she has suffered prejudice because Blatt has gained an unfair advantage by getting a preview of her arguments, which he can now use in crafting his legal strategy in arbitration.  (Opp. to Arbitration Motion at 24).  Additionally, by litigating parallel actions in court and arbitration, Pambakian suggests that Blatt is attempting to forum shop.  (*Id.*).  However, given that Blatt has moved to compel arbitration before the answer was due and before any motions were filed, the Court concludes that Blatt has not engaged in forum shopping by filing the lawsuit and moving to compel arbitration soon afterward.

Accordingly, Blatt did not waive his right to compel arbitration.

For the foregoing reasons, the Arbitration Motion is **GRANTED**.

## III.  **ANTI-SLAPP MOTION**

Pambakian and Rad seek to strike Blatt's claims under California's anti-SLAPP statute, codified at Code of Civil Procedure section 425.16.  Because the Court previously determined that the claims against Pambakian should be determined by an arbitrator, the following discussion only applies to claims brought against Rad.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No.  CV 19-7046-MWF (FFMx)           Date:  January 9, 2020**

Title:      Gregory Blatt v. Rosette Pambakian et al.

### A.      Background

The FAC alleges that Defendants made the defamatory statements in four separate incidents: (1) Rad's statements in a CNN interview that aired on August 14, 2018; (2) Pambakian's statements in an article published by CNN on August 16, 2018; (3) Pambakian's statements in an article published by CNN on December 18, 2018; and (4) Pambakian's statement in an article published by the Verge on December 18, 2018.  (FAC ¶ 95).

### B.      Legal Standard

The anti-SLAPP statute "was enacted to allow early dismissal of meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation." *Metabolife Int'l v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001) (holding that discovery provisions of section 425.16 do not apply in federal court).

The Court notes that the applicability of the anti-SLAPP statute in federal court has been questioned.  *See Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 274 (9th Cir. 2013) (Kozinski, C.J., concurring) ("Federal courts have no business applying exotic state procedural rules which, of necessity, disrupt the comprehensive scheme embodied in the Federal Rules, our jurisdictional statutes and Supreme Court interpretations thereof.").  Nonetheless, under existing precedent, Defendants have the right to bring their Motion.

Motions brought under the anti-SLAPP statute are evaluated in two steps. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one 'arising from' protected activity." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 819, 124 Cal. Rptr. 3d 256 (2011) (internal quotation marks and citation omitted).  "If the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim." *Id.*  "[W]hen an anti-SLAPP motion to strike challenges only the legal sufficiency of a claim, a district court should apply the Federal Rule of Civil Procedure 12(b)(6) standard and consider whether a claim is properly stated." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir.),

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No.  CV 19-7046-MWF (FFMx)                    Date:  January 9, 2020**
Title:      Gregory Blatt v. Rosette Pambakian et al.

*amended*, 897 F.3d 1224 (9th Cir. 2018), *and cert. denied sub nom. Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*, 139 S. Ct. 1446 (2019).

    "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute— i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." *Id.* (emphasis in original).

## C.    Request for Judicial Notice

    The parties have filed three separate requests for judicial notice.  All three requests are unopposed.

    ***First***, in conjunction with their Anti-SLAPP Motion, Defendants filed a request for judicial notice of two documents: (1) a copy of the Complaint filed on August 14, 2018 in *Rad, et al. v. IAC, et al.* Case No. 654038/2018 (N.Y. Sup. Ct.) (the "Valuation Complaint"); and (2) a copy of the Complaint filed on August 5, 2019 in *Pambakian v. Blatt, IAC/Interactive Corp. and Match Group, Inc.*, Case No. 19-STCV 27416 (Cal. Supt. Ct.).  (Docket No. 21, Exs. A, B).

    Both documents are filings made in two different court proceedings, one of which is in front of this Court.  The Court may take judicial notice of court filings and other matters of public record.  *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).  Accordingly, Defendants' request for judicial notice is **GRANTED**.

    ***Second***, in conjunction with his Opposition to the Anti-SLAPP Motion, Plaintiff filed a request for judicial notice of three exhibits: (1) a copy of Plaintiff's Opposition to Defendant's Motion to Compel Arbitration and Dismiss or Stay Litigation, *Pambakian v. Blatt*, No. 2:19-cv-7053 (C.D. Cal. Sept. 25, 2019) (ECF No. 45); (2) a copy of the New York Supreme Court's Decision and Order, *Rad v. IAC/Interactive Corp.*, Index No. 654038/2018 N.Y. Sup. Ct. June 13, 2019); and (3) a copy of a video of Sean Rad's August 14, 2018 CNN interview titled, *Tinder co-founders and early employees sue dating app's owners for billions*, available at

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No.  CV 19-7046-MWF (FFMx)**              **Date:  January 9, 2020**
Title:       Gregory Blatt v. Rosette Pambakian et al.

https://money.cnn.com/video/news/2018/08/14/tinder-lawsuit-
orig.cnnmoney/index.html.  (Docket Nos. 24, 25).

Plaintiff's RJN for the first two documents are also filings made in different
court proceedings.  Plaintiff's third exhibit is a video of an interview of Defendant
Rad, in which he made allegedly defamatory statements.  The video is referenced in
the Complaint and it is publicly available.  It is also from a source whose authenticity
cannot be questioned.  Accordingly, Plaintiff's request for judicial notice is
**GRANTED**.

***Third***, in conjunction with their Reply in support of the Anti-SLAPP Motion,
Defendants filed a supplemental request for judicial notice of one document: (1)
excerpts of Certified Reporter's Transcript of September 5, 2019 hearing held in *Rad,
et al. v. IAC, et al.*, Case No. 654038/2018 (N.Y. Sup. Ct.).  (Docket No. 30).

Courts "may take notice of proceedings in other courts, both within and without
the federal judicial system, if those proceedings have a direct relation to matters at
issue." *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d
244, 248 (9th Cir. 1992) (internal quotation marks and citation omitted).  Because this
hearing discusses Plaintiff's allegations in the FAC as well as his argument in the
Opposition, the proceeding has a direct relation to matters at issue.  Accordingly,
Defendants' supplemental request for judicial notice is **GRANTED.**

**D.    Discussion**

**1.    Choice of Law**

The parties first dispute whether New York or California substantive law should
apply.

"In diversity jurisdiction cases, such as this one, [courts] apply the substantive
law of the forum in which the court is located, including the forum's choice of law
rules." *First Intercontinental Bank v. Ahn*, 798 F.3d 1149, 1153 (9th Cir. 2015)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 19-7046-MWF (FFMx)                Date:  January 9, 2020
Title:       Gregory Blatt v. Rosette Pambakian et al.

(internal quotation marks and citation omitted).  Plaintiffs brought the action in the
Central District of California.  Accordingly, California's choice-of-law governs.

California applies the governmental interest approach.  *McCann v. Foster
Wheeler LLC*, 48 Cal. 4th 68, 87, 105 Cal. Rptr. 3d 378 (2010).  "This choice of law
analysis embodies the presumption that California law applies unless the proponent of
foreign law can show otherwise."  *Marsh v. Burrell*, 805 F. Supp. 1493, 1496 (N.D.
Cal. 1992).  Specifically with respect to anti-SLAPP law, "California has expressed a
strong interest in enforcing its anti-SLAPP law to 'encourage continued participation in
matters of public significance' and to protect against 'a disturbing increase in lawsuits
brought primarily to chill the valid exercise' of constitutionally protected speech."
*Sarver v. Chartier*, 813 F.3d 891, 899 (9th Cir. 2016) (quoting Cal. Civ. Proc. Code
§ 425.16(a)).  "To this end, courts are instructed to construe California's statute
'broadly.'"  *Id.*

California's governmental interest approach involves a three-step process.
*McCann*, 48 Cal. 4th at 87.  "First, the court determines whether the relevant law of
each of the potentially affected jurisdictions with regard to the particular issue in
question is the same or different."  *Id.*  "Second, if there is a difference, the court
examines each jurisdiction's interest in the application of its own law under the
circumstances of the particular case to determine whether a true conflict exists."  *Id.*
"Third, if the court finds that there is a true conflict, it carefully evaluates and
compares the nature and strength of the interest of each jurisdiction in the application
of its own law to determine which state's interest would be more impaired if its policy
were subordinated to the policy of the other state [citation] and then ultimately applies
the law of the state whose interest would be more impaired if its law were not applied."
*Id.* at 87-88 (internal quotation marks and citation omitted).

The parties agree that the anti-SLAPP laws in California and New York differ.
Specifically, they contend that California's anti-SLAPP laws are broader than New
York's laws because New York's anti-SLAPP statute applies to a narrower set of
conduct.  (*See* Opp. to Anti-SLAPP Motion at 10; Reply to Anti-SLAPP Motion at 3).
The Court agrees.  *Compare* NY Civ. R. 70-a, 76-a, *with* Cal. Civ. Code § 425.16.

---

**CIVIL MINUTES—GENERAL**                                                **31**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 19-7046-MWF (FFMx)            Date:  January 9, 2020
Title:     Gregory Blatt v. Rosette Pambakian et al.

Therefore, the Court must determine whether California or New York has a stronger interest under the second and third steps.  Blatt argues that New York's interest in applying its law to Blatt's claims is greater because the Valuation Lawsuit is being litigated in a New York state court.  (Opp. to Anti-SLAPP Motion at 10; Plaintiff's RJN, Ex. A at 55).  Moreover, Blatt asserts that at the time the statements were made, he was a New York resident and, as a result, his business and personal relationships were and are still now based principally in New York.  (Opp. to Anti-SLAPP Motion at 10; Plaintiffs RJN, Ex. A ¶ 44(d)(i); Declaration of Gregory Blatt ("Blatt Decl.") ¶¶ 2-5 (Docket No. 23)).

In response, Rad contends that there is no reason to deviate from the default rule that the law of the forum state will be invoked in a choice-of-law analysis.  According to Rad, Blatt has failed to overcome the presumption that California law applies by showing a compelling reason to displace California's anti-SLAPP statute.  (Reply to Anti-SLAPP Motion at 3).  Rad additionally argues that under the Ninth Circuit law, California has a greater interest than New York in providing the broader protections afforded by California law.  (*Id.* at 3-4 (citing cases)).

Moreover, Rad argues that the speech at issue has a far greater nexus to California than New York.  (*Id.* at 4).  Defendants Pambakian and Rad are California residents, Tinder is Los Angeles-based, and the alleged assault addressed in the purported defamatory statements took place in California.  (*Id.*).  Indeed, Blatt alleges that "a substantial part of events that give rise to [his] claim occurred in the Central District of California."  (*Id.* (citing FAC ¶ 26, 134)).  Rad further notes that in Blatt's arbitration demand, Blatt concedes that Los Angeles is the county in which the dispute arose.  (*Id.*).

The Court agrees with Rad that California has a stronger interest than New York in this action.  In *Sarver*, the Ninth Circuit held that "the interests of interstate comity and the competing interests of the states tilt in favor of applying California [anti-SLAPP] law" because "California would appear to object strongly to the absence of a robust anti-SLAPP regime, [while] New Jersey's interests would be less harmed by the use of California law."  831 F.3d 899-900; *see also Francis v. Wynn Las Vegas*, 557 F. App'x 662, 664 (9th Cir. 2014) ("[A]pplying Nevada's law would improperly limit

---

**CIVIL MINUTES—GENERAL**                                                    **32**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 19-7046-MWF (FFMx)              Date:  January 9, 2020
Title:       Gregory Blatt v. Rosette Pambakian et al.

California's expansive defendant-friendly policy").  Moreover, both Defendants reside
in California, and the alleged assault, which is the centerpiece of the defamation claim,
occurred in California.  Finally, even Blatt himself states in his FAC that "a substantial
part of events that give rise to [his] claim occurred in the Central District of
California."  (FAC ¶ 26).

        Accordingly, the Court applies the California anti-SLAPP laws.

                2.      **Claims Subject to Arbitration**

        Blatt also argues that California's anti-SLAPP statute does not apply to claims
subject to arbitration.  (Opp. to Anti-SLAPP Motion at 12).  Therefore, Blatt argues
that the claims subject to arbitration should not be stricken.  (*Id.* at 13).

        In response, Rad argues that the Arbitration Motion does not immunize the FAC
from anti-SLAPP's purview.  (Reply to Anti-SLAPP Motion at 6).  Because Blatt filed
his FAC in court, Rad argues that the FAC is subject to a motion to strike.  (*Id.*).
Moreover, even if the Court granted the Arbitration Motion, Rad argues that this anti-
SLAPP motion would still not be moot.  (*Id.*).  This is so because Blatt (1) does not
seek to compel arbitration against Rad; (2) seeks to hold Rad liable for all of
Pambakian's statements under Blatt's conspiracy theory; and (3) does not seek
dismissal of his claims against Pambakian, but only a stay.  (*Id.*).

        The Court agrees with Rad that the Arbitration Motion does not moot this Anti-
SLAPP Motion.  Because the Blatt's Arbitration Motion only seeks to compel
arbitration against Pambakian, the anti-SLAPP arguments made by Rad are still
applicable.  Moreover, because Blatt seeks to hold Rad liable for all of Pambakian's
statements under Blatt's conspiracy theory, even the claims subject to arbitration are
still subject to consideration for Blatt's claims against Rad.

                3.  **Step One: Whether the Claims Arise from Protected Activity**

        Under the first step of the anti-SLAPP analysis, the defendant must establish that
the claims at issue in this case – *i.e.,* defamation, defamation per se, and civil

_____

                        **CIVIL MINUTES—GENERAL**                              33

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 19-7046-MWF (FFMx)              Date:  January 9, 2020
Title:       Gregory Blatt v. Rosette Pambakian et al.

conspiracy – all "aris[e] from . . . act[s they have undertaken] in furtherance of [their] right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue."  Cal. Code Civ. Proc. § 425.16(b)(1).

The anti-SLAPP statute provides four ways in which an act is in furtherance of the person's right of petition or free speech.  *See* Cal. Code Civ. Proc. § 425.16(e)(1)-(4).  Rad argues that two types of covered acts are relevant here: (1) "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law"; *id.* § 425.16(e)(2), and (2) "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest."  *Id.* § 425.16(e)(3).

### a.    *Statements Made in Connection with Issues Under Consideration or Review by a Judicial Body*

Rad argues that all the allegedly defamatory statements were made about the Valuation Lawsuit.  (Anti-SLAPP Motion at 18).  Blatt does not appear to dispute this claim.  Instead, the parties primarily dispute whether the allegedly defamatory allegations contained in the Valuation Complaint constitute "statements made in connection with [] issue[s] under consideration or review by a judicial body."  Cal. Code Civ. Proc. § 425.16(e)(2).

Blatt argues that "it is insufficient to assert that the acts alleged were 'in connection with' an official proceeding.  Instead, [t]here must be a connection with an issue under review in that proceeding."  *Rand Resources, LLC v. City of Carson*, 6 Cal. 5th 610, 620, 243 Cal. Rptr. 3d 1 (2019) (internal quotation marks and citation omitted)).  Here, Blatt argues that there is no indication that the events which occurred at the 2016 holiday party constituted a material part of deciding whether Tinder's options were undervalued.  (Opp. to Anti-SLAPP Motion at 13-14).  Therefore, Blatt argues that the allegations were not "under consideration or review."  (*Id.*).

In support of this argument, Blatt cites *Paul v. Friedman*, 95 Cal. App. 4th 853, 117 Cal. Rptr. 2d 82 (2002).  There, the plaintiff brought a lawsuit alleging that the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No.  CV 19-7046-MWF (FFMx)**                **Date:  January 9, 2020**
Title:        Gregory Blatt v. Rosette Pambakian et al.

defendant conducted a harassing investigation that extended far beyond the scope of the issues subject to arbitration. *Id.* at 866.   The investigation was allegedly directed to personal matters bearing no relationship to the claims asserted in the arbitration, and in the course of the investigation, the defendant and his agents allegedly made disclosures of such details to clients and others. *Id.*  The defendant brought a motion to strike arguing that "*any* conduct in connection with an official proceeding is protected by the statute." *Id.*  The California Court of Appeal disagreed with the defendant.  The Court of Appeal "conclude[d] that the evidence [the defendant] presented with his motion to strike did not amount to a prima facie showing that his allegedly harassing investigation and related personal disclosures were in connection with or related to 'an issue under consideration or review' by the arbitrators [because] . . . [the] issues actually under review by the arbitrators bore no relationship to the allegations in [the plaintiff's] lawsuit." *Id.* 868.

In response, Rad argues that Blatt cannot avoid SLAPP simply by claiming that the allegations made in the Valuation Complaint is "irrelevant and erroneous." (Reply to Anti-SLAPP Motion at 8).  In fact, he argues that there is no question that the allegations concerning sexual misconduct and the subsequent cover-up are under review by the New York court. (*Id.*).  As support, he points to a transcript of a hearing in the lawsuit, in which the New York court refused to exclude the sexual harassment allegations from the case. (*Id.*; Defendants' Supplemental RFN, Ex. C at 012-013).  Therefore, Rad argues that these allegations remain a part of that lawsuit and are related to the Valuation Lawsuit. (Opp. at 8).

The Court agrees with Rad.  After hearing Blatt and IAC's arguments, the New York court refused to exclude the very same allegations at issue here.  Therefore, this is not a situation where the allegations which give rise to the Anti-SLAPP Motion bear no relationship to the underlying lawsuit.  Because Defendants have met their burden to show that the statements were made in connection with issues under consideration or review by a judicial body, the Court need not determine whether the statements also are also a matter of public concern.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 19-7046-MWF (FFMx)          Date:  January 9, 2020

Title:      Gregory Blatt v. Rosette Pambakian et al.

**b.** *Unlawful Statements*

Blatt additionally argues that the anti-SLAPP statute does not apply because
Rad's and Pambakian's statements are a part of a broader scheme of unethical conduct.
(Opp. to Anti-SLAPP Motion at 16).  Blatt asks the Court to look beyond the
statements to the conduct that provoked those statements in the first place –
Defendants' unlawful conspiracy and the improper litigation funding agreement.  (*Id.*
at 17).  From that broader lens, Blatt argues that Defendants' conduct is not protected.
(*Id.*).

In response, Rad argues that there is no authority for Blatt's argument that the
FAC is not subject to anti-SLAPP protection because it alleges speech in furtherance of
an unlawful scheme.  (Reply to Anti-SLAPP Motion at 12).   Moreover, Defendants
assert that courts hold that fair-and-true reporting privilege applies "regardless of the
defendants' motive for reporting it."  (*Id.* (citing *Hawran v. Hixson*, 209 Cal. App. 4th
256, 278, 147 Cal. Rptr. 3d 88 (2012)).

Rad also distinguishes *Flatley v. Mauro*, 39 Cal. 4th 299, 46 Cal. Rptr. 3d 606
(2006), a case cited by Plaintiff.  There, a plaintiff sued an attorney for civil extortion,
intentional infliction of emotional distress and wrongful interference with economic
advantage based on a demand letter the defendant had sent to the plaintiff and a
subsequent telephone call.  *Id.* at 305.  The defendant filed a motion to strike the
plaintiff's complaint under the anti-SLAPP statute.  *Id.*  The California Supreme Court
affirmed the lower court's denial of the motion.  *Id.*  The court held that "a defendant
whose assertedly protected speech or petitioning activity was illegal as a matter of law,
and therefore unprotected by constitutional guarantees of free speech and petition,
cannot use the anti-SLAPP statute to strike the plaintiff's complaint."  *Id.*  Specifically,
the court concluded that a defendant is precluded from bringing an anti-SLAPP motion
when "either the defendant concedes, or the evidence conclusively establishes, that the
assertedly protected speech or petition activity was illegal as a matter of law."  *Id.* at
320.  Because the defendant's communications "constituted criminal extortion as a
matter of law," the court affirmed the denial of the anti-SLAPP motion.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 19-7046-MWF (FFMx)          Date:  January 9, 2020
Title:      Gregory Blatt v. Rosette Pambakian et al.

Here, the Court cannot determine that the alleged defamatory statements were illegal as a matter of law.  As Rad points out, neither Pambakian nor Rad has conceded that they engaged in illegal conduct, and there is no uncontroverted and conclusive evidence of illegality.  (Reply to Anti-SLAPP Motion at 13).  While Blatt argues that the Court must accept his allegations about the litigation funding agreement and defendants' conspiracy as true for the purposes of this analysis, he provides no support for this position.  In fact, *Flatley* suggests otherwise; the court there held that the anti-SLAPP statue did not apply when the "assertedly protected speech or petition activity was illegal *as a matter of law*."  39 Cal. 4th at 320 (emphasis added).  Here, the Court cannot similarly determine that Defendants acted illegally as a matter of law.  Accordingly, the anti-SLAPP law applies here.

> **4.      Step Two: Whether Plaintiff Has Stated a Valid Defamation Claim**

Under step two, the Court must consider whether Blatt has demonstrated a reasonable probability of prevailing.  Cal. Civ. Code § 425.16(b)(1).  Rad argues that Blatt cannot meet this burden because all of his claims are barred as a matter of law by the fair and true reporting privilege.  (Anti-SLAPP Motion at 20).

> **a.      *Fair and True Reporting Privilege***

Unlike the typical prong 2 analysis, the defendant bears the burden of proving that each statement falls within the privilege.  *See Carver v. Bonds*, 135 Cal. App. 4th 328, 348-49 (2005) ("The Newspaper [who is invoking the fair and true reporting privilege] bears the burden of proving that the privilege applies."); *Youngevity Int'l Corp. v. Andreoli*, 749 F. App'x 634 (9th Cir. 2019) ("Because California courts review each statement within a pleading, and strike only protected statements, . . . we separately consider each statement that Youngevity argues is protected under section 425.16.")

"The fair report privilege confers an absolute privilege on any fair and true report in, or a communication to, a public journal of a judicial proceeding, or anything said in the course thereof."  *Healthsmart Pac., Inc. v. Kabateck*, 7 Cal. App. 5th 416,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | |
|---|---|
| **Case No.** CV 19-7046-MWF (FFMx) | **Date: January 9, 2020** |
| Title: Gregory Blatt v. Rosette Pambakian et al. | |

431, 212 Cal. Rptr. 3d 589 (2016), *as modified* (Jan. 10, 2017) (internal quotation marks and citation omitted); *see also* Cal. Civ. Code § 425.16(b)(1). "California courts have construed the phrase, "judicial proceeding," broadly to include the filing of a complaint." *Id.* at 432 (collecting cases). "Thus, fair and true communications to the news media about allegations in a complaint are covered by the privilege." *Id.*

"'Fair and true' in this context does not refer to the truth or accuracy of the matters asserted in the judicial proceedings, but rather to the accuracy of the challenged statements with respect to what occurred in the judicial proceedings." *Id.* at 434. "To be 'fair and true,' the report must [capture] the substance, the 'gist' or 'sting', of the subject proceedings as measured by considering the natural and probable effect [of the report] on the mind of the average reader." *Argentieri v. Zuckerberg*, 8 Cal. App. 5th 768, 787–88, 214 Cal. Rptr. 3d 358 (2017) (internal quotation marks and citation omitted). "The defendant is entitled to a certain degree of flexibility/literary license in this regard, such that the privilege will apply even if there is a slight inaccuracy in details—one that does not lead the reader to be affected differently by the report than he or she would be by the actual truth." *Id.* "When [the privilege] applies, the reported statements are absolutely privileged regardless of the defendants' motive for reporting them." *Healthsmart*, 7 Cal. App. 5th at 431.

"In general, whether a privileged occasion exists within the meaning of Civil Code section 47, subdivision (d), is for the court to decide; whether the report of the official proceedings itself is 'fair and true,' provided reasonable minds could disagree as to the effect of the communication on the average reader or listener, is a question of fact for the jury." *Id.* "When, however, there is no dispute as to what occurred in the judicial proceeding reported upon or as to what was contained in the report, the question is one of law." *Id.*

Here, the parties do not dispute what was alleged in the Valuation Complaint. They also do not dispute what the alleged defamatory statements are in one news clip video and three news articles. Instead, they dispute whether the allegedly defamatory statements communicate the allegations in the Valuation Compliant or otherwise communicate the "gist" or "sting" of that document.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 19-7046-MWF (FFMx)              Date:  January 9, 2020
Title:       Gregory Blatt v. Rosette Pambakian et al.

### b.    *Allegations in the Valuation Complaint*

The Complaint in the Valuation Lawsuit contains the following allegations:

128. At Tinder's December 2016 holiday party in Los Angeles, Blatt, who had just taken over as Tinder's "interim" CEO, groped and sexually harassed Rosette Pambakian, Tinder's Vice President of Marketing and Communications.

129. In mid-2017, Rad learned about these events.  Rad asked Pambakian about them, and she confirmed that Blatt had groped and sexually harassed her with colleagues present.

130. Rad immediately reported Blatt's conduct to Match's General Counsel, Jared Sine, and demanded that Tinder commission an independent investigation.

131. Sine informed Rad that the Match Board of Directors—of which Blatt was Chairman—would run its own investigation instead.  . . .

132. Believing that credible allegations of workplace misconduct against its CEO threatened Tinder and should be independently investigate, Rad pressed for a meeting of Tinder's Board of Directors.  Defendants refused and covered up Blatt's conduct instead.  Defendants even allowed Blatt to contact Pambakian and one of the eyewitnesses directly, whom Blatt then pressured to conceal his misconduct.  . . .

133. On information and belief, Defendants covered up Blatt's misconduct in part because he was essential to the execution of Defendants' scheme to deprive the Tinder Plaintiffs of their rights as optionholders—and to save Defendants billions of dollars in the process.

. . .

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No.  CV 19-7046-MWF (FFMx)          Date:  January 9, 2020**
Title:       Gregory Blatt v. Rosette Pambakian et al.

145. Only two weeks later, on August 1, 2017, Defendants announced that
Blatt would soon leave his position as the CEO of Match and Tinder.  Blatt
had been "interim" CEO of Tinder for fewer than eight months, spending
the bulk of his time executing Defendants' scheme.  He had also been
credibly accused of groping and sexually harassing a subordinate.  Yet
Blatt received a lucrative golden parachute from Defendants featuring a
glowing farewell message from IAC's controlling shareholder Barry
Diller, in which Diller praised Blatt's "integrity."  On information and
belief, Defendants allowed Blatt to walk away with hundreds of millions of
dollars, without any disclosure to the investing public or the IAC Board of
allegations of sexual misconduct, the ensuing cover-up, or the scheme to
take billions of dollars from the Tinder Plaintiffs and other Tinder
optionholders.

146. In September 2017, Blatt asked Rad to meet in person.  Blatt was irate
that Rad had reported the allegation of Blatt's sexual misconduct.  Blatt
threatened Rad, angrily saying, in sum and substance, that if Rad or anyone
else made public the misconduct allegations against him, Blatt would "take
[Rad] down" with him.

(Valuation Complaint, ¶¶ 128-133, 145, 146).

### c.    *CNN Broadcast on August 14, 2018*

In the CNN broadcast, the anchor introduces the news report by stating that co-
founders of Tinder and others were suing the parent company Match and leveling
serious charges against Tinder's former Chief Executive.  (Docket No. 23-2 at 54).
The broadcast then shows an interview with Rad, who describes the Valuation Lawsuit
and the allegations contained within the lawsuit.  (*Id.* at 55-57).

The relevant portion of the transcript as follows:

SEGALL [reporter]:  The lawsuit seeks at least $2 billion in damages,
suggesting the company was undervalued by at least $9 billion. The suit

---

**CIVIL MINUTES—GENERAL                                    40**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No.  CV 19-7046-MWF (FFMx)                Date:  January 9, 2020**
Title:      Gregory Blatt v. Rosette Pambakian et al.

also alleges that soon after Blatt was named Tinder's CEO in late 2016, he
groped and sexually harassed Tinder Vice President of Marketing and
Communications, Rosette Pambakian at a company holiday party.

> *RAD: I actually reported that misconduct to the company and the board -*
> *- and the board had a choice. They could either do the right thing and*
> *properly investigate and take the right action, or they can keep that*
> *executive in a place where he can finish the job of corrupting the*
> *valuation.*

SEGALL: Did you specifically talk to Blatt about these allegations?

RAD: Yes, I did.

SEGALL: And what was that conversation like?

> *RAD: I was threatened. I believe it was, "If you take me down, I'm going*
> *to take you down with me."*

(*Id.* at 56-57) (emphasis added).

The Court determines that this CNN broadcast falls within the fair and true
reporting privilege.  The gist and scope of this interview conveys that Match and
IAC covered up the sexual harassment allegation to execute the valuation process
and that Blatt subsequently said that he would take Rad down with him.  These
allegations are substantially similar to those contained within the Valuation
Lawsuit.  (*See* Valuation Complaint ¶¶ 130-133, 145-46).

Although Plaintiff argues that Rad did not attribute all of his claims to the
Valuation Complaint, viewing the report as a whole, the Court concludes that the
"natural and probable effect of the [report] on the average reader" is that the
allegations were made in the Valuation Complaint.  *See Healthsmart*, 7 Cal. App.
5th at 436 ("Although some statements, when viewed in isolation, could be
understood to communicate the allegedly defamatory matter as facts, not mere

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No.  CV 19-7046-MWF (FFMx)**              **Date:  January 9, 2020**
Title:      Gregory Blatt v. Rosette Pambakian et al.

allegations of facts, when the media reports are viewed in their entirety and in the context in which they were made, the only reasonable conclusion is that the statements refer to the allegations made in the Cavalieri complaint.").

### d.  *CNN Article on August 16, 2018*

The August 16, 2018 article begins by describing the Valuation Lawsuit, including the sexual harassment claim against Blatt and Tinder's inaction in response to the incident.  (Docket No. 23-2 at 67).  The article then continues and provides details about the alleged sexual harassment incident, which were not contained in the complaint:

> CNN has learned more details surrounding the alleged incident, which occurred during Tinder's 2016 holiday party at the SLS Hotel in Los Angeles.
>
> *According to Pambakian, the party coincided with Blatt being named CEO.  She said Blatt started behaving inappropriately, including saying at one point, "I get hard every time I look at you."  According to Pambakian, Blatt then said, "let's get out of here."*
>
> *"In that moment, I thought, 'My boss actually thinks I'm going home with him,'" she said. "I basically bolted, found two people I knew and said, 'Hey, let's go up to your room.'"*
>
> *They gathered in that hotel room, one of several the company had booked for the evening.*
>
> *Pambakian said Blatt showed up soon after, although she does not know if he was aware she was there.*
>
> *She said she was sitting on the bed when Blatt entered the room and, without saying anything to anyone else in the room, pushed her back*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No.  CV 19-7046-MWF (FFMx)          Date:  January 9, 2020**
Title:      Gregory Blatt v. Rosette Pambakian et al.

*onto the mattress, climbed on top of her, and began kissing and fondling
her.*

*. . .*

"From what we understood from interviews and investigations, there was
consensual cuddling taking place," the source said.

*Pambakian strongly disagrees. "It wasn't consensual -- there was no
opportunity, no 'hi,' 'hello,' before I even knew it, Greg Blatt was on top
of me in a hotel room," she said.*

(*Id.* at 68) (emphasis added).

Blatt argues that the majority of the statements are not found in the Valuation
Complaint, which only describes the holiday party incident in one single, conclusory
allegation: that Blatt "sexually harassed and groped" Pambakian at a holiday party.
(Opp. to Anti-SLAPP Motion at 19).  Blatt argues that these details present him as a
rapacious aggressor, which does not appear in the Valuation Complaint.  (*Id.* at 20).
Moreover, Blatt argues that the details have a very different "gist" and "sting" than the
Valuation Complaint because Pambakian's characterization of the conduct in the
article is of a different degree and are a deviation of a substantial character that would
be expected to produce a different effect on the reader than the initial allegations of
sexual harassment in the Valuation Complaint.  (*Id.* at 20-21).

In response, Rad points out that the article repeatedly refers to the "lawsuit" and
refers to the holiday party as the "alleged incident."  (Reply to Anti-SLAPP at 17).
Viewing the article as a whole, Rad argues that no reasonable person could conclude
anything other than Pambakian's statements referred to the allegations in the Valuation
Lawsuit.

The Court agrees with Blatt, although this is a close call.  While this article
began with a fair and true reporting of the lawsuit, it then continued to describe the
alleged sexual assault and harassment in much more graphic detail that does not appear

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 19-7046-MWF (FFMx)            Date:  January 9, 2020
Title:      Gregory Blatt v. Rosette Pambakian et al.

in the Valuation Complaint.  Even the article itself states that it "learned more details surrounding the alleged incident," which implies that the details did not come from the New York Valuation Complaint.  Moreover, although the Valuation Complaint did mention that Blatt "groped and sexually harassed" Pambakian with colleagues present, the Court concludes that the details contained in the CNN Article is expected to produce a different effect on the reader based on the graphic details that are not contained in the complaint.

Accordingly, the statements contained in the August 16, 2018 article do not fall under the fair and true reporting privilege.

### e.        *Verge and CNN Articles on December 18, 2018*

Blatt additionally argues that the two articles published on December 18, 2018 by Verge and CNN contain defamatory statements that fall outside the scope of the privilege.  Both articles discuss an email that Pambakian sent to Match Group's CEO Mandy Ginsberg and Tinder's CEO Elie Seidman, as well as Ginsberg's response. (Docket No. 23-2 at 72-76; *Id.* at 77-78).  Specifically, the articles discuss Pambakian's assertions that Tinder conducted a sham investigation and determined that the alleged assault was consensual cuddling.  (*Id.*).  They also quote Pambakian's assertion that she was fired because she made sexual assault allegations against an executive.  (*Id.*).

Blatt argues that both articles attribute the facts stated in the articles to Pambakian and her email, not the Valuation Complaint.  (Opp. to Anti-SLAPP Motion at 23).  Therefore, Blatt argues that the reader would think that these statements come from Pambakian.  (*Id.*).  In response, Pambakian argues that the lawsuit was referenced throughout both articles, including in the title of the article and the email sent by Pambakian.  (Reply to Anti-SLAPP Motion at 18-20).  Reviewing the "entirety" of the media reports and the "context" in which the allegedly defamatory statements were made, Pambakian contends that the only reasonable conclusion is that the statements are fair and true reports of allegations in the Valuation Complaint.  (*Id.* at 20).

The Court determines that some of the statements fall under the privilege.  Both articles discuss the fact that Pambakian and other Tinder employees filed a lawsuit

CIVIL MINUTES—GENERAL                                          44

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  CV 19-7046-MWF (FFMx)                Date:  January 9, 2020
Title:      Gregory Blatt v. Rosette Pambakian et al.

against Match and IAC, alleging in part that Blatt sexually harassed Pambakian.
(Docket No. 23-2 at 71, 77).  Both articles also refer to Pambakian's assertion that
Tinder and IAC contacted a "sham investigation," in which they determined that the
assault was consensual cuddling.  (*Id.* at 72, 77).  These assertions fall under the fair
and true reporting privilege because they contain the same gist and sting as the
allegations contained in the Valuation Complaint – namely, that Match and IAC
"covered up" her allegations of sexual assault.

However, the Court determines that other statements fall outside the privilege.
For example, the articles quote Pambakian's email, in which she asserts that she was
put on leave immediately after filing the New York Valuation lawsuit.  (*Id.* at 72, 78).
The articles also include references to other statements from Pambakian's email, such
as her assertion that she faced pressure from the company to resign, and she was
ultimately fired the day before her remaining stock options vested.  (*Id.* at 72, 78).
Both of these statements do not come from the Valuation Complaint; in fact, the
complaint does not reference any retaliatory acts that Match or IAC took against
Pambakian.  Even looking at the whole context of the articles, the Court cannot
conclude that the allegations about Match and IAC's retaliatory acts against Pambakian
contain the same gist or sting as the allegations contained in the Valuation Complaint.

In sum, the Court determines that the August 14, 2018 article falls under the fair
and true reporting privilege in its entirety, and the allegedly defamatory statements in
the August 16, 2018 CNN article do not fall under the privilege.  The Court also
concludes that some, but not all, of the December 18, 2018 Verge and CNN articles
fall under the privilege.  Specifically, statements about the alleged sexual assault and
the "sham investigation" in the December 18, 2018 Verge and CNN articles fall under
the privilege.  However, statements about Match and IAC's retaliatory acts against
Pambakian fall outside the privilege.

Because Defendants have not challenged the merits of the defamation claims in
any other way, the Anti-SLAPP Motion is **GRANTED** *in part* and **DENIED** *in part* as
to the defamation claims.

CIVIL MINUTES—GENERAL                                               45

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 19-7046-MWF (FFMx) | Date:  January 9, 2020 |
|---|---|---|
| Title: | Gregory Blatt v. Rosette Pambakian et al. | |

### 5.    Civil Conspiracy Claim

"Although conspiracy to commit a tort is not a separate cause of action from the tort itself, alleging a conspiracy fastens liability on those who agree to the plan to commit the wrong as well as those who actually carry it out."  S*tueve Bros. Farms, LLC v. Berger Kahn*, 222 Cal. App. 4th 303, 323, 166 Cal. Rptr. 3d 116 (2013) (internal quotation marks and citation omitted).  "The elements of a civil conspiracy are the formation and operation of the conspiracy and damage resulting to plaintiff from an act done in furtherance of the common design."  *Id.*

The Complaint alleges that Rad and Pambakian entered a conspiracy when "Rad offered and Pambakian accepted millions of dollars in exchange for Pambakian joining the Valuation Lawsuit and making false allegations of sexual harassment against Blatt."  (FAC ¶ 132).  Because both Rad and Pambakian are alleged to be parties to the conspiracy, a single defamatory statement by either defendant is sufficient to survive the Anti-SLAPP motion.  Accordingly, the Anti-SLAPP Motion is **GRANTED** *in part* and **DENIED** *in part* as to liability allegedly arising from the civil conspiracy theory of liability, while recognizing there is no civil conspiracy "claim" as such under California law.

## IV.   CONCLUSION

The motions are ruled on as follows:

- The Arbitration Motion is **GRANTED**; and

- the Anti-SLAPP Motion is **DENIED** *as moot* as to Pambakian, and **GRANTED** *in part* and **DENIED** *in part* as to Rad.

The action against Pambakian is hereby **STAYED** until further application by the parties or Order of this Court.  The action against Rad will proceed in parallel to the arbitration proceeding.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

**Case No.**  **CV 19-7046-MWF (FFMx)**           **Date:  January 9, 2020**
Title:      Gregory Blatt v. Rosette Pambakian et al.

        The parties shall file Joint Status Reports every 120 days to update the Court on
the status of arbitration, and a final Joint Status Report within ten (10) days after the
arbitration concludes.  Each report must indicate on the face page the date on which the
next report is due.  Although both parties shall participate in the drafting of the joint
reports, Plaintiff shall be responsible for ensuring that the status reports are timely filed
with the Court.

        IT IS SO ORDERED.